UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JUDGE PAULEY

——————————————————x
PIPEFITTERS LOCAL NO. 636 DEFINED
BENEFIT PLAN, Individually and on Behalf
of All Others Similarly Situated,

                      Plaintiff,

      vs.

BANK OF AMERICA CORPORATION,
BRIAN T. MOYNIHAN and CHARLES H.
NOSKI,

                Defendants.
——————————————————x

11 CIV 0733

Civil Action No.

CLASS ACTION

COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS

RECEIVED
FEB 02 2011
U.S.D.C. S.D.N.Y.
CASHIERS

DEMAND FOR JURY TRIAL

## INTRODUCTION

1.      This is a securities class action on behalf of all persons who purchased or otherwise acquired the common stock of Bank of America Corporation ("BofA" or the "Company") between January 20, 2010 and October 19, 2010, inclusive (the "Class Period"), against BofA and certain of its officers and/or directors for violations of the Securities Exchange Act of 1934 ("1934 Act").

2.      BofA is a bank holding company and a financial holding company. The Company is a financial institution, serving individual consumers, small and middle market businesses, large corporations and governments with a range of banking, investing, asset management and other financial and risk management products and services.

3.      During the Class Period, defendants issued materially false and misleading statements regarding the Company's business. Defendants concealed defects in the recording of mortgages and improprieties with respect to the preparation of foreclosure paperwork that harmed BofA's investors when BofA had to temporarily discontinue foreclosures and admit to the problems it was experiencing. For much of the Class Period, defendants also concealed that BofA had previously engaged in a practice known as "dollar rolling," wherein it omitted billions of dollars in debt from its balance sheet reported to the public. As a result of defendants' false statements, BofA's stock traded at artificially inflated prices during the Class Period, reaching a high of $19.48 per share on April 15, 2010.

4.      On May 20, 2010, BofA filed its Form 10-Q for the first quarter of 2010 in which it disclosed aspects of its "repo-to-maturity" transactions (dollar rolling), claiming the transactions did not have a material impact on BofA's balance sheet.

5.      Later, on May 26, 2010, *The Wall Street Journal* reported that BofA had hidden billions of dollars in debt from investors when reporting its financial statements over the past three years.

6.      In September 2010, news surfaced about foreclosure snafus at BofA and other large banks due to paperwork issues.

7.      On October 8, 2010, BofA announced a nationwide foreclosure halt pending a review of its foreclosure processes and whether there were irregularities with respect to its previously completed foreclosure activities.

8.      On October 13, 2010, the attorneys general of 50 states, led by Iowa, announced a probe into U.S. banks regarding loan underwriting guidelines and their allowance for credit losses. The attorneys general launched a joint investigation of the practices banks used in evicting delinquent borrowers from their homes.

9.      After this news, BofA stock fell $0.69 per share to close at $12.60 per share on October 14, 2010, on volume of 511 million shares.

10.     On October 19, 2010, BofA announced its third quarter 2010 financial results, reporting a net loss of $7.3 billion and a diluted earnings per share ('EPS") loss of $0.77. BofA further reported receiving $18 billion in claims about faulty home loans that it may have to repurchase.

11.     On this news, BofA stock dropped $0.54 per share, to close at $11.80 per share on October 19, 2010 – a one-day decline of 5% on volume of 574 million shares.

12.     Later, on November 16, 2010, a New Jersey Bankruptcy Judge dismissed a BofA claim against a debtor, citing testimony of a BofA employee who admitted that BofA (through its acquisition of Countrywide Financial Corp. in July 2008) routinely did not bother to transfer essential documents for loans sold to investors. As *American Banker* reported on Monday, November 22, 2010, "The BofA employee's admission that the lender customarily held on to

promissory notes could also undermine the industry's position that document transfers to securitization trusts are fundamentally sound."

