```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   PIPEFITTERS LOCAL NO. 636
     DEFINED BENEFIT PLAN,
 4
                     Plaintiff,
 5
                  v.                        11 Civ. 733 (WHP)
 6
     BANK OF AMERICA CORPORATION,
 7   et al.,
                                            Conference
 8                   Defendants.

 9   ------------------------------x

10                                          New York, N.Y.
                                            May 18, telephone
11                                          6:00 p.m.

12   Before:

13          HON. WILLIAM H. PAULEY III

14                                          District Judge

15
                APPEARANCES
16

17   KIRBY McINERNEY LLP
          Attorneys for Local 388 Funds
18   BY:  ROGER W. KIRBY
          EDWARD M. VARGA, III
19

20   LAW OFFICES OF THOMAS G. AMON
          Attorneys for 11 Civ. 2475 Plaintiffs
21   BY:  HARRY H. WISE III

22
     LABATON SUCHAROW LLP
23        Attorneys for funds group Plaintiffs
     BY:  MICHAEL STOCKER
24

25
```

```
 1                    APPEARANCES

 2

 3   GRANT & EISENHOFER P.A.
          Attorneys for Plaintiffs
 4   BY:  GEOFFREY C. JARVIS

 5

 6   BARRACK, ROSOS & BACINE
          Attorneys for Pennsylvania Public School Employees
          Retirement System
 7   BY:  LEONARD BARRACK
          MARK R. ROSEN
 8        JEFFREY A. BARRACK

 9

10   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
          Attorneys for Defendant Bank of America Corporation and
          individual Bank of America defendants
11   BY:  JAY B. KASNER
          SCOTT D. MUSOFF

12

13   DAVIS POLK & WARDWELL
          Attorneys for Individual Defendants in 11 Civ. 2475
14   BY:  CHARLES S. DUGGAN
          BRIAN M. BURNOVSKI

15

16

17

18

19

20

21

22

23

24

25
```

1            (Case called)

2            THE COURT:  Good evening everyone.

3            THE CLERK:  Will counsel for the plaintiffs give their

4    appearances.

5            MR. JARVIS:  Jeff Jarvis from the law firm of Grant &

6    Eisenhofer on behalf of lead plaintiff movant in the securities

7    case The Funds Group.

8            MR. STOCKER:  Mike Stocker from Labaton Sucharow on

9    behalf of the same group.

10           MR. WISE:  Harry Wise, of counsel to Tom Amon's

11   office, with plaintiff Cinotto in the derivative case.

12           MR. KIRBY:  Roger Kirby, your Honor, together with Ed

13   Varga and Syria Palannapia on behalf of Local 338.

14           MR. ROSEN:  Good evening, your Honor.  Mark Rosen from

15   the firm of Barrack, Rodos & Bacine, joined by my senior

16   partner Leonard Barrack from Barrack, Rodos & Bacine, as well

17   as Jeffrey Barrack and the client's counsel Mr. Gerald Gornish,

18   on behalf of the Pennsylvania Public School Employees

19   Retirement System.

20           THE COURT:  Good evening.

21           MR. KASNER:  Good evening, your Honor.  Jay Kasner and

22   Scott Musoff from the Skadden Arps firm.  We represent all of

23   the defendants in 733, 1280, 1982, and we represent Bank of

24   America in the derivative suit 2475.  Good evening.

25           THE COURT:  Good evening.

1           MR. DUGGAN:  Charles Duggan, joined by my colleague

2    Brian Burnovski, Davis Polk & Wardwell.  We represent the

3    individual defendants in the Cinotto derivative action 2475.

4           THE COURT:  Good evening.  I have various dueling, and

5    it is more than just two, motions for appointment of lead

6    counsel.  I want to hear briefly from counsel on those motions.

7    And I want to discuss my view that at the end of the day

8    whoever I determine is going to be lead counsel is going to

9    file an amended consolidated complaint with respect to the

10   securities actions.  I'd like to hear what the parties' views

11   are about the derivative action, whether they can proceed

12   together or not.

13          Mr. Jarvis, do you want to be heard?

14          MR. JARVIS:  I would like to, your Honor, briefly.  I

15   represent the fund group.  The fund group is the Swedish

16   pension fund AP7, the Arkansas Teacher Retirement System from

17   Arkansas, and KCB Asset Management from Belgium.  We are, I

18   think the papers are clear, the group with the largest loss.  I

19   think by any measure we have the largest loss.

20          I think the common standard we all seem to be relying

21   on these days is something called LIFO, last in/first out,

22   which is a way, I'm sure your Honor is aware, of how you

23   measure transactions of stock or how you actually account for

24   them.  Under that measurement our loss was about $20.2 million,

25   the institutional investor group.

1          THE COURT:  How is your situation, that is, your

2     client's situation, different from the situation that I

3     confronted in Baydale?

4          MR. JARVIS:  I think it is different in a number of

5     very, very significant respects.  First of all, as your Honor

6     is well aware, your Honor knew extensively the putative lead

7     plaintiff, the Swedish group in that case, was a private asset

8     management outfit that was like a third tier subsidary of a

9     very complex conglomerate that was owned by 24 insurance

10    companies.

11         I think your Honor throughout a goodly portion of the

12    opinion pointed out that there were a number of potential

13    conflicts raised by the -- putting aside the ownership issue

14    and the movant issue, there were a number of very complex

15    issues that could be raised by the fact that it was ultimately

16    insurance companies, what was their involvement.  There were

17    foreign exchange transactions.  There were a whole bunch of

18    conflicts merely by the nature of the client and its corporate

19    structure.

20         In this case those sorts of conflicts simply don't

21    exist.  We are a state pension fund.  We are representing the

22    retirees of the country of Sweden.  In that extraordinarily

23    important respect, all the conflicts your Honor raised there,

24    simply don't exit here with respect to AP7 at all.

25         THE COURT:  Doesn't determining whether AP7 has

1    standing require this Court to conduct an extensive analysis?

