UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| PENNSYLVANIA PUBLIC SCHOOL | : | CIVIL ACTION NO: |
| EMPLOYEES' RETIREMENT SYSTEM, | : | 11-CV-00733-WHP |
| individually and on behalf of all others | : | |
| similarly situated, | : | |
| | : | CLASS ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| BANK OF AMERICA CORPORATION, et al., | : | |
| | : | |
| Defendants. | : | **JURY TRIAL DEMANDED** |
| | : | |
| | : | |

## CONSOLIDATED CLASS ACTION COMPLAINT



RECEIVED
SEP 29 2011
U.S.D.C. S.D. N.Y.
CASHIERS

## TABLE OF CONTENTS

I.      NATURE OF THE ACTION ..................................................................................... 2

II.     JURISDICTION AND VENUE ............................................................................... 13

III.    PARTIES ................................................................................................................ 13

        A.      Lead Plaintiff ............................................................................................ 13

        B.      Defendants ................................................................................................. 14

                1.  BAC ................................................................................................ 14

                2.  The Executive Defendants ............................................................. 15

                3.  The Underwriter Defendants.......................................................... 16

                4.  The Director Defendants................................................................ 18

                5.  PricewaterhouseCoopers LLP........................................................ 20

IV.     CLASS ACTION ALLEGATIONS ....................................................................... 21

V.      SUBSTANTIVE ALLEGATIONS ........................................................................ 23

        A.      The Inadequacies of MERS ...................................................................... 26

                1.  Background ..................................................................................... 26

                2.  Problems Foreclosing With MERS................................................. 29

                3.  Material Weakness in Internal Controls Concerning MERS Loans ................. 34

        B.      BAC's Hidden Exposure to MBS Representation and Warranty Risks ................. 36

                1.  Background ..................................................................................... 36

                2.  Faulty Mortgage Loans Underlying the MBS Securitizations........................... 42

                3.  Defendants Concealed Risks Related to Repurchase Obligations From
                    Representations and Warranties........................................................... 47

                4.  BAC's Material Weakness in Internal Controls ................................ 51

C.    Other Undisclosed Problems Caused by the Faulty Loans Underlying the MBS Issuances of BAC and Its Legacy Entities .................................................. 56

D.    BAC's Issuance of Common Equivalent Securities ................................. 58

E.    The Extent and Nature of the Risks Concerning MERS and Repurchase Demands from MBS Counterparties Are Revealed at the End of the Class Period, Long After BAC Successfully Completed Its Offering of Common Equivalent Shares .............................................................. 60

F.    Further Disclosures Made After the Class Period Confirm That the Defendants' Class Period Statements Were Untrue or Misleading .............................. 68

VI.    BAC'S UNTRUE AND MISLEADING PORTRAYAL OF ITS FINANCIAL CONDITION AND RISK EXPOSURES ......................................................... 74

VII.    DEFENDANTS' VIOLATIONS OF GAAP AND SEC RULES ................................. 103

A.    Duties of the Chief Financial Officer and Chief Executive Officer under GAAP and SEC Regulations .................................................. 104

B.    Generally Accepted Accounting Principles and SEC Rules .................................. 105

C.    Specifically Relevant GAAP Requirements ......................................... 107

D.    BAC's Ineffective Disclosure Controls and Procedures and Ineffective Internal Control over Financial Reporting ............................................. 109

E.    Generally Accepted Auditing Standards ................................................. 111

F.    PwC Audits of BAC Were an Extreme Departure from PCAOB Auditing Standards .................................................. 115

VIII.    LOSS CAUSATION/ECONOMIC LOSS ................................................. 116

IX.    NO SAFE HARBOR ................................................. 119

X.    APPLICABILITY OF THE PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE .................................................. 120

XI.    ADDITIONAL ALLEGATIONS OF SCIENTER ON EXCHANGE ACT CLAIMS .. 122

XII.    COUNT I
For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against the Defendants .................................................. 123

XIII.    COUNT II
         For Violations of Section 20(a) of the Exchange Act Against the
         Executive Defendants ....................................................................................... 126

XIV.    ALLEGATIONS RELATING TO CLAIMS BROUGHT PURSUANT TO THE
         SECURITIES ACT ............................................................................................. 128

XV.     COUNT III
         For Violations of Section 11 of the Securities Act against Defendants BAC and the
         Securities Act Individual Defendants ............................................................. 130

XVI.    COUNT IV
         For Violations of Section 11 of the Securities Act against the
         Underwriter Defendants .................................................................................... 132

XVII.   COUNT V
         For Violations of Section 11 of the Securities Act against Defendant PwC .................. 134

XVIII. COUNT VI
         For Violations of Section 15 of the Securities Act against the Executive Defendants ... 135

XIX.    REQUEST FOR RELIEF ............................................................................... 136

Lead Plaintiff, Pennsylvania Public School Employees' Retirement System (hereinafter referred to as "Lead Plaintiff" or "PSERS"), by its undersigned counsel, brings this action for violations of the federal securities laws on behalf of itself and all other similarly situated persons or entities (the "Class," as defined in ¶¶ 55-56 herein), who purchased or otherwise acquired common stock or "Common Equivalent Securities" issued by Bank of America Corporation ("BAC" or the "Company") from February 27, 2009 through October 19, 2010 (the "Class Period").  The allegations in this Complaint are based on Lead Plaintiff's personal knowledge as to itself, and on information and belief, including the investigation of counsel, as to all other matters.  The investigation of counsel is predicated upon, among other things, review and analyses of public filings with the United States Securities and Exchange Commission ("SEC"), including, among other things, BAC's Forms 10-K, 10-Q, 8-K and S-3, Registration Statements, Prospectuses and amendments and supplements thereto; press releases; BAC conference call transcripts and presentation materials; media reports about the Company; publicly available data relating to the prices and trading volumes of BAC securities; reports issued by securities analysts who followed BAC; complaints filed in actions against the Company; testimony, statements and documents submitted to Congressional committees and investigators; and interviews with former employees and others with personal knowledge of information pertinent to this Complaint.  Lead Plaintiff believes that substantial, additional evidentiary support for the allegations set forth herein will be obtained after a reasonable opportunity for discovery.

# I.      NATURE OF THE ACTION

1.      To understand what this case is about, it is important first to understand what it is

not about.  Simply put, this case is ***not*** about BAC's acquisitions of either Countrywide Financial

Corp. ("Countrywide") or Merrill Lynch & Co., Inc. ("Merrill Lynch") (sometimes collectively

referred to herein as BAC's "legacy entities"), nor is this case about the collapse of the financial

markets in 2008, although the events that give rise to the claims asserted herein had their origins

in those events.  Instead, this case involves untrue and misleading statements made by BAC and

its executives in their efforts to escape from onerous executive compensation restrictions

imposed on them as a result of BAC's participation in the U.S. government's Troubled Asset

Relief Program ("TARP") and to repay the TARP funds to the government.  Defendants knew it

would be impossible for the Company to raise capital in a new securities offering, the success of

which was essential to repaying the $45 billion in TARP funds BAC had received from the U.S.

government, if they told the truth about (1) the Company's reliance on an inadequate mortgage

processing and tracking system referred to as MERS; and (2) the Company's exposure to billions

of dollars in repurchase claims stemming from what Defendants knew were faulty mortgages

securitized and sold into the marketplace as residential mortgage-backed securities ("MBS") in

the years leading up to the financial crisis.

***MERS***

2.      There are similarities and differences in the way each state within the United

States handles real estate mortgage foreclosures.  When a purchaser of real estate borrows funds

to pay all or part of the purchase price, the lender will typically secure the loan by taking back a

mortgage, which creates a lien on the property.  The purchaser (*i.e.*, the "borrower") will execute

and deliver to the lender a promissory note and a mortgage or, in some states, deed of trust (for

convenience, both will be referred to as "mortgage").  Under the laws of virtually every

jurisdiction, to insure that the lien of the mortgage has priority over liens against the mortgaged property, the lender records the mortgage in the county where the property is located.  This requirement, which predates the American Revolution, places the world on notice of the ownership of that mortgage and protects against intervening claims to title on the property. Absent such recording, the lien may not have priority over other liens that may be recorded thereafter.  Thus, the validity and priority of the lien is of primary importance to the lender.

3.      Until the latter part of the 20th century, banks that originated real estate loans typically held them and serviced them until they were paid off.  At some point, an organized secondary market for real estate loans developed, enabling lenders to separate the mortgage lending and servicing functions.  Financial institutions that originated and serviced the loans could sell the mortgages—including the cash flow of interest and amortized principal—to other financial institutions or investors.  But to assure that the assignments were effective against competing claims, state and local laws generally require the assignments of the promissory notes reflecting the loans to be delivered to the assignees and the assignments of the mortgages to be recorded.

4.      At some point, financial institutions developed the concept of securitizing mortgage lending.  Financial institutions that originated mortgages began to transfer groups of mortgages to trusts created to hold the mortgages.  The financial institutions would then cause the trusts to issue and sell debt instruments (often "trust certificates"), which were, in essence, bonds backed by the mortgages.  These instruments are known as mortgage-backed securities, or MBS.  Investors purchasing these trust certificates would receive periodic payments from the trusts, as borrowers paid interest on their loans and paid down the principal.

3

5.      While real estate values were rising, this arrangement worked out well.  As is well known, however, real estate values reached a peak around 2006 or 2007 and began to decline precipitously thereafter.  As values plummeted, and as the economy went into recession, mortgage defaults rose.  In response, the trusts began foreclosure proceedings.  But these foreclosures were, in many instances, blocked.  It turned out that when the mortgages were transferred to the trusts as part of the securitization process, the documentation for the assignments was flawed.

6.      Instead of following accepted laws for assigning notes and mortgages, financial institutions, including BAC, used the facilities of MERS.  MERS is a computerized electronic clearinghouse developed by MERSCORP, Inc. and its subsidiary Mortgage Electronic Registration Systems, Inc., to process and track mortgage ownership immediately after loan closing, purportedly eliminating the need to prepare and record assignments for subsequent transactions.  By establishing a single system for processing and tracking ownership rights, MERS reduced the time and expense otherwise necessary to sell loans into the secondary market.  Instead of recording the mortgages in the name of the original lender (such as BAC or Countrywide), however, mortgages were frequently recorded either in the name of a private entity–MERS–or by listing MERS as the nominee of the real (but undisclosed) owner of that mortgage.  Then, when the lender tried to transfer this real estate loan to another entity – which was a necessary step in the creation of these mortgage-backed securities – it simply placed a notation in MERS' computers, rather than make a public filing in the local records office where the underlying property was located and where the original mortgage was recorded.

7.      Despite knowledge of the inherent inadequacies of operating the MERS system, BAC relied on MERS in the absence of any legislative or judicial precedent approving this

practice as a substitute for the process required by law for recording mortgages.  In their rush to securitize millions of mortgage loans for sale into the secondary market, BAC and its legacy entities (and others who were creating MBS) found cumbersome the laws requiring that assignments of interests in real estate – in this case, transfers of mortgages – from one entity to another must be recorded in the local government's records office.  MERS circumvented those laws.

8.     BAC also disregarded the legal principles governing the disposition of notes accompanying mortgages in many jurisdictions.  Ignoring the long-standing principle that "the mortgage follows the note," BAC and its legacy entities failed to physically deliver the promissory notes the borrowers had executed to the trust or other entity created to hold the various mortgages in the MBS portfolio.  In addition, in many cases, BAC and its legacy entities failed to properly endorse the notes to make them legally negotiable, or in a number of cases completely lost the notes.  In each of these cases, the consequence was that the notes were not properly transferred with the mortgages, which rendered the assignment of the mortgages invalid and therefore made the notes unsecured.

9.     At all times relevant hereto, Defendants (as defined in ¶ 41) knew, but actively concealed from investors, that MERS was not effective in conveying legal title to the purportedly assigned mortgages, and that effectuating valid foreclosures under MERS would be nearly impossible because neither MERS nor BAC, acting as alter ego or agent for one another, had a sufficient legally-cognizable interest in the debt secured by mortgages registered in the MERS system.  As such, neither MERS nor BAC, acting as alter ego or agent for one another, would have standing to foreclose on a delinquent mortgage.

***MBS Repurchase Claims***

10.     Defendants also knew, but actively concealed from BAC's investors, that the problems BAC faced related to foreclosures were even more acute because many of the underlying mortgages comprising the MBS that BAC and its legacy entities had issued were the product of inadequate underwriting and origination practices, which would inevitably result in billions of dollars in repurchase claims to BAC from MBS counterparties.

11.     During and prior to the Class Period, BAC and its legacy entities were in the business of lending money for residential home purchases and then packaging these mortgage loans into MBS, which they sold to investors.  To sell MBS to investors, BAC and its legacy entities made a series of representations and warranties about these loans and, *inter alia*, the validity of the title of the promissory notes and mortgages that made up these mortgage-backed securities.  Over the course of a few years, BAC and its legacy entities had together sold trillions of dollars of MBS to investors.

12.     BAC claimed that the origination of these loans and the resulting sale of these MBS was exceedingly profitable for its business, not just for the fees that were initially collected in issuing the loans and in selling the MBS, but also in the fees earned over time for servicing the mortgages that it packaged and sold.  During the Class Period, the prices of BAC's common stock and a related security–its Common Equivalent Securities–were buoyed based upon these claims of success in generating residential real estate loans and marketing them as MBS.  Lead Plaintiff and other members of the proposed class purchased BAC's common stock and Common Equivalent Securities in the context of these untrue or misleading statements.

13.     The truth was far from the image that Defendants tried to create.  Specifically, Defendants knew that these residential real estate loans were far riskier than they had

represented.  While continuously proclaiming their commitment to sound lending and

underwriting practices, BAC and its legacy entities had created a system where the principal, if

not sole, criterion in making any lending decision was whether the loan could be resold to

investors, normally as part of an MBS issuance.  During the years prior to the Class Period, the

underwriting standards for making loans had been severely relaxed, and BAC and its legacy

entities had readily granted exemptions from even these quite minimal standards when proposed

loans did not meet the test.  For example, legacy Countrywide pioneered the approach of

matching the best terms – from the borrower's perspective – of any competing loan offer, which

had the effect of creating a race to the bottom for lending standards, as the Company adopted the

most forgiving elements of each alternative.  Lenders also had readily made "Alt-A" and "no

document loans," which were known in the vernacular as "liar's loans" because no effort was

made to verify the applicant's statements concerning assets, employment or other ostensible

lending criteria.  And lending officers, to increase their compensation, routinely encouraged

borrowers to submit inflated income and assets, or changed the information provided on the

applications themselves, to ensure that they would be approved.

14.     Defendants knew, but failed to disclose, that these improper lending practices

resulted in mortgage loans that were structurally unsound when issued during the years from

2004 through 2007 to a record numbers of borrowers, in complete disregard of BAC's duty to

reasonably evaluate the risks of default and the unavailability of foreclosure.  Many of these

borrowers would have never qualified for their mortgages if the Company and its legacy entities

had engaged in appropriate underwriting.  Defendants watched in "real-time" as the

extraordinary default rates on these mortgages exacerbated BAC's foreclosure woes and (1)

exposed BAC to billions of dollars in MBS repurchase claims from MBS investors based on

BAC's untrue representations and warranties in the original sale of the MBS; and (2) caused

BAC to incur other significant financial losses such as lost income from Mortgage Servicing

Rights ("MSRs") and losses from BAC's own loan portfolios.

***TARP Repayment***

15.     Repaying the $45 billion in TARP money by the end of 2009 was a high priority

for Defendants because it would free BAC from executive pay restrictions placed upon

companies bailed out by the U.S. government.  For BAC to repay TARP, however, it had to raise

capital through a new securities offering.  The disclosure of either BAC's problems with MERS

or the existence and magnitude of its certain exposure to billions of dollars in MBS repurchase

demands as a result of the improper lending practices and extremely risky real estate loans would

have made raising billions of dollars in new capital virtually impossible.  During 2009,

Defendants concealed the inadequacies with MERS and BAC's exposure to billions of dollars in

repurchase claims as a result of faulty MBS issuances, knowing that any disclosure of these

issues would compromise BAC's ability to repay the $20 billion it had received from the U.S.

government through TARP in October 2008 and an additional $25 billion it had received in

January 2009.

16.     Repaying TARP by the end of 2009 was such a central focus for BAC that

Defendants devised an unorthodox securities offering aimed at circumventing a restriction in

BAC's own certificate of incorporation limiting its total number of common shares of stock

outstanding to 10 billion shares.  Because any offering of common stock sufficient to raise

enough capital for the TARP repayment would have put BAC over its limit of 10 billion

outstanding common shares, Defendants devised a strategy to raise capital by the end of the year,

before they could obtain shareholder approval to increase the number of authorized common

shares.  The vehicle was an offering of "Common Equivalent Securities," which consisted of depositary shares representing interests in shares of the Company's Common Equivalent Junior Preferred Stock, Series S, and contingent warrants to purchase additional shares of common stock.  The securities were structured so that, upon obtaining shareholder approval of an amendment of its certificate of incorporation within a time period not to exceed 105 days from the date of the completion of the offering—*i.e.*, at a special meeting of the Company's shareholders—the contingent warrants would expire without becoming exercisable, and the Common Equivalent Stock would automatically convert in full into shares of common stock at the rate of one share of common stock for each depository share representing a fractional interest in BAC's Common Equivalent Stock.  If the shareholders had voted against the amendment, the Contingent Warrants and depository shares would have separated and begun trading separately while the Common Equivalent Shares would have partially converted into BAC common stock.

17.     Defendants' concealment of both the inadequacies of MERS and of BAC's massive exposure to billions of dollars in MBS repurchase claims from counterparties enabled BAC to complete the unorthodox offering, raising $19.29 billion dollars that it used to repay its TARP debt to the U.S. government on December 9, 2009.  On February 23, 2010, BAC announced that shareholders had approved the amendment to its certificate of incorporation, and that the Common Equivalent Securities would automatically convert to common stock, effective at 9:30 a.m. on February 24, 2010.

18.     After its TARP repayment, BAC was temporarily riding high.  Gradually, however, the problems that Defendants were able to conceal began to surface.

*Truth Begins to Emerge*

19.     Throughout the Class Period, many of the investors that had purchased MBS in reliance upon the representations and warranties that BAC and its legacy entities had made about the quality and title of the underlying loans discovered that the loans were not nearly as safe as the Company had represented and that there were problems in foreclosing on the mortgages. These investors began to complain to the Company about its representations and warranties and to threaten legal action.

20.     Defendants sought to stonewall these complaints and demands for relief, refusing requests to examine loan files that were in the MBS trusts and offering spurious defenses, such as asserting that the untrue representations and warranties could not have been the cause of any injury to the purchasers of mortgage-backed securities because the borrowers had managed to make some payments before ultimately defaulting.  In addition, the Company resorted to hoping that some of the claims could not be successfully asserted because the requisite percentage of investors in a particular MBS had not signed off on making a claim against the Company.  When all else failed, BAC stated that it would fight each claim on a loan-by-loan basis, knowing that could make the representation and warranty claims against it drawn out and expensive.

21.     Indeed, Defendant Price had told analysts during BAC's fourth-quarter 2009 earnings conference call held on January 20, 2010 that private representation and warranty claims were generally "unenforceable" and that the analysts should not put private claims on their "radar screen."  The following month at BAC's special shareholder's meeting, BAC shareholders approved the requisite amendment to its certificate of incorporation to allow the Common Equivalent Shares to convert into BAC common stock.

22.     Meanwhile, a number of courts had declined to enforce BAC's right to foreclose on mortgages purportedly assigned to MBS trusts on the ground that title transfers through MERS were invalid.  Rather than candidly admit the problems the Company and its legacy entities had created, Defendants compounded the difficulty with a series of judicial misrepresentations.   BAC employees, or servicers hired to act on BAC's behalf, began churning out thousands of affidavits and other legal papers in which the affiants, acting on behalf of BAC, falsely assured courts in foreclosure proceedings that they had personally reviewed the loan files or otherwise had personal knowledge of the facts, and affirmed that the notes supporting the debt existed and had been properly endorsed and transferred.  These employees, who became known as "robo-signers," executed hundreds of affidavits every day, attesting to facts that they did not know and that were, in many instances, not true.

23.     In September 2010, there were media reports suggesting that some mortgage lenders were engaged in improprieties with respect to foreclosures on delinquent mortgage loans. In response to these reports, in late September several mortgage lenders, including GMAC Mortgage's Ally Financial Inc. and JPMorgan Chase, announced that they were suspending foreclosures.  On September 30, 2010, the United States Treasury Department launched an investigation into foreclosure practices nationwide.

24.     With government and public pressure mounting, BAC was forced to announce on October 1, 2010, that it would suspend foreclosures in 23 states in order to review its foreclosure practices.  A week later, BAC extended this foreclosure moratorium to all 50 states.  But Defendants continued to deny any wrongdoing, with BAC chief executive officer Brian Moynihan stating that BAC announced the suspensions only to "clear the air."

25.     On October 13, 2010, the attorneys general of all 50 states announced a joint investigation into the underwriting guidelines, reserve policies and foreclosure practices of the nation's major banks, including BAC.  Nearly a week later, on October 19, 2010, BAC finally admitted that there were "technical issues" with its servicing and foreclosure practices.

26.     At the same time that the market became aware of the problems with BAC's foreclosure practices, BAC also made a more candid disclosure of the risk of its exposure to MBS counterparty repurchase demands.  On October 18, 2010, a group of MBS investors, including the Federal Reserve Bank of New York, wrote a letter to BAC demanding that BAC repurchase $47 billion worth of Countrywide-issued residential MBS.  The next day, on October 19, 2010, BAC disclosed that it had received over $26 billion in repurchase claims, nearly $13 billion of which remained unresolved, and that it could not give an estimate of its total potential exposure.

27.     The market reacted swiftly and adversely to these disclosures with investors losing billions of dollars of value in their BAC common stock.  This lawsuit seeks compensation for those investors.

***The Claims Asserted in the Complaint***

28.     Lead Plaintiff asserts two sets of claims in this Complaint.  The first asserts a series of fraud claims under Section 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") against those defendants, including BAC and certain of its executives, who made materially untrue and misleading statements that caused the prices of BAC securities to be artificially inflated over the course of the Class Period.

29.     The second asserts a series of strict liability and negligence claims under the Securities Act of 1933 ("Securities Act") against those defendants who are statutorily liable

under Sections 11 and 15 of the Securities Act for materially untrue statements in, and

misleading omissions from, the offering documents for BAC's public offering of Common

Equivalent Shares during the Class Period (the "Offering Documents," as defined in ¶ 144

below).

## II.    JURISDICTION AND VENUE

30.    The claims on behalf of the Class (defined in ¶¶ 55-56 below) arise under

Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k, 77*l* and 77o), and under Sections

10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 (17 C.F.R.

§240.10b-5), promulgated by the SEC.  This Court has jurisdiction pursuant to Section 22(a) of

the Securities Act (15 U.S.C. § 77v(a)); Section 27 of the Exchange Act (15 U.S.C. § 78aa); and

28 U.S.C. §§ 1331 and 1337.

31.    Venue is proper in this District pursuant to Section 22 of the Securities Act,

Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).  Many of the acts and transactions

giving rise to the violations of law complained of herein occurred in this District.

32.    In connection with the acts, conduct and other wrongs complained of herein,

Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

the United States mails, and the facilities of a national securities market.

## III.    PARTIES

### A.    Lead Plaintiff

33.    Lead Plaintiff Pennsylvania Public School Employees' Retirement System is a

public pension fund system organized for the benefit of the current and retired public school

employees of the Commonwealth of Pennsylvania.  As of March 31, 2011, PSERS had plan

assets of $50.8 billion and had more than 600,000 active, vested or inactive members and

annuitants.  PSERS purchased the Company's securities during the Class Period, including

BAC's common stock and the Common Equivalent Securities issued in the December 2009 public offering, and suffered substantial damages as a result.

**B.     Defendants**

**1.     BAC**

34.     Defendant BAC is a financial holding company and the largest lender in the United States, providing a range of banking and nonbanking financial services and products in the United States and in more than 40 countries globally.  The Company's operations are divided into segments.  Bank of America Home Loans and Insurance is the mortgage unit of Bank of America. Bank of America Home Loans is composed of: Mortgage Banking, which originates purchases, securitizes, and services mortgages; Banking, which operates a federally chartered thrift that primarily invests in mortgage loans and home equity lines of credit primarily sourced through its mortgage banking operation; and Capital Markets, which operates as an institutional broker-dealer that primarily specializes in trading and underwriting mortgage-backed securities. BAC's Global Consumer and Small Business Banking segment offers savings accounts, money market savings accounts, certificates of deposit, individual retirement accounts, regular and interest-checking accounts, and debit cards; and consumer real estate products, including mortgage products for home purchase and refinancing, reverse mortgage products, and home equity products; and insurance services.  The Company's Global Corporate and Investment Banking segment provides commercial and corporate bank loans, indirect consumer loans, real estate lending products, and leasing and asset-based lending products for clients and commercial real estate firms; and debt and equity underwriting, merger-related advisory services and risk management solutions.  The Company's Global Wealth and Investment Management segment offers investment and brokerage services, estate management, financial planning services,

14

fiduciary management, credit and banking expertise, and diversified asset management products to institutional clients and high-net-worth individuals.

35.     On January 11, 2008, BAC announced that it would acquire failing mortgage giant Countrywide, a subprime mortgage specialist that was among the financial institutions with the most troubled loans during the subprime mortgage crisis.  BAC completed the transaction on July 1, 2008.  On September 14, 2008, at the height of the 2008 financial crisis, BAC agreed to acquire Merrill Lynch, a transaction it completed on January 1, 2009.  Merrill Lynch was a major player in the business of converting mortgages into securities to be sold to investors, and was one of the largest producers and sellers of collateralized debt obligations ("CDOs"), complex securities that package a large number of mortgage bonds and other debt.  This action does ***not*** involve, and seeks to assert no claims with respect to, the acquisitions of either Countrywide or Merrill Lynch.  However, both entities had a role in the events leading up to the Defendants' liability here, as Countrywide and Merrill Lynch were the source of many of the real estate loans and associated MBS whose liability exposure was not accurately and timely disclosed to BAC investors.  Moreover, Merrill Lynch was one of the two lead underwriters of the public offering of the Company's Common Equivalent Securities in December 2009.

## 2.     The Executive Defendants

36.     Defendant Kenneth D. Lewis ("Lewis") served as Chief Executive Officer from April 2001 until Dec. 31, 2009, when his resignation became effective.  Lewis served on the BAC Board of Directors at the time of the December 2009 offering of Common Equivalent Securities and signed BAC's 2009 Shelf Registration Statement on Form S-3 and included Prospectus filed with the SEC on April 20, 2009 (the "2009 Registration Statement").