13.     The true facts, which were known by the defendants but concealed from the investing public during the Class Period, were as follows:

(a)     BofA did not have adequate personnel to process the huge numbers of foreclosed loans in its portfolio;

(b)     BofA had not properly recorded many of its mortgages when originated or acquired, which would severely complicate the foreclosure process if it became necessary;

(c)     Defendants failed to maintain proper internal controls related to processing of foreclosures;

(d)     BofA's failure to properly process both mortgages and foreclosures would impair the ability of BofA to dispose of bad loans; and

(e)     BofA had engaged in a practice known internally as "dollar rolling" to remove billions of dollars of debt from its balance sheet over the prior years.

14.     As a result of defendants' false statements and omissions, BofA's common stock traded at artificially inflated prices during the Class Period.  However, after the above revelations seeped into the market, the Company's shares were hammered by massive sales, sending them down nearly 42% from their Class Period high.

## JURISDICTION AND VENUE

15.     The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5.

16.     This Court has jurisdiction over the subject matter of this action pursuant to §27 of the 1934 Act.

17.     Venue is proper in this District pursuant to §27 of the 1934 Act.   Acts and transactions giving rise to the violations of law complained of herein occurred in this District.

## PARTIES

18.     Plaintiff Pipefitters Local No. 636 Defined Benefit Plan purchased BofA common stock as described in the attached certification and was damaged thereby.

19.     Defendant BofA is a bank holding company and a financial holding company.   The Company is a financial institution, serving individual consumers, small and middle market businesses, large corporations and governments with a range of banking, investing, asset management and other financial and risk management products and services.   BofA is headquartered in Charlotte, North Carolina, and has branch offices throughout the United States, including many in this District.

20.     Defendant Brian T. Moynihan ("Moynihan") is, and at all relevant times was, President, Chief Executive Officer ("CEO") and a director of BofA.

21.     Defendant Charles H. Noski ("Noski") has been Chief Financial Officer ("CFO") and Executive Vice President of BofA since May 2010.

22.     Defendants Moynihan and Noski (the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of BofA's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.   They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the

positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

23.     Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about BofA. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of BofA common stock was a success, as it: (i) deceived the investing public regarding BofA's prospects and business; (ii) artificially inflated the price of BofA common stock; and (iii) caused plaintiff and other members of the Class to purchase BofA common stock at inflated prices.

## CLASS ACTION ALLEGATIONS

24.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired BofA common stock during the Class Period (the "Class"). Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

25.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. BofA has 10 billion shares of stock outstanding, owned by thousands of persons.

26.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     whether the 1934 Act was violated by defendants;

- 5 -

(b)     whether defendants omitted and/or misrepresented material facts;

(c)     whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether defendants knew or deliberately disregarded that their statements were false and misleading;

(e)     whether the price of BofA common stock was artificially inflated; and

(f)     the extent of damage sustained by Class members and the appropriate measure of damages.

27.     Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

28.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

29.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**BACKGROUND**

30.     BofA, a financial holding company, provides a range of banking and nonbanking financial services and products in the United States and internationally.  The Company's Global Consumer and Small Business Banking segment offers savings accounts, money market savings accounts, certificates of deposit, individual retirement accounts, regular and interest-checking accounts, and debit cards; consumer real estate products, including mortgage products for home purchase and refinancing, reverse mortgage products, and home equity products; and insurance services.  Bank of America's Global Corporate and Investment Banking segment provides commercial and corporate bank loans, indirect consumer loans, real estate lending products, and

leasing and asset-based lending products for banking clients, middle market commercial clients, multinational corporate clients, public and private developers, homebuilders, and commercial real estate firms; advisory services, financing, and related products for institutional investor clients in support of their investing and trading activities; debt and equity underwriting, merger-related advisory services and risk management solutions; and treasury management, trade finance, foreign exchange, short-term credit facilities, and short-term investing options for correspondent banks, commercial real estate firms, and governments. The Company's Global Wealth and Investment Management segment offers investment and brokerage services, estate management, financial planning services, fiduciary management, credit and banking expertise, and diversified asset management products to institutional clients and high-net-worth individuals.