2         MR. JARVIS:  I don't think so, your Honor, in the

3    sense that the structure of AP7 is that the AP7, at least as is

4    relevant to this particular matter, has something called the

5    fixed or the equity fund.  It's a fund that is owned by or

6    controlled by AP7.  The retirees of Sweden I think own

7    fractional interest in the fund.

8         I think the analogy, for  example, might be if your

9    Honor owned Vanguard, if your Honor might own a share in a

10   particular Vanguard fund.  Your Honor certainly would have no

11   ability, as an owner in that fund, to do anything on behalf of

12   the fund.  You own your piece, you can redeem it when you wish.

13   There are obviously redemption rules, but that's not relevant

14   here.  The fact is that Vanguard would act on your Honor's

15   behalf.

16        If there were lawsuits to be brought for losses in

17   that particular Vanguard fund, Vanguard would bring those

18   lawsuits on behalf of the fund.  There is no difference here.

19   We are the fund's management company.  We are a governmental

20   entity, but we are the management company of that fund.  The

21   fund owns the assets.  We would act on behalf of the AP7 equity

22   fund.

23        We have with us also, I think as was noted in the

24   Baydale case, they said we will bring in a U.S. pension fund

25   partner.  We don't have to bring in a U.S. pension fund

1    partner.  We have Arkansas Teacher.  They are very experienced

2    with plaintiffs.  I have had several conversations on the phone

3    with all of my guys.  They know what they are about in

4    Arkansas.  The guys in Sweden have done this a couple of times

5    as well.  They are all willing to go forward and really look to

6    maximize the returns to the class.

7            Huff I think is the case we all refer to.  It's the

8    one everybody looks to.

9            THE COURT:  Right.  That's the Second Circuit.

10           MR. JARVIS:  Those guys tend to be somebody that

11   certainly I listen to.  I guess even your Honor from your

12   position.

13           THE COURT:  They grade my papers, so I generally have

14   to pay attention to what they are doing.

15           MR. JARVIS:  There is an enormous difference, frankly,

16   between AP7 and Huff.  Huff was a true asset management company

17   in the sense that they would make an asset management decision.

18   Let's say they bought a million shares of BOA.  They would then

19   allocate that purchase to each of their managed accounts.

20   Their management accounts would have the ability if they

21   wanted.  In fact, as the Court noted in Huff, many of the

22   managed accounts had brought individual actions in that case.

23   Huff them tried to bring it on behalf of some others.  It

24   didn't really get assigned, which it thought it could.  It

25   belatedly got the assignment.  An enormously different

perspective.

          Who owns it?  In this case it is a fund that we

control.

          THE COURT:  Does AP7 actually own the Bank of America

securities?

          MR. JARVIS:  No.  The AP7 equity fund owns the

security.  Just like, for example, if your Honor was in the

Vanguard Voyager Fund or something like that, the Voyager Fund

or trust I believe would own it, but Vanguard takes every

action on behalf it.  We are exactly the same.  If your Honor

were to say, Mr. Jarvis, your client can't sue here, there is

no one else who can.  We control that fund.  The fund doesn't

have any other lawyers.

          Mr. Grottheim, who is the president of AP7, is the guy

who makes decisions on behalf of the fund.  He doesn't

obviously do all the asset allocations.  That's not his thing.

But he runs the fund.  He makes decisions as to who to sue, who

not to sue.  Not that they are suing that many people I

suspect, but these things do come up.  There is no one else.

          That is really the prime difference between AP7 and

Huff.  In that case, in each case the client could have, had it

so chosen, decided I want to sue whoever that is over there,

hired their own lawyer and done it because I own those Bank of

America shares.  Here the individual pensioners in Sweden own a

fractional interest in the fund.  The fund is the one who is

1    going to be bringing the case through AP7.  It's an AP7 fund,

2    AP7 equity fund.  It presents a radically different ownership

3    instruct.

4           I read your Honor's opinion as saying your Honor had

5    two concerns.  The one on the ownership.  I thought your Honor

6    was legally concerned.  And I agree with your Honor's

7    description of the structure of that particular Swedish client,

8    I could see the concern.  It was a very, very, very convoluted

9    corporate structure with ownership all over the place.  That is

10   really a signal, signal difference here.

11          We have what is a traditional pension fund, one of the

12   better known pension funds in Europe.  It is not among the

13   biggest, but it is a very nicely sized pension fund.  It is no

14   different than Nordbank or ADP in the Netherlands that are all

15   set up along a very similar structure.  So this presents a

16   totally different situation.

17          THE COURT:  If I wanted to avoid foreign

18   entanglements, as our first president observed in his address

19   to the country, wouldn't I be better off to select the

20   Pennsylvania retirement group?

21          MR. JARVIS:  If your Honor wishes to avoid foreign

22   entanglements, obviously we have Arkansas.  It is hard to get

23   much more American than Arkansas.  I live in Pennsylvania, so I

24   won't say too much bad about the Pennsylvania retirement

25   system.  But it is Pennsylvania.

 1              I do believe this is important, and I think it is

 2      something that is not often addressed in these matters of late.

 3      Your Honor is, of course, aware of the Supreme Court's recent

 4      very significant decision in National Australia Bank.  I think,

 5      if one reads the rhetoric in the world, it is generally

 6      perceived as a decision by the Supreme Court that was really

 7      opposed to the interests of foreign investors in some ways.

 8              I would take a very distinct difference with that.

 9      The Second Circuit had previously I think substantially limited

10      what we call the subject matter as affects us, and it was hard

11      to bring those cases.  What Supreme Court did, and I think the

12      decisions of this court in particular, the Southern District,

13      have pointed out that there is no difference under Morrison

14      between foreign entanglement, foreign plaintiffs and American

15      plaintiffs, they are to be treated exactly the same.

16              If you are a foreign investor who purchased your

17      shares on a U.S. exchange, we are going to treat you just like

18      Pennsylvania.  And if you're in Pennsylvania and you bought the

19      shares of a company in Europe, you're out.  Just like if you

20      were Sweden, Swedish AP7, and you bought it on a foreign

21      exchange.