37.     Defendant Joseph Lee Price, II ("Price") served as Chief Financial Officer of the Company from January 2007 to January 2010.  He continued to serve as the President of BAC's Consumer and Small Business Banking until September 2011, when BAC announced that he would be leaving the Company.  Price signed BAC's 2009 Registration Statement.

38.     Defendant Brian T. Moynihan ("Moynihan") served as President of BAC's Global Banking and Global Wealth and Investment Management from January 22, 2009 until January 1, 2010, when he assumed the position of Chief Executive Officer and Chairman of the Board of Directors of the Company.  Before January 22, 2009, Moynihan was BAC's general counsel.

39.     Defendant Charles H. Noski ("Noski") served as Chief Financial Officer of the Company from May 11, 2010 until BAC announced in April 2011 that he would step down as chief financial officer at the end of June 2011.  He currently serves as vice chairman of the Company.

40.     Defendant Neil Cotty ("Cotty") served as interim Chief Financial Officer of the company from February 2010 until May 2010.  Cotty currently serves as the Company's Chief Accounting Officer.

41.     Defendants Lewis, Price, Moynihan, Noski and Cotty are referred to collectively herein as the "Executive Defendants."  BAC and the Executive Defendants are referred to collectively herein as the "Defendants."

### 3.     The Underwriter Defendants

42.     As underwriters of BAC's public offering of Common Equivalent Securities in December 2009, as specified in ¶¶ 142-144 herein, the following defendants were responsible for

ensuring the truthfulness and accuracy of the various statements contained in or incorporated by

reference into the Offering Documents:

a.  Merrill Lynch Pierce Fenner & Smith Incorporated, an indirect wholly owned subsidiary of BAC, which was a co-managing underwriter of and ran the book on BAC's December 2009 offering;

b.  UBS Securities LLC, which was a co-managing underwriter of BAC's December 2009 offering;

c.  Cantor Fitzgerald & Co.;

d.  Deutsche Bank Securities Inc.;

e.  Goldman, Sachs & Co.;

f.  Keefe, Bruyette & Woods, Inc.;

g.  Mizuho Securities USA Inc.;

h.  Morgan Stanley & Co. Inc.;

i.  SG Americas Securities , LLC;

j.  Santander Investment Securities Inc.;

k.  Stifel, Nicolaus & Company, Inc.;

l.  UniCredit Capital Markets, Inc.;

m.  Wells Fargo Securities, LLC;

n.  Sanford C. Bernstein & Co., LLC;

o.  CCB International Capital Ltd.;

p.  Cowen & Company, LLC;

q.  Daiwa Securities America, Inc.;

r.  ICBC International Securities Ltd.;

s.  National Australia Bank Ltd.;

t.  Broadpoint Capital, Inc.;

u.      KeyBanc Capital Markets Inc.;

v.      Macquarie Capital (USA) Inc.;

w.      RBS Securities Inc.;

x.      Samuel A. Ramirez & Co., Inc.;

y.      Samsung Securities Co., Ltd.;

z.      Southwest Securities, Inc.; and

aa.     SunTrust Robinson Humphrey, Inc.

43.     The defendants named in paragraph 42(a) – (aa) are referred to collectively herein as the Underwriter Defendants.

### 4.      The Director Defendants

44.     Defendant William P. Boardman ("Boardman") served as a director of the Company from June 2009 to May 2011.  Boardman served on the BAC Board of Directors at the time of the December 2009 offering of Common Equivalent Securities.

45.     Defendant Frank Paul Bramble, Sr. ("Bramble") has served as a director of the Company from January 2006 to the present.  Bramble currently serves as Chairman of the Enterprise Risk Committee of the Board of Directors.  Bramble served on the BAC Board of Directors at the time of the December 2009 offering of Common Equivalent Securities and signed BAC's 2009 Registration Statement.

46.     Defendant Virgis William Colbert ("Colbert") has served as a director of the Company from June 2009 to the present.  Colbert currently serves as a member of the Compensation and Benefits Committee, the Corporate Governance Committee, and the Credit Committee of the Board of Directors.  Colbert served on the BAC Board of Directors at the time of the December 2009 offering of Common Equivalent Securities.

18

47.     Defendant Charles K. Gifford, Jr. ("Gifford") served as Chairman of the Company from April 2004 until his retirement in January 2005.  Gifford has served as a director of the Company from April 2004 to the present.  Gifford currently serves as a member of the Executive Committee and as Chairman of the Credit Committee of the Board of Directors.  Gifford served on the BAC Board of Directors at the time of the December 2009 offering of Common Equivalent Securities and signed BAC's 2009 Registration Statement.

48.     Defendant Charles Otis Holliday, Jr. ("Holliday") has served as a director of the Company from September 2009 to the present and is the current Chairman of the Board of Directors.  Holliday also currently serves as Chairman of the Executive Committee of the Board of Directors.  Holliday served on the BAC Board of Directors at the time of the December 2009 offering of Common Equivalent Securities.

49.     Defendant Monica C. Lozano ("Lozano") has served as a director of the Company from April 2006 to the present.  Lozano currently serves as a member of the Corporate Governance Committee, Credit Committee, and Executive Committee of the Board of Directors.  Lozano served on the BAC Board of Directors at the time of the December 2009 offering of Common Equivalent Securities and signed BAC's 2009 Registration Statement.

50.     Defendant Thomas John May ("May") has served as a director of the Company from April 2004 to the present.  May currently served as a member of the Enterprise Risk Committee and as Chairman of the Corporate Governance Committee of the Board of Directors.  May served on the BAC Board of Directors at the time of the December 2009 offering of Common Equivalent Securities and signed BAC's 2009 Registration Statement.

51.     Defendant Thomas Michael Ryan ("Ryan") served as a director of the Company from April 2004 until his retirement in 2010.  Ryan served on the BAC Board of Directors at the

19

time of the December 2009 offering of Common Equivalent Securities and signed BAC's 2009 Registration Statement.

52.     Defendant Robert W. Scully ("Scully") has served as a director of the Company from August 2009 until the present.  Scully is currently a member of the Audit Committee and Chairman of the Compensation and Benefits Committee of the Board of Directors.  Scully served on the BAC Board of Directors at the time of the December 2009 offering of Common Equivalent Securities.

53.     The Defendants named in paragraphs 44-52 along with Defendant Lewis are referred to collectively as the "Director Defendants."   The Director Defendants along with Defendant Price are referred to collectively as the "Securities Act Individual Defendants."

### 5.      PricewaterhouseCoopers LLP

54.     Defendant PricewaterhouseCoopers LLP ("PwC") at all relevant times served as an Independent Registered Public Accounting Firm for BAC.  PwC audited the Company's financial statements the last nine years, including for the years ended December 31, 2008 and 2009, which financial statements were approved by PwC and included in BAC's annual reports for those years, as filed on Forms 10-K with the SEC.  BAC's audited 2008 financial statement included in its annual report on Form 10-K filed with the SEC on February 27, 2009, was incorporated by reference in the Offering Documents for the Company's December 2009 offering of Common Equivalent Securities.  The fees billed to the Company by PwC for professional services rendered in 2008 were $83.4 million, in 2009, $128 million, and in 2010, $123.6 million.

## IV.    CLASS ACTION ALLEGATIONS

55.    Lead Plaintiff brings this action on its own behalf and as a class action pursuant to Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of all persons or entities who purchased or otherwise acquired either the Company's Common Equivalent Securities in the December 2009 public offering pursuant to the 2009 Registration Statement and Prospectus Supplements or who purchased or acquired the Company's common stock during the Class Period, from February 27, 2009 through October 19, 2010, and who suffered damages as a result (the "Class").

56.    Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of each of the Executive Defendants; (iii) any person who was an executive officer and/or director of BAC during the Class Period; (iv) any entity that served as an underwriter for BAC's offering of Common Equivalent Shares; (v) any person, firm, trust, corporation, officer, director, or any other individual or entity in which any Defendant has a controlling interest or that is affiliated with any of the Defendants; and (vi) the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

57.    The members of the Class are so numerous that joinder of all members is impracticable.  BAC's securities were actively traded on the New York Stock Exchange during the Class Period.  While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that Class members number in the tens of thousands, if not more.  Record owners and other members of the Class may be identified from records maintained by BAC or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

58.     Lead Plaintiff's claims are typical of the claims of the members of the Class. Lead Plaintiff and all members of the Class sustained damages as a result of the conduct complained of herein.

59.     Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interests that are contrary to or in conflict with those of the members of the Class that Lead Plaintiff seeks to represent.

60.     A class action is superior to other methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members individually to seek redress for the wrongful conduct alleged herein.

61.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual Class members.  Among the questions of law and fact common to the Class are:

(a)     whether the Defendants violated the federal securities laws as alleged herein;

(b)     whether documents, including the Company's SEC filings, press releases and other public statements made by Defendants during the Class Period, contained misstatements of material fact or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(c)     whether the market prices of BAC securities during the Class Period were artificially inflated due to the material misrepresentations and/or non-disclosures complained of herein;

22

(d)     with respect to Lead Plaintiff's claims under Section 10(b) of the Exchange Act, whether the Section 10(b) Individual Defendants acted with the requisite state of mind in omitting and/or misrepresenting material facts in the documents filed with the SEC, press releases and public statements;

(e)     with respect to Lead Plaintiff's claims pursuant to Section 20(a) of the Exchange Act, whether the Executive Defendants are controlling persons of the Company;

(f)     with respect to Lead Plaintiff's claims pursuant to the Securities Act, whether the Offering Documents for the Class Period offering of Common Equivalent Securities contained untrue statements of material fact or material omissions; and

(g)     whether the members of the Class have sustained damages as a result of the misconduct complained of herein and, if so, the appropriate measure thereof.

62.     Lead Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

## V.     SUBSTANTIVE ALLEGATIONS

63.     BAC entered 2009 seeking to rise from the depths of the financial crisis raging after the ravages of 2008.  Due in part to its acquisitions of troubled Countrywide and Merrill Lynch, the Company was forced to take $45 billion in TARP money from the U.S. government, the first installment of $25 billion in October 2008 and the second installment of $20 billion in January 2009.

64.     While receiving TARP money from the U.S. government helped to keep the Company solvent, it did so at a steep price to the Executive Defendants.  Participation in TARP required BAC to submit to extensive limitations on executive compensation during the period that the Treasury Department held the debt of or an equity interest in the Company.  After the

BAC Board's decision to award no year-end incentives to the Company's executive officers for 2008, the prospect of receiving very little in the way of executive compensation for 2009 was especially troubling for the Executive Defendants.

65.     As such, in early 2009, the first order of business for the Company and the Executive Defendants was to repay the Company's TARP obligation to the federal government and thereby gain the relief from the onerous executive compensation restrictions.  On March 3, 2009, Defendant Lewis made this point when he met with a group of editors from *The Economist* and *CFO* magazine.  As an article from the same day on *CFO.com* noted:

> The curbs on executive pay in the new economic stimulus law are a strong incentive for Bank of America to pay back the funds it's been lent under the Troubled Asset Relief Program, Kenneth Lewis, the bank's executive chairman and chief executive officer told a group of editors from *The Economist* and *CFO* this morning.

> While BoA's top management feels a sense of loyalty to each other and the corporation — and thus would be likely to stay with the bank — the fact that the curbs apply to the next 20 most highly compensated employees goes too far, Lewis said.

> Some employees below the top management level might be among the company's top producers, and restrictions on their pay may make them susceptible to offers by foreign companies, Lewis said, suggesting that could hurt a U.S. bank's profits.

66.     So began a media onslaught on the part of BAC to let the market know that it intended to repay its TARP obligation as soon as possible.  Only weeks later, in interviews with both *The Charlotte Observer* and *The Los Angeles Times*, Defendant Lewis made headlines when he said that BAC was interested in paying back all of the TARP money it had taken, possibly making a first payment in April 2009 and completely paying off its obligation by the fourth quarter of 2009.

67.     The need to repay its TARP obligation in 2009 became even more emergent for BAC when, in September 2009, Defendant Lewis announced that he would be stepping down as the Company's chief executive officer.  The Company knew that replacing Lewis would be difficult, if not impossible, if it were still participating in TARP, as finding qualified executives who would work for a company subject to severe executive compensation restrictions would be incredibly difficult.  Further, everyone at BAC understood that, for so long as the Company continued participating in TARP, it was at an extraordinary competitive disadvantage to companies that were not subject to what they considered onerous executive pay restrictions.

68.     The problem for Defendants was that time was running short.  BAC did not have enough cash on hand to be able to repay the full amount of $45 billion that it had taken from TARP, and BAC was effectively "maxed out" on the number of shares of common stock that the Company's certificate of incorporation authorized for issuance.  To find a way to raise capital and escape from the executive compensation strictures imposed by TARP, Defendants devised a strategy to issue Common Equivalent Securities, the depository shares of which would automatically convert to BAC common stock upon the Company's obtaining shareholder approval of an amendment of its certificate of incorporation at a special meeting of the Company's shareholders to be held in February 2010.

69.     Defendants knew, however, that such an offering would not be successful if they disclosed to investors the Company's mortgage-related problems arising from inadequacies with MERS and BAC's enormous exposure to repurchase demands from faulty MBS offerings.  Therefore, rather than disclose these issues to the market, Defendants chose to continue to cover them up.

A.      **The Inadequacies of MERS**

1.      **Background**

70.     Since even before the founding of the United States, there has been an established system for protecting the interests of all parties engaged in real estate lending.  For centuries, the law in every American jurisdiction has required that interests in real property be recorded in local government offices to be effective and to put the world on notice of the interests.

71.     BAC and its legacy entities decided in the mid-1990s to join with other mortgage originators to circumvent, for their convenience, the tried and true system for recording mortgages and providing notice to all interested parties.  Rather than complying with state recording statutes that mandated that assignments of interests in real estate, including the assignments of mortgages, be filed of record in local government offices, and without the imprimatur of any legislation authorizing this change in practice, BAC and its legacy entities chose to use the facilities of MERS, to reduce costs and facilitate securitization of mortgages.

72.     The MERS system is operated by MERSCORP, Inc. and its wholly owned subsidiary, Mortgage Electronic Registration Systems, Inc.  The president and chief executive officer of MERSCORP, R.K. Arnold, has admitted that, "MERS is owned and operated by and for the mortgage industry."  According to Mr. Arnold's November 18, 2010 testimony to the Subcommittee on Housing and Community Opportunity of the U.S. House of Representatives Financial Services Committee, BAC is one of the "principal owners" of MERSCORP.

73.     MERS is a computerized electronic clearinghouse for processing and tracking mortgage ownership immediately after loan closing, purportedly eliminating the need to prepare and record assignments for subsequent transactions between MERS members.  Members of

MERS, including BAC,[1] pay membership dues and per-transaction fees to MERS in exchange for the right to use and access MERS records related to real estate and mortgages.

74.     MERS is an unconventional company.  It has no employees but it authorizes tens of thousands of individuals, each selected and serving at the pleasure of one of its member lenders, to claim the title of "officer" in order to execute necessary documents.  At last report,

---

[1]   A number of the Company's agents or alter egos, also members of MERS, directed its operations pursuant to covenants set forth in MERS membership agreements, policies and practices, including the following agents or alter egos:

(a)   Bank of America Warehouse Lender, 201 North Tyron Street, Charlotte, NC 28255, MERS member no. 1004159, is described in the MERS membership directory as an "Interim Funder, [and] Investor";

(b)   Bank of America, N.A., 1800 Tapo Canyon Road Mail ID #CA6-914-01-43, Simi Valley, CA 93063, MERS member no. 1000157, is described in the MERS membership directory as an "Originator, Servicer, Subservicer, Investor, Document Custodian, [and] MERS 1-2-3";

(c)   Bank of America, NA (formerly Fleet National Bank), 475 Crosspoint Parkway, Getzville, NY 14068, MERS member no. 1000746, is described in the MERS membership directory as an "Originator, Servicer, Subservicer, Investor, [and] Document Custodian";

(d)   Bank of America, National Association, 475 Crosspoint Parkway P.O. Box 9000, Getzville, NY 14068-9000, MERS member no. 1000255, is described in the MERS membership directory as an "Originator, Servicer, Subservicer, Interim Funder, Investor, Document Custodian, [and] Warehouse/Gestation Lender";

(e)   Bank of America, National Association as Trustee, 135 S. LaSalle Street Suite 1625, Chicago, IL 60603, MERS member no. 1000567, is described in the MERS membership directory as an "Investor, Document Custodian, Master Servicer, [and] Trustee";

(f)   Bank of America, National Association Trustee/Custodian for WAMU/WMMSC, 2571 Busse Road Suite 200 / Dock 49, Elk Grove Village, IL 60007, MERS member no. 1003646, is described in the MERS membership directory as an "Investor, Document Custodian, [and] Trustee";

(g)   Merrill Lynch BUSA, a division of Bank of America, N.A., 30015 West South Temple, Salt Lake City, UT 84101, MERS member no. 1003935, is described in the MERS membership directory as an "Interim Funder, [and] Investor";

(h)   Merrill Lynch Mortgage Lending, a division of Bank of America NA, 4 World Financial Center, New York, NY 10080,  MERS member no. 1003045, is described in the MERS membership directory as an "Originator, [and] Investor";

(i)   Merrill Lynch SURF, a division of Bank of America, N.A., 650 Third Avenue South Suite 1500, Minneapolis, MN 55402, MERS member no. 1002179, is described in the MERS membership directory as an "Originator, Servicer, Subservicer, Investor, [and] Document Custodian";

(j)   Merrill Lynch, a division of Bank of America, N.A., 4802 Deer Lake Drive East, Jacksonville, FL 32246-6484, MERS member no. 1000111, is described in the MERS membership directory as an "Originator, Servicer, Subservicer, Investor, [and] Document Custodian"; and

(k)   Countrywide Warehouse Lending, 8511 Fallbrook Ave, West Hills, CA 91304, MERS member no. 1000880, is described in the MERS membership directory as an "Servicer, Subservicer, Interim Funder, Investor, [and] Document Custodian."

MERS has over 20,000 such "officers" authorized to take actions in its name.  In reality, these "officers" remain employees of the various MERS members, including BAC, which pay their salaries and control and direct their actions as "officers" of MERS.

75.     MERS claims to eliminate the need to physically record the assignment of mortgages between MERS members by either listing "MERS" as the original mortgagee or listing MERS as the "nominee" for the unidentified mortgagee on the original mortgage documents filed with local government offices.  As MERS and its members would readily admit in court, however, neither alternative conveys any real ownership interest to MERS, as the loan documents make clear that MERS holds no ownership interest in the loan, and payments made on the debt secured by the mortgage are to go to the company servicing the loan, and not to MERS.

76.     Not only did this use of MERS serve to deprive local governments of substantial recording revenues generated from mortgage assignments, it failed to provide adequate notice to all interested parties of secured interests in property.  For these reasons, as many courts have found, during the Class Period BAC was unable to lawfully foreclose on property allegedly assigned through MERS when loans were in default.[2]  When, as was often the case, the lender sought to transfer the loan from one MERS member to another MERS member, it would not file any document with the local government recording office disclosing the assignment.  Instead, it would simply make a notation on MERS' private computerized records that the mortgage had been assigned.  Thus, there would be no public disclosure of the name of the new purported holder of that mortgage.

---

[2]  It should be emphasized that the references to the MERS systems in this complaint are made solely for their relevance to Lead Plaintiff's securities claims.  Nothing in this complaint should be construed as an attempt by or on behalf of borrowers to recover for wrongful foreclosures, or by competing lenders to challenge the priority of a secured interest in real property.  This action is brought solely on behalf of investors who purchased BAC securities.

## 2.      Problems Foreclosing With MERS

77.      Twenty-three states, including Florida, New York and New Jersey, require court approval of a foreclosure action.  Such actions can be brought either by the mortgagee or by assignment of the claim to the purported mortgage owner.  This creates numerous problems, such as when MERS was listed as the owner or nominee of both the first and second mortgage on a property and an action is brought to foreclose on one of those mortgages.  In those situations, MERS appears as both the plaintiff and defendant in the same foreclosure proceeding.  The problem exists as well in the other 27 states, where foreclosures are handled without judicial intervention.  But the MERS issue in those states arises only where a borrower seeks bankruptcy protection or seeks relief in court.

78.      The potential magnitude of the problems with MERS was laid out in sworn testimony from a BAC employee in United States Bankruptcy Court.  Linda DeMartini, a team leader in the Company's mortgage-litigation management division, who stated during a hearing in *Kemp v. Countrywide Home Loans, Inc.*, Case No. 08-18700-JHW, Adversary No. 08-2448 (Bkrtcy. D.N.J. Nov. 16, 2010), that Countrywide **routinely** did not transfer the mortgage note when it purported to assign the mortgage to another entity.[3]  Instead, it purported to sell the mortgage while retaining physical possession of the loan note.  In *Kemp,* the Chief Judge of the United States Bankruptcy Court for the District of New Jersey held that a note from a Countrywide loan was not enforceable where the mortgage was assigned, but the associated note was not transferred and not properly endorsed to the new owner.

---

[3] Except where otherwise noted, all emphases are added.

79.     According to the transcript of the Bankruptcy hearing in *Kemp*, DeMartini held management and training positions since joining Countrywide Home Loans, and had been involved in every aspect of servicing and "had to know about everything in order to do that." DeMartini testified that it was routine for the lender to keep mortgage promissory notes even after loans were bundled by the thousands into MBS and sold to investors.  Chief Judge Judith H. Wizmur asked Ms. DeMartini at the hearing whether the promissory notes involved in the related securitizations ever moved to follow the transfer of ownership. "I can't say that they're never moved because, I mean, with this many millions of loans as we have I wouldn't presume to say that, ***but it is not customary for them to move***," DeMartini responded.  Based upon this testimony, the Bankruptcy Court specifically found that "it was customary for Countrywide to maintain possession of the original note and related loan documents."

80.     Because the law generally holds that the mortgage follows the note and that transferring the mortgage without physically transferring and properly endorsing the note rendered the mortgage ineffective and therefore the loan unsecured, this problem existed throughout BAC's mortgage portfolio and in the portfolios of MBS entities that BAC had created.  And a number of courts also held that lenders could not retroactively cure these problems by assigning the notes after the mortgages had been transferred or after foreclosure actions had been initiated.  These recording and assignment failures and mishandling of the associated notes were particularly significant in times of financial downturns, when many homeowners lost their jobs and lacked the means to pay their mortgages, and foreclosure became the only way for lenders to recover on their defaulted loans.

81.     A November 19, 2010 article in *American Banker* discussing the Bankruptcy Court ruling in *Kemp*, entitled "Countrywide Routinely Failed to Send Key Docs to MBS

Trustees, [BAC] Employee Says," stated that the BAC employee's admission that the lender customarily held on to promissory notes could undermine the position that document transfers to securitization trusts are fundamentally sound.  The article quoted a bankruptcy lawyer not involved in the case as calling the testimony *"a major problem"* for BAC, saying "[t]hese original notes were supposed to be transferred and delivered all the way up the line and *for this witness to admit they were never transferred is pretty amazing*" and "I've never see this admitted anywhere."[4]

82.     Another demonstration of the consequences of MERS's failure to properly record mortgages was provided in *Wetzel v. Mortgage Elec. Registration Systems, Inc.*, No. 09-1410, 2010 Ark. 242, 2010 WL 2025115 (Ark. May 20, 2010).  In *Wetzel*, MERS, as nominee for BAC, had failed to record a mortgage.  The Arkansas Supreme Court, in response to a certified question from the bankruptcy court concerning the effectiveness of filing an affidavit of lost mortgage, stated that the recording of the affidavit of lost mortgage did not constitute constructive notice sufficient to defeat the claim of a bona fide purchaser.

83.     BAC or its legacy entities also frequently lost or misplaced the original notes associated with the mortgages and thus could not even demonstrate the Company's entitlement to foreclose on the property if the loan was in arrears.  This prompted BAC to engage in the mass production of sworn affidavits or other statements, purportedly made upon personal information after a review of the relevant files, in which the affiant swore to the existence of the loans and

---

[4]  Contrary to any suggestion that the failure to timely transfer and endorse the notes accompanying the mortgages was only an occasional, technical oversight that did not reflect ordinary practices at BAC and its legacy entities, facts have continued to be discovered suggesting how such misconduct was both pervasive and intentional.  An August 31, 2011 article entitled "Robo-Signing Redux: Servicers Still Fabricating Foreclosure Documents" in *American Banker* reported that many banks, including BAC, were fabricating documents purporting to assign mortgages years after the transactions allegedly were made.  The article specifically cited a mortgage assignment that BAC filed on July 29, 2011 purporting to memorialize a transfer of ownership of a mortgage from New Century Mortgage Corp. to a trustee, Deutsche Bank, even though New Century went bankrupt in 2007, and the Deutsche Bank trust that purported to hold the loan was created for a securitization completed in 2006, about five years before the BAC assistant vice president signed it over to the trust.

that the underlying notes had been misplaced by the lender.  Confidential Witness ("CW") 1 worked as a foreclosure specialist for BAC beginning in April 2010 and continuing through the end of the Class Period.  CW-1 witnessed various BAC employees engaging in "robo-signing" of documents, including a BAC vice president and assistant vice president who CW-1 stated would sign piles of affidavits and other documents.  In reality, these "robo-signers" executed hundreds of affidavits or other statements each day without having personally reviewed the files and without having any good faith basis to affirm that these affidavits or statements were, in fact, true.  This was precisely the conclusion reached by the Comptroller of the Currency of the United States of America in a consent order issued on April 13, 2011, following an examination of the Company's residential real estate mortgage foreclosure processes.

84.     Defendants knew of these serious problems concerning the Company's ability to foreclose on mortgages with defaulted loans because materially adverse decisions were rendered by various courts in state foreclosure proceedings in which BAC or one of its legacy entities tried to foreclose on their mortgages.  A number of judicial decisions, many involving BAC or a legacy entity as a party, raised serious questions concerning the effectiveness of reliance upon MERS and the ability to foreclose upon a mortgage when that mortgage was purportedly placed in the name of MERS as a nominee, but where the note was not properly assigned.  *See*, *e.g.*, *Bellistri v. Ocwen Loan Servicing, LLC,* 284 S.W.3d 619 (Mo. App. March 3, 2009); *In re Mitchell*, No. BK-S-07-16226- LBR, 2009 WL 1044368 (Bkrtcy. D. Nev. March 31, 2009); *In re Hawkins*, No. BK-S-07-13593-LBR, 2009 WL 901766 (Bkrtcy. D. Nev. March 31, 2009); *In re Wilhelm*, 407 B.R. 392 (Bkrtcy. D. Idaho July 7, 2009); *In re Box,* No. 10-20086, 2010 WL 2228289 (Bkrtcy. W.D. Mo. June 3, 2010); *Mortgage Electronic Registration Systems, Inc. v.*

*Saunders*, 2 A.3d 289, 2010 Me. 79 (Me. Aug. 12, 2010); *Reingard-Guirma v. BAC, Nat'l Ass'n*, Civil No. 10-1065-PK, 2010 WL 3945476 (D. Or. Oct. 6, 2010).