31.     On July 1, 2008, BofA acquired Countrywide Financial Corporation ("Countrywide") by issuing 107 million shares of BofA common stock for 583 millions shares of Countrywide common stock. This acquisition dramatically increased the number of home mortgage loans serviced by BofA from 4 million pre-acquisition to 14 million post acquisition. Even more significantly, a much higher proportion of Countrywide loans were delinquent and likely to lead to foreclosure than those BofA had previously serviced.

32.     Prior to the acquisition, Countrywide had utilized a company called Mortgage Electronic Registration Systems, Inc. ("MERS") to record the vast number of mortgage loans it was originating using extremely aggressive lending practices. In order to save time and money on registering the mortgage liens in the public records of the various counties in which Countrywide originated the loans, Countrywide used MERS to track the movement of the loans through the securitization process. However, the process led to a great deal of confusion. MERS was to be a nominee of Countrywide but not necessarily the mortgagee and not entitled to payments, nor to

foreclose.  Through the process of working with MERS, the mortgages on homes became separated from the notes on the homes.  MERS might be the mortgage holder but not the noteholder. Countrywide continued to be the servicer but with no real rights to payments or rights to foreclose. These defects began surfacing in various foreclosure proceedings in 2009, but the extent of the problems were concealed by BofA.

33.    Following the acquisition, BofA executives decided to use Countrywide's homegrown mortgage-servicing technology, but soon discovered that Countrywide's system did not communicate well with BofA's system.  More alarming, however, was BofA's discovery that information was missing from many Countrywide loan files, making it difficult to deal with borrowers.  This became a critical problem when loans went into foreclosure, since paperwork and recording problems would make it difficult if not impossible to foreclose on certain loans.

34.    In fact, it was common practice for Countrywide to retain notes it should have transferred.  In an Opinion dated November 16, 2010, the United States Bankruptcy Court for the District of New Jersey noted testimony by Linda DeMartini, a supervisor and operational team leader for the Litigation Management Department for BAC Home Loans Servicing L.P.:

> As to the location of the note, Ms. DeMartini testified that to her knowledge, the original note never left the possession of Countrywide, and that the original note appears to have been transferred to Countrywide's foreclosure unit, as evidenced by internal FedEx tracking numbers.  She also confirmed that the new allonge had not been attached or otherwise affixed to the note.  She testified further that it was customary for Countrywide to maintain possession of the original note and related loan documents.

35.    By year-end 2009, BofA had more than $20 billion in non-performing loans and was working on tens of thousands of foreclosures.  In order to prevent a collapse in BofA's stock price and prevent borrowers from stopping foreclosures due to faulty procedures, defendants concealed the paperwork and recording problems associated with the loans which would inhibit efficient foreclosures.

36.    For years prior to 2010, BofA had engaged in a practice intended to make its financial statements appear more favorable.  This practice, known in the industry as Repo 105, involved BofA misclassifying billions of dollars of debt as sales on quarter-end balance sheets.  This practice was concealed from investors at the beginning of the Class Period.

### DEFENDANTS' FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

37.    On January 20, 2010, BofA issued a press release announcing its fourth quarter and full-year 2009 financial results.  The Company reported full-year 2009 net income of $6.3 billion and a net loss for the fourth quarter of 2009 of $5.2 billion or a diluted EPS loss of $0.60.  The release stated in part:

> "While it's disappointing to report a loss for the fourth quarter, there were a number of important accomplishments worth noting," said Chief Executive Officer and President Brian T. Moynihan. "First, we repaid the American taxpayer, with interest, for the TARP investment. Second, we have taken steps to strengthen our balance sheet through successful securities offerings. And third, all of our non-credit businesses recorded positive contributions to our results."