22              The idea that a U.S. plaintiff is maybe better than a

23      foreign plaintiff I think goes to the very heart of Morrison

24      and is something that Morrison rejects.  Morrison simply

25      doesn't care where you're from.  All it cares about is where

1    you bought and did you take advantage of the U.S. securities

2    markets and the protections that are offered to investors under

3    those markets.

4          My clients clearly purchased their shares on the New

5    York Stock Exchange.  That was an issue that was raised, but it

6    was clear.  Frankly, we didn't think it was an issue.  We

7    listed all of our trades in dollars.  But we made it clear.  We

8    checked our records.  Everything was brought on the NYSE.  Mr.

9    Grottheim, our president, put that in.

10         Therefore, there is, I would argue, your Honor, no

11   reason to seek avoid foreign entanglements.  In fact, your

12   Honor ought not to seek to avoid foreign entanglements.  Your

13   Honor ought to send the message to foreign investors that if

14   you come here to New York or to another American exchange, you

15   are treated no differently than if you were an American.  We

16   look at everybody the same, everybody who wishes to come here

17   will be treated with the same legal protections of our system.

18         That I think is truly the argument that Morrison,

19   whether it was the case or not that it limited effects testing,

20   one could argue that the effects test would pass that it was

21   American as it was previously in place.

22         Under the Morrison transaction test, I think it is

23   clear that everybody is the same and that your Honor, I would

24   argue -- it's your Honor's decision of course -- ought not to

25   seek to avoid foreign entanglements.  In fact, your Honor ought

1    to embrace foreign entanglements to send a message come to the

2    United States, invest here, don't flee our markets, we are not

3    going to treat you different.

4            THE COURT:  Thank you, Mr. Jarvis.

5            Mr. Kirby, do you want to be heard?

6            MR. KIRBY:  Yes, your Honor.  Thank you.  Let me begin

7    with the so-called funds group.  I think this matter, your

8    Honor, if anything, is a fortiori Baydale, because in this

9    matter, in addition to the Baydale issue, whether there was

10   appropriate authority at the time in an Article III sense,

11   there are dueling affidavits that are in the record.

12           If you look at dockets 44 and 47, filed respectively

13   by Pennsylvania and our colleagues from AP7, you will see that

14   they are debating the very issue of whether or not AP7, which

15   did not buy any of these BAC shares, can or does have

16   appropriate authority to advance.

17           As the Court indicated in its examination of counsel

18   for AP7, this may require a considerable amount of extensive

19   work falling under the larger rubric of a unique defense, which

20   is one of the rebuttable items specifically outlined in the

21   PSLRA.  So what was listed by counsel was really a series of

22   paradigmatic points of distinction without a Huff difference.

23           As to Arkansas's great experience, that is a petard

24   that blows up on its own application.  What it did in its

25   papers was grossly mask its experience.  At docket 13,

paragraph 5, it laid out a number of cases in which it had been involved, saying with respect to these cases Arkansas teachers sought to serve.  I emphasize the words "sought to serve" as a lead plaintiff in the following class actions under the federal securities laws during the last three years.  And then it lists a lot of these cases.

What it omits to say, your Honor, is that it actually served or was appointed in seven of those cases as lead or co-lead counsel.  That is an important lack of candor.  And it is not just an incidental lack of candor.  The PSLRA specifically says that you can only serve as lead plaintiff in a certain number of cases over a certain period, and Arkansas violates that.  So, one can infer fairly that its phrase "sought to serve" was done pointedly.

What we have in respect of The Funds Group is a situation where they do admittedly, at least for purposes of this discussion, have the largest loss, but they also fall under the clear rebuttable issue of whether or not they really are the most capable of adequately representing the class because of the demonstrated lack of candor -- the lack of candor by itself demonstrates a PSLRA violation -- and because of the fact that they do have the singular unique defense, as is already part of the record by virtue of the expert submission filed by Pennsylvania under docket 44 and response in docket 47 by our friends in Arkansas.

1          Believe me, your Honor, I'm very careful to mention

2     lack of can core in Arkansas because the larger part of my

3     relations are in fact from Arkansas.  So I'm treading gingerly

4     on this.

5          There is also the issue of whether or not they can be

6     a group.  The PSLRA, it seems to many courts but not all

7     courts, abjures the idea of groups that had no existing

8     business relationship that come together just for purposes of

9     litigation.

10         As to Pennsylvania, your Honor, Pennsylvania has no

11     timely motion to become a lead plaintiff.  They are out of

12     time.  Their motion papers made very clear -- it's docket 7 --

13     that they were seeking appointment as part of the group.  There

14     is nothing in that motion paper that says that they weren't

15     seeking a lead either individually or in the alternative or the

16     usual catch-all at the end for such other relief as the court

17     may consider just and proper.

18         THE COURT:  Can you cite a case that holds that the

19     withdrawal of one member of a lead plaintiff group renders the

20     group's motion procedurally defective?

21         MR. KIRBY:  In our brief we cite a case, and I'm not

22     sure it responds squarely to the question, but that is not

23     really the fact here.  It might have been one thing if they did

24     as our friends in Arkansas did, filed a motion that said, we

25     want to be appointed as a group or in the alternative as

1    individuals, but they didn't do that.  Their motion says, we

2    want to be appointed as a group.  The declaration that they

3    filed in support of it pointed out heavily how they as a group

4    would work together, and they jointly pushed the case forward.

5            There is a case at 214 F.R.D. 117, jump to 120-121,

6    where it says a potential lead plaintiff must file a complaint

7    or timely move for appointment as lead plaintiff.  As I said,

8    this is not absolutely congruent here in the response to the

9    question the Court asked, but the facts here are special

10   because of the deficiency.  It is not something to be taken

11   lightly.  The PSLRA plainly states you have to make a motion

12   within 60 days.

13           There is considerable Supreme Court authority for the

14   idea -- not for the idea -- for the rule of law that when a

15   statute specifically sets out a right or a duty, the court's

16   sole function is to enforce it according to its terms.  For

17   that I direct the Court to 540 U.S.526, 534, and numerous other

18   cases that hold to the same effect.

19           THE COURT:  Doesn't PPSERS cite cases in which courts

20   have permitted one party to withdraw?