85.     Further, by the beginning of the Class Period, decisions from the New York Supreme Court, Kings County, arising from private foreclosure-related actions in Brooklyn had rattled secondary mortgage market insiders.  A number of these decisions were rendered by the Honorable Arthur M. Schack, and were discussed by an exclusive group of insiders within the secondary mortgage and mortgage servicing markets, particularly those who were acting through servicer entities, who had used the MERS system to process and track beneficial interests in mortgage loans that they claimed to own.  Judge Shack had repeatedly ruled that an assignment from MERS was "defective" and was therefore insufficient to confer standing, relying on stated hornbook New York law:  "To foreclose on a mortgage, a party must have title to the mortgage," and ruling that such an assignment was a nullity.  *See, e.g., U.S. Bank Nat'l Ass'n, as Trustee for CSAB Mortgage-Backed Pass-Through Certificates, Series 2006-2 c/o America's Servicing Company v. Bernard*, No. 29003/07, 2008 WL 383814 (N.Y. Sup. Feb. 14, 2008); *Perla v. Real Property Solutions Corp.*, No. 3912/07, 2008 WL 1849860 (N.Y. Sup. April 28, 2008); *HSBC Bank USA, N.A., as Trustee for Nomura Asset-Backed Certificate Series 2006-AF1 v. Yeasmin*, No. 34142/07, 2008 WL 1915130 (N.Y. Sup. May 2, 2008); *Wells Fargo Bank, National Association as Trustee and Custodian for Morgan Stanley ABS Capital1 Inc., MSAC 2007–HE4 v. Reyes*, No. 5516/08, 2008 WL 2466257 (N.Y. Sup. June 19, 2008) ("There are no recorded assignments of the note from MERS as nominee ... to any other party.").  While Defendants were aware of these decisions, they were not widely circulated and were not disseminated to the investment community.

86.     BAC had an interest at stake and was identified as an interested party in the matters cited above.  BAC or one of its legacy entities received copies of these adverse decisions, and these decisions were reported to BAC's Legal Department and senior executive personnel responsible for establishing and modifying reserves, including the chief accounting officer and chief financial officer.

87.     Defendants knew of the scope of the problems associated with failures of internal controls to adequately process and track the company's interests in mortgage loans, particularly those securitized and sold to investors in the form of mortgage-backed securities and those that the Company held or serviced.  While these adverse decisions sufficiently informed Defendants that the Company had an enormous financial risk associated with the defects in its title to mortgage loan assets through the Class Period, and most certainly by mid-2009, Defendants concealed these problems from the investing public, which had no information about the magnitude of BAC's involvement with MERS or with the defects in BAC's mortgage loan assets.

### 3.    Material Weakness in Internal Controls Concerning MERS Loans

88.     The policies, procedures, and internal controls used by the Company were specifically employed by Defendants to conceal the problems created by MERS.  Defendants repeatedly told participants in the market that the Company's systems of controls were effective throughout the Class Period.  Defendants also repeatedly reported throughout the Class Period that they had sufficiently tested and appropriately attested to the operational effectiveness of the Company's internal controls.  But a company's internal controls cannot be considered effective where a material weakness exists.  Here, BAC's internal controls with regard to its interests processed and tracked through MERS were broken. Defendants set policies and implemented

34

practices that improperly took advantage of that material weakness to keep the Company's

MERS risk from surfacing throughout the Class Period.

89.     Information provided by confidential witnesses confirms that the Company had

weaknesses in its internal controls related to MERS loans.  CW-2 was a Reconveyance Specialist

Coordinator in a Southern California office for Countrywide and BAC from June 2002 through

July 2010.  CW-2 worked in the Reconveyance Department, which was responsible for ensuring

that all prior assignments on a loan were correct and accurate so that the Company had title to the

loan when it was being paid off.   CW-2's department determined the chain of assignments on a

loan.  CW-2 worked on the MERS system on a regular basis for loans that were registered to

MERS.   CW-2 said that she knows of no department at Countrywide or BAC that checked on

recordings for MERS loans at the county level.

90.     CW-2 stated that the formal review policies and processes were different for loans

that were registered on MERS.  ***On loans that were recorded on MERS, CW-2  would not have

to confirm, or do anything, with the chain of title for the loan***.  CW-2 explained that if the loan

was registered in MERS, it was assumed at the Company that the title had been perfected.

91.     CW-2 stated that Countrywide had an agreement with MERS whereby all

Countrywide loans were recorded on MERS because BAC, MERS and Countrywide were

considered and treated as the same entity, and Countrywide loans and MERS loans, for example,

were considered and trusted as virtually the same thing.

92.     CW-2 explained that the documentation for some mortgage loans failed to include

a MERS identification number even where the documentation contained language used for

MERS loans.  CW-2 said that giving those loans additional scrutiny or checking whether the

proper documentation was recorded in the appropriate county office were exceptions to the

regular practice, because the Company's policy was about numbers and production.  CW-2 said

that, because of the high volume and inability to determine assignments on loans, improper

foreclosures occurred.  According to CW-2, the Company did not care about correcting these so-

called non-registered MERS loans because the policy and practice was designed to increase

production regardless of quality.

93.     Defendants knew of the scope of the problems associated with the failures of the

Company's controls to process and track its interests in mortgage loans, particularly those

securitized and sold to investors in the form of MBS and that it otherwise held or serviced.

While the Company's policies and practices that were supposed to ensure that assignments were

correct and accurate, that the Company had clean title to mortgage loans held or on which it

retained servicing rights, and that the Company could determine the chain of assignments on a

loan, those very policies and practices bypassed any control to check county records for MERS

loans and assignments.  Throughout the Class Period, Defendants concealed from the public this

material weakness in internal controls, and these underlying problems regarding MERS.

**B.      BAC's Hidden Exposure to MBS Representation and Warranty Risks**

**1.      Background**

94.     Prior to its acquisition of Countrywide on July 1, 2008, BAC had a relatively

small footprint in residential mortgage lending.  Entering 2009 with the newly acquired

Countrywide business, however, BAC underwrote a larger share of the U.S. MBS market than

any other company.  In that year alone, BAC underwrote 63 issuances of MBS totaling

approximately $51 billion, corresponding to 17.5 percent of the total market.  According to

industry newsletter Inside Mortgage Finance, BAC was also the largest U.S. mortgage servicer,

and as of Sept. 30, 2010, BAC oversaw $2.09 trillion of loans.  These were some of the Company's core and most critical business operations.

95.     Before the commencement of the Class Period, many lenders, including BAC and its legacy entities, had begun to pursue a course of selling a substantial portion of their real estate loans on the secondary market, mostly through a process of mortgage securitization, rather than retaining the resulting notes and mortgages themselves as part of their assets.

96.     Mortgage securitization is a process by which real estate loans are acquired and pooled together; certificates backed by the pools of loans are then sold to investors, who are paid interest and principal from the income flowing from the mortgage pools.  As payments are received from the real estate borrowers on the underlying mortgages, the cash and principal are pooled and interest is paid to investors in order of priority determined by the specific tranche held by that investor in the MBS.  The most senior tranche is the first to get paid when proceeds come in and the last to realize any loss if the real estate borrowers are late in making payments or default on the loan.  Each lower tranche gets paid sequentially later than the immediately higher tranche, and thus is at greater risk of non-payment if all of the funds due are not received.  The lower the tranche, the higher the interest rate offered to compensate investors for the greater risk undertaken.

97.     To create an MBS, a group of loans is deposited in a trust or special purpose entity created for that purpose.  The trust or special purpose entity issues and distributes certificates for the MBS that are sold to investors.

98.     Another integral part of the process is the role of a mortgage servicer in collecting the mortgage payments from the borrowers by receiving their principal and interest payments. The mortgage servicer then transfers these funds to the trust or special purpose entity for

distribution to the MBS investors.  The mortgage servicer receives a fee for its services in

collecting and distributing payments.  Frequently, BAC or one of its legacy entities retained the

role of mortgage servicer even after assigning the underlying loans to a trust or special purpose

entity for inclusion in the MBS.

99.     The result of the process of mortgage securitization is that the risk of loss is

transferred, in part, from the real estate lender to investors who purchase MBS.  Thus, by

securitizing the loans that its mortgage operation generated, BAC created income for itself

through its role as mortgage servicer, and was able to collect servicing fees in the form of

mortgage servicing rights, or "MSRs," while removing risk from its balance sheet.  Of course, if

a borrower defaulted on its loan, it would adversely affect the Company's MSRs.

100.    The underwriting decisions made by BAC and its legacy entities reflected the

enormous pressure applied by BAC's management to generate an inventory of mortgage loans to

feed BAC's securitization business.  Emails written before the start of the Class Period by

Countrywide management and disclosed in other litigation confirm that, because priority was

given to generating an inventory of loans to be packaged and sold to investors, lending officers

often had little or no concern about the borrowers' ability to pay back the loans, and that the key

criteria for making lending decisions was establishing an acceptable portfolio of mortgage loans

to be sold in the secondary market or securitized and sold in MBS issuances.

101.    The harmful consequences of the overemphasis of BAC and its legacy entities on

generating inventory for securitization rather than on making prudent lending decisions were set

forth in a May 13, 2010 letter from counsel for BAC to the Financial Crisis Inquiry Commission,

which was treated as confidential until the FCIC made its materials publicly available after the

Class Period.  That letter states that, in 2006 and 2007, Countrywide sold MBS comprised of its

subprime mortgages with a total par value at issuance of approximately $118 billion, but that the par value of the retained interest held by BAC in these securities was only approximately $2 billion as of February 19, 2010, and that by the end of 2009, a full 37% of the Alt-A loans and 52% of the subprime loans that had been issued by Countrywide were delinquent.

102.    The securitization process did not allow for the transfer of *all* the risks of loss, however, since BAC was responsible for guarantees, in the form of recourse obligations upon violation of representations and warranties, given to investors of mortgage-backed securities as terms of MBS transactions.  These MBS investors include (a) government sponsored entities ("GSEs"), such as the Federal National Mortgage Association ("Fannie Mae"), the Federal Home Loan Mortgage Corporation ("Freddie Mac") and the Government National Mortgage Association ("Ginnie Mae"); and (b) private label purchasers, which are entities in the business of creating and selling mortgage-backed securities.  A third group, monoline insurers, had exposure to these MBS through their provision of insurance on losses in the portfolios.

103.    While there were some differences in how the MBS were sold to each of these groups, there are many similarities in terms of certain common assurances that the sellers of these mortgage loans were required to provide in the form of representations and warranties given to the purchasers.

104.    In each MBS composed of loans originated by BAC or its legacy entities, BAC as the seller provided (or in the case of prior sales by the Company's legacy entities, BAC assumed liability for) representations and warranties to induce investors to purchase these securities subject to recourse guarantees.  These representations encompassed compliance with the underwriting standards and guidelines used to originate the mortgages comprising the securities, the nature of the appraisals used to determine the value of the underlying properties, the

mortgages' loan-to-value ("LTV") ratios, and other facts material to the investment decisions of purchasers of mortgage-backed securities.

105.    The representations and warranties given by BAC and its legacy entities played a crucial role in the sale of MBS.  Typical representations and warranties assured buyers that the loans being packaged complied with underwriting standards and met certain criteria relevant to the riskiness of the loan, such as the borrower's creditworthiness, the LTV ratio in the mortgaged property, and the ratio of the borrower's total indebtedness to income or assets, and whether the loans were for the purchase of owner-occupied residences.  BAC and its legacy entities has received, and paid billions on, claims for breach of these representations and warranties.

106.    One of the most critical representations and warranties made in the sale of every mortgage-backed security was that BAC or its legacy entities had and was conveying good title to the mortgage loans and that the notes and mortgages were properly assigned.  A typical Prospectus Supplement that was issued when BAC or Countrywide mortgage loans were packaged into mortgage-backed securities stated:

> In addition, each of the sellers will represent and warrant that, prior to the sale of the related mortgage loans to the depositor, the applicable seller had good title to the mortgage loans sold by it . . . . Under the pooling and servicing agreement, the depositor will assign all its right, title and interest in the representations, warranties and covenants (including the sellers' repurchase or substitution obligation) to the trustee for the benefit of the certificate holders.

107.    BAC and its legacy entities not only breached the representations and warranties concerning compliance with underwriting standards and other facts relevant to the packaged loans, but also breached these representations and warranties concerning good title because (a) BAC and its legacy entities routinely failed to physically deliver the original promissory notes and security instruments for the mortgage loans to the trusts created to hold the mortgage-backed securities, as required by applicable legal requirements; (b) BAC and its legacy entities routinely

40

failed to execute valid endorsements of the notes at the time of their claimed transfer, as required by applicable legal requirements; and (c) the trusts created to hold these obligations did not possess good title to many of the loans and lacked the legal authority to enforce the mortgages against the borrowers in the event of a default.

108.    The MBS agreements provided that if the representations and warranties were not accurate, then the purchasers may demand the rescissionary remedy that BAC either (a) buy back the mortgage-backed securities and refund the purchase price to the investors, or (b) make settlement payments to the purchasers to otherwise indemnify them.

109.    BAC and its legacy entities breached these representations and warranties in the manner they handled, recorded and transferred these mortgages and associated notes.  The putative holders of the mortgages were frequently unable to foreclose on the properties (and liquidate the collateral to mitigate the losses), thereby rendering these loans as unsecured and making it much more difficult to collect on the associated real estate loans and causing BAC to incur significantly higher mortgage servicing costs.  In addition, the sort of facts that could make a mortgage violate the typical representations and warranties relevant to the riskiness of the packaged mortgages, such as mortgages being issued to persons with questionable credit or with high LTV or total debt-to-income ("DTI") or assets ratios, were the very facts that made it more likely that the borrowers would be delinquent or default on their payments, and that the MBS that owned that loan would have difficulty recouping their investment.

110.    As set forth below, Defendants knew that the representations and warranties that BAC and its legacy entities had issued exposed the Company to billions of dollars in liability, yet they failed to disclose to BAC investors this enormous exposure.

### 2.    Faulty Mortgage Loans Underlying the MBS Securitizations

111.    Defendants also made untrue or misleading statements about the Company's success with integrating Countrywide's operations and thereby gave investors untrue assurances that the combined operations were able to handle and were, in fact, properly handling, real estate lending, mortgage servicing and foreclosure activities.

112.    The reality, which was known early on, was to the contrary.  Shortly after the end of the Class Period, an article in the November 1, 2010 edition of *The Wall Street Journal* entitled "B of A Tries to Untangle Files," confirmed that Defendants had been aware early on of the risks and challenges arising from the acquisition of the Countrywide portfolio:

> ***"We knew it would be challenging,"*** says one executive involved in the integration [of Countrywide and BAC].
>
> Bank of America soon discovered that information was missing from many Countrywide loan files, making it more difficult to communicate effectively with borrowers.  "You would shake your head and say: How can that be?" this executive says.
>
> It didn't help that many Countrywide executives were let go during the integration, with Bank of America installing its own employees in key posts.

113.    In an interview on October 21, 2010, with investigators from the Financial Crisis Inquiry Commission (FCIC), established by the Fraud Enforcement and Recovery Act of 2009, Defendant Lewis said that the Company's reserves became an issue about which he "heard from the finance group and CFO," and he admitted that "reserve building "became an issue in 2008 and 2009."  Lewis, the finance group and the CFO knew that they had to "build the reserves...during...the 2009 time."  The interview makes clear that, at the start of the Class

Period, then CEO Defendant Lewis and then CFO, Defendant Price knew material adverse information about the Company's legacy Countrywide and Merrill Lynch assets.

114.    During the interview with FCIC investigators, Lewis was asked about the August 2007 BAC due diligence conducted in connection with the acquisition of Countrywide.  That due diligence addressed Countrywide's origination practices and the types of loans Countrywide was originating.  According to Lewis: "there was a lot of due diligence prior to the signing of the agreement."  After the acquisition, BAC tightened the underwriting standards and loan types for loan origination at the Company.  Such programs and tightened underwriting guidelines resulted in ***89% of the legacy mortgage loans originated in 2005 and 2006***, which BAC now had on its books, ***were ineligible for origination***.  Lewis stated that BAC's due diligence personnel found that providing for additional loan losses was required "across the board."  This information known by Lewis, Price and others at the Company at the beginning of the Class Period, but was not disclosed during the Class Period to investors.

115.    Further, the flaws in BAC's mortgage servicing and foreclosure operations were confirmed by a number of confidential witnesses.  For example, CW-3 was a Compliance Risk Management Manager at BAC during the Class Period.  CW-3 worked in California and CW-3's responsibilities included performing compliance reviews, audits and analyses on mortgage foreclosure documents, which CW-3 said were necessary for policy as well as procedural guidelines.  CW-3 also performed compliance reviews, audits and analysis for certain mortgages that were securitized or bundled and sold to governmental programs or entities.

116.    CW-3 explained that the mortgage bundling was suspect during CW-3's tenure at the Company, because the documentation was not always in compliance with guidelines, as required, within 20 days of a mortgage being booked.  CW-3 performed compliance procedures

with the MERS system to make sure certain documents had been obtained for each mortgage and that MERS had in its possession all of the documents it was required to possess.

117.    CW-3 stated that as part of CW-3's responsibilities CW-3 and CW-3's team would perform random audits on mortgages that had been assembled at BAC. The purpose of the audits was to ensure that, among other things, BAC had obtained all the necessary loan documents and they had been entered accurately into the MERS system.

118.    As part of CW-3's compliance reviews and audits, CW-3 was tasked with checking that all pertinent mortgage documents had been obtained and recorded in the MERS system.  However, CW-3's group never was tasked with checking to see if mortgage loan documents were recorded in the local land recording offices where the property was located; the group merely checked to see if mortgage documents had been obtained and were present in the MERS file.

119.    CW-3 also performed more substantive analysis in some areas, including the audit of the amortization schedules for each of the loans. Auditors reviewed information contained in BAC's internal system, pertinent financial documents, and MERS, and would then re-calculate the monthly payments and balances from internal data systems and compare it to the information in MERS and any financial transaction records to which BAC had access, *i.e.* bank records, credit card records, etc., to ensure that the information was consistent and accurate.  These audits revealed that the amortization data for the mortgage loans was at times suspect.  CW-3 stated that his interactions and review of documents in the system, together with CW-3's experience with knowing the volume of documents, led to the conclusion that the Company was not performing sufficient compliance reviews.  In fact, during these audits, CW-3 found these ***amortization schedules were incorrect in 20-30% of the cases reviewed***, directly impacting the

44

Company's accounting determinations of the fair values associated with its loan portfolios held and serviced, including MSRs, which depend on the amortization schedules to calculate the present value of expected future cash flows.

120.    CW-3 stated that at least 10,000 files contained a discrepancy between the computer generated and hand calculated amortization schedules during a substantive audit of amortization schedules that were conducted by CW-3's group from approximately December of 2009 through February 2010.  These amortization schedules constitute an essential component in fair value calculations related to loan portfolios and mortgage-servicing rights, and Company accountants require accurate amortization schedules in order to perform their accounting responsibilities.  CW-3's department compiled the files into an audit report, the purpose of which was to report on the system errors and to provide information for investor purposes. The audit report was then presented by his group to senior managers at BAC, including the  Company's compliance mortgage and corporate senior management.  CW-3 stated that the audit report went to the Company's top management because the information in it needed to be reported to investors for securitization purposes.  Because of the investor relations aspect of the audit findings, top management needed to review it for compliance.

121.    CW-4, a vice president who worked in BAC's Asset Backed Commercial Paper Conduit Group during the Class Period, noted that in 2007, 2008 and 2009 it was apparent to BAC that there would be losses in residential mortgages and mortgage-backed securities, either held or serviced by BAC.  The Company's relevant personnel knew that there were going to be substantial losses.

122.    Further, Defendants were able to monitor the deteriorating performance of the securitizations and BAC did, in fact, monitor this performance.  CW-4 described one field in the

Company's servicing system that identified for each loan the securitization it was in or whether it is on the balance sheet.  In fact, CW-4 confirmed that BAC senior management had visibility into mortgage servicing on virtually a real-time basis.

123.    CW-4 explained that the structured finance group of BAC received daily, weekly, and monthly reports on events within the portfolio of securitized loans in its capacity as a trustee of the securitization or the master servicer of the loans.  BAC's structured products division would then compile this data into a monthly servicing report.  CW-4 stated that in 2008 it became evident that there were going to be issues with the residential mortgage-backed securities, and the bank, as master servicer, and the structured products group was looking at the data frequently.  They had direct access to the Countrywide servicing system so that at any time they could run reports to see what took place during the day or the week or the past two weeks.  They could run that report based upon any time frame they wanted to see.

124.    CW-4 explained that the periodic service reports were aggregated and distributed up the BAC management chain, and were specifically provided to BAC's chief financial officer and president.  The reports included the performance and statistic measurements that were needed by management to make executive and business decisions.

125.    Defendants certainly knew by the start of the Class Period that legacy assets would be "challenging" at best, with nearly 90% of legacy Countrywide mortgage loans originated in 2005 and 2006 admittedly ineligible for origination under BAC's Class Period underwriting guidelines.  But those facts, together with the known errors in amortization schedules – required to properly account for cash flows from mortgage assets – and substantial losses in servicing, were concealed from investors during the Class Period.

### 3.      Defendants Concealed Risks Related to Repurchase Obligations From Representations and Warranties

126.     Defendants knew about the severely faulty underwriting standards employed by BAC and its legacy entities in originating mortgage loans that BAC and its legacy entities later securitized and sold to investors.  Defendants also knew, through real-time computer access processing and tracking of the mortgage loans underlying these securitizations that an inordinately large percentage of these loans were defaulting.  As such, Defendants knew that it was only a matter of time before investors who purchased these tranches of MBS would invoke their rescissionary remedies under the representations and warranties guarantees in those MBS and seek to have BAC repurchase these securities or otherwise reimburse investors.  Despite this, Defendants chose to conceal from the market BAC's massive exposure to repurchase demands, to ensure that the market would remain in the dark on this issue.

127.     Before the Class Period, BAC and its legacy entities retained third-parties, including Clayton Holdings, Inc. ("Clayton"), to analyze the loans it was considering placing in securitizations.  Even though these firms rejected a large number of loan applications because they did not satisfy stated underwriting standards, BAC waived a significant percentage of these rejected loans and approved them for securitization without taking adequate steps to ensure that these loans had in fact been underwritten in accordance with applicable guidelines or had other compensating factors that excused the loans' non-compliance.  As a result, BAC and its legacy entities recklessly or knowingly allowed into the securitizations a substantial number of mortgage loans that did not conform to their own underwriting standards.  Upon learning from the third-party due diligence firms that there were high percentages of defective, or at least questionable, loans in the sample of loans they reviewed, BAC and its legacy entities failed to

47

take any additional steps to verify that the population of loans in the securitizations did not include a similar percentage of defective and/or questionable loans. All these events took place before the start of the Class Period.  Defendants concealed these facts from the market throughout the Class Period.

128.     Clayton's trending reports, which were provided to the FCIC and were not made publicly available until after the end of the Class Period, confirmed that significant portions of the 2006 and 2007 vintage loans that were reviewed and rejected by Clayton because they fell outside the applicable underwriting guidelines, were subsequently "waived in" by BAC and included in securitizations.  *See* All Clayton Trending Reports Q1 2006-Q2 2007, at 3 (Clayton Services Inc. 2007), available at http://fcic.law.stanford.edu/hearings/testimony/the-impact-of-the-financial-crisis-sacramento#documents.  Merrill Lynch also engaged Clayton to perform due diligence reviews of loan pools to determine whether the loans conformed to the representations made by the originators and complied with Merrill's own credit policies. According to Clayton's internal documents provided to the FCIC, Merrill was also informed that significant amounts of the loans it had reviewed "failed to meet guidelines," but those loans, too, were subsequently waived in by Merrill Lynch and included in securitization.  Defendants did not disclose these facts to the market during the Class Period.

129.     Clayton Vice President Vicki Beal testified before the FCIC that the third-party due diligence firms' "exception reports" were provided to BAC and its legacy entities.  As a result, Defendants were aware by the start of the Class Period that a significant percentage of the mortgage loans involved in the Company's core operations and most critical financial results did not meet underwriting guidelines but were included anyway in pools underlying MBS by way of

48

the "waiver" process.  Beal Tr. 43:17-25, 44: 1-11.  Beal's testimony was provided to the FCIC

on September 23, 2010, but was not made publicly available until after the Class Period.

       130.    Furthermore, in a complaint recently filed by insurer American International

Group, Inc. ("AIG"), alleging that BAC, among others, engaged in fraud and violated the

Securities Act of 1933, AIG stated that a former senior project leader at Clayton from 2004 to

2009 revealed to AIG investigators that BAC was not actually interested in the fundamental

credit quality of the loans reviewed during BAC's due diligence process.  Indeed, according to

AIG's complaint, this former Clayton employee revealed that a BAC vice president of Structured

Products specifically told him that he "didn't give a flying f*** about [debt-to-income ratio]"

and other credit characteristics of the loans being reviewed for securitizations.  Instead, as AIG

alleges, the BAC vice president said that BAC was concerned only that the loans met federal,

state, and local lending compliance standards, *i.e.*, predatory lending laws related to the amount

of fees and points that could be charged on loans.  According to AIG's complaint, the BAC vice

president told this former Clayton employee that he did not care about elements of the loans like

appraisals, debt-to-income ratio, or credit because, "we [Bank of America] can sell [the loans] to

whoever" and "we [Bank of America] can sell [the loans] down the line."  On one occasion, AIG

alleges, this former Clayton employee recalled that Clayton had assigned a certain employee that

was particularly knowledgeable about appraisals to review a pool of loans for BAC, and that this

employee was kicking loans out due to inaccurate or suspect appraisals.  The AIG complaint

alleges that the former employee revealed that this made the BAC vice president angry and that

he was told to "get rid of this f***ing guy," leading to that certain employee's termination.  *See*

Complaint, *American Int'l. Group, Inc. v. Bank of America Corp., et al.*, CV No. 652199/2011

(NY Sup. August 8, 2011) at paragraph 331.