38.    On April 9, 2010, *The Wall Street Journal* published an article about large banks, including BofA, which had been concealing their debt levels from investors over the previous five quarters.  The article, entitled "Big Bank Mask Risk Levels; Quarter-End Loan Figures Sit 42% Below Peak, Then Rise as New Period Progresses; SEC Review," stated in part:

> Major banks have masked their risk levels in the past five quarters by temporarily lowering their debt just before reporting it to the public, according to data from the Federal Reserve Bank of New York.

*     *     *

> Excessive borrowing by banks was one of the major causes of the financial crisis, leading to catastrophic bank runs in 2008 at firms including Bear Stearns Cos. and Lehman Brothers. Since then, banks have become more sensitive about showing high levels of debt and risk, worried that their stocks and credit ratings could be punished.

*     *     *

"The efforts to manage the size of our balance sheet are appropriate and our policies are consistent with all applicable accounting and legal requirements," a Bank of America spokesman said.

\*          \*          \*

The SEC now is seeking detailed information from nearly two dozen large financial firms about repos, signaling that the agency is looking for accounting techniques that could hide a firm's risk-taking. The SEC's inquiry follows recent disclosures that Lehman used repos to mask some $50 billion in debt before it collapsed in 2008.

\*          \*          \*

Some banks make big trades that don't show up in quarter-end balance sheets. That is what happened recently at Bank of America involving a trade designed to mature before the end of 2009's first quarter, people familiar with the matter say.

Two Bank of America traders bought $40 billion of mortgage-backed securities from clients for one month, while at the same time agreeing to sell the securities back before quarter's end, according to people familiar with the matter. This "roll" trade provided the clients with cash and the bank with fees.

Robert Qutub, then Bank of America's chief financial officer for global markets, told Michael Nierenberg, a former Bear Stearns trader who oversaw the traders who made the roll trade, to cap the size of the short-term transaction, people familiar with the matter say.

A week later, however, the amount tied to the trade shot up to $60 billion, these people say, before dropping to $25 billion, one of these people said, appearing to some at headquarters that the group had defied the order to cap the trade.

A bank spokeswoman said "the team was aware of and worked within its risk limits."

39.    On April 16, 2010, BofA issued a press release announcing its first quarter 2010

financial results, reporting net income of $3.2 billion or $0.28 diluted EPS. The press release stated

in part:

Two factors primarily drove results in the first quarter:

- Provision for credit losses fell by $3.6 billion from the year-ago period, reflecting an improvement in credit quality.

- Strong capital markets activity, including record sales and trading driven by industry-leading corporate and investment banking positions, helped drive results for Global Banking and Markets.

"With each day that passes, the 2010 story appears to be one of continuing credit recovery, and our results reflect a gradually improving economy," said Chief Executive Officer and President Brian T. Moynihan. "Our customers – individuals, companies, and institutional investors – increasingly see the value of our integrated capabilities. We also are seeing ample indications that those integrated capabilities hold promise for long-term shareholder value."

40.    On May 7, 2010, BofA filed its Form 10-Q for the quarter ended March 31, 2010, in which it disclosed aspects of its prior failure to accurately report its balance sheets. The Form 10-Q stated in part:

At the end of certain quarterly periods during the three years ended December 31, 2009, the Corporation had recorded certain sales of agency mortgage-backed securities (MBS) which, based on a more recent internal review and interpretation, should have been recorded as secured borrowings. These periods and amounts were as follows: March 31, 2009 – $573 million; September 30, 2008 – $10.7 billion; December 31, 2007 – $1.8 billion; and March 31, 2007 – $4.5 billion. As the transferred securities were recorded at fair value in trading account assets, the change would have had no impact on consolidated results of operations. Had the sales been recorded as secured borrowings, trading account assets and federal funds purchased and securities loaned or sold under agreements to repurchase would have increased by the amount of the transactions, however, the increase in all cases was less than 0.7 percent of total assets or total liabilities. *Accordingly, the Corporation believes that these transactions did not have a material impact on the Corporation's Consolidated Balance Sheet.*