21           MR. KIRBY:  It is not the withdrawal.  First of all,

22   there is no court that this Court has to listen to in this

23   regard other than the Supreme Court saying that when a statute

24   says something, the court has got to follow the statute.

25           I honestly don't know what the motion papers look like

1   in the cases cited by Pennsylvania.  I don't know whether those

2   cases did, which most people do, plead for a result by way of a

3   motion in the alternative or, as they did on this motion, say,

4   we want to be appointed jointly.  That's docket 7.  And they

5   didn't even ask, they didn't give the Court a catch-all

6   opportunity.

7          Regardless, the law is clear on its face:  Within 60

8   days you've got to move.  They didn't move to be sole lead in

9   that 60-day period.  The Supreme Court time and again has said

10  the court's sole function is to enforce the law if it's in the

11  statute and it's plain on its face.  I can cite other cases for

12  that proposition.

13         This is really just a variant of the Huff decision,

14  when one thinks about it, or the Court's decision in Baydale or

15  SLM, where there were very strict rules about playing nunc pro

16  tunc games.  You can't tunc one thing and then come in and nunc

17  it back.  It's just not permitted.

18         The truth of the matter is Local 381, which is in fact

19  local, the only local one.  It's from Mineola, Long Island.

20  It's an institutional investor.  There are no serious arguments

21  why it shouldn't be lead except it lost only $388,000, which is

22  bagatelle only to the previous defendant here but not to most

23  people.  It is a considerable amount of money.

24         The head of that union is Mr. John DeRosario, who has

25  publicly gone on record to address certain issues concerning

1  financial fraud by banks and other things.  It is a very active

2  entity.  He would have been here today except we thought we

3  would be here on a pretrial scheduling order.

4       I think that under those circumstances where you have

5  one entity that really is unassailable/unimpeachable in any

6  serious way, you have another entity that has demonstrated a

7  lack of candor, that has a unique defense that this Court

8  itself has identified, and the circumstances that the Second

9  Circuit said it found are disabling, and you have another party

10 who simply didn't move on time, and you have a rule that says

11 you have to move on time or you're out, and a Supreme Court

12 series of decisions or litany of decisions that say that, one

13 has to rest upon Local 388.

14       I thank you, unless the Court has any questions.

15       THE COURT:  Thank you, Mr. Kirby.

16       Mr. Rosen.

17       MR. ROSEN:  Thank you very much, your Honor.  Judging

18 from the colloquy of what my predecessor said, it is clear your

19 Honor has a good grasp of the issues, so I don't want to

20 retread ground that doesn't need to be covered.

21       THE COURT:  Especially at 6:30.

22       MR. ROSEN:  Especially.  But I do want to address a

23 couple of points.

24       First the issue of what governs this motion.  We are

25 not writing on tabula rasa.  Not only do we have Huff, we have

1    your Honor's two decisions in SLM and in Baydale v. American

2    Express.  Baydale, with all due respect to Mr. Jarvis, is

3    directly on point.  In that case you had a Swedish fund that

4    submitted a declaration including an opinion from a Swedish

5    attorney that said we are the only ones that can sue for the

6    fund, and if we can't, no one else can.

7         Your Honor said even if you accepted that contention,

8    even if your Honor accepted the assertion that this fund had to

9    be able to sue because no one else could sue on behalf of the

10   beneficiaries of that fund, your Honor would nonetheless not

11   select them, to avoid, I think your Honor's term was, a

12   needless litigation sideshow.

13        I had some experience with that and with litigation on

14   this matter.  Mr. Barrack and I were among counsel representing

15   the plaintiffs in the WorldCom case.  We are awfully proud of

16   that because we produced the second largest recovery in the

17   history of the PSLRA, $6 billion plus.

18        I see my friend Mr. Kasner from Skadden Arps here

19   today as a defense counsel.  He took the deposition of one of

20   our plaintiffs that I personally defended.  I can assure your

21   Honor, judging Mr. Kasner's work in that case, not just that

22   day but throughout, that the defendants will aggressively and

23   assertively consistent with their professional responsibility

24   explore every potential weakness, every potential

25   vulnerability.  The issue your Honor raised about the sideshow

19

1    and the continued uncertainty is exactly what a good lawyer

2    like Mr. Kasner and his colleagues will explore.

3         I was prepared to argue that AP7 doesn't own the

4    stock, but it appears they have conceded that and it is a

5    manager.

6         THE COURT:  Why is your client's failure to file an

7    individual motion or to move in the alternative not a failure

8    to comply with the motion requirement of 78u-4?

9         MR. ROSEN:  Let me address that directly.  I mentioned

10   that we had the second biggest recovery in history in the

11   WorldCom case.  The first biggest recovery was Enron.  We did

12   not represent the plaintiffs in that, Lerach Coughlin did.

13   They moved on behalf of a number of institutional funds before

14   Judge Harmon in federal court in Houston.  Judge Harmon

15   indicated she did not a want a group.  So Lerach Coughlin's

16   clients, all but one, which is the California Public Employees

17   Retirement System, which is referred to as CALPERS, were

18   through.  And the court appointed them.  Another case where the

19   court approved the remainder of people after some movants had

20   withdrawn from a group is Tyco.

21        What the court said in Netsky is directly appropriate:

22   To say you needed to add a tag line at the end "and if you

23   don't name us collectively, name us separately," would elevate

24   form over substance.  If your Honor ruled that way, here is my

25   prediction, in fact its my guarantee.  Effective tomorrow

1    morning, because everyone follows what happens in these cases,

2    every single lead plaintiff motion in every single court in the

3    country will add the tag line that says, if you don't choose us

4    collectively, choose us individually.  It would make no

5    difference.

6              The law is clear.  In the Cardinal Healthcare case,

7    where I was one of the plaintiffs' counsel seeking appointment,

8    the court said, and in many other cases we cited in memoranda,

9    the court said, if we elect not to accept one or more of the

10   members of the group, we retain the power to appoint the rest

11   of the group without having separately moved.