131.    These underlying defects in securitizations were known by the Defendants at the start of the Class Period and, in substantial part, gave rise to numerous material repurchase demands about which Defendants misled the market throughout the Class Period.

132.    Senior executives at BAC had their fingers on the pulse of what repurchase demands were being made, in what amount, and by which entity.  CW-4 explained that at BAC, repurchase and put back demands were funneled through the Company's Structured Finance Products division.  When a demand letter alleging violations of representations and warranties was delivered, it ordinarily went to the trustee of the securitized trust, who would then provide it to BAC as servicer.  All master servicers who worked within the structured finance group of BAC would be alerted to a repurchase demand involving mortgage loans in securitizations that they serviced.

133.    CW-5, a former BAC Senior Vice President in Technical Accounting and Derivatives and a legacy Countrywide employee, stated that top BAC executives were routinely informed of information concerning repurchase requests through the issuance of regular repurchase request and reserve reports, which were circulated to a number of executives, including the Company's CEO and CFO.  CW-5 confirmed that Defendants Lewis and Moynihan were directly involved in being notified of repurchase requests, and if large repurchase requests were made, that information would immediately go up the chain of command.

134.    For example, CW-6, a former Managing Director of Technical Accounting & Accounting Policy for Countrywide Financial Corporation who was responsible for maintaining accounting policies and working with the outside auditors, said that Fannie Mae and Freddie Mac told BAC that because BAC had sold these loans to the GSEs and they were incurring

50

losses under the representations and warranties, the GSEs demanded repurchase or other recourse reimbursement.  CW-6 confirmed that, at this point, Company executives from BAC's internal legal department, as well as the Company's Fannie or Freddie liaison, would get involved.

135.    William Brewster, director of the Mortgage Fraud program at Fannie Mae, explained to FCIC investigators that Countrywide and Bank of America were two of the top five banks to which Fannie Mae put loans.  "[O]ur finding rate [for fraud] is about 70%.  We looked at maybe $1 billion," Brewster told FCIC investigators.  The percentage of loans actually reimbursed of those for which Brewster's group requested reimbursement was, in 2007, 80%, and in 2008 it was 55%.  He said: "We expect about 80% about every year."  But, he explained, the other groups, like the credit loss, underwriting and appraisal groups at Fannie Mae, would be showing much larger numbers on repurchase claims than the fraud group.

### 4.    BAC's Material Weakness in Internal Controls

136.    The facts alleged in this paragraph demonstrate that BAC had a material weakness in its internal controls.  While this material weakness made it likely that BAC in fact misstated the amount of loan repurchase accruals, these allegations are not intended to state or support a claim based on the misstatement of loan loss reserves. Rather, these facts demonstrate that, because of the Company's material weakness in its internal controls, BAC's stated reserves could not be relied upon.  In addition, these facts demonstrate that Defendants engaged in manipulative conduct:

(a)    BAC's practices for establishing repurchase accruals during the Class Period sidestepped the Company's formal procedures, and instead left the determination to be solely made by the Company's chief financial, executive and risk officers, with participation

from the legal department, and as such completely and intentionally overrode the Company's internal controls.  In addition, the aggressive accounting judgments used by Defendants when establishing these accruals essentially declaring a fight over every loan file and refusing to book an accrual until some late-stage culminating event are a substantial departure from the standards available to BAC accountants from PwC, as set forth below in paragraphs 292-304, and from the "conservative" standards that Defendants told analysts were being employed at the Company during the Class Period.

(b)      Former Countrywide Managing Director CW-6, referred to above in paragraph 134, described the extremely aggressive policy BAC implemented with regard to repurchase liability accruals.  The theory was, according to CW-6, that if BAC's allowance for loan losses was kept low, the counter-party would not get insight into the Company's thinking about its actual exposure.  The result, however, was that the Company's disclosures about those reserves were known by the Defendants to be inadequate.

(c)      CW-5, a former Countrywide Managing Director of Mortgage Banking Accounting, had first-hand exposure and direct knowledge of repurchase allowance accounting issues.  CW-5, along with Countrywide Bank's Chief Financial Officer, reported to BAC's CFO, Defendant Price, about their work on the accounting determinations.  CW-5 confirmed that Lewis and Moynihan had ultimate decision making authority for the accruals relating to the repurchase demands.

(d)      CW-5 commented on a disparity between BAC's accrual practices and amounts and the increasingly deteriorating performance of legacy Countrywide residential mortgage-backed securities portfolios.  CW-5 explained that, in 2010, BAC's President and CEO, Brian Moynihan, took an intractable position to fight every repurchase request tooth and

nail, threatening to review every loan in a portfolio.  CW-5 explained that under those policies

set at the top, the Company's accountants would not be permitted to book an accrual to the

repurchase allowance until certain late stage events occurred, such as, *inter alia*, a formal

demand made through the trustee or the filing of litigation.  This runs contrary to accepted

accounting principles and industry practices.

        (e)     It became increasingly clear to CW-5 that Countrywide's underwriting

standards (which formed the basis for the securitized mortgages) were generally acknowledged

to be substantially lower than their representations.  CW-5 stated that it was inconceivable that

the amount of money by which BAC was under-accrued was determined innocently; and CW-5

stated that defendants absolutely had to have known that these repurchase requests then existed

through the class period.  CW-5 confirmed that BAC's CFO, Price, knew, on a daily basis, the

performance characteristics of all of the legacy Countrywide mortgage-backed securities being

serviced, because BAC had securitized portfolio reports run daily and disseminated weekly to the

Company's CFO.

        (f)     The fact that BAC objectively failed to accrue allowances at an adequate

level in furtherance of Defendants' efforts to conceal material risks from investors related to

MBS repurchase demands is corroborated by comparisons to the repurchase allowance levels of

other banks that had far less MBS exposure than BAC.  Throughout the Class Period, while BAC

had far more exposure to these demands than any other bank due to its market share as a result of

its acquisitions of Countrywide and Merrill Lynch, BAC accrued for repurchase claims at a level

significantly lower than its peers JPMorgan Chase & Co., Citigroup and Ally Financial.  For

example, while these peer companies maintained allowances ranging from 84% to 200% of

outstanding repurchase demands during the Class Period, BAC maintained allowances

approximately 38% to 50% during the same crucial period.  In fact, as set forth below at ¶¶ 166-174, BAC was forced to radically increase its allowance for these repurchase demands in 2011.

(g)     This significant increase in 2011 was not surprising to CW-7, a director within the structured finance division of one of BAC's MBS counterparties.  CW-7 stated that while BAC's strategy was to deny all claims that the Company received, that strategy changed in 2011 because of the tremendous amount of "overhang" on BAC's stock due to investor uncertainty about the Company's full exposure to repurchase claims.  The result was a large jump in BAC's allowance for repurchase claims in the second quarter of 2011.  CW-7 stated that, during the Class Period, BAC's quarterly accruals for repurchase claims seemed limited to a level that allowed BAC to still report a profit.

(h)     While Defendants knew that BAC was facing repurchase demands from MBS counterparties due to the documentation deficiencies and faulty underwriting standards employed by BAC and its legacy entities and expected to receive many more, Defendants ***never*** adequately disclosed this exposure to investors during the Class Period.

(i)     CW-8 is a former legacy Countrywide accountant responsible for the consumer and small business loan loss reserves function at the Company.  CW-8's loss allowance accounting and reporting group was comprised of a small group of executives that reported directly to the Company's CFO.  CW-8 stated that the Company's system for loss and repurchase accruals provided management with virtually instantaneous visibility into the underlying loan data .  Company management could look at any pool of loans held or serviced and ascertain related information, including the average profile and historical patterns of defaults.

54

(j)      CW-8 explained that loss forecasts from the Company's operating divisions would be consolidated and presented to BAC's Allowance Committee every month at monthly Allowance Committee Review meetings. CW-8 was part of the team that prepared the detailed minutes that were taken of every Allowance Committee meeting and routinely submitted to the entire Committee for review and approval.

(k)      Defendant Cotty was the Chairman and Secretary of the Committee during the period when he served as BAC's Chief Accounting Officer.   Various recommendations for allowances from the Company's operating division accountants would be presented to the Allowance Committee and the Committee would formalize a final recommendation.  CW-8 explained that the purpose of the Allowance Committee was to enable the Company to make sure it had adequate controls for determining accruals.

(l)      The Committee's final recommendations were ordinarily formalized and presented to the Company's CFO for approval. BAC's CFO signed off on the accrual recommendations on a monthly basis for the Company to book in its general ledger and disclose through its financial statements, which were reviewed by PwC on a quarterly basis and audited by PwC each year.

(m)      The Allowance Committee had total visibility into the loans held or serviced by the Company.  According to CW-8, many of the loans BAC held or serviced, including those put into the securitization, were of a quality different from that represented. CW-8 explained that, because the losses were accelerating, the Company projected delinquency rates forward, and did not simply rely on historical performance, as they had in the past.  When determining reported fair values of the legacy Countrywide MSRs and loan portfolio, CW-8 stated that Defendant Cotty was directly involved.

(n)     BAC's procedures for determining allowances for repurchase claims sidestepped the Company's formal internal control procedure, highlighting a material weakness in controls as a red flag for accountants and auditors working on the Company's financial statements.  CW-8 stated that, contrary to those control procedures, allowances for representation and warranty violations would be handled *directly* by the Company's chief accounting officer and chief financial officer, not through recommendations from the Company's Allowance Committee.  Management was essentially overriding the Company's system of internal controls.

(o)     This accounting policy significantly departed from accounting generally accepted in the United States because the company had made representations and warranties in connection with those securitizations for which it faced enormous recourse obligations through the Class Period, and since.

**C.     Other Undisclosed Problems Caused by the Faulty Loans Underlying the MBS Issuances of BAC and Its Legacy Entities**

137.    BAC not only securitized the faulty mortgages that the Company and its legacy entities had originated, but it also continued to service a large portion of these faulty mortgages and kept many unsecuritized mortgages in its own portfolio, generating income.  As such, when these mortgages began to default at an extraordinarily high rate due to the problems set forth above, and because BAC was unable to properly foreclose due to the extensive problems with MERS, BAC also began suffering losses in its standalone loan portfolio and a severe impairment of its mortgage servicing rights.

138.    But both before and during the Class Period, the Securities and Exchange Commission's Division of Corporation Finance wrote to the chief financial officers of a number of banks, and posted the sample letters on the SEC website, warning that delaying the recognition of credit losses and failing to maintain appropriate allowances for loan losses in the

current environment would be a violation of Generally Accepted Accounting Principles and that

reporting banks should enhance the Management Discussion and Analysis disclosures related to

the provision and allowance for loan losses.  The so-called "Dear CFO" letters from the SEC set

forth the following standards that were disregarded by Defendants throughout the Class Period

when the established the Company's reserves:

> ***Clear and transparent disclosure about how you account for your provision and allowance for loan losses has always been critically important to an investor's understanding of your financial statements.***  While generally accepted accounting principles regarding how to account for these items have not changed in recent years, ***the current economic environment may require you to reassess whether the information upon which you base your accounting decisions remains accurate, reconfirm or reevaluate your accounting for these items, and reevaluate your Management's Discussion and Analysis disclosure***. …

> ***Certain types of loans, such as option ARM products, junior lien mortgages, high loan-to-value ratio mortgages, interest only loans, subprime loans, and loans with initial teaser rates, can have a greater risk of non-collection*** than other loans.  Additional information about higher-risk loans may be useful to an understanding of the risks associated with your loan portfolio and to evaluating any known trends or uncertainties that could have a material impact on your result of operations. …

> A decline in the value of assets serving as collateral for your loans may impact your ability to collect on those loans. …

> Finally, although determining your allowance for loan losses requires you to exercise judgment, ***it would be inconsistent with generally accepted accounting principles if you were to delay recognizing credit losses*** that you can estimate based on current information and events.

139.    Defendants failed to comply with this warning, and even as they watched the

deterioration of BAC's mortgage portfolio unfold in real-time before their eyes as set forth

above, Defendants concealed from investors during the Class Period the risk that the high

delinquency rates and the MERS issues could make the reserves inadequate.

140.    Defendants also failed to reveal that the deterioration in BAC's mortgage

portfolio was having a significantly adverse impact on its revenue stream from servicing these

faulty mortgages. MSRs are defined in Company's securities filings as "[t]he right to service a mortgage loan when the underlying loan is sold or securitized. Servicing includes collections for principal, interest and escrow payments from borrowers and accounting for and remitting principal and interest payments to investors." MSRs constituted a significant corporate asset because of the fees they generated and constituted a core and crucial part of the Company's business. But as the default rate on the faulty mortgages originated by BAC and its legacy entities continued to rise during the Class Period, BAC's revenue stream from servicing these mortgages became severely impaired. Defendants concealed from the investors during the Class Period the true extent of this impairment.

141. Further, Defendants also failed to reveal that the deterioration in BAC's mortgage portfolio, the significant adverse impact on the MSR revenue stream, as well as the increasing exposure to claims for repurchase for violation of representations and warranties, caused the Company's reported goodwill in its consumer mortgage lending reporting unit to be impaired. Defendants concealed from the investors during the Class Period the true extent of this impairment.

### D.  BAC's Issuance of Common Equivalent Securities

142. On December 2, 2009, BAC issued a press release attached to a Form 8-K filed with the SEC announcing that it would "repay U.S. taxpayers their entire $45 billion investment provided under [TARP]" following the completion of a securities offering of Common Equivalent Securities. While Defendant Lewis boasted of BAC's ability to repay this obligation "with interest," and touted the Company's origination of "$760 billion in new credit" and its "leadership role in financing home ownership," the press release made no mention of the severe problems BAC was facing as set forth above. BAC's Common Equivalent Securities offering

was conducted as a pull down from the shelf pursuant to the Company's Shelf Registration

Statement on Form S-3 that had been filed with the SEC on April 20, 2009.

143.    Also on December 2, 2009, BAC filed a presentation with the SEC making clear

that BAC needed this offering of Common Equivalent Securities to be successful in order to

repay its TARP obligation.  In that presentation, titled "BAC, Raising Capital to Repay

Government Investment (TARP)," BAC touted the fact that U.S. regulatory authorities,

undoubtedly unaware of the severe problems facing the Company as described above, had

approved BAC's TARP repayment plan and that BAC was taking advantage of this "current

opportunity to repay TARP."  The presentation noted that, while the Company's certificate of

incorporation authorized BAC to have 10 billion shares outstanding, it already had 8.7 billion

common shares outstanding as of September 30, 2009, and approximately 1 billion shares

reserved for "convertibles, warrants and other use."  As such, the Company devised the offering

of Common Equivalent Securities because "there are insufficient common shares authorized and

available" for the offering to raise enough capital to repay TARP.  The presentation ended with

BAC falsely touting that, in 2009, the Company had substantially strengthened its balance sheet.

144.    BAC filed the 2009 Registration Statement on April 20, 2009, and Prospectus

Supplements with the SEC on December 3, 2009, and December 4, 2009 for its Common

Equivalent Securities offering (referred to, collectively with the 2009 Registration Statement, as

the "Offering Documents").  The Prospectus Supplements revealed that the depository shares

representing interests in BAC's Common Equivalent Securities would be priced at $15.00 per

share, meaning that BAC would raise $18.8 billion in the offering, after underwriting

commissions.  The Prospectus Supplements also listed each of the Underwriter Defendants as

underwriters of the offering, and stated that Defendant PwC had consented to inclusion of its

audit report for BAC's 2008 financial statements in the Company's Form 10-K filed on February 27, 2009, which were incorporated into the Offering Documents by reference.

145.    On December 9, 2009, while still concealing from the market the significant risks to the Company posed by its reliance on MERS and the significant exposure to repurchase demands from MBS investors, the Company issued a press release attached as an exhibit to a Form 8-K filed with the SEC titled "BAC Completes Repayment of TARP."  The press release noted that the offering of Common Equivalent Securities was successful in raising $19.29 billion for the Company to help repay its TARP obligation.  Defendant Lewis stated that the repayment of TARP "demonstrate[d] the strength of [BAC]."  Lead Plaintiff purchased over one million shares of Common Equivalent Securities in the offering.

146.    Formally completing the offering of Common Equivalent Securities, BAC hosted a special meeting of the Company's shareholders on February 23, 2010, to consider an amendment to the Company's certificate of incorporation to allow the Common Equivalent Securities to be converted into the Company's common stock.  Without any knowledge of the significant undisclosed risks facing the Company, shareholders voted to approve the amendment. The Common Equivalent Securities, including those held by Lead Plaintiff, were automatically converted into shares of BAC common stock the next day, on February 24, 2010, in accordance with the terms of the offering.

    **E.    The Extent and Nature of the Risks Concerning MERS and Repurchase Demands from MBS Counterparties Are Revealed at the End of the Class Period, Long After BAC Successfully Completed Its Offering of Common Equivalent Shares**

147.    On September 24, 2010, the Attorneys General of Iowa and North Carolina announced that they were beginning separate investigations into the foreclosure practices of GMAC Mortgage's Ally Financial Inc. ("Ally").  The Attorney General of California then

ordered Ally to suspend all foreclosures in California.  Senator Al Franken of Minnesota asked

government regulators to collaborate on a "thorough investigation into the alleged misconduct."

On September 29, 2010, JP Morgan Chase announced that it too was suspending foreclosures in

the 23 states where courts adjudicate foreclosures.  On September 30, 2010, the United States

Treasury Department launched an investigation into foreclosure practices nationwide.

   148. Under immense government and public pressure, BAC reluctantly announced on

October 1, 2010 that it, too, would suspend foreclosures in 23 states while it reviewed its

foreclosure practices.  On October 8, 2010, the Company announced that it was extending the

foreclosure suspension to all 50 states.  Defendant Moynihan steadfastly denied any wrongdoing

on BAC's part, however, noting that it suspended foreclosures only to "clear the air."

   149. On October 9, 2010, *The Wall Street Journal*, in an article titled "[BAC] Halts

Foreclosures; Bank Expands Freeze After Pressure From Government-Run Mortgage Firm,"

reported that "[i]n conversations with [BAC], Freddie [Mac] said financial penalties or litigation

could result if the bank did not take additional steps" to resolve BAC's foreclosure issues.  *The*

*Journal* noted that:

> Bank of America Corporation services 14 million mortgages, or one out of every
> five in the U.S., and its loan-servicing portfolio exceeds $2.1 trillion in size. Of its
> mortgages, 10 million came from its 2008 acquisition of troubled California
> lender Countrywide Financial Corp. More than 80% of its delinquent loans were
> acquired through Countrywide.

The article published the following charts of U.S. home loans in foreclosure or 90-days past due,

and the largest mortgage servicers by portfolio size, in trillions:



150.    On the same day, *The New York Times* also reported on the story in an article

titled "Top Bank Halts Its Foreclosures In All 50 States."  The article noted that "the uncertainty

[over foreclosures] is putting the housing market in turmoil and causing vast confusion" and that

> [n]ot only is Bank of America watched more closely as the nation's largest bank,
> it also finds itself deeper in the subprime mortgage mess. It holds $102 billion in
> subprime loans on its balance sheet from the period when lending standards were
> most lax -- 2005 to 2007 -- more than JPMorgan Chase, Citigroup or Wells Fargo,
> according to a report by Christopher Kotowski, an analyst with Oppenheimer.

151.    Thereafter, on October 12, 2010, *The Wall Street Journal* reported that BAC was

one of the top three banks with the largest dollar amounts of foreclosed home loans on its books,

and that BAC had $18.7 billion, or 4.39% , of its 1- to 4-family mortgage loans in foreclosure.
Further, the *Journal* reported that BAC, as of June 30, 2010, had $88 billion in servicing rights
on loans in foreclosure.

152.    Then, on October 13, 2010, the attorneys general of all 50 states announced that
they would investigate the underwriting guidelines, reserve policies, and foreclosure practices of
the nation's major banks, including BAC.  When the coordinated 50-state investigation was
announced, the New Jersey Attorney General stated: "[t]his is not a gray area.  Either our legal
requirements for filing foreclosures were followed or they weren't, and we will hold the
companies accountable for their systematic violations."  The Acting Director of the New Jersey
Division of Consumer Affairs stated that "[s]ervicers must scrupulously follow the law when
they file foreclosures and that includes only submitting affidavits on personal knowledge."

153.    In response to these disclosures, which more fully, but not entirely revealed the
true state and uncertainty of the Company's problems with foreclosures related to MERS, BAC's
stock fell from a price of $13.52 on October 12, 2010, to close at $11.98 on October 15, 2010, a
drop of over 12%.

154.    Less than a week later, on October 18, 2010, BAC Home Loans issued a
statement providing that it would amend foreclosure documents in 102,000 foreclosure actions.

155.    A day later, on October 19, 2010, BAC finally admitted there were "technical
issues" with its servicing and foreclosure practices.  In particular, BAC disclosed that its ongoing
review "has particular focus on the process and controls in place for completing affidavits and
notarizations" and that, "[f]or the 23 judicial [foreclosure] states, [BAC is] amending and re-
filing 102,000 foreclosure affidavits."  Speaking on BAC's analyst conference call, Defendant
Moynihan admitted that BAC had problems in this area, and was seemingly unsure of their

63

extent or the progress the Company had made in rectifying them, unconvincingly stating that "[w]e fixed the affidavit signing problem, or we'll be fixing it in very short order."  Defendant Moynihan admitted that "[t]he issue of foreclosure is a big deal…." For the first time, the Company's CEO discussed the Company's reliance on the MERS system to process and track its interests in loans, specifically relating to his statements to the '04-'07 vintage mortgage loans:

> [A]s we look at the so-called MERS issue, as we look at some of the other stuff that is raised, and I think you've seen a lot of people write on this and talk about it, we don't see the issues that people were worried about, quite frankly, but we're taking them very seriously. We're making sure we're right. *But for example, one of the issues was you needed to take title in your own name prior to foreclosure out of MERS.* . . .  So there's [sic] nuances in how all these things play out. … I think the best way to think about it is, I don't think the technical issue is as big a deal. The issue of foreclosure is a big deal, and the issue is we have got to get on with it because it will restore the health in the market. And I think, the overstatement that this is all messed up, it's been going on for a while. We've been ramping up the people, us and the other servicers. …

> [T]he loans that are originated, you're saying it's origination defect, if you look at what's happened in 2008 and 2009, there's just been very little activity. And the loan quality which changed the underwriting standards when we bought Countrywide, they'd already changed theirs. So that occurred in 2008. You're not seeing new activity created here from new originations of any magnitude. *What I'm saying is the origination activity between 2004, 2005, 2006, 2007, that's where the balances are.*

156.    As a result of these disclosures Defendants were forced to make, the market for the first time appreciated the material risks that Defendants had known since the start of the Class Period with regard to legacy mortgage loans, the inability of the MERS system to secure the Company's interest in such loans on the secondary mortgage markets, and the scope and amount of the BAC's exposure to representation and warranty claims by MBS investors.

157.    Moynihan's forced disclosures about "need[ing] to take title in your own name prior to foreclosure out of MERS" alerted analysts that the Company faced material risks when pursuing foreclosures, particularly in "judicial foreclosure states," such as Florida and New York

(which were two of the top five states where BAC's outstanding residential mortgage loans had the highest concentration), due to the Company's reliance on MERS.

158. The revelation of BAC's improper servicing and foreclosure procedures, and the resulting halt to foreclosure proceedings, had major financial ramifications for the Company. The need to halt foreclosures imposed the direct cost of limiting BAC's ability to obtain relief when borrowers were seriously delinquent. And the consequences were huge. One observer explained that on a broader scale, "[d]efaulters living in their homes are getting a subsidy worth about $2.6 billion a month, according to a *Wall Street Journal* analysis based on mortgage data from LPS Applied Analytics and rent data from the Commerce Department. That's 0.25% of U.S. personal income, roughly equivalent to the benefit top earners receive from Bush-era tax breaks." Mark Whitehouse, "The Stealth Stimulus Of Defaulters Living For Free," *The Wall Street Journal*, Nov. 1, 2010, A2.

159. At the same time that the market became aware that BAC had significant problems with foreclosures related to MERS, it was also revealed that the Company's exposure to anticipated demands from investors to buy back bad mortgages far exceeded the Company's reserves of $4.4 billion by more than tenfold. Tangible proof of the consequences of the Company's deficient practices and the magnitude of the shortfall in reserves for the liability to buy back mortgages was painfully demonstrated when, on October 18, 2010, a group of investors, including the Federal Reserve Bank of New York (the "New York Fed") and other major investors in MBS, including Pacific Investment Management Company, LLC ("PIMCO") and BlackRock Financial Management, Inc. ("BlackRock"), demanded that BAC repurchase up to *$47 billion* worth of Countrywide-issued residential mortgage backed securities.

160.     On the same day as the call with analysts, October 19, 2010, *The Wall Street Journal Online* reported on the repurchase demand made by the New York Fed, PIMCO, and BlackRock in an article titled: "Bondholders Pick a Fight With Banks; An Attempt to Recoup Losses as Foreclosures are Restarted; for BofA, Countrywide Pain Continues."  The article stated, in relevant part:

> As mortgage servicer, Bank of America is responsible for collecting loan payments and working with troubled borrowers. BNY Mellon, the bond trustee, is charged with administering the securitizations, or bond trusts, for the benefit of investors. Investors say they are concerned both about servicing and violations of representations and warranties made when the loans were packaged into bonds.

> Monday's action lays the groundwork for what could be one of the first lawsuits by mortgage-bond investors seeking to enforce their contract rights, including loan buybacks, in response to the current foreclosure crisis. Investors have mounted other challenges based on alleged violations of securities laws.

161.     *The Wall Street Journal* published another article on October 19, 2010, titled "On Foreclosures, BofA Has Explaining to Do," linking BAC's foreclosure issues with the repurchase demands of private investors and stressing the gravity of the situation and its implications for BAC investors.  Specifically, the article stated:

> …[BAC] also has to address investors' biggest concern—whether the foreclosure issues reflect deeper problems with loans' legal status. If that were the case, banks could face a big risk from private investors demanding repurchases of securitized mortgage bonds.

> Banks are already facing repurchase demands from Fannie Mae, Freddie Mac and mortgage-insurance firms, for bad loans made during the housing bubble. In the first half of this year, Bank of America took $1.7 billion in charges because of such requests, while outstanding repurchase demands at the bank totaled $11 billion.

> *       *       *

> The fear is that repurchase requests could swell if foreclosure problems are due to loans' legal status. In that case, private investors may jump into action.