In repurchase transactions, typically, the termination date for a repurchase agreement is before the maturity date of the underlying security. However, in certain situations, the Corporation may enter into repurchase agreements where the termination date of the repurchase transaction is the same as the maturity date of the underlying security and these transactions are referred to as "repo-to-maturity" (RTM) transactions. The Corporation enters into RTM transactions only for high quality, very liquid securities such as U.S. Treasury securities or securities issued by government-sponsored entities. The Corporation accounts for RTM transactions as sales in accordance with GAAP, and accordingly, de-recognizes the securities from the balance sheet and recognizes a gain or loss in the Consolidated Statement of Income. At March 31, 2010 and December 31, 2009, the Corporation had outstanding RTM transactions of $3.0 billion and $6.5 billion that had been accounted for as sales.

- 11 -

41.     On July 16, 2010, BofA issued a press release announcing it second quarter 2010

financial results.  The Company reported net income of $3.1 billion or $0.27 diluted EPS.  The press

release stated in part:

> "Our quarterly results show that we are making progress on our strategy to
> align around our three core customer groups – consumers, businesses, and
> institutional investors – and create the financial institution that customers tell us they
> want, built on a broad relationship of clarity, transparency, and helping them manage
> through challenging times," said Chief Executive Officer and President Brian
> Moynihan.  "We improved our capital foundation through retained earnings, and
> credit quality improved even faster than expected.  We have the most complete
> financial franchise in the world, and we are focused on executing our strategy and
> delivering outstanding long-term value to our customers and shareholders."

42.     After releasing its second quarter 2010 results on July 16, 2010, BofA hosted a

conference call with investors, media representatives and analysts, during which defendant

Moynihan represented the following:

> We did make $3.1 billion in net income for the quarter, but importantly, with the
> earnings, we are continuing to move our core franchise forward.  Our credit quality
> continues to improve, in some cases faster than we anticipated as we came into this
> year.  As the management team and I put together the principles we're going to
> operate under to make sure that we can position this company now and in the future
> in the way it needs to be positioned, one of the principles we've been focused on is to
> continuing [sic] to strengthen our balance sheet.
>
> *          *          *
>
> At the same time, we're devoting a ton of effort and expense to working through
> defaults, short sales and modifications, and we're attempting to help every customer
> we can.  In spite of all that hard work, we'll continue to see elevated foreclosures,
> short sales and other liquidations for the next several quarters as we clean up the
> legacy Countrywide portfolio.

43.     On October 8, 2010, BofA announced a nationwide foreclosure halt pending a review

of its foreclosure processes and whether there were irregularities with respect to its previously

completed foreclosure activities.

44.     On October 13, 2010, the attorneys general of 50 states, led by Iowa, announced a

probe into U.S. banks regarding loan underwriting guidelines and their allowance for credit losses.

The attorneys general launched a joint investigation of the practices banks used in evicting delinquent borrowers from their homes.

45.     After this news, BofA's stock fell $0.69 per share to close at $12.60 per share on October 14, 2010, on volume of 511 million shares.

46.     On October 19, 2010, BofA announced its third quarter 2010 financial results, reporting a net loss of $7.3 billion and a diluted EPS loss of $0.77.  BofA further reported receiving $18 billion in claims about faulty home loans that it may have to repurchase.

47.     On this news, BofA's stock dropped $0.54 per share, to close at $11.80 per share on October 19, 2010 – a one-day decline of 5% on volume of 574 million shares.

48.     In November 2010, BofA was sorting through 102,000 foreclosure files in five separate offices, attempting to retroactively document mortgage recording and transfers so it could complete foreclosures in various locations with varying rules.

49.     Later, on November 16, 2010, a New Jersey Bankruptcy Judge dismissed a BofA claim against a debtor, citing testimony of a BofA employee who admitted that BofA/Countrywide routinely did not bother to transfer essential documents for loans sold to investors.  As *American Banker* reported on Monday, November 22, 2010, "The BofA employee's admission that the lender customarily held on to promissory notes could also undermine the industry's position that document transfers to securitization trusts are fundamentally sound."