12             We were a group of two when we moved.  We are now a

13   group of one.  It would make absolutely no difference for us to

14   have added a sentence that says, and if your Honor doesn't

15   approve the group, appoint either or both of us.  It makes no

16   difference.  We have shown our capacity.

17             The last point I would like to address relates to Mr.

18   Jarvis and what he said about how they are able to adequately

19   function.  I don't mean this to talk about Mr. Jarvis

20   personally whatsoever.  I have the greatest respect for all the

21   lawyers in this room, plaintiffs and defendants, they are all

22   top flight and all very ethical.

23             But they did something unusual in this case.  The lead

24   plaintiff motion was filed on a Monday.  The preceding Friday

25   KBC's representative executed a declaration that in the very

first paragraph said, we hereby select the firm of Motley Rice
as lead counsel for all purposes.  That's on a Friday.  Then, a
Monday these three institutions, AP7, KB3, and Arkansas
Retirement System, file a motion that does not mention Motley
Rice as lead counsel; instead, it mentions Grant & Eisenhofer
and the Labaton firm.

It is very curious as to how they relate.  What they
said in their last brief was, well, gee, we all conferred and
decided to change, we didn't need three counsel, we propose
two.  What does that say in terms of who actually made the
determination?  KBC signed a declaration saying we want Motley
Rice and the next business day that declaration is submitted
not in support of Motley Rice.  It either suggests there is an
issue in terms of their ability to relate or that it was not
the clients who made that determination, it was counsel.

I can't judge, because I wasn't there, but I would
have thought, your Honor, that if I had misrepresented or
suggested something that is inappropriate, that in their reply
memorandum they would submit a reply declaration from KBC on
that issue.  They submitted other things.  They submitted a
declaration showing how KBC had illegal assignment claims, but
they never addressed that issue.  That suggests an issue in
terms of a foreign plaintiff's ability.

I don't have a problem with them being a foreign
plaintiff.  But what we submitted and has not been contested is

1    that AP7's interest is different from that of AP1, which had

2    originally moved with PPSERS and with another group of funds

3    because AP7 does not have an ownership interest.  In fact, as

4    we submitted in the declaration from Poppelman, the firm in

5    Sweden Bird & Bird, which is a very prominent firm as he

6    explained in his declaration, they are prohibited by law from

7    having an interest in those funds.

8            We submitted and pointed out in our briefs -- I could

9    do it again but I don't think your Honor needs it -- time and

10   again where AP7 referred to itself as a manager.  They did it

11   in their opening memorandum.  They did it in Mr. Grottheim's

12   article which we attached in my declaration in opposition to

13   their motion.  They are a manager and not an owner.

14           They may very well be able to file a claim on behalf

15   of AP7 at the conclusion of this litigation, just as a

16   custodian is always able to file a claim.  But there is enough

17   uncertainty, there is enough question in my mind, respectfully,

18   and I would respectfully suggest ought to be in the Court's

19   mind, that with lawyers of Mr. Kasner's ability in this

20   litigation, this will be a continuing source of uncertainty and

21   is a classic example of a unique defense that threatens the

22   ability of plaintiffs to prosecute the case.

23           We think that is entirely something your Honor can

24   consider.  Your Honor addressed it specifically in Baydale.

25   This should come as no surprise to my worthy opponents today,

1    because both the Labaton firm and another one of the

2    plaintiff's firms in that group were counsel in that case.

3    They should have seen this issue coming.  The fact that they

4    didn't avoid it is a reflection of the fact that Baydale

5    applies.

6              Under Baydale I respectfully submit AP7 is not

7    eligible.  If AP7 is not eligible, the next biggest claimant

8    seeking appointment is PPSERS, and therefore we respectfully

9    suggest that the Court ought to appoint PPSERS.

10             Unless your Honor has any questions, that's all I

11   would say.

12             THE COURT:  Thank you.

13             MR. JARVIS:  Your Honor, may I briefly respond since

14   everybody seems to be shooting at me today?

15             THE COURT:  I'm going to give you that opportunity in

16   view of Mr. Rosen's comments in particular.

17             MR. JARVIS:  Let me start with Arkansas, because it's

18   an easier one.  Yes, they have been lead plaintiff.  I think I

19   trumpeted to you the fact that they were lead plaintiff before.

20   There is something in the PSLRA known as the 5 in 3 rule.  You

21   are supposed to serve as lead no more that five times over

22   three years.  But it has been routinely, and we have cited

23   cases case, routinely waived in the face of institutional

24   investors.  It is something that has simply not been applied to

25   institutional investors.

1          THE COURT:  Just talk a little slower.

2          MR. JARVIS:  It's the lateness of the hour.  I am

3     trying to get your Honor home.

4          THE COURT:  We will have less stress if you just talk

5     a little slower.  We have been in the midst of a trial that I

6     started on February 28th.

7          MR. JARVIS:  Almost over, though, right, your Honor?

8          Arkansas has served as lead plaintiff five, six, seven

9     times.  There is a 5 in 3 rule, your Honor is aware of it, in

10    the PSLRA.  It is routinely waived for institutional investors.

11    I think there are innumerable opinions in this court that have

12    done so.  It is simply not an issue with respect to Arkansas.

13    The cases are cited in our brief.  I'm not going to read them.

14    I think your Honor has read our briefs on that point.  That's

15    the first point.

16         The second thing is the idea that KBC somehow listed

17    Motley Rice and that that is some form of manipulation.  What

18    happened I think is that people talked and they decided that

19    they wanted to move together with everybody else but we didn't

20    want there to be three lead counsel in front of you, as a group

21    we decided that, and we decided there would be two lead

22    counsel.  There is nothing wrong with that.

23         The lead plaintiff's papers, contrary to Mr. Rosen's

24    lead plaintiff's papers, were filed as they were viable in the

25    group, and counsel insists that they existed since day one.

 1          The idea that somehow we were engaged in manipulation

 2     but they weren't.  You know, the cases they have cited --

 3     WorldCom, Tyco, which was our case, I did a lot of that, I was

 4     heavily involved, essentially litigating that case myself,

 5     which brought $3 billion, I think it was the third largest case

 6     in history, Enron -- where the court said, gee, I don't want

 7     all these, pick one, are fundamentally different from what we

 8     have here, which it is was, at least from my perspective,

 9     frankly, an attempt to manipulate the process.