> *       *       *

> Given legal hurdles facing private investors, no one is quite sure how this will play out. One hedge fund that is "short" Bank of America's stock, Branch Hill Capital, has argued the bank could face total repurchase-related losses of nearly $60 billion in today's money.

162.    Later on the same day the Company disclosed its foreclosure issues to the market, BAC issued its financial results for the third quarter of 2010, revealing that, as of September 30, 2010 (before the claim of October 18, 2010, by certain investors including the New York Fed, PIMCO, and BlackRock), BAC had received over $26 billion in repurchase claims, nearly $13 billion of which remained unresolved.  Even more troubling, BAC also estimated that it expected another $9 billion in repurchase claims from GSEs alone, and could not give an estimate as to its potential exposure to either private label securitizations/whole loan investors (similar to the demand made on October 18, 2010 by the New York Fed, PIMCO and BlackRock) or private label securitizations wrapped by monoline insurers.  A *San Francisco Business Times* article written the following month on the significance of these demands observed, "[t]he move on the part of bondholders signals the ***tsunami coming into shore for Bank of America*** and other lenders facing such repurchase requests for tens of billions of mortgages made during the historic credit bubble."  On the October 19, 2010, analyst conference call, Defendant Moynihan stated:

> [T]here have been a number of questions raised about the reps and warranties exposure that exists across the industry and specifically at Bank of America.... [G]iven the level of discussion, we thought it made sense to try to layout the components for you today.…  [T]he environment around repurchases continues to be challenging….  Through September, we've received approximately $18 billion in repurchase claims associated with [the legacy Bank of America and legacy Countrywide] population[s], representing only 1.5% of the total loans sold to [GSEs].  [R]ecently, in our capacity as the servicer on 115 private label security transactions, we received a letter from eight investors purportedly owning interests in these transactions. The letter asserts breaches of certain servicing obligations including an alleged failure to provide notice of breaches of reps and warranties….  The 115 deals have an original and current principal balance of approximately $104 billion, and $46 billion respectively….  [W]e think it is

important for investors to know that we will vigorously contest such claims and
defend the interest of Bank of America shareholders.

163.    Following these disclosures, BAC common stock dropped materially, from a

closing price of $12.34 on October 18, 2010 to close at $11.80 on October 19, 2010.

164.    The magnitude of the repurchase demands demonstrates that the Company did not

disclose the risk on its obligations relating to violations of representations and warranties issued

in connection with the packaging and sale of MBS, and that Defendants' repeated assurances to

the market that they were carefully monitoring the Company's liabilities, managing its balance

sheet, and had taken adequate accruals were untrue or misleading at the time these statements

were made.

165.    BAC's exposure to liabilities relating to its business of securitizing mortgage

loans was of independent significance for investors, given its potential impact on the Company's

fortunes by promising to grow its business and revenues associated with MBS, including MSRs,

as well as for the negative consequences that were flowing from the massive breaches of the

representations and warranties given to make these sales.

**F.    Further Disclosures Made After the Class Period Confirm That the
Defendants' Class Period Statements Were Untrue or Misleading**

166.    The untruth and materiality of Defendants' Class Period misstatements and

omissions concerning the mortgage-backed securities set forth below at ¶¶ 179-276 are borne out

by several significant developments and disclosures that followed the end of the Class Period.

167.    On February 25, 2011, BAC filed with the SEC its Form 10-K for the period

ending December 31, 2010, revealing for the first time in an SEC filing its relationship to and

significant problems with MERS:

We currently use the MERS system for *a substantial portion* of the residential
mortgage loans that we originate, including loans that have been sold to investors

68

or securitization trusts. Additionally, certain legal challenges have been made to the process for transferring mortgage loans to securitization trusts, asserting that having a mortgagee of record that is different than the holder of the mortgage note *could "break the chain of title" and cloud the ownership of the loan*. … If certain required documents are missing or defective, or if the use of MERS is found not to be effective, we could be *obligated to cure certain defects or in some circumstances be subject to additional costs and expenses, which could have a material adverse effect on our cash flows, financial condition and results of operations.* We may also face negative reputational costs from these servicing risks, which could reduce our future business opportunities in this area or cause that business to be on less favorable terms to us. (2010 10-K at 11, 35.)

This should have been disclosed by the beginning of the Class Period.

168.   It did not take long for events to show how materially untrue or misleading Defendants' statements had been.  Soon after repeatedly assuring the market that BAC had adequately disclosed its exposure to liabilities based upon the representations and warranties given in connection with the creation of mortgage-backed securities, the Company was forced to admit that the reality was far different.  On January 3, 2011, BAC announced it would pay about $2.8 billion to resolve certain repurchase obligations owed to Freddie Mac and Fannie Mae relating to mortgages originated by Countrywide, and that it expected to take a provision of approximately $3 billion.

169.   Even this multi-billion dollar payment did not fully exhaust BAC's liabilities to Fannie Mae and Freddie Mac, however, because certain loans sold to Freddie Mac and Fannie Mae were not covered by the settlement, and Defendants soon alarmed the market with the magnitude of this remaining exposure.  The Company's 10-Q report for the quarter ended March 31, 2011 disclosed that in the three-month period between December 31, 2010 and March 31, 2011, "our total unresolved repurchase claims totaled approximately $13.6 billion compared to $10.7 billion at December 31, 2010."

170.    That 10-Q report also ominously warned that "[i]t is reasonably possible that future representations and warranties losses may occur, and we currently estimate that the upper range of possible loss related to non-GSE sales as of March 31, 2011 *could be $7 billion to $10 billion over existing accruals.*" In fact, on September 2, 2011, the Federal Housing Finance Agency ("FHFA"), as conservator for Fannie Mae and Freddie Mac, filed new complaints in the United States District Court for the Southern District of New York and the Supreme Court of the State of New York against BAC and various related entities and individuals relating to over $6 billion in MBS Fannie Mae and Freddie Mac had purchased between September 30, 2005 and November 5, 2007. The FHFA suits alleged that the Company and various related entities, including Merrill Lynch, had "falsely represented that the underlying mortgage loans complied with certain underwriting standards and guidelines, including representations that significantly overstated the ability of the borrowers to repay their mortgage loans."

171.    On April 15, 2011, BAC announced that it had reached agreement with a monoline insurer, Assured Guaranty Ltd., and its subsidiaries to resolve buy-back claims arising from allegations of breaches of representations and warranties concerning 29 mortgage-backed securities for which Assured had provided insurance, for an estimated total cost of approximately $1.6 billion.

172.    On June 28, 2011, BAC announced that it entered into a settlement agreement with Bank of New York Mellon ("BNY Mellon"), as trustee for over 500 mortgage-backed securities trusts that had been issued to non-GSE entities. Rather than having to pay the $47 billion demanded by counsel for the trusts in October 2010, BAC announced that it would be required to pay *only* $8.5 billion and that this would cover most of the non-GSE mortgage-backed securities composed of loans originally issued by Countrywide between 2004 and 2008.

70

Based upon this proposed settlement and others, BAC recorded a provision of $14 billion for its repurchase liabilities, and said its total recorded liability related to representations and warranties repurchase exposure was $17.8 billion, for the quarter ended June 30, 2011.

173.    This proved to be far from a sure end to the Company's liabilities on MBS claims, as a number of investors in the trusts moved to intervene to object to the proposed settlement, and the attorneys general of two states – New York and Delaware – announced their opposition to the deal.  Several major investors, including AIG, the Federal Deposit Insurance Corporation, six Federal Home Loan Banks, several public pension funds and even Goldman Sachs, whose subsidiaries were among the parties that negotiated the deal with BAC, also announced their objections to the deal, either on its merits or because they lacked sufficient information to evaluate it.  An August 26, 2011 *Business Week* article on the proposed settlement quoted the head of an investment and brokerage firm that advises mortgage-securities investors as saying, "[t]his deal is like a fish: the more you look at it the more it stinks."  Meanwhile, BAC warned that if the $8.5 billion deal did not go through, it "***could have a material adverse effect on our cash flows, financial condition and results of operations.***"

174.    Even after announcing the proposed BNY Mellon deal, BAC stated:

> [I]t is reasonably possible that future representations and warranties losses may occur in excess of the amounts recorded for these exposures…. [T]he Corporation has not recorded any representations and warranties liability for certain potential monoline exposures and certain potential whole loan and other private-label securitization exposures.  The Corporation currently estimates that the range of possible loss related to non-GSE representations and warranties exposure as of June 30, 2011, ***could be up to $5 billion over existing accruals.***

Because the Defendants were aware of their exposure to potential representation and warranty claims by the beginning of the Class Period, this type of disclosure (without amounts) should have been made then.

175.    Further confirmation of the nature and scope of BAC's true practices — which, as alleged herein, were not accurately or adequately disclosed during the Class Period — was provided by an examination of the Company's residential real estate mortgage foreclosure practices by the regulatory agency charged with primary oversight of its conduct.  On April 13, 2011, the Comptroller of the Currency issued a consent cease and desist order, which stated in pertinent part:

The Comptroller finds, and the Bank neither admits nor denies, the following:

(1) …. During the recent housing crisis, a substantially large number of residential mortgage loans serviced by the Bank became delinquent and resulted in foreclosure actions.  The Bank's foreclosure inventory grew substantially from January 2009 through September 2010.

(2) In connection with certain foreclosures of loans in its residential mortgage servicing portfolio, the Bank:

(a) filed or caused to be filed in state and federal courts affidavits executed by its employees or employees of third-party service providers making various assertions, such as ownership of the mortgage note and mortgage, the amount of the principal and interest due, and the fees and expenses chargeable to the borrower, in which the affiant represented that the assertions in the affidavit were made based on personal knowledge or based on a review by the affiant of the relevant books and records, when, in many cases, they were not based on such personal knowledge or review of the relevant books and records;

(b) filed or caused to be filed in state and federal courts, or in local land records offices, numerous affidavits or other mortgage-related documents that were not properly notarized, including those not signed or affirmed in the presence of a notary;

(c) litigated foreclosure proceedings and initiated non-judicial foreclosure proceedings without always ensuring that either the promissory note or the mortgage document were properly endorsed or assigned and, if necessary, in the possession of the appropriate party at the appropriate time;

(d) failed to devote sufficient financial, staffing and managerial resources to ensure proper administration of its foreclosure processes;

(e) failed to devote its foreclosure processes adequate oversight, internal controls, policies, and procedures, compliance risk management, internal audit, third party management, and training; and

(f)  failed to sufficiently oversee outside counsel and other third-party providers handling foreclosure-related services;

(3) By reason of the conduct set forth above, the Bank engaged in unsafe or unsound banking practices.

176.    Similarly, on April 13, 2011 a number of regulatory agencies, including the United States Department of the Treasury, Comptroller of the Currency, and Office of Thrift Supervision, issued a consent order in which they found that MERS, of which BAC was a principal owner and which played a crucial role in its securitization strategy, had engaged in unsafe or unsound banking practices.  Specifically, after conducting an examination of MERS, and with MERS having consented to the terms of the Consent Order, these agencies found that MERS: (1) "failed to exercise appropriate oversight, management supervision and corporate governance, and…failed to devote adequate financial, staffing, training, and legal resources to ensure proper administration and delivery of services…"; (2) "failed to establish and maintain adequate internal controls…"; and (3) "engaged in unsafe or unsound practices that expose them and [their members such as BAC] to unacceptable operational, compliance, legal, and reputational risks."

177.    On August 4, 2011, BAC filed its Form 10-Q for the second quarter ended June 30, 2011.  The Second Quarter 2011 10-Q (item 1A. Risk Factors, p. 219) revealed that the Company faced risks, in addition to those previously disclosed in BAC's 2010 10-K, including exposure to risk to repurchase mortgage loans in amounts that could have ***"a material adverse effect on the Company's cash flow, financial condition and results of operations"***:

> ***We have been, and expect to continue to be, required to repurchase mortgage loans and/or reimburse the GSEs and monolines for loses due to claims related to representations and warranties made in connection with sales of RMBS and mortgage loans, and have received similar claims, and may receive additional claims, from whole loan purchasers, private-label securitization investors and private-label securitization trustees, monolines and others.  We have recorded provisions for certain of these exposures and have settled others on a bulk***

***basis.  However, the ultimate resolution of these exposures could have a
material adverse effect on our cash flows, financial condition and results of
operations.***

In connection with loans sold to GSEs and investors other than GSEs, we or our
subsidiaries or legacy companies made various representations and warranties.
Breaches of these representations and warranties may result in a requirement that
we repurchase mortgage loans, or indemnify or provide other remedies to
counterparties.  Bank of America and legacy Countrywide sold approximately
$1.1 trillion of loans originated from 2004 through 2008 to the GSEs.  In addition,
legacy companies and certain subsidiaries sold loans originated from 2004
through 2008 with an original principal balance of $963 billion to investors other
than GSEs.

***The amount of our total unresolved repurchase claims from all sources totaled
approximately $11.6 billion at June 30, 2011.***  These repurchase claims include
$1.7 billion in demands from investors (none of whom are in the Investor Group)
in the Covered Trusts received in the third quarter of 2010, but otherwise do not
include any repurchase claims related to the Covered Trusts.  ***The total amount of
our recorded liability related to representations and warranties repurchase
exposure was $17.8 billion at June 30, 2011.***  We recorded a provision of $14.0
billion in the three months ended June 30, 2011, of which $8.6 billion was for the
BNY Mellon Settlement and $5.4 billion was for non-GSE and to a lesser extent
GSE exposures.

***It is reasonably possible that future representations and warranties losses may
occur in excess of the amounts recorded for non-GSE exposures.***

178.    Thus, events in the months following the close of the Class Period confirmed the

materiality and falsity of Defendants' statements and omissions that failed to accurately and

timely disclose the massive exposure BAC faced from its reckless securitization practices.

## VI.    BAC'S UNTRUE AND MISLEADING PORTRAYAL OF ITS FINANCIAL
CONDITION AND RISK EXPOSURES

179.    Throughout the Class Period, Defendants made a number of statements in filings

with the SEC, in press releases and in conversations with analysts that were materially untrue or

misleading.

180.    Defendants misled the market about the material risks related to the Company's

reliance on the MERS system to process and track the Company's interest in mortgage loans that

were securitized, or that were purchased and sold as whole loans, on the secondary mortgage markets.  Defendants knew at the beginning of the Class Period that the Company had received adverse decisions about its reliance on MERS from state courts in foreclosure actions and from federal courts in bankruptcy proceedings, which decisions determined that the Company's reliance on MERS severed the "chain of title" and "clouded" the ownership of the loan.  As a result, Defendants knew that the MERS system may not serve as an operating substitute for compliance with state laws for perfecting a secured interest in real property and that the Company faced a material risk that its reliance on the MERS system, which, the Company admitted only after the end of the Class Period in its 2010 Form 10-K, was "substantial."   By failing to disclose this material risk, or any detail about it, during the Class Period, Defendants concealed this risk from the market.  When speaking about its loans and loan portfolios during the Class Period, Defendants concealed that the Company's reliance on MERS clouded the ownership of the loans, portfolios, and related cash flows from servicing rights.  **In fact, Defendants never mentioned MERS in an SEC filing until after the Class Period.**

181.    By the time the Class Period started and the fiscal year ending December 31, 2008 audited financials were filed with the SEC, Defendants knew that the vast majority of vintage '04-'07 MBS assets that had been sold by Countrywide did not satisfy objective underwriting standards for origination, in violation of representations and warranties made to MBS purchasers.  As noted above, *89% of the Countrywide-originated mortgage loans in 2005 and 2006, which BAC now had on its books, were ineligible for origination*.  At the beginning of the Class Period Defendants also knew that material amounts of the Merrill Lynch CDO assets acquired were impaired.

182.    Defendants' publicly-disseminated statements, including statements contained in documents filed with the SEC, were untrue or misleading by failing to disclose that a substantial majority of mortgages that BAC and its legacy entities had securitized into MBS before the Class Period and sold to investors did not meet the Company's underwriting standards and violated representations and warranties that BAC and its legacy entities made in the securitization process about the quality of the mortgages, resulting in the significant risk, known by Defendants before the Class Period, that BAC would be forced to repurchase those mortgages ('MBS Representation and Warranty Risks").

### The 2008 Form 10-K

183.    The Class Period herein began when the Defendants filed with the SEC BAC's Form 10-K for the fiscal year ending December 31, 2008 on February 27, 2009 ("2008 10-K"), which was executed by Defendants Lewis and Price, as well as by certain of the Director Defendants.  The 2008 10-K sets forth the Company's audited financial statements and related footnote disclosures for the fiscal year ending December 31, 2008, Management's Discussion and Analysis of Financial Condition and Results of Operations, and contains the Report of Management on Internal Control Over Financial Reporting.  The 2008 10-K also is accompanied by the Report of the Company's Independent Registered Public Accounting Firm, PwC, which the auditing firm executed on February 25, 2009.

184.    The 2008 10-K failed to disclose the risks that the Company was then facing with regard to (a) the mortgages on which its operating results were heavily dependent, including '04-'07 vintage loans that gave rise to enormous representation and warranty claims, and (b) the lack of sufficient internal controls to adequately secure the Company's interests in loans that it processed and tracked only through the MERS system.

185.    For example, the amount the Company reported on its balance sheet for "purchased impaired" loan portfolios, or "nonperforming loan" portfolios, "residential mortgages" portfolios and "discontinued real estate" portfolios, totally failed to alert investors to the material risks and weaknesses associated with the Company's blind reliance on the MERS system to process and track BAC's interests in mortgage loans in the secondary mortgage markets.  Also, none of the Company's loan portfolio statements disclosed the risks Defendants knew that BAC faced in foreclosure or bankruptcy proceedings in connection with the MERS system.  Finally, none of the loan portfolio statements disclosed the scope and extent of the Company's MBS Representation and Warranty Risks.

186.    Specifically, the 2008 10-K reported the loan assets held by the Company in various core and critical portfolios from which the Company reported some of its most significant operating results.  This report was misleading because it failed to disclose the substantial economic risks, as alleged above, from the Company's failure to perfect its interest in the admittedly "substantial" volume of mortgage loans reflected in these amounts that were processed and tracked solely through the MERS system.  Without any disclosure about the material risks of the Company's reliance on the MERS system, specifically the risk that the Company's reliance on MERS severed the "chain of title" and "clouded" the ownership of a substantial portion of these mortgage loan and portfolio values, the Company's financial results reported in the 2008 10-K were materially untrue or misleading.

187.    The Company's 2008 Form 10-K disclosures also misled the market about material facts related to its mortgage loan servicing portfolio.  MSRs are nonfinancial assets that are created when an underlying mortgage loan is sold and the Company retains the right to service the loan.  The 2008 10-K reported that the servicing portfolio at December 31, 2008 was

$2.1 trillion, which included $1.7 trillion of residential first mortgage, home equity lines of credit and home equity loans serviced for others.  (2008 10-K at 31.)

188.     The mortgage loan servicing amounts set forth in the above paragraph were misleading because the Defendants (a) failed to disclose that the Company's MSR revenues could be adversely affected by the unenforceability of mortgage loans processed and tracked through the MERS system, and (b) included in these amounts loans that were subject to the Company's repurchase obligations because they were sold as MBS in violation of representations and warranties.  The nondisclosure of both facts made the affirmative statements about the Company's mortgage servicing portfolio untrue or misleading.

189.     Defendants' description of the loans and portfolios in the 2008 Form 10-K was untrue or misleading because it did not disclose that the Company faced substantial risk that, based on the Company's reliance on MERS to process and track its ownership interests in such loans, the mortgages securing the loans would be found unenforceable when pursuing foreclosures, especially in "judicial foreclosure states," such as Florida or New York.

190.     Defendants also concealed the scope and extent of the Company's MBS Representation and Warranty Risks.  Defendants simply stated the following:

> At December 31, 2008 and 2007, the Corporation had **recourse obligations** of $157 million and $150 million with varying terms up to seven years on loans that had been securitized and sold.
>
> The Corporation sells loans with various representations and warranties related to, among other things, **the ownership of the loan, validity of the lien securing the loan, absence of … liens against the property securing the loan, the process used in selecting the loans for inclusion in a transaction, the loan's compliance with any applicable loan criteria established by the buyer, and the loan's compliance with applicable local, state and federal laws.** Under the Corporation's representations and warranties, the Corporation may be required to either repurchase the mortgage loans with the identified defects or indemnify the investor or insurer. In such cases, the Corporation bears any subsequent credit loss on the mortgage loans. During 2008, the Corporation repurchased $448 million of

loans from securitization trusts as a result of the Corporation's representations and warranties. The Corporation's representations and warranties are generally not subject to stated limits. ***However, the Corporation's contractual liability arises only when the representations and warranties are breached.*** The Corporation attempts to limit its risk of incurring these losses by structuring its operations to ensure consistent production of quality mortgages and servicing those mortgages at levels that meet secondary mortgage market standards. ***In addition, certain of the Corporation's securitizations include a corporate guarantee, which are contracts written to protect purchasers of the loans from credit losses up to a specified amount. The losses to be absorbed by the guarantees are recorded when the Corporation sells the loans with guarantees. The Corporation records its liability for representations and warranties, and corporate guarantees in accrued expenses and other liabilities and records the related expense through mortgage banking income.***

In addition to the amounts included in the preceding tables, during 2008, the Corporation purchased $12.2 billion of mortgage-backed securities from third parties and resecuritized them, as compared to $18.1 billion during 2007. (2008 10-K at 135.)

191.    These statements were materially untrue or misleading because they failed to disclose the size of existing repurchase demands made by GSEs, monoline insurers, and private investors.  Rather, the Defendants concealed the loan portfolios that were the subject of repurchase demands, the amount of the loans that were subject to the guarantees that BAC had committed to the GSEs, monoline insurers and private investors, and that repurchase demands could materially impact the Company's earnings, capital and liquidity.  As a consequence of Defendants' failure to disclose these then known risks or facts, investors reading the 2008 10-K were misled about the Company's exposure to the monoline companies and GSEs in connection with repurchase demands.

192.    Defendants reported in the 2008 10-K that the "increase in foreclosed properties of $1.2 billion was driven primarily by the addition of Countrywide." (2008 10-K at 63.)  This statement was misleading because Defendants did not disclose in the 2008 10-K that, due to the Company's reliance on MERS to process and track its ownership interests in such loans, the

Company faced substantial risk when pursuing foreclosures, especially in "judicial foreclosure states," such as Florida and New York.

193.    In the 2008 10-K, defendants Lewis and Price executed a certification reporting their opinions that the Company's internal controls for financial reporting was effective, as follows:

> The management of Bank of America Corporation is responsible for establishing and maintaining adequate internal control over financial reporting. … Management assessed the effectiveness of the Corporation's internal control over financial reporting as of December 31, 2008…. [M]anagement concluded that, as of December 31, 2008, the Corporation's internal control over financial reporting is effective ….

194.    The 2008 10-K and the certification by Defendants Lewis and Price were materially misleading because the Company's strategic reliance on the MERS system to process and track its ownership in mortgage loans sold or securitized constituted a material weakness evidenced by the Company's failure to secure its interests in an admittedly "substantial" portion of the mortgage loans and portfolios reported in the annual financial results.

195.    The 10-K and certification by Defendants Lewis and Price were also materially untrue or misleading because BAC's practices for establishing repurchase reserves sidestepped the Company's reserving procedures through committee, and instead were determined solely by the Company's chief financial, executive and risk officers, with participation from the legal department, and as such completely and intentionally avoided the Company's internal controls.

196.    Accompanying the 2008 10-K, defendant PwC executed a certification reporting its opinions that the Company's financial statements were reported in compliance with generally accepted accounting principles, that PwC had conducted an audit in compliance with generally accepted auditing standards, and that the Company's controls for financial reporting were effective, as follows:

In our opinion, the accompanying Consolidated Balance Sheet and the related
Consolidated Statement of Income, Consolidated Statement of Changes in
Shareholders' Equity and Consolidated Statement of Cash Flows present fairly, in
all material respects, the financial position of Bank of America Corporation and
its subsidiaries at December 31, 2008 and 2007, and the results of their operations
and their cash flows for each of the three years in the period ended December 31,
2008 in conformity with accounting principles generally accepted in the United
States of America. Also in our opinion, the Corporation maintained, in all
material respects, effective internal control over financial reporting as of
December 31, 2008…. We conducted our audits in accordance with the standards
of the Public Company Accounting Oversight Board (United States). …. We
believe that our audits provide a reasonable basis for our opinions. … (2008 10-K
at 109.)

**BAC's Announcement of Its First-Quarter 2009**
**Financial Results for the Quarter Ended March 31, 2009**

197.    On April 20, 2009, BAC issued a press release announcing its financial results for

the first quarter 2009, including net income for the quarter of $4.2 billion.  The April 20 press

release reported the mortgage loan assets held by the Company in various core and critical

portfolios from which the company reported some of its most significant operating results.  This

press release was misleading because it failed to disclose the substantial economic risks set forth

herein.  The Defendants had failed to secure the Company's interest in the admittedly

"substantial" volume of mortgage loans reflected in these amounts that were processed and

tracked solely through the MERS system.  Without any disclosure about the material risks of the

Company's reliance on the MERS system, the Company's financial results reported in the April

20 press release were materially untrue or misleading.

198.    In addition, while reporting the Company's core operating and financial results

related to the Company's servicing fees and other results related to the sale of MBS in the

secondary mortgage markets, Defendants failed to disclose the scope and extent of the

Company's MBS Representation and Warranty Risks.

81

*April 20, 2009 Earnings Conference Call*

199.    On April 20, 2009, the Company conducted an earnings conference call with analysts to discuss its financial results.  During that call, Defendant Lewis continued to hide the spike in bad debt associated with the '04-'07 vintage mortgage loans in which the Company had a purported interest.  While discussing the Company's operating results, Lewis did not say anything about MERS or the MBS that had been originated in violation of the representations and warranties pursuant to which they were sold to investors.

*First Quarter 2009 10-Q*

200.    On May 7, 2009, BAC filed its Form 10-Q for the quarter ended March 31, 2009 with the SEC, repeating all the amounts set forth above from the April 20 press release. Defendants Lewis and Price executed certifications contained in the Form 10-Q reporting their opinions that the Company's (a) financial information in the 10-Q fairly presented the Company's results in all material respects, and (b) internal controls for financial reporting were effective during the quarter.

201.    The Form 10-Q was materially untrue or misleading because Defendants failed to disclose the material economic risks that the Company faced corresponding to the Company's loan portfolio that it processed and tracked through the MERS system.