50.     The true facts, which were known by the defendants but concealed from the investing public during the Class Period, were as follows:

(a)     BofA did not have adequate personnel to process the huge numbers of foreclosed loans in its portfolio;

(b)    BofA had not properly recorded many of its mortgages when originated or acquired, which would severely complicate the foreclosure process if it became necessary;

(c)    Defendants failed to maintain proper internal controls related to processing of foreclosures;

(d)    BofA's failure to properly process both mortgages and foreclosures would impair the ability of BofA to dispose of bad loans; and

(e)    BofA had engaged in a practice known internally as "dollar rolling" to remove billions of dollars of debt from its balance sheet over the prior years.

51.    As a result of defendants' false statements and omissions, BofA's common stock traded at artificially inflated prices during the Class Period. However, after the above revelations seeped into the market, the Company's shares were hammered by massive sales, sending them down nearly 42% from their Class Period high.

## LOSS CAUSATION/ECONOMIC LOSS

52.    During the Class Period, as detailed herein, the defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of BofA common stock and operated as a fraud or deceit on Class Period purchasers of BofA stock by misrepresenting the Company's business and prospects. Later, when the defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of BofA common stock fell precipitously, as the prior artificial inflation came out of the price over time. As a result of their purchases of BofA common stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

53.     Plaintiff incorporates ¶¶1-52 by reference.

54.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

55.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     employed devices, schemes and artifices to defraud;

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of BofA common stock during the Class Period.

56.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for BofA common stock.  Plaintiff and the Class would not have purchased BofA common stock at the price they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by defendants' misleading statements.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

57.     Plaintiff incorporates ¶¶1-56 by reference.

- 15 -

58.    The Individual Defendants acted as controlling persons of BofA within the meaning of §20(a) of the 1934 Act.  By reason of their positions with the Company, and their ownership of BofA stock, the Individual Defendants had the power and authority to cause BofA to engage in the wrongful conduct complained of herein.  BofA controlled the Individual Defendants and all of its employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays for judgment as follows:

A.    Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.    Awarding plaintiff and the members of the Class damages, including interest;

C.    Awarding plaintiff reasonable costs and attorneys' fees; and

D.    Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED: February 2, 2011

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD


SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
DARREN J. ROBBINS
DAVID C. WALTON
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

SULLIVAN, WARD, ASHER & PATTON, P.C.
JACQUELINE A. KELLY
MICHAEL J. ASHER
25800 Northwestern Highway
1000 Maccabees Center
Southfield, MI 48075-1000
Telephone: 248/746-0700
248/746-2760 (fax)

Attorneys for Plaintiff

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

PIPEFITTERS LOCAL NO. 636 DEFINED BENEFIT PLAN ("Plaintiff") declares:

1. Plaintiff has reviewed a complaint and authorized its filing.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

<i>See</i> attached Schedule A.

5. Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

<i>In re Franklin Bank Corp. Sec. Litig.</i>, No. 4:08-cv-01810 (S.D. Tex.)<br>
<i>In re Zale Corporation Sec. Litig.</i>, No. 3:09-cv-02133-B (N.D. Tex.)<br>
<i>Pipefitters Local No. 636 Defined Benefit Plan v. Tekelec, et al.</i>, No. 5:11-cv-00004-D (E.D.N.C.)

6. The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery.

BANK OF AMERICA

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 1st day of February, 2011.

PIPEFITTERS LOCAL NO. 636 DEFINED BENEFIT PLAN

By: _____

Its: Chairman

By: _____

Its: Secretary

- 2 -

BANK OF AMERICA

SCHEDULE A

SECURITIES TRANSACTIONS

**Acquisitions**

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 03/22/2010 - SD | 15,000 | $17.23 |
| 04/19/2010 - SD | 8,000 | $19.01 |
| 05/13/2010 - SD | 1,600 | $17.22 |

*Settlement dates are indicated with "SD" attached to the date.