10          They moved to dump their foreign plaintiff.  They

11     wanted to come before your Honor and say, gee, we are just all

12     American PPSERS, so they dropped their foreign plaintiff.

13     Maybe it was because their foreign plaintiff didn't want to

14     attack another Swedish fund.  I don't know.

15          Mr. Rosen says, I wasn't in the room but I know they

16     moved one way and they didn't ask your Honor's opinion as to

17     perhaps one would be better than two.  They decided to change

18     what they filed, after it was filed, when they saw that the

19     loss they had wasn't big enough.  So they said OK, we're not

20     going to win that way, so we are going to try and win another

21     way, because these cases in general, the entity with the

22     largest loss is appointed except when there are other issues.

23          We didn't try to manipulate anything.  The moving

24     papers we filed on the first day is the same group that stands

25     before you today.  We still seek lead plaintiff as a group.

1           I can tell you I've been on phonecalls with KBC and

2    AP7 and Arkansas Teacher, and they talked, and everybody knew

3    what the situation was.  Nobody complained that, oh, my gosh,

4    why couldn't Motley Rice be lead counsel.  It was well

5    understood that we thought having three lead counsel probably

6    wasn't the best way to go.  In these sorts situations, two lead

7    counsel dealing with the resources that Mr. Kasner is probably

8    going to bring against us makes sense.  My firm and Labaton are

9    two of the largest in this business and are capable of handling

10   that, as we have proven numerable times over the years.

11          I might add, your Honor, that they have done so in

12   joint counsel arrangement more times than I can count.  You

13   might ask them who their joint counsel was in WorldCom.  It was

14   the firm of Bernstein Litowitz.  They also worked with

15   Bernstein Litowitz in the Cendant case.  I think we have put a

16   list of other situations.  The idea that there is one firm and

17   that should make it better I think is just absurd.

18          The last point.  Look, I read Baydale.  We knew about

19   Baydale.  They said, oh, they should have read Baydale.  What?

20   For someone who we thought would be a good lead plaintiff, we

21   shouldn't move AP7?  The only way to avoid Baydale is to not

22   have them move if your Honor says, gee, if you are a pension

23   fund that organized your structure through a fund structure as

24   opposed to a direct ownership structure, that therefore you are

25   precluded?

```
 1            Now, I know there are at least a couple of U.S. state
 2    pension fund that operate under the same exact structure.
 3    Connecticut I believe is one.  Are we to say that Connecticut
 4    can never serve as a lead plaintiff in a securities litigation
 5    in the United States?  Are we to say AP7 can never, because of
 6    the structure they choose even though they meet every
 7    requirement of Huff, can never serve as a lead plaintiff in a
 8    security action in the United States?
 9            It's your Honor's decision, obviously.  I don't think
10    that is the concern.
11            In Baydale, as I think I pointed out, there were a
12    couple of issues.  There was maybe a slight ownership issue.
13    But it was compounded multiple times by the other things that I
14    think your Honor frankly spent some more time on that case
15    talking about than the actual ownership issue that simply don't
16    exist here.
17            This is a pension fund.  These are exactly the kind of
18    people in that your Honor would appoint.  Unless your Honor has
19    specific questions, I think I have said enough, and probably
20    too rapidly.  Even with your admonition, I'm sure I was too
21    fast.
22            THE COURT:  Thank you, Mr. Jarvis.
23            MR. KIRBY:  Your Honor, may I take one minute?
24            THE COURT:  Yes.  Go ahead.
25            MR. KIRBY:  A propos the allusion to Enron, it is not
```

1    a question of being entitled to withdraw.  It's a question of

2    fact that they didn't make the motion in a proper way.  It's

3    not just form over substance.  It's rule of law that says you

4    have to proceed in certain ways.  We have no idea what the

5    notice of motion looked like in Enron.  We have no idea whether

6    or not an argument like this argument was made.  What we do

7    know is that the Supreme Court said when the law is written in

8    a certain way, it's got to be followed.

9         As Mr. Rosen pointed out, this is not going to create

10    much of a problem going forward.  If anybody has made the same

11    mistake that Pennsylvania made, then they can correct it by an

12    amended notice of motion with one sentence later this evening

13    if they want.

14         I should say, your Honor, also that the notice of

15    motion was not the only place where they said they were moving

16    jointly.  They are supporting a declaration, which is docket

17    9-6 at paragraphs 4 and 5, which made a big deal, a big to-do

18    out of the fact that their mutual interests prompted them to

19    join together before filing the motion we discussed joining

20    together, etc.  So it wasn't just one haphazard allusion in

21    this case.  It was that they made a motion for one result and

22    they can't suddenly seek a different result.

23         As to Arkansas, as we pointed out the, cases do go

24    both ways on whether or not an institution can serve more than

25    five times.  We in our paper brief filed on April 21, which is

1    docket 26, at page 9, provided a whole host of cases that say

2    that institutional investors are governed by the same rules as

3    everybody else.

4           Really, the question here is not whether or not they

5    are governed by the same rules, although we believe that they

6    are.  The indisputable part of it is that they lacked candor in

7    identifying the cases where they had been a lead plaintiff.

8    They did so purposefully.  I didn't hear my colleague walk away

9    from the fact that they have put in a masking phrase.

10          In response to the question can they never serve if

11   they have a particular structure, the answer is yes, they can

12   never serve if they don't satisfy Article III of the

13   Constitution.  Nobody has been able to bring a case or

14   otherwise properly enter a courthouse if they don't satisfy

15   Article III.  And even if at the end of the day here they can

16   show that they satisfy Article III, I'm in complete agreement

17   with Mr. Rosen and with the Court that it raises a unique

18   defense.

19          Thank you.

20          THE COURT:  Thank you, Mr. Kirby.

21          Mr. Kasner.

22          MR. KASNER:  Your Honor, if it please the Court, two

23   minutes on a couple of housekeeping details.

24          THE COURT:  I was just going to get to you.  Go right

25   ahead.