202.    In addition, while reporting the Company's core operating and financial results related to the Company's servicing fees and other results related to the sale of MBS in the secondary mortgage markets, Defendants failed to disclose the scope and extent of the Company's MBS Representation and Warranty Risks.

203.    The Form 10-Q and certification by Defendants Lewis and Price were materially misleading because the Company's strategic reliance on the MERS system to process and track its ownership in mortgage loans sold or securitized was a material weakness evidenced by the

82

Company's failure to secure its interests in an admittedly "substantial" portion of the mortgage loans and portfolios reported in the quarterly financial results.

204.    The Form 10-Q and certification by Defendants Lewis and Price were also materially untrue or misleading because BAC's practices for establishing repurchase reserves sidestepped the Company's reserving procedures through committee, and instead were determined solely by the Company's chief financial, executive and risk officers, with participation from the legal department, and as such completely and intentionally avoided the company's internal controls.

**BAC's Announcement of Its Financial Results**
**for the Quarter 2009, Ended June 30, 2009**

205.    On July 17, 2009, BAC issued a press release announcing its financial results for the second quarter 2009, including net income for the quarter of $3.2 billion.  The July 17 press release reported the mortgage loan assets held by the Company in various core and critical portfolios from which the company reported some of its most significant operating results.  The press release was misleading because the it failed to disclose the substantial economic risks set forth herein.  The Defendants had failed to secure the Company's interest in the admittedly "substantial" volume of mortgage loans reflected in these amounts that were processed and tracked solely through the MERS system.  Without any disclosure about the material risks of the Company's reliance on the MERS system, the Company's financial results reported in the July 17 press release were materially untrue or misleading.

206.    In addition, while reporting the Company's core operating and critical financial results related to the Company's servicing fees related to MBS, Defendants failed to disclose the scope and extent of the Company's MBS Representation and Warranty Risks.

83

*July 17, 2009 Earnings Conference Call*

207.     On July 17, 2009, the Company conducted an earnings conference call with analysts to discuss its financial results.  During that call, Defendants continued to conceal the spike in bad debt associated with the '04-'07 vintage mortgage loans in which the Company had an interest.  While discussing the Company's quarterly operating results, the Defendants failed to disclose the truth.

208.     Rather than disclose the huge spike in losses related to legacy mortgage assets, particularly those from the '04-'07 vintages, or that were subprime or otherwise nontraditional, and as a result were subject to the Company's recourse guarantee, Defendant Price merely stated:

> Now, there are a number of things affecting [the consumer real estate] portfolio…. Formal [foreclosure] moratoriums have now been lifted …. [O]nce a loan has been evaluated under all our various programs, if no other alternative exists, those loans will be released into foreclosure.

209.     These statements were materially untrue or misleading because Defendant Price misled the market about the Company's core operating results and failed to disclose the material risks that Defendants knew with regard to legacy '04-'07 vintage mortgage loans, the inability of the MERS system to process and track the Company's interest in such loans, or the scope and extent of the Company's MBS Representation and Warranty Risks.

210.     Defendant Price's statements were also materially untrue or misleading because he did not disclose that, due to the Company's reliance on MERS to process and track its ownership interests in the very loans on which he was offering comments, the Company faced substantial risk when pursuing foreclosures, especially in "judicial foreclosure states," such as Florida and New York.

*Second Quarter 2009 10-Q*

211.     On August 7, 2009, BAC filed with the SEC its Form 10-Q for the quarter ended June 30, 2009, which repeated the Company's representation of its financial results for the quarter previously disseminated in its July 17, 2009 press release.  Defendants Lewis and Price executed certifications contained in the Form 10-Q reporting their opinions that the Company's (a) financial information in the 10-Q fairly presented the Company's results in all material respects, and (b) internal controls for financial reporting were effective during the quarter.

212.     The Form 10-Q was materially untrue or misleading because Defendants failed to disclose the material economic risks that the Company faced corresponding to the Company's loan portfolio that it processed and tracked through the MERS system.

213.     In addition, while reporting the Company's core operating and financial results related to the Company's servicing fees and other results related to the sale of MBS in the secondary mortgage markets, Defendants failed to disclose the scope and extent of the Company's MBS Representation and Warranty Risks.

214.     The Form 10-Q and certification by Defendants Lewis and Price were materially misleading because the Company's strategic reliance on the MERS system to process and track its ownership in mortgage loans sold or securitized constituted a material weakness evidenced by the Company failure to secure its interests in an admittedly "substantial" portion of the mortgage loans and portfolios reported in the quarterly financial results.

215.     The Form 10-Q and certification by Defendants Lewis and Price were also materially untrue or misleading because BAC's practices for establishing repurchase reserves sidestepped the Company's stated procedure for making decisions through committee and as such completely and intentionally avoided the Company's internal controls.  Instead, repurchase

reserves were determined solely by the Company's chief financial, executive and risk officers, with participation from the legal department.

***BAC's Announcement of Its Financial Results
for the Quarter Ended September 30, 2009***

216.    On October 16, 2009, BAC issued a press release announcing its financial results for the third quarter 2009, including a net loss for the quarter of $1.0 billion.  The October 16 press release reported the mortgage loan assets held by the Company in various core and critical portfolios from which the company reported some of its most significant operating results. This press release was materially misleading because the 10-Q failed to disclose the substantial economic risks set forth herein.  The defendants had failed to secure the Company's interest in the admittedly "substantial" volume of mortgage loans reflected in these amounts that were processed and tracked solely through the MERS system.  Without any disclosure about the material risks of the company's reliance on the MERS system, the Company's financial results reported in the October 16 press release were materially untrue or misleading.

217.    The press release was also materially untrue or misleading because it failed to disclose the material risks facing the company in the Countrywide impaired portfolio that were known at the beginning of the Class Period as they specifically related to: (a) '04-'07 vintage mortgage loans and the guarantees made by the Company to investors who purchased those loans in the form of MBS, and (b) the failure of the Company to secure its ownership or servicing interests in such mortgage loans because of Defendants' reliance on the MERS system. Defendants did not disclose that, because of the Company's reliance on MERS to process and track its interests in such loans, the Company faced substantial risk when pursuing foreclosures, especially in "judicial foreclosure states," such as Florida and New York.

218.    In addition, while reporting the Company's core operating and critical financial results related to the Company's servicing fees related to MBS, Defendants failed to disclose the scope and extent of the Company's MBS Representation and Warranty Risks.

***October 16, 2009 Earnings Conference Call***

219.    On October 16, 2009, the Company conducted an earnings conference call with analysts to discuss its financial results.  During that call, Defendants continued to conceal the spike in bad debt associated with the '04-'07 vintage mortgage loans in which the Company had an interest.  Defendants did not say anything about the MBS that had been originated in violation of the representations and warranties pursuant to which they were sold to investors.

220.    Rather than disclose the huge spike in losses related to BAC and its legacy entities' mortgage assets, particularly those from the '04-'07 vintages, or that were subprime or otherwise nontraditional, and as a result were subject to the Company's recourse guarantee, Defendant Price stated:

> Formal moratoriums on foreclosures have been lifted…. [O]nce a loan has been evaluated under all the various programs, if no other alternative exists, that loan will be released into foreclosure....

221.    These statements were materially untrue or misleading because Defendant Price misled the market about the Company's core operating results and failed to disclose the material risks that Defendants knew with regard to legacy '04-'07 vintage mortgage loans, the inability of the MERS system to secure the Company's interest in such loans, and the scope and extent of the Company's MBS Representation and Warranty Risks.

222.    Defendant Price's statements were also untrue or misleading because he did not disclose that, due to the Company's reliance on MERS to process and track its ownership interests in the very loans on which he was offering comments, the Company faced substantial

risks pursuing foreclosures, especially in so-called "judicial foreclosure states," such as Florida and New York.

***Third Quarter 2009 10-Q***

223.    On November 6, 2009, BAC filed its Form 10-Q for the quarter-ended September 30, 2009, repeating all the amounts set forth above from the October 16 press release. Defendants Lewis and Price executed certifications contained in the Form 10-Q reporting their opinions that the Company's (a) financial information in the 10-Q fairly presented the Company's results in all material respects, and (b) internal controls for financial reporting were effective during the quarter.

224.    The Form 10-Q was materially untrue or misleading because defendants failed to disclose the material economic risks that the Company faced corresponding to the Company's loan portfolio that it processed and tracked through the MERS system.

225.    In addition, while reporting the Company's core operating and financial results related to the Company's servicing fees and other results related to the sale of MBS in the secondary mortgage markets, Defendants failed to disclose the scope and extent of the Company's MBS Representation and Warranty Risks.

226.    The Form 10-Q and certification by Defendants Lewis and Price were materially misleading because the Company's strategic reliance on the MERS system to process and track its ownership in mortgage loans sold or securitized was a material weakness evidenced by the Company failure to secure its interests in an admittedly "substantial" portion of the mortgage loans and portfolios reported in the quarterly financial results.

227.    The Form 10-Q and certification by Defendants Lewis and Price were also materially untrue or misleading because BAC's practices for establishing repurchase reserves sidestepped the Company's reserving procedures through committee, and instead were

determined solely by the Company's chief financial, executive and risk officers, with participation from the legal department, and as such completely and intentionally avoided the company's internal controls.

***Prospectus Supplements for BAC Common Equivalent Securities***

228.    BAC filed Prospectus Supplements for its Common Equivalent Securities offering with the SEC on December 3 and December 4, 2009.  The Prospectus Supplements disclosed that the depository shares representing interests in BAC's Common Equivalent Securities would be priced at $15.00 per share, meaning that BAC would raise $18.8 billion in proceeds from the offering, after underwriting commissions.  BAC completed the Common Equivalent Securities offering on December 4, 2009, using the proceeds to repay its obligation to the U.S. government under the Company's participation in TARP.

229.    The Prospectus Supplements incorporated therein the Company's 2008 Form 10-K filed on February 27, 2009, and stated that Defendant PwC had consented to inclusion of its audit report for BAC's 2008 financial statements that were a part of that 10-K.

230.    Thus, the materially untrue or misleading statements and omissions contained in the 2008 10-K as set forth above in paragraphs 183-196, including the Company's reported loan assets and portfolios, related state concentrations and mortgage servicing assets, and its guarantees on MBS, were thereby repeated and disclosed to investors and the market through the Prospectus Supplements filed with the SEC on December 3 and 4, 2009.

231.    The loan assets and related state concentrations that were incorporated into the Prospectus Supplements were misleading because they did not disclose that, by using MERS, the Company had failed to secure its interest in the admittedly "substantial" volume of mortgage loans reflected in these amounts.

232.    In addition, while reporting the Company's core operating and financial results related to the Company's servicing fees and other results related to the sale of MBS in the secondary mortgage markets, Defendants failed to disclose the scope and extent of the Company's MBS Representation and Warranty Risks.

**BAC's Announcement of Its Financial Results
for the Year-End December 31, 2009**

233.    On January 20, 2010, BAC issued a press release announcing its financial results for the fourth quarter and year-end 2009, including full-year 2009 income of $6.03 billion compared with $4.00 billion for 2008.  With Brian Moynihan as the Company's new Chief Executive Officer and President, the Defendants highlighted the Company's TARP repayment: "Bank of America repaid the $45 billion of the U.S. taxpayers' preferred stock investment in the company as part of TARP.  Repayment followed the successful completion of a securities offering."  The press release stated:

> During the fourth quarter, Bank of America sold 1.286 billion common equivalent securities, generating gross proceeds of $19.3 billion. The offering was priced at $15.00 per depository share and its proceeds, along with existing corporate funds, were used to repurchase all the preferred stock issued to the U.S. Department of the Treasury to repay the TARP investment.

Defendants Moynihan stated: "[W]e repaid the American taxpayer, with interest, for the TARP investment [and w]e have taken steps to strengthen our balance sheet through successful securities offerings."

234.    The January 20, 2010 press release reported the mortgage loan assets held by the Company in various core and critical portfolios from which the company reported some of its most significant operating results.  The press release was misleading because it failed to disclose the substantial economic risks set forth herein.  The defendants had failed to secure the Company's interest in the admittedly "substantial" volume of mortgage loans reflected in these

amounts that were processed and tracked solely through the MERS system.  Without any

disclosure about the material risks of the company's reliance on the MERS system, the

Company's financial results reported in the January 20 press release were materially untrue or

misleading.

235.     In addition, while reporting the Company's core operating and financial results

related to the Company's servicing fees and other results related to the sale of MBS in the

secondary mortgage markets, Defendants failed to disclose the scope and extent of the

Company's MBS Representation and Warranty Risks.

***2009 Form 10-K***

236.     On February 26, 2010, BAC filed with the SEC its Form 10-K for the fiscal year

ending December 31, 2009 ("2009 10-K"), executed by Defendants Moynihan, and Cotty, as

well as the Director Defendants.  The 2009 10-K set forth the Company's audited financial

statements and related footnote disclosures for the fiscal year ending December 31, 2009,

Management's Discussion and Analysis of Financial Condition and Results of Operations, and

contains the Report of Management on Internal Control Over Financial Reporting.  The 2009 10-

K also is accompanied by the Report of the Company's Independent Registered Public

Accounting Firm, PwC, which the auditing firm executed on February 26, 2010.

237.     The 2009 10-K set forth amounts reported as assets in the Company's loan,

purchased impaired, as well as its nonperforming, residential mortgages, and discontinued real

estate, portfolios.  None of these statements alerted investors to the material risks and material

weaknesses in internal controls associated with the Company's blind reliance on the MERS

system to process and track BAC's interests in mortgage loans in the secondary mortgage

markets.  Also, none of these statements disclose the risks in foreclosure or bankruptcy

proceedings that were known by Defendants in connection with reliance on MERS.

238.    The 2009 10-K reported the mortgage loan assets held by the Company in various core and critical portfolios from which the company reported some of its most significant operating results.  The 10-K was misleading because the Form 10-K failed to disclose the economic risks set forth herein.  The defendants had failed to secure the Company's interest in the admittedly "substantial" volume of mortgage loans reflected in these amounts that were processed and tracked solely through the MERS system.  Without any disclosure about the material risks of the company's reliance on the MERS system, the Company's financial results reported in the 2009 10-K are materially untrue or misleading.

239.    Defendants also reported residential mortgage state concentrations in Florida and New York, and home equity state concentrations in Florida, New Jersey and New York. The 2009 10-K states: "At December 31, 2009, the purchased non-impaired discontinued real estate portfolio was $1.6 billion....  Florida represented nine percent of the portfolio and 16 percent of the nonperforming loans at December 31, 2009."  But Defendants never disclosed in the 2009 10-K that, because of the Company's reliance on MERS to process and track its ownership and servicing interests in such loans, the Company faced substantial risk when pursuing foreclosures, especially in judicial foreclosure states like Florida and New York.

240.    Defendants attempted to nominalize the substantial risks that the Company faced on its loan and MBS guarantees arising from representation and warranties made at the time of the underlying transactions.  The 2009 10-K states that:

> We have experienced and continue to experience increasing repurchase demands from and disputes with these buyers and monoline financial guarantors.  In the event we are required to repurchase these mortgage and other loans or provide indemnification or other recourse, this could significantly increase our losses and thereby affect our future earnings.… [(2009 10-K at 5)].

241.    Defendants' statements in the 2009 10-K were untrue or misleading because there was no disclosure that a majority of the loans BAC and its legacy entities had sold and packaged as MBS did not meet the Company's underwriting standards and violated representations and warranties that had been made at the time of sale.  The market therefore was uninformed of the size of the Company's exposure.  For example, because the MERS system failed to comply with state laws for perfecting a secured interest in a mortgage loan assignment, all such MBS assignments processed and tracked solely through MERS were in violation of the representation and warranties.

242.    Defendants reported in the Company's 2009 10-K that its mortgage and banking production income increases were "partially offset by an increase in representations and warranties expense to $1.9 billion in 2009 from $246 million in 2008. The increase in representations and warranties expense was driven by increased estimates of defaults reflecting deterioration in the economy and housing markets combined with a higher rate of repurchase or similar requests."  (2009 10-K at 32.)

243.    These statements were materially untrue or misleading because they failed to disclose the scope and extent of BAC's MBS Representation and Warranty Risks.

244.    The 2009 Form 10-K stated:

We also have indirect exposure to monoline financial guarantors, primarily in the form of guarantees supporting our mortgage and other loan sales.  Indirect exposure may exist when we purchase credit protection from monoline financial guarantors to hedge all or a portion of the credit risk on certain mortgage and other loan exposures.  A loss may occur when we are required to repurchase a loan and the market value of the loan has declined or when we are required to indemnify or provide recourse for a guarantor's loss.  We have experienced and continue to experience increasing repurchase demands from and disputes with monoline financial guarantors.  We expect to contest such demands that we do not believe are valid. In the event that we are required to repurchase loans that have been the subject of repurchase demands or otherwise provide indemnification or

other recourse, this could significantly increase our losses and thereby affect our future earnings.  (2009 10-K at 70.)

245.    These statements were materially untrue or misleading because the Defendants omitted materially adverse facts that they then knew about the inability of the MERS system to secure the Company's interest in such loans or the scope and extent of the MBS Representation and Warranty Risks.  Tellingly, Defendants did not reveal the size of the then existing repurchase demands made by MBIA and AIG, the amount of the loans that were subject to the guarantees that BAC had committed to AIG and MBIA, the repurchase of which could adversely impact the Company's capital and liquidity position.  Without disclosing these then known risks or facts, investors reading the 2009 10-K were misled about the Company's exposure to the monoline companies in connection with repurchase demands.

246.    The 2009 Form 10-K also stated:

The Corporation sells mortgage loans and, in the past sold home equity loans, with various representations and warranties related to, among other things, ***the ownership of the loan***, validity of the lien securing the loan, ***absence of*** … ***liens against the property securing the loan***, ***the process used in selecting the loans for inclusion in a transaction, the loan's compliance with any applicable loan criteria established by the buyer, and the loan's compliance with applicable local, state and federal laws***. Under the Corporation's representations and warranties, the Corporation may be required to repurchase the mortgage loans with the identified defects, indemnify or provide other recourse to the investor or insurer. In such cases, the Corporation bears any subsequent credit loss on the mortgage loans. The Corporation's representations and warranties are generally not subject to stated limits and extend over the life of the loan. However, ***the Corporation's contractual liability arises only if there is a breach of the representations and warranties that materially and adversely affects the interest of the investor or pursuant to such other standard established by the terms of the related selling agreement.*** The Corporation attempts to limit its risk of incurring these losses by structuring its operations to ensure consistent production of quality mortgages and servicing those mortgages at levels that meet secondary mortgage market standards. ***In addition, certain of the Corporation's securitizations include corporate guarantees that are contracts written to protect purchasers of the loans from credit losses up to a specified amount. The estimated losses to be absorbed under the guarantees are recorded when the Corporation sells the loans with guarantees.*** …. The Corporation records its

liability for representations and warranties, and corporate guarantees in accrued expenses and other liabilities and records the related expense in mortgage banking income. During 2009 and 2008, the Corporation recorded representations and warranties expense of $1.9 billion and $246 million. During 2009 and 2008, the Corporation repurchased $1.5 billion and $448 million of loans from first lien securitization trusts under the Corporation's representations and warranties **and corporate guarantees** and paid $730 million and $77 million to indemnify the investors or insurers. In addition, during 2009, the Corporation repurchased $13.1 billion of loans from first lien securitization trusts as a result of modifications, loan delinquencies or optional clean−up calls.  (2009 10-K at 144.)

247.    These statements were materially untrue or misleading because the defendants

omitted materially adverse facts that they then knew about the scope and extent of the MBS

Representation and Warranty Risks.  Defendants did not reveal the then existing repurchase

demands made by MBIA and AIG, nor did they disclose the remaining outstanding repurchase

issues the Company then faced from the GSEs.  Rather, the Defendants concealed the loan

portfolios that were the subject of the AIG and MBIA demands, and the remaining outstanding

GSE repurchase demands, the amount of the loans that were subject to the guarantees that BAC

had committed to AIG, MBIA and the GSEs, the repurchase of which loans could adversely

impact the Company's capital and liquidity position.  Without disclosing these then known risks

or facts, investors reading the 2009 10-K were misled about the Company's exposure to the

monoline companies and GSEs in connection with repurchase demands.

248.    The Defendants misled the market about the Company's responsibility for its

guarantees.  By stating that the Corporation's liability arises "**only if**" there is a breach of the

representations and warranties that **"materially and adversely affects the interest of the**

**investor,"** the Defendants concealed that the breach itself triggers the recourse obligation of

repurchase, as a rescissionary remedy, as set forth in the related selling agreements.  And

Defendants misled the market about the amount and scope of that obligation, concealing all the

material risks that they then knew with regard to the demands that had been made through the filing of the 2009 10-K.

249.    In the 2009 10-K, defendants Moynihan and Cotty executed a certification reporting their opinions that the Corporation's internal control over financial reporting was effective, as follows:

> The management of Bank of America Corporation is responsible for establishing and maintaining adequate internal control over financial reporting.
>
> *              *              *
>
> Management assessed the effectiveness of the Corporation's internal control over financial reporting as of December 31, 2009….
>
> *              *              *
>
> Based on that assessment, management concluded that, as of December 31, 2008, the Corporation's internal control over financial reporting is effective….

250.    The certification by defendants Moynihan and Cotty was materially misleading because the Company's strategic reliance on the MERS system to process and track its ownership in mortgage loans sold or securitized was a material weakness evidenced by the Company's failure to secure its interests in an admittedly "substantial" portion of the mortgage loans and portfolios reported in the annual financial results.

251.    The certification by defendants Moynihan and Cotty was also materially untrue or misleading because BAC's practices for establishing repurchase reserves sidestepped the Company's reserving procedures through committee, and instead were determined solely by the Company's chief financial, executive and risk officers, with participation from the legal department, and as such completely and intentionally avoided the company's internal controls.

*BAC's Announcement of Its First-Quarter 2010 Financial Results*

252.    On April 16, 2010, BAC issued a press release announcing its financial results for

the first quarter 2010, including net income for the year of $3.2 billion.  The April 16 press

release reported the mortgage loan assets held by the Company in various core and critical

portfolios from which the company reported some of its most significant operating results.  The

press release was misleading because it failed to disclose the substantive economic risks set forth

herein.  The defendants had failed to secure the Company's interest in the admittedly

"substantial" volume of mortgage loans reflected in these amounts that were processed and

tracked solely through the MERS system.  Without any disclosure about the material risks of the

company's reliance on the MERS system, the Company's financial results reported in the April

16 press release were materially untrue or misleading.

253.    In addition, Defendants failed to disclose the scope and extent of the Company's

substantial MBS Representation and Warranty Risks.

*April 16, 2010 Earnings Conference Call*

254.    On April 16, 2010, the Company conducted an earnings conference call with

analysts to discuss its financial results.  During that call, Defendants continued to conceal the

spike in bad debt associated with the '04-'07 vintage mortgage loans in which the Company

purportedly had an interest.  Defendants did not say anything about the MBS that had been

originated in violation of the representations and warranties.

255.    In the conference call, Defendant Moynihan stated:

> I think the results reinforce what I think will be the trends that we'll discuss over
> the next few quarters.  Decreasing charge-offs, potential reserve releases, and
> those types of things that dominate the credit discussion.

*       *       *

With legacy asset write-downs now down to an immaterial amount, and that also shows the worst of the crisis is behind us we believe.…

256.    Defendant Moynihan failed to state anything during the call about the Company's actual guarantees that obligated the Company.  Moynihan also failed to disclose the Company's MBS Representation and Warranty Risks or the amount of the loans serviced by the Company from MBS that were subject to the Company's guarantee to repurchase upon violation of representations and warranties.  And Moynihan continued to conceal the material risks the Company faced with regard to its admittedly "substantial" reliance on MERS.

257.    Defendant Moynihan also misled analysts on the April 16 call because he specifically mentioned "decreasing charge-offs" and "potential reserve releases," while he failed to state the scope or amount of the Company's recourse obligations, and he misled the analysts on the call to believe that "the worst of the crisis is behind us," when he knew otherwise.

258.    Defendant Cotty stated:

This is the first time in several quarters where write-downs on legacy assets didn't have a significant impact on revenue.

*               *               *

[A]s we have done in the past, we repurchased government issued delinquent loans because it's more economical than to continue advanced principal and interest at a security rate.  These loans are still insured by the government but do in fact show up on our 30-plus performing delinquency measures.  I bring your attention to these items because in some instances they may mask the trends of improvement we are experiencing.

*               *               *

These government insured loans are primarily related to repurchases from Ginnie Mae securitizations for economic reasons, as I mentioned earlier.

Defendant Moynihan added:

So on the actual charge-off levels, I think you can see the trend lines.…  And you can look at them.

*               *               *

98

I think we will see continued improvement there.

*            *            *

In terms of reserve releases, we're trying to be conservative here, .… And we're sitting with strong reserves.  We built the reserves up significantly year-over-year.  We'll continue to hold those reserves.

*            *            *

[T]alking…more clearly[, ] as we bought Countrywide we inherited portfolios which are not core and those will run off.…  It's just that impaired portfolio, and things will run off over time.

259.    Defendants Cotty failed to disclose the scope and extent of the Company's MBS Representation and Warranty Risks or the amount of the loans serviced by the Company from MBS that were the subject to the Company's guarantee to repurchase upon violation of representations and warranties.  And Defendants continued to conceal the material risks the Company faced with regard to its admittedly "substantial" reliance on MERS.

260.    Defendants' statements about delinquencies or defaults during the call were also untrue or misleading because they did not disclose the substantial risk that, due to the Company's reliance on MERS, the Company faced when pursuing foreclosures, especially in so-called "judicial foreclosure states," such as Florida and New York.

***First Quarter 2010 10-Q***

261.    On May 7, 2010, BAC filed with the SEC its Form 10-Q for the quarter-ended March 31, 2010, which repeated the Company's representations of its financial results for the quarter previously disseminated in its April 16, 2010 press release.  Defendants Moynihan and Cotty executed certifications contained in the Form 10-Q reporting their opinions that the Company's (a) financial information in the 10-Q fairly presented the Company's results in all

99

material respects, and (b) internal controls for financial reporting were effective during the quarter.

262.    The Form 10-Q was materially untrue or misleading because defendants failed to disclose the material economic risks that the Company faced corresponding to the Company's loan portfolio that it processed and tracked through the MERS system.

263.    The Form 10-Q and certification by defendants Moynihan and Cotty were materially misleading because the Company's strategic reliance on the MERS system to process and track its ownership in mortgage loans sold or securitized was a material weakness evidenced by the Company failure to secure its interests in an admittedly "substantial" portion of the mortgage loans and portfolios reported in the quarterly financial results.