1          MR. KASNER:  Thank you, your Honor.  I must confess,

2     your Honor, in all the years I have been doing this I have

3     never heard the argument, and I'm flattered by it, that we

4     should be appointed lead plaintiff because our clients can

5     withstand Kasner and Skadden Arps scrutiny under cross-

6     examination.  So we don't have any fight in this, your Honor,

7     other than I say I am flattered.  But that's not why I rose to

8     address the Court.

9          THE COURT:  Right.  My first question for you is

10    whether Bank of America has any objection to consolidating the

11    securities actions after I decide the issue of lead counsel.

12         MR. KASNER:  We do not, your Honor.

13         THE COURT:  Second, do you have any view or suggestion

14    concerning the derivative action?

15         MR. KASNER:  We do, your Honor.  Our view, your Honor,

16    is that we would support consolidation of the proceedings or

17    coordination of the proceedings between the securities cases

18    and the derivative case.  I didn't know whether your Honor was

19    going to wish to hear from derivative counsel first.  But if it

20    please the Court, just to lay out what our position is,

21    speaking in the derivative case on behalf of our clients and

22    the clients represented by the Davis Polk firm, we would

23    support coordination, your Honor.

24         Our present intention, subject to talking with Mr.

25    Amon on a schedule, would be to move to dismiss that complaint

1    in the derivative suit among other things on the grounds of

2    failure to have made a demand, just to put a marker down.  Your

3    Honor, the independence of the Bank of America board to

4    consider a demand, albeit in a slightly different context, was

5    recently recognized about a month or month and a half ago in

6    another case by Judge Rakoff, where he dismissed a complaint

7    for failure to make a demand.

8            Given that we anticipate moving to dismiss that

9    complaint on those grounds, we think it would be premature,

10   your Honor, to permit discovery in one case to go forward in

11   advance.  The discovery is going to be identical.  In addition,

12   the derivative suit has two federal causes of action, and our

13   motion to dismiss those claims would trigger the Private

14   Securities Litigation Reform Act stay in any event.

15           We would support coordination and we would request

16   permission under your Honor's rules to make a motion to dismiss

17   the complaint and to confer with Mr. Amon on an appropriate

18   schedule, which we would then submit to your Honor in a

19   stipulation.

20           THE COURT:  Why can't we fix a schedule for that

21   motion now?

22           MR. KASNER:  We are happy to do that, your Honor.  We

23   have not had a chance to discuss the specifics, but I think we

24   would collectively be prepared to submit a brief, an opening

25   brief, by the end of June.

1        THE COURT:  Let me hear on the derivative action from

2   Mr. Wise.

3        MR. WISE:  Yes, your Honor.  I, too, think that

4   coordination is a good thing.  We both contemplated that what

5   would first happen in the derivative case would be this motion.

6        THE COURT:  It sounds like a very discrete issue, that

7   is, the failure to make a demand.

8        MR. KASNER:  Your Honor, I don't want to speak for my

9   friends at Davis Polk, but there may be arguments on the

10  individual defendants' behalf that go to failure to state a

11  claim independent of the demand issue.

12        MR. DUGGAN:  Yes, your Honor, that's right.  We would

13  anticipate both moving on the grounds that the complaint

14  doesn't excuse the failure to make a demand as well as to make

15  arguments that the complaint fails to state a claim against

16  individual defendants.

17        THE COURT:  Let's assume that I can resolve the

18  appointment of lead counsel in the next 30 days.  I'd like to

19  fix a schedule now for moving forward on the motions.  I ask

20  each of the three candidates for lead counsel to think about

21  how much time they need to prepare a consolidated amended

22  complaint.  Quite frankly, you have probably all already been

23  thinking about it, because that's the way these cases go.

24        Let's assume that by June 24 I'm going to issue an

25  order of some kind on the appointment of lead counsel.  Is it

33

1   safe to assume that whoever the lead counsel is can prepare an

2   amended consolidated complaint and file it by the end of July?

3       MR. ROSEN:  Your Honor, we will be glad to comply with

4   whatever schedule your Honor sets.

5       THE COURT:  That's obvious, except I want to try to do

6   something that is common-sensical as opposed to absurd.  I know

7   whether I order the absurd or the common-sensical, you're going

8   to do it.

9       MR. ROSEN:  Your Honor, there is one housekeeping

10  issue relating to Mr. Kasner, relating to something he

11  mentioned in the memorandum the parties submitted.  We first

12  proposed, and our colleagues agreed with our proposal, that

13  given the pendency of the investigations by the various state

14  attorneys general -- we learned a few days ago that the U.S.

15  bankruptcy trustee has an investigation, there may be others

16  under way, in which the defendants are already producing

17  documents -- the Court give some relief from the automatic stay

18  under the PSLRA and direct the defendants to share with the

19  plaintiffs the same documents.

20      Your Honor talked about the normal way these things

21  work.  What frequently happens, as I'm sure your Honor is

22  aware, plaintiffs file a consolidated complaint, defendants

23  move to dismiss it.  If the court finds any errors, the

24  plaintiffs are given leave to amend.  Typically, if not the

25  first time, then the second time, the plaintiffs' consolidated

1   complaint is filed that satisfies a motion to dismiss.  All of

2   that is an extra round for the Court.

3         Given that there are all these documents being

4   produced, what we would respectfully suggest your Honor

5   consider is a limited lifting of the automatic stay so that

6   whatever documents the defendants produce to the various state

7   attorneys general or the other authorities, they produce to the

8   plaintiffs, and then the plaintiffs can provide a much more

9   detailed, much more factual pleading to make it much less

10  likely that your Honor would have to deal with motions to

11  dismiss twice.  We think it makes it that much more likely that

12  it will be pled with sufficient specificity to get past the

13  gate and avoid a second round.

14        That housekeeping issue is out there.  I don't know if

15  your Honor wants to address that now or later, but that is an

16  issue that would affect the schedule.

17        MR. KIRBY:  Your Honor, on behalf of 388, we join in

18  that application.