264.    The Form 10-Q and certification by defendants Moynihan and Cotty were also materially untrue or misleading because BAC's practices for establishing repurchase reserves sidestepped the Company's reserving procedures through committee, and instead were determined solely by the Company's chief financial, executive and risk officers, with participation from the legal department, and as such completely and intentionally avoided the company's internal controls.

265.    With respect to repurchase demands for securitized loans pursuant to representations and warranties, the Company stated in its Notes to the Financial Statements (p. 34):

> At March 31, 2010 and December 31, 2009, the [liability for representations and warranties] was $3.3 billion and $3.5 billion. For the three months ended March 31, 2010 and 2009, the representations and warranties expense was $526 million and $434 million, loans repurchased from investors and securitization trusts (including those in which the monoline financial guarantors insured some or all of the related bonds) amounted to $654 million and $359 million, and the amount paid to satisfy claims (including those in which the monoline financial guarantors insured some or all of the related bonds) was $297 million and $63 million.…

\*          \*          \*

At March 31, 2010, the unpaid principal balance of loans related to unresolved repurchase requests previously received from monoline financial guarantors was approximately \$3.0 billion, including \$2.1 billion that have been reviewed by the Corporation where, in its view, a valid defect has not been identified which would constitute an actionable breach of its representations and warranties and \$900 million that are in the process of review.… [A] liability has not been established related to repurchase requests where a valid defect has not been identified and other unasserted requests to repurchase loans from the securitization trusts in which the monoline financial guarantors have insured all or some of the related bonds.

266.    The statements were materially untrue or misleading because the defendants omitted materially adverse facts that they then knew with regard to the scope and extent of the Company's Representation and Warranty Risks.

267.    Defendants did not reveal the then existing repurchase demands made by MBIA and AIG, or other monolines.  Rather, the Defendants concealed the loan portfolios that were the subject of the AIG and MBIA demands, and those of other monolines, and the amount of the loans that were subject to the guarantees that BAC had committed to AIG, MBIA, and other monolines, or that the repurchase demands could adversely impact the Company's capital and liquidity position.

268.    In addition, the Company's admittedly "substantial" reliance on MERS was concealed in this disclosure.

**_BAC's Announcement of Its Second Quarter 2010 Financial Results_**

269.    On July 16, 2010, BAC issued a press release announcing its financial results for the second quarter 2010, including net income for the quarter of \$3.1 billion.  The July 16 press release reported the mortgage loan assets held by the Company in various core and critical portfolios from which the company reported some of its most significant operating results.  The press release was misleading because the 10-Q failed to disclose the substantial economic risks

set forth herein.  The Defendants had failed to secure the Company's interest in the admittedly "substantial" volume of mortgage loans reflected in these amounts that were processed and tracked solely through the MERS system.  Without any disclosure about the material risks of the company's reliance on the MERS system, the Company's financial results reported in the July 16 press release were materially untrue or misleading.

270.    In addition, Defendants failed to disclose the scope or extent of the Company's MBS Representation and Warranty Risks.

***Second Quarter 2010 10-Q***

271.    On August 6, 2010, BAC filed with the SEC its Form 10-Q for the quarter-ended June 30, 2010, which repeated the Company's representations of its financial results for the quarter previously disseminated in its July 16, 2010 press release.  Defendants Moynihan and Noski executed certifications contained in the Form 10-Q reporting their opinions that the Company's (a) financial information in the 10-Q fairly presented the Company's results in all material respects, and (b) internal controls for financial reporting were effective during the quarter.

272.    The Form 10-Q was materially untrue or misleading because Defendants failed to disclose the material economic risks that the Company faced corresponding to the Company's loan portfolio that it processed and tracked through the MERS system.

273.    The statements were also materially untrue or misleading because the Defendants misled the market about materially adverse facts that they then knew with regard to the scope and extent of the Company's MBS Representation and Warranty Risks.

274.    The Form 10-Q and certification by defendants Moynihan and Noski were materially misleading because the Company's strategic reliance on the MERS system to process

and track its ownership in mortgage loans sold or securitized constituted a material weakness evidenced by the Company failure to secure its interests in an admittedly "substantial" portion of the mortgage loans and portfolios reported in the quarterly financial results.

275.     The Form 10-Q and certification by defendants Moynihan and Noski were also materially untrue or misleading because BAC's practices for establishing repurchase reserves sidestepped the Company's reserving procedures through committee, and instead were determined solely by the Company's chief financial, executive and risk officers, with participation from the legal department, and as such completely and intentionally avoided the company's internal controls.

276.     Defendants also misled investors in this 10-Q about the material risks related to the Company's reliance on the MERS system to process and track the Company's interest in vintage mortgage loans that were securitized.  Defendants knew that the Company had received adverse decisions about its reliance on MERS, from state courts in foreclosure actions and from federal courts in bankruptcy proceedings, which had determined that the Company's reliance on MERS severed the "chain of title" and "clouded" the ownership of the loan.  Defendants thus knew that the Company faced a material risk from its "substantial" reliance on the MERS system.  Defendants concealed that the Company's reliance on MERS clouded the ownership of its loans portfolios, and exposed BAC to enormous recourse guarantee claims based on a violation of representations and warranties given to MBS investors.

## VII.     DEFENDANTS' VIOLATIONS OF GAAP AND SEC RULES

277.     GAAP are those principles recognized by the accounting profession and the SEC as the uniform rules, conventions, and procedures necessary to define accepted accounting practices at a particular time.  GAAP principles are the official standards accepted by the SEC

and promulgated in part by the American Institute of Certified Public Accountants ("AICPA"). SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading or inaccurate, despite footnote or other disclosures. SEC Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures accompanying the most recent annual financial statements. 17 C.F.R. § 210.10-01(a)(5). Additionally, SEC registrants are required under SEC rules to maintain sufficient systems of internal controls to ensure fair reporting in conformity with GAAP.

### A. Duties of the Chief Financial Officer and Chief Executive Officer under GAAP and SEC Regulations

278. Defendants Price, Cotty and Noski, during their respective tenures as CFO during the Class Period, were ultimately responsible for adopting sound accounting policies and for establishing and maintaining a system of internal controls sufficient to result in accurate and reliable recording of transactions and the fair presentation of the Company's financial results, including its revenues and expenses, assets and liabilities, and cash flows, in the books and records, of the Company. This responsibility included adequately supporting the journal entries recording, *inter alia*, guarantees on MBS, and properly accounting for and disclosing the risks related to loan losses and repurchase exposure and demands.

279. Defendants Price, Cotty and Noski, during their respective tenures as CFO during the Class Period, were ultimately responsible for executing certifications to BAC's Forms 10-Q and 10-K acknowledging such responsibilities. Such certifications, pursuant to Section 302 and 906 of the Sarbanes-Oxley Act of 2002, specifically acknowledged that Defendants Price, Cotty and Noski, during their respective tenures as CFO during the Class Period, and other BAC senior

104

management, were responsible for establishing and maintaining disclosure controls and procedures, internal control over financial reporting and the fair presentation of the Company's financial statements, including related footnotes, in accordance with GAAP.  Such certifications represented that the Company's consolidated financial statements: (a) did not contain any untrue statements of material facts, (b) did not omit any material facts necessary to make the statements in its consolidated financial statements not misleading; (c) fairly presented in all material respects the financial condition, results of operations, and cash flows, to management's (*i.e.*, BAC's CEO's and CFOs') knowledge; and (4) complied with the Securities Exchange Act of 1934.  BAC's CEO and CFOs further certified that they evaluated the effectiveness of the Company's disclosure controls and procedures and internal control over financial reporting, and deemed them effective.

### B.      Generally Accepted Accounting Principles and SEC Rules

280.      Item 303 of SEC Regulation S-K requires the disclosure of Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A"), in both annual and quarterly financial statements, to provide information "***necessary to an understanding*** of [the registrant's] financial condition, changes in financial condition and results of operations."  17 C.F.R. § 229.303(a).  In 1989, the SEC issued an interpretation providing guidance regarding MD&A, stating that the SEC had long recognized a "…need for narrative explanation of the financial statements, because a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance." This interpretation also stated that the general purpose of MD&A requirements is "…to give investors an opportunity to look at the registrant through the eyes of management…[,]" particularly with

emphasis on the registrant's prospects for the future.[5]  The SEC again, in December 2003, issued

an interpretation that provided additional guidance regarding MD&A, stating that the MD&A

requirements are intended to meet three principal objectives:

> *[T]o provide a narrative explanation of a company's financial statements that enables investors to see the company through the eyes of management;*
>
> [T]o enhance the overall financial disclosure and *provide the context within which financial information should be analyzed*; and
>
> [T]o provide information about the quality of, and potential variability of, a company's earnings and cash flow, so that investors can ascertain the likelihood that past performance is indicative of future performance.

281.    Regulation S-K speaks to the importance of disclosures in a company's public

filings and provides specific guidance on what the SEC expects to see in such filings.  It requires

the MD&A to include the following with respect to a company's results of operations, in relevant

part:

> Describe any *known trends or uncertainties that have had or that the registrant reasonably expects will have material favorable or unfavorable impact* on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues…, the change in the relationship shall be disclosed.

17 C.F.R. § 229.303(a)(3)(ii); *see also* 17 C.F.R. § 229.303(a)(1).

282.    Additionally, SEC regulations require the MD&A to discuss the registrant's off-

balance sheet arrangements, which include obligations under a guarantee contract and retained or

contingent interests in assets transferred to an unconsolidated entity (such as MSRs or contingent

representation and warranty exposure), that have or are reasonably likely to have a current or

future effect on the registrant's financial results that is material to investors.  17 C.F.R.

§ 229.303(a)(4).

---

[5] SEC Interpretation: *Management's Discussion and Analysis of Financial Condition and Results of Operations; Certain Investment Company Disclosures,* dated May 18, 1989.

## C.      Specifically Relevant GAAP Requirements

283.    There are additional GAAP provisions that relate to the accounting issues at issue in this case, and specifically with respect to the Company's recourse liability for representations and warranties made in MBS transactions.  In BAC's and its legacy entities' MBS transactions, the Company provided, in essence, protection (or a guarantee) to the investors in the mortgage-backed securities sold through securitized trusts.  In most cases, in the event of a representation and warranty violation, the Company was required to repurchase the underlying debt assets and return the amount invested (less principal distributions to date).  This rescissionary remedy was an agreement under the terms of the related MBS transaction.  The required accounting disclosure for such obligations is governed by GAAP under "Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others" ("FIN 45"), which in 2009 was codified as part of the FASB Accounting Standards Codification ("ASC"), topic 460, Guarantees ("ASC 460").  Because a guarantee imposes a performance obligation, FIN 45 requires disclosure of guarantees, or groups of similar guarantees, *regardless of whether the likelihood of having to make payments is deemed unlikely or remote*.  FIN 45, ¶ 9; ASC 460-10-25-3.  The disclosure is required to provide: (a) the nature of the guarantee, including the approximate term of the guarantee, how the guarantee arose, and the events or circumstances that would require the guarantor to perform under the guarantee, and the current status of the payment/performance risk of the guarantee; (b) the maximum potential amount of future payments (undiscounted) that the guarantor could be required to make under the guarantee; and (c) current carrying amount of the liability, if any, for the guarantor's obligations under the guarantee.  FIN 45 ¶ 13; ASC 460-10-50-2; ASC 460-10-50-3; ASC 460-10-50-4.

284.     GAAP under "Accounting for Contingencies" ("FAS 5"), which was codified in 2009 as part of the FASB Accounting Standards Codification ("ASC"), topic 450, Contingencies ("ASC 450"), requires disclosure of losses incurred and loss contingencies existing as of the date of the financial statements.  Specifically, FAS 5 provides the following, in relevant part:

> If no accrual is made for a loss contingency… or if an exposure to loss exists in excess of the amount accrued… disclosure of the contingency shall be made when there is at least a reasonable possibility that a loss or an additional loss may have been incurred. The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible range of loss or state that such an estimate cannot be made… (FAS 5 ¶ 10; ASC 450-20-50.)

FAS 5 and ASC 450 provide examples of loss contingencies that are applicable here, including the collectability of receivables (*e.g.*, the risk that amounts due may not be collected, including principal and interest, according to contractual terms); recovery of the carrying amount of assets; actual or possible claims and assessments; guarantees of indebtedness of others; and agreements to repurchase receivables (*e.g.*, to repurchase related property) that had been sold.  FAS 5, ¶¶ 1, 4, 23 (as amended by FAS 114, Accounting by Creditors for Impairment of a Loan ("FAS 114"), 31; ASC 450-10-05-5; ASC 450-20-05-3; ASC 450-20-20.  FAS 5 and ASC 450 require the disclosure of such loss contingencies when it is at least reasonably possible (*i.e.*, more than remote but less than likely) that a loss has been incurred (or if exposure to additional loss in excess of any amount already recorded has been incurred) as of the date of the financial statements.  FAS 5, ¶¶ 3, 10; ASC -20-20; ASC 450-20-50.

285.     Defendants' Class Period misstatements and omissions about the Company's reliance on MERS and about the scope and extent of the Company's MBS Representation and Warranty Risks, as alleged herein, caused material and knowing violations of these GAAP.

**D.   BAC's Ineffective Disclosure Controls and Procedures and Ineffective Internal Control over Financial Reporting**

286.   Throughout the Class Period, the Company lacked adequate disclosure controls and procedures, and internal control over financial reporting, despite Defendants' certifications and other statements to the contrary.

287.   The Exchange Act requires the Company to maintain effective disclosure control and procedures, and effective internal control over financial reporting.  The Company's management, including its principal executive and financial officers, must evaluate (a) the effectiveness of its disclosure controls and procedures as of the end of each fiscal quarter-end, (b) the effectiveness of its internal control over financial reporting as of the end of each fiscal year-end, and (c) any changes in its internal control over financial reporting that occurred during each fiscal quarter that materially affected, or were reasonably likely to materially affect, its internal control over financial reporting.  17 C.F.R. § 240.13a-15, 240.15d-15.  SEC Regulation S-K requires the Company's principal executive and financial officers to quarterly and annually, as applicable, disclose the conclusions of such evaluations.  17 C.F.R. § 229.307, 229.308.

288.   Further, in connection with the Sarbanes Oxley Act of 2002, the tenets of which have now been incorporated into Regulation S-K, management of public companies is required to report, at least annually, on the effectiveness of the company's internal controls over financial reporting.  The ultimate goal of this process is for company management to express an opinion on the effectiveness of the company's internal control over financial reporting because a company's internal control cannot be considered effective if one or more material weaknesses exist.  17 C.F.R. § 229.308.

289.   The Company's disclosure controls and procedures, and internal control over financial reporting, were not effective throughout the Class Period because of the existing

109

material weaknesses described below.  Defendants caused the Company to issue financial statements that were, because of the violations described herein, not in conformity with GAAP and SEC rules.

290.   Specifically, the Company's wrongful reliance solely on the MERS system, as described herein, was a material weakness evidenced by the Company's failure to secure its interests in a substantial portion of the mortgage loans and portfolios reported in the Company's financial results, which resulted in, and was foreseeably likely to have resulted in, the material misstatements of the Company's annual and interim financial statements.  Also, the Company's accounting practices for repurchase losses also represented a material weakness because the Defendants sidestepped the Company's ordinary and formalized procedures requiring a committee process.  Instead, repurchase loss accruals were determined solely by the Company's chief financial, executive and risk officers, with participation from the legal department, and, as such, completely and intentionally overrode the Company's internal controls and governing committees, which resulted in, and was foreseeably likely to have resulted in, the material misstatements of the Company's financial statements, as alleged herein.  Thus, Defendants' Sarbanes Oxley certifications regarding the effectiveness of the Company's internal controls were untrue.

291.   For the foregoing reasons, Defendants caused the Company's financial statements, including the related footnote disclosures thereto, as of and for the years ended December 31, 2008 and December 31, 2009, and related Forms 10-K, (the "relevant annual financial statements"), as well as interim financial statements as of and for the quarterly periods ended March 31, 2009, June 30, 2009, September 30, 2009, March 31, 2010, June 30, 2010, and September 30, 2010, and related Forms 10-Q (the "relevant interim financial statements" and,

collectively, the "relevant financial statements") to not present fairly, in conformity with GAAP and SEC rules, the Company's financial position and results of operations.

### E. Generally Accepted Auditing Standards

292.    SEC Regulations, including Regulation S-X and section 404 of the Sarbanes Oxley Act, require that the annual financial statements and the effectiveness of internal controls over financial reporting of public companies be audited by an accredited, independent, and external accounting firm. Throughout the relevant timeframe, PwC was the Company's external auditor.  PwC audited or reviewed the Company's materially false and misleading financial statements identified herein, and certified that (a) BAC's annual financial statements were prepared in accordance with GAAP; and (b) BAC maintained effective internal control over financial reporting.  PwC also represented that it conducted its audits in accordance with the standards of the Public Company Accounting Oversight Board ("PCAOB") (such standards being referred to hereinafter as "PCAOB auditing standards.")  Additionally, PwC consented to: (a) the incorporation by reference in the Offering Documents of its "…report dated February 25, 2009 relating to the financial statements and the effectiveness of internal control over financial reporting, which appears in Bank of America's Annual Report on Form 10-K for the year ended December 31, 2008;" and (b) references made to PwC under the headings "Experts" in such Offering Documents.  Unbeknownst to investors, PwC's statements and certifications were materially untrue and/or misleading because, *inter alia*: (a) BAC's financial statements did not comply with GAAP; (b) BAC's internal control over financial reporting was not effective, as a result of certain material weaknesses that existed; (c) PwC did not comply with the standards of the PCAOB in its audits and reviews of BAC's financial statements and internal control over

financial reporting; and (d) PwC should have issued adverse opinions (rather than unqualified

opinions) on both BAC's financial statements and internal control over financial reporting.[6]

293.    PCAOB auditing standards represent the guidelines by which audits of financial

statements and internal control over financial reporting must be planned, performed, and reported

to the market.

294.    PwC was required to plan and conduct its audits, and report on the financial

statements and footnotes of BAC and the effectiveness of BAC's internal control over financial

reporting, in accordance with PCAOB auditing standards.  In order to satisfy the obligations of

an external auditor under PCAOB auditing standards, the auditor's overarching and chief

obligation is to exercise, in all phases of its audits, what is referred to as "due professional care"

and "professional *skepticism*."  AU § 150, Generally Accepted Auditing Standards, ¶ 2 ("AU

150"); AU § 230, Due Professional Care in the Performance of Work, ¶¶ 1-2, 7 ("AU 230");

PCAOB Auditing Standard No. 5, *An Audit of Internal Control Over Financial Reporting That is

Integrated With an Audit of Financial Statements* ("AS 5"), ¶ 4.[7]  PwC was also bound by such

requirements to exercise due professional care and professional skepticism when performing its

reviews of BAC's quarterly financial statements.  AU § 722, Interim Financial Information ("AU

722"), ¶ 1.

295.    Throughout its audits and reviews for the relevant timeframe, PwC was lacking

the requisite application of due care and professional skepticism, particularly in light of its

---

[6] An unqualified opinion states that financial statements are presented fairly, in all material respects, in conformity
with GAAP, while an adverse opinion states the opposite:  that the financial statements are not presented fairly in
conformity with GAAP.  (AU § 508, Reports on Audited Financial Statements ("AU 508"), ¶ 10.)  An adverse
opinion on the financial statements is required when the financial statements taken as a whole are not presented in
conformity with GAAP.  (AU 508, ¶ 58.)  If one or more material weaknesses exist in a company's internal control
over financial reporting, then internal controls cannot be considered effective and the auditor must express an
adverse opinion on such.  (AS 5, ¶¶ 3, 90.)

[7] Certain auditing standards are codified under the prefix "AU."

extensive knowledge of the mortgage industry during the relevant timeframe as it relates to mortgage servicing risks and increasing representation and warranty loan repurchase claims, discussed herein.

296.    Audits also involve, at the outset, a distinct requirement and functional application of a planning process.  PCAOB auditing standards explicitly require auditors to plan (and perform) the work to achieve the objectives of both the financial statement audit as well as the audit of internal control over financial reporting.

297.    With respect to PwC's responsibilities for obtaining an understanding of, and auditing the effectiveness of, Bank of America's internal control over financial reporting for 2008 and 2009, PwC was subject to the requirements of AS 5.  AS 5 provides requirements and guidance for when an auditor is engaged not only to audit the subject company's financial statements and footnotes, but also to perform an audit of the effectiveness of internal control over financial reporting, as required by the Sarbanes Oxley Act of 2002, as was the case here for PwC's engagement with Bank of America.

298.    Because a company's internal controls cannot be considered effective if one or more material weaknesses exist, in order to form a basis for expressing an opinion, the auditor must plan and perform the audit of internal controls over financial reporting to obtain competent evidence that is sufficient to obtain reasonable assurance about whether material weaknesses exist as of the date specified in management's assessment of its internal controls.  AS 5.

299.    A material weakness is defined by SEC Regulation S-X and PCAOB auditing standards as:

 [A] deficiency, or a combination of deficiencies, in internal control over financial reporting…such that there is a reasonable possibility [i.e., reasonably possible or probable, as those terms are used in GAAP, in FAS 5] that a material

misstatement of the [company's] annual or interim financial statements will not be prevented or detected on a timely basis.

17 C.F.R. § 210.1-02(a)((4); AS 5, Appendix A, ¶ A7.[8]

300.    When planning and performing the audit of internal control over financial reporting, the auditor should take into consideration the results of his or her fraud assessment that is made as part of the financial statement audit.  AS 5, ¶ 14.

301.    PwC's 2008 audit opinion on BAC's financial statements and internal controls over financial reporting, which was incorporated into the December 2009 Prospectus Supplements, failed to satisfy its obligations as an external auditor under the PCAOB auditing standards, and the statement therein that its audit was conducted in accordance with generally accepted auditing standards was untrue, for the reasons set forth herein.

302.    Defendants' Class Period misstatements and omissions about the Company's reliance on MERS caused the Company's relevant financial statements to contain material and knowing violations of GAAP through the Class Period, as alleged herein.  Absent PwC's extreme departure from PCAOB auditing standards, investors would have otherwise timely been made aware of the related materially untrue or misleading statements and omissions.

303.    Defendants' misstatements and omissions about the scope and extent of the Company's MBS Representation and Warranty Risks also caused material and knowing violations of GAAP through the Class Period.  Absent PwC's extreme departure PCAOB auditing standards, investors would have otherwise timely been made aware of the related materially untrue or misleading statements and omissions.

---

[8] A "deficiency' is defined by PCAOB auditing standards as existing "…when the design or operation of a control does not allow management or employees, in the normal course of performing their assigned functions, to prevent or detect misstatements on a timely basis."  A "significant deficiency" is defined by SEC Regulation S-X and PCAOB auditing standards as "a deficiency, or a combination of deficiencies, in internal control over financial reporting that is less severe than a material weakness, yet important enough to merit attention by those responsible for oversight of the company's financial reporting."  17 C.F.R. § 210.01-09(a)(4); AS 5, Appendix A, ¶¶ A3, A11.

304.     The Defendants' use of improper accounting principles and practices in violation of GAAP and SEC reporting requirements was contrary to established accounting principles and practices.  Defendants' knowing departure from GAAP resulted in the material misstatement of the Company's relevant financial statements reported throughout the Class Period.  Absent PwC's extreme departure from PCAOB principles, investors would have otherwise timely been made aware of the related materially untrue or misleading statements and omissions.

**F.     PwC Audits of BAC Were an Extreme Departure from PCAOB Auditing Standards**

305.     PwC's audits of BAC's Class Period financial statements represent an extreme departure from PCAOB auditing standards.  PwC did not exercise due professional care, was reckless in its planning and supervision, and failed to utilize proper evidential matter.  The red flags were many, and the standards were well understood, as discussed herein.

306.     PwC departed from the PCAOB auditing standards requirements of due professional care in connection with its audit procedures.  Members of the engagement team possessed direct knowledge that the Company's accounting was aggressive and was designed to shield public disclosure of known material and adverse facts.  PwC's failure to act appropriately in response to these and other red flags and standards known to the engagement team was an extreme departure from the care required of them by PCAOB auditing standards.

307.     PwC was reckless in its planning and supervision.  PwC's own materials identify known material and adverse risks to companies with substantial mortgage servicing operations and related assets, like BAC and PwC's other audit clients, including AIG and MBIA.  These assessments should have prompted additional audit planning to detect the other Defendants' misconduct herein alleged.  As a result, PwC's substantive failure to address these risks in the

planning of its audits was an extreme departure from the requirements of PCAOB auditing standards.

308.    PwC failed to utilize proper evidential matter.   PwC was aware of repurchase accrual accounting policy decisions made by BAC, and was therefore aware of management's aggressive accounting policies, and material weaknesses of internal controls, but nevertheless failed to obtain the proper evidential matter throughout its audits, as set forth herein. PwC's blind reliance on management representations nullified its audit of the financial statements.  As a result of this substantive failures, PwC's work on its audits was an extreme departure from PCAOB auditing standards.

## VIII.   LOSS CAUSATION/ECONOMIC LOSS

309.    During the Class Period, as alleged herein, the Defendants named in the Exchange Act claims engaged in a scheme to deceive the market and in a course of conduct that artificially inflated the value of BAC's securities and operated as a fraud on Class Period purchasers of BAC securities by misrepresenting, *inter alia*, the significant risks posed by problems with foreclosures encountered by the Company as a result of its reliance on MERS, as well as its exposure to billions of dollars in MBS repurchase demands.  When the truth later entered the market and became apparent to investors, the price of BAC common stock materially declined as the artificial inflation largely dissipated.

310.    As a result of their purchase of BAC securities during the Class Period at artificially inflated prices, Lead Plaintiff and other members of the Class suffered economic loss, i.e., damages under the federal securities laws, when subsequent disclosures slowly removed the inflation from the price of such securities.  Had the full truth been disclosed to the market at or

before the time of its ultimate disclosure, Lead Plaintiff would have been unwilling to purchase the Company's securities at the prices then being offered in the market.

311.    The untrue and misleading statements and material omissions caused BAC's common stock to trade at artificially inflated levels throughout the Class Period, reaching a Class Period high closing price of $19.48 per share on April 15, 2010.  However, as a direct and proximate result of the various corrective disclosures set forth herein, which, over time, began to reveal the truth that had been previously concealed by the Defendants' wrongful conduct, by the end of the Class Period, the common stock had lost nearly 40% of its value, closing on October 19, 2010 at $11.80 per share.