19        THE COURT:  Mr. Kasner?

20        MR. KASNER:  Yes.  Good evening, your Honor.  I don't

21  know if your Honor wishes to hear argument on an issue that

22  your Honor has twice addressed and foreclosed.  I'll just for

23  the record cite your Honor's decision in the Smith Barney

24  transfer case, which is reported at 2006 Westlaw -- this is a

25  long one -- 1738078, and of course your Honor' decision of two

 1    years ago in the Royal Bank of Canada case, a 2009 Westlaw --

 2            THE COURT:  I'm familiar with those, obviously.  Maybe

 3    the third time is the charm.  Here is how I want to handle

 4    that.  I think it would be appropriate to tee up a little

 5    briefing on that, but only after the appointment of lead

 6    counsel.  Then that lead counsel can decide whether my two

 7    prior decisions are sufficient to discourage a motion or

 8    whether there is something really different here, where

 9    discovery is going to be lost forever if it's not produced

10    during the stay.

11            Let's get back to my question about whether or not

12    July 29th is a good date or whether you need more time.  If you

13    need more time, let's just try to fix a schedule now.

14            MR. JARVIS:  As plaintiffs, we hate to come before

15    your Honor to say we think we need more time before we have

16    even gotten selected.  I would suggest that I have very great

17    familiarity with Bank of America and with its alleged

18    transgressions in the world of residential mortgage-backed

19    securities since I have a number of cases in that area.  There

20    is a lot going on, a lot that is happening.

21            May I suggest, your Honor, I think your Honor is

22    right, by the way, that there should be no decision or briefing

23    on the motion to stay.  But perhaps your Honor should set a

24    very tight schedule there, say seven days after you decide,

25    somebody has to get in a quick either they want to lift the

 1    stay or they don't.  Maybe seven for Mr. Kasner.  You could

 2    even forgo a quick reply quickly.

 3              Then, if your Honor were to deny to lift the stay,

 4    no, the stay is in, I would prefer myself 45 to 60.  60 would

 5    be better.  If your Honor granted a lifting of the stay, that

 6    would really change the schedule.  There would be an unknown

 7    quantity of documents to be reviewed.  Otherwise, why lift it?

 8              THE COURT:  Right.  We would have to come back

 9    together.

10              MR. JARVIS:  Right.  I would ask for 60 from your

11    decision on the stay, your Honor, is what I would prefer given

12    my druthers.

13              MR. KIRBY:  Your Honor, I agree with the idea that, as

14    the Court mentioned, it wants briefing after lead plaintiff

15    appointment, that we are put on a short tether.  If the Court

16    denies it, we have 60 days.  If the Court grants it, then you

17    will tell us what to do.

18              MR. ROSEN:  Your Honor, that is acceptable to PPSERS

19    as well.

20              THE COURT:  Now it's your turn.

21              MR. KASNER:  Your Honor, obviously we will defer to

22    whatever the Court wants.  Your Honor has made clear repeatedly

23    and the cases in this area have made clear repeatedly there is

24    no free peek to frame the case.  Congress made that judgment in

25    1995.

```
 1              It is astonishing that my three friends on the
 2    plaintiffs' side are imploring the Court give us discovery but
 3    don't require us to file a consolidated complaint.  Your Honor,
 4    if the case is that weak, then we shouldn't be here at all.  I
 5    recognize it's within your Honor's discretion, but the law is
 6    clear here.  You don't get a key to the courthouse and you
 7    don't get a key to discovery to frame your pleading.
 8              THE COURT:  Here is the schedule I'm going to fix.  I
 9    will decide the motion by no later than the end of June.  An
10    amended consolidated complaint will be filed by September 23.
11    The motion to dismiss in both the securities case and the
12    derivative case can be filed on November 4.  Opposition on
13    December 16th.  I'll give, because of the holidays, to submit a
14    reply on January 6th.  I'll hear argument on the motions on
15    January 27th at 11 o'clock.
16              Does that sound like a schedule the parties can live
17    with?
18              MR. ROSEN:  Yes, your Honor.
19              MR. JARVIS:  Agreed, your Honor.
20              MR. KIRBY:  I'm not sure what happened exactly to the
21    opportunity for lead plaintiff to apply to the Court for relief
22    under --
23              THE COURT:  You can apply as soon as you are
24    appointed.
25              MR. KIRBY:  OK.
```

```
 1              THE COURT:  The longer you wait, the less traction it

 2    has.  Is that acceptable to the defendants?

 3              MR. KASNER:  Yes, your Honor, it is.  Just one

 4    housekeeping detail.

 5              THE COURT:  Mr. Duggan?

 6              MR. DUGGAN:  Yes, your Honor.

 7              THE COURT:  Go ahead.

 8              MR. KASNER:  I'm sorry, your Honor.  I just want to

 9    make clear on the record that which is understood with all

10    counsel, that the defendants' time to answer any of the

11    complaints in either the existing shareholder suits or the

12    derivative suit is extended through and including determination

13    of those motions by your Honor.

14              THE COURT:  That's clear to me.  I think the federal

15    rules would make that clear also.

16              I'm going to ask counsel to submit a proposed

17    scheduling order to me, circulate it, and submitted it to me so

18    we can docket it.  Anything further?

19              MR. ROSEN:  No, your Honor.

20              MR. KIRBY:  No, your Honor.

21              MR. JARVIS:  No, your Honor.

22              MR. KASNER:  Just to make the Court aware, Mr. Duggan,

23    representing the individuals, reminded me, there are two

24    derivative suits that are pending in the North Carolina state

25    courts, and there was a derivative suit brought in New York
```

1    State supreme.  The state supreme court case we understand has

2    been withdrawn.

3              We have advised the Court and the defendants in those

4    cases in North Carolina of the existence of this case.  We told

5    the Court there we would let it know the schedule that your

6    Honor adopts and reserve the right there, of course, to seek a

7    stay of that case in light of your Honor's case here.  I just

8    wanted to make the court aware of that.

9              THE COURT:  I appreciate that.  Counsel, have a good

10   evening.  Thanks for coming in.

11             (Adjourned)

12

13

14

15

16

17

18

19

20

21

22

23

24

25