312.    As partial corrective disclosures were made to the market at the very end of the Class Period, the market prices of BAC's securities declined with relevant news.    For example, and as noted above at ¶¶ 147-162, on October 5, 2010 BAC suspended foreclosure proceedings in 23 states, which was later extended nationwide on October 8, 2010; articles by both *The Wall Street Journal* and *The New York Times* followed on October 9 and October 12, 2010, reporting on the foreclosure suspension by BAC and BAC's potentially large exposure to foreclosure-related issues and possible impairment of the Company's MSRs and other core assets; and on October 13, 2010, the state attorneys general from all fifty states announced an investigation into the underwriting guidelines, reserve policies, and foreclosure practices of the nation's major banks, including BAC.

313.    The market reacted negatively to this series of disclosures.  In response to these disclosures, which more fully, but not entirely revealed the true state and uncertainty of the Company's problems with foreclosures related to MERS and the scope and extent of the Company's MBS Representation and Warranty Risks, BAC's stock fell from a closing price of

$13.52 on Tuesday, October 12, 2010, to close at $11.98 on Friday, October 15, 2010, a drop of over 12%. The loss in market capitalization from this drop was more than $15 billion.

314.    These disclosures were followed shortly thereafter by another series of disclosures on October 18 and 19, 2010 as noted above at ¶¶ 154-155. First, on October 18, 2009, a group of investors including the New York Fed, PIMCO, and BlackRock demanded that BAC repurchase *$47 billion* worth of Countrywide-issued residential mortgage backed securities. Later that same day, BAC issued a statement providing that it would amend foreclosure documents in 102,000 foreclosure actions.

315.    The next day, on October 19, 2010, BAC announced its financial results for the third quarter of 2010. As related to BAC's mortgage servicing and foreclosure issues, Defendants admitted (i) that there were "technical issues" with BAC's servicing and foreclosure practices; (ii) that BAC's ongoing review of its servicing and foreclosure practices "has particular focus on the process and controls in place for completing affidavits and notarizations;" and (iii) that "[f]or the 23 judicial [foreclosure] states, [BAC is] amending and re-filing 102,000 foreclosure affidavits." As related to BAC's risk of exposure to repurchase demands from MBS investors, Defendants admitted (i) that BAC had received over $26 billion in repurchase claims, nearly $13 billion of which remained unresolved; (ii) that BAC estimated that it expected another $9 billion in repurchase claims from GSE's alone; and (iii) that BAC could not give an estimate as to its potential exposure to either private label securitizations (similar to the demand made on October 18, 2010 by the New York Fed, PIMCO and BlackRock) or private label securitizations wrapped by monoline insurers. These additional disclosures demonstrated that the Company's prior statements omitted material information about economic risks related to MERS incurred by the Company in its mortgage foreclosure and servicing operations, and that the Company's prior

statements concerning the risk of its exposure to repurchase demands from MBS investors were materially untrue or misleading.

316.    With these disclosures, on October 19, 2010, the market price of BAC common stock dropped from $12.34 to close at $11.80 per share, a drop of approximately 4.5%.  The loss of market capitalization was more than $5.4 billion.

317.    The price declines directly and proximately resulting from the above-discussed disclosures were not caused by market conditions, industry news, random market movements, or by BAC-related information unrelated to the alleged misleading statements.  Each of the above-referenced disclosures partially corrected the untrue or misleading information previously provided to the market for which the Lead Plaintiff, on behalf of itself and the Class, seek to be compensated.

## IX.    NO SAFE HARBOR

318.    The statutory safe harbor provided for certain forward-looking statements does not apply to any of the untrue or materially misleading statements alleged in this action.  Many of the specific statements pleaded were not identified as, and were not, "forward-looking statements" when made.  To the extent that there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements, the Executive Defendants are liable for those untrue or materially misleading statements because at the time each such statement was made, the particular speaker knew that the particular statement was untrue or misleading, or the statement was authorized or approved

119

by an Executive Officer of the Company who knew that these statements were untrue or materially misleading.

## X.   APPLICABILITY OF THE PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

319.   At all relevant times, the market for both BAC's common stock and its Common Equivalent Securities was an efficient market that promptly digested current information with respect to the Company from all publicly-available sources and reflected such information in the prices of the Company's securities.  Through the Class Period:

(a)   BAC's securities met the requirements for listing, and were listed and actively traded, on the NYSE, a highly efficient and automated market;

(b)   BAC met the requirements of a seasoned issuer to file registration statements under Form S-3; in addition, as a regulated issuer, BAC filed periodic public reports with the SEC and the NYSE;

(c)   BAC regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services, and through periodic analyst conference calls and presentations; securities analysts and the business press followed and published research reports regarding BAC that were publicly available to investors;

(d)   The market price of BAC securities reacted promptly to the dissemination of public information regarding the Company; and

(e)     The average daily trading volume for BAC common stock during the Class Period was approximately 258,932,970 shares traded, and for BAC Common Equivalent Securities prior to their automatic conversion was approximately 18.7 million shares traded.

320.     Not only did the price of BAC's common stock reflect the functioning of an efficient market, but the price of BAC's Common Equivalent Securities during the time between their issuance on December 4, 2009, and their automatic conversion to common stock on February 24, 2010, closely processed and tracked the price of BAC's common stock trading at that time, as demonstrated in the following chart:



321.     As a result of the misconduct alleged herein (including Defendants' misstatements and omissions), the markets for BAC's securities were artificially inflated.  Under such circumstances, the presumption of reliance available under the fraud on the market theory applies.

322.     Plaintiff and the other Class members relied on the integrity of the market prices for the Company's securities and were substantially damaged as a direct and proximate result of their purchases of BAC securities at artificially inflated prices and the subsequent decline in the prices of those securities when the truth was disclosed.

323.     Had Lead Plaintiff and the other members of the Class known of the material adverse information not disclosed by Defendants, or been aware of the truth behind Defendants' material misstatements and omissions, they would not have purchased BAC securities at inflated prices.

324.     Lead Plaintiff and the proposed Class are also entitled to the *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) presumption of reliance to the extent that Defendants' statements during the Class Period failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

## XI.  ADDITIONAL ALLEGATIONS OF SCIENTER ON EXCHANGE ACT CLAIMS

325.     The Defendants named in the Exchange Act Counts acted, as set forth above, with either the intent to deceive or recklessness in the sense of an extreme departure from the standards of ordinary care in that these Defendants (a) knew that these statements or omissions were untrue or misleading; (b) had access to information suggesting that these public statements were untrue or misleading; or (c) failed to investigate or check information they had a duty to monitor or ignored obvious signs of fraud, at the time these public statements were made.  This includes, but is not limited to, statements giving investors false assurances or explanations for corporate events.

326.     Further evidence of Defendants' scienter may be found in the extraordinary steps that MBS investors have been required to take to get basic information from BAC to examine the

loan files for the mortgages that made up the MBS.  A number of complaints MBS investors

brought against BAC specifically mention that they were unable to gain access to many of the

relevant loan files.  In fact, on July 12, 2010, the FHFA, as conservator for Fannie Mae and

Freddie Mac, announced that it had issued 64 subpoenas to various entities seeking documents

related to private-label mortgage-backed securities in which Fannie Mae and Freddie Mac had

invested.  An article published one week later in The New York Times entitled "Holding

Bankers' Feet to the Fire," noted that FHFA "had to resort to subpoenas, it said, because when it

asked the institutions for the records it got nowhere for many months."  These facts evidence not

only concealment from those MBS investors, but also concealment from the Class as well.

## XII.  COUNT I

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### Against the Defendants

327.    Lead Plaintiff repeats and realleges each and every allegation set forth above in

¶¶ 1-326 as if fully set forth herein.

328.    This claim is brought pursuant to Section 10(b) of the Exchange Act and Rule

10b-5 promulgated thereunder, on behalf of Lead Plaintiff and all other members of the Class,

against the Defendants.

329.    During the Class Period, the Defendants named in this claim, individually, and in

concert, by the use and means of instrumentalities of interstate commerce, the mails and the

facilities of a national securities exchange, employed devices, schemes and artifices, made, or

substantially participated in, the creation of untrue statements of material fact and/or omitted to

state material facts necessary to make statements made, in light of the circumstances under

which they were made, not misleading, and engaged in acts, practices and a course of business

that operated a fraud and deceit upon Class members, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

330.     The untrue or misleading statements and omissions of the Defendants named in this claim were made with scienter and were intended to and did, as alleged herein: (i) deceive the investing public, including Lead Plaintiff and other members of the Class; (ii) artificially inflate and maintain the market price of the Company's securities; and (iii) cause Lead Plaintiff and members of the Class to purchase BAC's securities at artificially inflated prices.

331.     Defendants presented a misleading impression of BAC's finances and prospects by failing to inform the market of the inherent inadequacies of the MERS system and the scope and extent of BAC's MBS Representation and Warranty Risks.  As a result, this caused and maintained artificial inflation in the prices of BAC's publicly traded securities throughout the Class Period and until the truth was fully disclosed.

332.     The Defendants named in this claim were individually and collectively responsible for making the statements and omissions alleged herein, by virtue of having prepared, approved, signed and/or disseminated documents that contained untrue statements of material fact and/or making direct statements to the investing public on conference calls and at investor meetings detailed herein.

333.     During the Class Period, the Defendants named in this claim occupied executive-level positions at the Company and were privy to material non-public information concerning BAC.  Each of them knew or recklessly disregarded the adverse facts specified herein and omitted to disclose those facts.

334.     By making the misleading statements contained herein, the Defendants knew or recklessly disregarded that they would artificially inflate the price of the Company's securities.

Because of their respective positions with BAC, the Defendants had and used their influence and control to further the scheme alleged herein.  The Defendants named in this claim had broad responsibilities including communicating with the financial markets and providing the markets with financial results and accurate information concerning its business operations, risk concentrations, exposures to losses, and other potential drains on the Company's financial stability.

335.    As described herein, the Defendants knowingly, intentionally or recklessly made materially untrue statements and omissions.

336.    Defendants' untrue statements and omissions were made in connection with the purchase or sale of the Company's securities.

337.    In ignorance of the materially untrue and misleading nature of Defendants' statements and/or in reliance upon the integrity of the market price for BAC securities, Lead Plaintiff and the other members of the Class purchased BAC securities at artificially inflated prices during the Class Period.  But for the fraud alleged herein, Lead Plaintiff and other Class members would not have purchased the securities at artificially inflated prices.

338.    The market prices for BAC common stock declined materially upon the public disclosure of the facts that had previously been misrepresented or materially omitted by the Defendants, as described herein.

339.    Lead Plaintiff and the other members of the Class were substantially damaged as a direct and proximate result of their purchases of BAC securities at artificially inflated prices and the subsequent declines in the price of BAC common stock when the truth was disclosed.

340.    This claim was brought within two years after discovery of this fraud and within five years of the making of the statements alleged to be materially untrue and misleading.

341.     By virtue of the foregoing, the Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and are liable to Lead Plaintiff and the members of the Class, each of whom has been damaged as a result of such violation.

## XIII.  COUNT II

### For Violations of Section 20(a) of the Exchange Act
### Against the Executive Defendants

342.     Lead Plaintiff repeats and realleges each and every allegation set forth above in ¶¶ 1-341 as if fully set forth herein.

343.     This claim is brought pursuant to Section 20(a) of the Exchange Act against each of the Executive Defendants.  This claim is brought on behalf of Lead Plaintiff and all members of the Class who purchased or otherwise acquired BAC securities during the Class Period.

344.     As alleged herein, BAC is liable to Lead Plaintiff and the members of the Class who purchased or otherwise acquired BAC securities based on the materially untrue and misleading statements and omissions as set forth above, pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 of promulgated thereunder.

345.     Throughout the Class Period, the Executive Defendants were controlling persons of BAC within the meaning of Section 20(a) of the Exchange Act, and were culpable participants in the fraud alleged herein.

346.     The Executive Defendants exercised control over BAC during the Class Period through the key roles they played in the Company's management and their direct involvement in its day to day operations, including its financial reporting and accounting functions, and therefore caused the Company to engage in the conduct and practices complained of herein.

347.     As senior executive officers of the Company, the Executive Defendants had a duty to disseminate accurate and truthful information regarding BAC's financial statements and

to correct any previously issued statements that had become untrue so that the market prices of BAC securities would be based upon truthful and accurate information.

348.     Given their individual and collective responsibilities for managing BAC throughout the Class Period, the Executive Defendants were regularly presented to the market as the individuals responsible for BAC's day-to-day business and operations, as well as the Company's strategic direction.  The Executive Defendants accepted responsibility for presenting quarterly and annual results, setting guidance for future periods and assuring the market about the state of, and prospects for, the Company.

349.     Each of the Executive Defendants culpably participated in some meaningful sense in the fraud alleged herein.  The Executive Defendants, as set forth more fully in ¶¶ 63-146, 166-291, 325-326 above, each acted with scienter in that they knew or recklessly disregarded that BAC's publicly reported financial results issued during the Class Period, as well as statements concerning the Company's financial results, its use of MERS, and the scope and extent of its MBS Representation and Warranty Risks as contained in its SEC filings and press releases and at analyst conferences, were materially untrue or misleading.

350.     As a result of the untrue or misleading statements and omissions alleged herein, the market prices of BAC securities were artificially inflated during the Class Period.  Under such circumstances, the presumption of reliance available under the "fraud on the market" theory applies, as set forth in detail above.  Lead Plaintiff and the members of the Class relied upon either the integrity of the market or upon the statements and reports of BAC, or both, in purchasing BAC securities at artificially inflated prices.

351.     This claim was brought within two years after the discovery of this fraud and within five years of the making of the statements alleged herein to be materially untrue and misleading.

352.     By virtue of the foregoing, each of the Executive Defendants is liable to Lead Plaintiff and other members of the Class, each of whom has been damaged as a result of BAC's underlying violations.

## XIV.   ALLEGATIONS RELATING TO CLAIMS BROUGHT PURSUANT TO THE SECURITIES ACT

353.     The facts relevant to the claims under the Securities Act are, as set forth below, that BAC's Offering Documents for the Common Equivalent Securities Offering in December 2009 contained untrue statements of material fact and omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading.

354.     In the allegations and claims set out in this part of the Complaint (Counts Three through Six), Lead Plaintiff asserts a series of strict liability and negligence claims based on the Securities Act.  The Securities Act claims are asserted against the Company, the Securities Act Individual Defendants, the Underwriter Defendants, and PwC.  Each of these Defendants is statutorily liable under Section 11 of the Securities Act for the materially inaccurate statements and omissions contained in the Offering Documents, including BAC's materially untrue or misleading financial statements incorporated therein, for the Common Equivalent Securities offering.

355.     Lead Plaintiff also asserts control person liability under Section 15 of the Securities Act against various principals of BAC, including BAC's directors at the time of the Common Equivalent Shares offering.

356.    The Securities Act claims are not based on any knowing or reckless misconduct on behalf of the Defendants and Lead Plaintiff specifically disclaims any allegations of fraud in these non-fraud claims under the Securities Act.

357.    Lead Plaintiff purchased over one million Common Equivalent Securities in or traceable to BAC's December 2009 offering for those securities.

358.    In the December 2009 Common Equivalent Securities offering, BAC raised over $19 billion in capital that it used to repay its obligation to the U.S. government under the Company's participation in TARP.  The Common Equivalent Securities offering was conducted pursuant to a shelf registration statement, which BAC filed with the SEC on Form S-3, on April 20, 2009.

359.    The 2009 Registration Statement included one or more prospectuses, which described the general terms that applied to the registered securities and the general manner in which they were to be offered.  For the December 2009 Common Equivalent Securities offering, the specific terms of the securities being offered and the specific manner in which BAC offered the securities were included in a prospectus supplement or pricing supplement that became part of the respective prospectus and 2009 Registration Statement pursuant to which the offering was conducted.  Specifically, with respect to the December 2009 Common Equivalent Securities offering, BAC issued: the 2009 Registration Statement; a prospectus supplement filed with the SEC on December 3, 2009; and a prospectus supplement filed with the SEC on December 4, 2009.

360.    The 2009 Registration Statement was signed by Defendants Lewis, Price, Bramble, Gifford, Lozano, May and Ryan.  Furthermore, each of the Director Defendants served on the Board at the time of the December 2009 offering of Common Equivalent Securities.

361.     As identified in ¶ 42, the Underwriter Defendants acted as the underwriters for the Common Equivalent Securities offering.  Therefore, each of the Underwriter Defendants was an "underwriter," as described in Section 2(11) of the Securities Act, of the December 2009 Common Equivalent Securities offering.

362.     For purposes of liability under the Securities Act, the "effective date" of the 2009 Registration Statement is the date of the Common Equivalent Securities offering.

363.     As set forth in ¶¶ 179-232 above, the Offering Documents (as defined in ¶ 144), which specifically incorporated, *inter alia*, the BAC 2008 Form 10-K, contained untrue statements of material fact and material omissions.

## XV.    COUNT III

### For Violations of Section 11 of the Securities Act against Defendants BAC and the Securities Act Individual Defendants

364.     Lead Plaintiff repeats and realleges the allegations above in ¶¶ 1-324 and 353-363.  For purposes of this claim, Lead Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct.

365.     This claim is brought pursuant to Section 11 of the Securities Act on behalf of Lead Plaintiff and other members of the Class against BAC and the Securities Act Individual Defendants.

366.     This claim is asserted on behalf of all Class members who purchased or acquired BAC Common Equivalent Securities in or traceable to the December 2009 offering.

367.     The Offering Documents at issue herein contained untrue statements of material fact and omitted material facts required to be stated in order to make the statements contained therein not misleading as set forth above.

368.     Defendant BAC is the issuer of the Common Equivalent Securities pursuant to the 2009 Registration Statements.  As issuer of the securities, BAC is strictly liable to Lead Plaintiff and to members of the class who acquired these securities pursuant or traceable to the December 2009 offering for the materially untrue or misleading statements and omissions and alleged herein.

369.     The Securities Act Individual Defendants did not make a reasonable investigation and did not possess reasonable grounds for believing that the statements contained in the Offering Documents were true, did not omit any material fact, and were not materially misleading.  As such, they are liable to Lead Plaintiff and to members of the Class who acquired the Common Equivalent Securities pursuant or traceable to the 2009 Registration Statement for the materially untrue statements and omissions and alleged herein.

370.     The Offering Documents, at the time they became effective, contained untrue statements of fact and omitted facts necessary to make the facts stated therein not misleading. The facts misstated and omitted would have been material to a reasonable person reviewing the Offering Documents.

371.     Lead Plaintiff and the Class did not know, and in the exercise of reasonable diligence could not have known, of the misstatements and omissions of the Offering Documents.

372.     Lead Plaintiff and the Class have sustained damages as a result of the misstatements and omissions of the Offering Documents, for which they are entitled to compensation.

373.     This action was brought within one year after the discovery of the untrue statements and omissions, and within three years after the offering.

## XVI.   COUNT IV

### For Violations of Section 11 of the Securities Act
### against the Underwriter Defendants

374.    Lead Plaintiff repeats and realleges the allegations above in ¶¶ 1-324 and 353-363.  For purposes of this claim, Lead Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.

375.    This claim is brought pursuant to Section 11 of the Securities Act on behalf of Lead Plaintiff and other members of the Class against the Underwriter Defendants.

376.    This claim is asserted on behalf of all Class members who purchased or acquired BAC's Common Equivalent Securities in or traceable to the December 2009 offering.

377.    The Underwriter Defendants served as the underwriters of the offering and qualify as such according to the definition contained in Section 2(a)(11) of the Securities Act, 15 U.S.C. § 77b(a)(11).  As such, they participated in the solicitation, offering, and sale of equity securities to the investing public pursuant to the 2009 Registration Statement.

378.    Due to their role as underwriters of the Common Equivalent Securities in the offering, the Underwriter Defendants were responsible for the contents and dissemination of the Offering Documents and are liable under Section 11 of the Securities Act for any material misrepresentations or omissions contained therein.  The Underwriter Defendants did not make a reasonable investigation and did not possess reasonable grounds for believing that the statements contained in the Offering Documents about MERS and about the scope and extent of the Company's MBS Representation and Warranty Risks were true, did not omit any material fact, and were not materially misleading.

132

379.    The allegations contained herein relating to BAC's materially untrue or misleading statements are replete with examples of the failure of the Underwriter Defendants to perform a reasonable investigation and due diligence in connection with the offering.

380.    As alleged herein, BAC failed to disclose its misplaced reliance on MERS and subsequent problems with foreclosures as well as the scope and extent of BAC's MBS Representation and Warranty Risks.  The Underwriter Defendants were or should have been aware of these problems and, given the significance of the Company's exposure to repurchase demands from MBS counterparties, in the course of their due diligence, the Underwriter Defendants should have required management to adequately disclose those problems and risks.

381.    Had the Underwriter Defendants performed due diligence with respect to the foregoing, they would have uncovered the untrue and misleading statements in the Offering Documents and SEC filings incorporated in the Offering Documents.

382.    Lead Plaintiff and other members of the Class purchased BAC Common Equivalent Securities in or traceable to the December 2009 offering.  The offering was conducted pursuant to the 2009 Registration Statement, and amendments and supplements thereto.

383.    The Offering Documents, at the time they became effective, contained untrue statements and omitted facts necessary to make the facts stated therein not misleading.  The facts misstated and omitted would have been material to a reasonable person reviewing the Offering Documents.

384.    Lead Plaintiff and the Class did not know, and in the exercise of reasonable diligence, could not have known of the misstatements and omissions of the Offering Documents.

385.   Lead Plaintiff and the Class have sustained damages as a result of the misstatements and omissions of the Offering Documents, for which they are entitled to compensation.

386.   This action was brought within one year after the discovery of the untrue statements and omissions, and within three years after the offering.

## XVII.  COUNT V

### For Violations of Section 11 of the Securities Act against Defendant PwC

387.   Lead Plaintiff repeats and realleges the allegations above in ¶¶ 1-324 and 353-363.  For purposes of this claim, Lead Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.

388.   This claim is brought pursuant to Section 11 of the Securities Act on behalf of Lead Plaintiff and other members of the Class against Defendant PwC.

389.   This claim is asserted on behalf of all Class members who purchased or acquired BAC's Common Equivalent Securities in or traceable to the December 2009 offering.

390.   The Offering Documents at issue herein contained untrue statements of material fact and omitted material facts required to be stated in order to make the statements contained therein not misleading as set forth above.

391.   Defendant PwC issued audit opinions for BAC's 2008 10-K, which, with PwC's consent, was incorporated by reference in the Offering Documents.  As such, PwC expressly consented to serve as an accounting expert with respect to the offering of the securities issued pursuant to the Offering Documents at issue herein.

392.   The known facts regarding BAC's faulty reliance on an inadequate MERS system and BAC's enormous exposure to repurchase demands from MBS counterparties demonstrate

that PwC was negligent in performing its audits relative to its obligations under GAAS and PCAOB standards. By issuing clean audit opinions despite the internal control deficiencies at BAC, PwC acted negligently.

393. Lead Plaintiff and other members of the Class purchased BAC Common Equivalent Securities in or traceable to the December 2009 offering. The offering was conducted pursuant to the 2009 Registration Statement, and amendments and supplements thereto.

394. The facts misstated in and omitted from the Offering Documents would have been material to a reasonable person reviewing them.

395. Lead Plaintiff and the Class did not know, and in the exercise of reasonable diligence, could not have known of the misstatements and omissions of the Offering Documents.

396. Lead Plaintiff and the Class have sustained damages as a result of the misstatements and omissions of the Offering Documents, for which it is entitled to compensation.

397. This action was brought within one year after the discovery of the untrue statements and omissions, and within three years after the offering.

## XVIII. COUNT VI

### For Violations of Section 15 of the Securities Act
### against the Executive Defendants

398. Lead Plaintiff repeats and realleges the allegations above in ¶¶ 1-324 and 353-363. For purposes of this claim, Lead Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.

399. This claim is brought pursuant to Section 15 of the Securities Act on behalf of Lead Plaintiff and other members of the Class against the Executive Defendants.

400.     This claim is asserted on behalf of all Class members who purchased or acquired BAC's Common Equivalent Securities in the December 2009 offering.

401.     The Executive Defendants, at the time of the Offering Documents alleged to be untrue and misleading, conducted and participated, directly and indirectly, in the operation and management of BAC.

402.     Because of their positions of control and authority at BAC and as senior officers of the Company, the Executive Defendants were able to, and did, control the contents of the Offering Documents that contained materially untrue and misleading information.

403.     Therefore, the Executive Defendants were controlling persons of Defendant BAC within the meaning of Section 15 of the Securities Act., and are liable for BAC's violations of Section 11 of the Securities Act, as alleged in Count III.

## XIX.  REQUEST FOR RELIEF

**WHEREFORE**, Lead Plaintiff respectfully requests the following relief and judgment:

A.     Declaring this action to be a proper class action pursuant to Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B.     Awarding Lead Plaintiff and the members of the Class compensatory damages, including, where appropriate, rescission or rescissory damages;

C.     Awarding Lead Plaintiff and the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees and other costs; and

D.     Awarding such additional or different relief as this Court may deem just and proper.

## JURY TRIAL DEMAND

Lead Plaintiff hereby demands a trial by jury in this action for all issues so triable.

Dated: September 23, 2011

**BARRACK, RODOS & BACINE**

By_____

A. Arnold Gershon (AG-3809)
Regina M Calcaterra (RC-3858)
William J. Ban (WB-0382)
425 Park Avenue, 31st Floor
New York, NY 10022
Telephone: (212) 688-0782
Facsimile: (212) 688-0783

-and-

**BARRACK, RODOS & BACINE**

By:___ /s/ Jeffrey A. Barrack_____
Leonard Barrack
Gerald J. Rodos
Mark R. Rosen
M. Richard Komins
Jeffrey A. Barrack (JB-8668)
Chad A. Carder
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-0600
Fax: (215) 963-0838

*Attorneys for Lead Plaintiff*
*Pennsylvania Public School Employees'*
*Retirement System and Lead Counsel*
*for the Class*

137

Gerald Gornish
Chief Counsel
Steven Skoff
Assistant Counsel
Pennsylvania Public School Employees'
    Retirement System
5 North Fifth Street, 5th Floor
Harrisburg, PA  17101
Telephone:  (717) 720-4912
Fax:  (717) 783-8010

Sarah Yerger
Senior Deputy Attorney General
Civil Litigation Section
Office of Attorney General
15th Floor Strawberry Square
Harrisburg, PA  17120
Telephone:  (717) 705-2503
Fax:  (717) 772-4526

*Attorneys for Lead Plaintiff*
*Pennsylvania Public School Employees'*
*Retirement System*