C3SHPIP1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

PIPEFITTERS LOCAL NO. 636
DEFINED BENEFIT PLAN,

                    Plaintiffs,          New York, N.Y.

               v.                        11 Civ. 733 (WHP)

BANK OF AMERICA CORPORATION,
*et al.,*

                    Defendants.

------------------------------x

                                         March 28, 2012
                                         5:30 p.m.

Before:

                    HON. WILLIAM H. PAULEY III,

                                         District Judge

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

C3SHPIP1

1                              APPEARANCES

2   BARRACK RODOS & BACINE
          Attorneys for Plaintiffs
3   BY:   MARK R. ROSEN
          JEFFREY A. BARRACK

4

5   SKADDEN ARPS SLATE MEAGHER & FLOM, LLP
          Attorneys for Defendants Bank of America, Kenneth D.
          Lewis, Joe L. Price, II, Brian T. Moynihan, Charles H.
6         Noski and Neil Cotty
    BY:   JAY B. KASNER
7         SCOTT D. MUSOFF

8   WILMER CUTLER PICKERING HALE AND DORR, LLP
          Attorneys for Underwriter Defendants
9   BY:   JEFFREY B. RUDMAN
          MICHAEL G. BONGIORNO

10

11  KING & SPALDING
          Attorneys for Defendant PricewaterhouseCoopers, LLP
    BY:   DIANA L. WEISS
12        JAMES J. CAPRA, JR.

13  DAVIS POLK & WARDWELL
          Attorneys for Defendant Bank of America
14  BY:   CHARLES DUGGA

15

16

17

18

19

20

21

22

23

24

25

C3SHPIP1

```
 1              (In open court)

 2              THE DEPUTY CLERK:  Pennsylvania Public School

 3     Employees' Retirement System v. Bank of America.

 4              Appearances for the plaintiff.

 5              MR. ROSEN:  Good afternoon, your Honor.  Mark Rosen,

 6     Barrack Rodos & Bacine.  I am joined by my partner Jeffrey

 7     Barrack, and we are also joined by a representative client,

 8     Mr. Steven Scott, as well as other attorneys from my office.

 9              THE COURT:  Good afternoon, gentlemen.

10              THE DEPUTY CLERK:  Appearances for the defendants.

11              MR. KASNER:  Good afternoon, your Honor.  Jay Kasner

12     and Scott Musoff, from Skadden Arps, for Bank of America and

13     certain individual defendants.

14              THE COURT:  Good afternoon.

15              MR. RUDMAN:  If you please, your Honor, Jeff Rudman

16     and Mike Bongiorno, from Wilmer Hale, for the underwriter

17     defendants.

18              THE COURT:  Good afternoon.

19              MS. WEISS:  Diana Weiss and my partner Jim Capra, from

20     King & Spalding, for PricewaterhouseCoopers.

21              THE COURT:  Good afternoon.

22              MR. DUGGAN:  Charles Dugga, Davis Polk & Wardwell, for

23     the Bank of America, director defendant.

24              THE COURT:  Good afternoon, Mr. Dugga.

25              All right.  This is oral argument on the defendants'
```

C3SHPIP1

1    motions.  Let me say this.  I have read all of the briefs in

2    this case.  In fact, I read them all again very, very early

3    this morning, way before breakfast.  So I really think that

4    oral argument should be limited to raising matters that weren't

5    specifically discussed in the papers, or giving me additional

6    authorities, or of course responding to some questions that I

7    have.  I say this not just because it is 5:30 in the afternoon,

8    but because I believe that enough ink has already been spilled

9    on these motions.

10         With that caveat, who wishes to be heard?

11         MR. KASNER:  Your Honor, I hesitate to rise.

12         THE COURT:  You don't have to.

13         MR. KASNER:  If it please the court, I know your

14   Honor's preference is for the lectern.  So I will just get

15   myself situated for a moment.

16         Good afternoon, your Honor.  I assure the court that I

17   will be brief, and of course welcome as always the opportunity

18   to respond to whatever is on your Honor's mind.

19         For the record, my name is Jay Kasner.  I appear on

20   behalf of Bank of America as well as the individual defendants

21   Kenneth Lewis, Joe Price, Brian Moynihan, Charles Noski and

22   Neil Cotty.

23         Your Honor, I had proposed today just to address two

24   points, relying on our papers for the balance.  The first

25   relates to the so-called MERS allegations and the other relates

C3SHPIP1

1     to the so-called repurchase reserve disclosure allegations.

2     And, your Honor, I will only address those from the perspective

3     of one or two additional points on scienter and one or two

4     additional points with respect to whether or not there are any

5     false or misleading statements relating either to MERS or the

6     reserves.

7              I believe that Mr. Rudman, on behalf of the

8     underwriter defendants, had intended to address the court

9     briefly on the statute of limitations point, resting on their

10    briefs for the balance, and I have not had an opportunity -- I

11    know that Ms. Weiss intends to raise whatever issues are

12    relevant to PricewaterhouseCoopers she wishes to raise, in

13    light of your Honor's admonition.

14             I know your Honor is fully familiar with the standards

15    applicable on this motion.  Your Honor, with respect to MERS --

16    that stands for mortgagee electronic recording system.  The

17    MERS system on this record is an electronic recording service

18    that has been in place since 1995.  It is used by hundreds of

19    financial institutions and it is also in the record, your

20    Honor, that 60 percent of the mortgages at one point in the

21    recent past in this country were registered in the MERS system.

22             THE COURT:  Why do disclosures that are made in the

23    securitization prospectuses satisfy defendants' duties to

24    disclose its reliance on MERS to shareholders?

25             MR. KASNER:  I think your Honor recognized this

C3SHPIP1

1    concept in the *Yukos Oil* case as well.  This case is predicated

2    on allegations that the Bank of America securities were traded

3    in an efficient market.  In that context, all information

4    relating to Bank of America, from whatever source, is baked

5    into the price of the stock.  Hence, the efficient market

6    theory.  Our position, your Honor, is that there was nothing

7    that we didn't disclose about MERS that we were obligated to

8    have disclosed.  Principally, the plaintiffs agree, your Honor.

9    Their whole theory in this case is somehow it was implied, when

10   Bank of America listed loans on its balance sheet, that those

11   loans could be validly foreclosed.

12          Even if your Honor were to conclude that, well, maybe

13   there should have been something said about that, and we submit

14   there is absolutely no basis to conclude that on this record as

15   a matter of law, there was disclosure, as your Honor

16   recognized, in the marketplace about MERS, about the use of

17   MERS, about the risks of MERS.  That disclosure, your Honor,

18   appears in the record to Mr. Musoff's affidavit in 2006, in

19   2007 and in 2008, among others.  Long before this class period

20   started it was all out there.

21          So that is why, your Honor, it is germane, if in fact

22   there was a disclosure obligation, and we submit that there was

23   none, it is out there.  Your Honor, we would point the court of

24   course, among others, to the *Wilson v. Merrill Lynch* case,

25   where the Second Circuit, last November, observed that in

C3SHPIP1

1    assessing whether there had been market manipulation, which

2    required deception, the court, your Honor, can look to whatever

3    is in the marketplace as bearing on that question.  Just

4    yesterday, your Honor, we forwarded to the court the decision

5    of the Second Circuit, albeit in a summary order, in the *Smith*

6    *Barney* case.

7          Now we submitted that decision to your Honor on the

8    motion to strike, but another component of that decision, just

9    yesterday, from a three-judge panel of the Second Circuit,

10   adopting the *Wilson* case, again looks to the totality of

11   disclosure to see whether or not a reasonable shareholder has

12   been misled.

13         Now, counsel for --

14         THE COURT:  Where, other than in the prospectuses, was

15   the reliance on MERS disclosed?

16         MR. KASNER:  Well, your Honor, by Bank of America

17   specifically, it was in the myriad of prospectuses that are in

18   the record.

19         If I may, so it is on the transcript, so I know your

20   Honor knows, that is in Mr. Musoff's declaration in Exhibit L,

21   Exhibit K, among others.

22         THE COURT:  Those are intended for private investors,

23   aren't they, as opposed to people who are purchasing shares on

24   the open market?

25         MR. KASNER:  Well, the purpose of the document, your

C3SHPIP1

1    Honor, is for private investors, that's correct.  However,

2    those documents are in the public domain, much as any other

3    registration statement or other document that contains or, for

4    that matter, a posting on an internet site, such as the Second

5    Circuit in the *Glaxo SmithKline* case found was sufficient

6    notice, just as the *Wilson* decision of the Second Circuit found

7    a website was sufficient disclosure.

8         But it is not just there, your Honor.  Part of what

9    plaintiff alleges, as the court knows, is Bank of America

10   should have disclosed that MERS was a risky proposition.  Worse

11   yet, that MERS in fact did not convey adequate title, because

12   Justice Arthur Schack of the Brooklyn State Supreme Court, in

13   2008, had a couple of decisions out there suggesting that maybe

14   MERS didn't have standing because of the way MERS worked.

15        Now, your Honor, those problems that Justice Schack

16   identified are remediable, and they were.  His view about MERS

17   was not shared by judges throughout the country.  We have the

18   *Cervantes* case from the Ninth Circuit of last year specifically

19   saying MERS is appropriate.

20        But when Justice Schack came down with those opinions,

21   your Honor, it wasn't as if nobody was watching what was going

22   on at his courthouse.  The New York Times --

23        THE COURT:  Gretchen Morgenson.  If I read one more

24   time about her article, I want to pull my hair out.

25        MR. KASNER:  Your Honor, I will not say one word about

C3SHPIP1

1    my views of Ms. Morgenson's editorializing.  However, for

2    purposes of this issue, it was out there.

3           The Wall Street Journal, Mr. Musoff's declaration

4    Exhibit Q, and --

5           THE COURT:  I will say, by the way, I think she is a

6    great reporter.  Whenever she has a column that I see, I read

7    it.

8           MR. KASNER:  Your Honor, dare I say don't believe

9    everything that you read necessarily, having lived through some

10   of the events that she writes about.

11          THE COURT:  I am paid to be skeptical.  That is my job

12   as a judge.

13          MR. KASNER:  Fair enough, your Honor.

14          The point, though, in terms of what else was out

15   there, Judge, we have put into the record a number of different

16   sources making plain that MERS and the use of MERS and the

17   widespread use of MERS was not just contained in the prospectus

18   supplements of Countrywide and Bank of America or

19   Ms. Morgenson's article or the Wall Street Journal article that

20   we mentioned.  There are articles in Mortgage Banking Magazine.

21   I recognize not the most widely-read periodical in the country,

22   perhaps, but out there nonetheless.

23          The percentage of, as I mentioned, of mortgages was

24   out there that was on the MERS system.  The New York Court of

25   Appeals, your Honor -- my friend and colleague, now Judge

C3SHPIP1

1    Kaye -- wrote an opinion on MERS a bunch of years ago.  So the

2    issue of MERS, the use of MERS, was out there.

3            Now, why is that germane, your Honor?  It is germane,

4    we believe, because, as your Honor recognized we believe in

5    *Yukos*, there is no duty in assessing whether something is false

6    and misleading.  It is out there.

7            THE COURT:  How is this question appropriate for this

8    court to resolve, though, on a 12(b)(6) motion?

9            MR. KASNER:  Your Honor, I think the Circuit and the

10   two authorities at a minimum and your Honor's opinion in *Yukos*

11   have answered that question.  It is out there.  There is no

12   issue that is required to be developed as to whether this

13   material was in the public domain.  The court can take judicial

14   notice, as your Honor knows -- this is sort of bleeding into

15   the motion to strike and I vowed I wouldn't argue that this

16   evening, but the court can take cognizance of what is out there

17   for two different purposes.

18           Number one, as part of this issue of whether the total

19   mix of information renders what the plaintiffs claim was

20   disclosed out there.  But as importantly, in weighing the

21   probabilities, that the *Tellabs* decision and that your Honor's

22   decision in the *CIBC* case both recognize you have to weigh.

23           In *CIBC* your Honor recognized that you are able to

24   look at materials in the public domain to gauge whether or not

25   there is a strong inference that senior executives at Bank of

C3SHPIP1

1    America committed intentional fraud by not disclosing the

2    speculative possibility that Justice Schack in Brooklyn, three

3    years earlier, had concluded, well, maybe there is an issue

4    with MERS.  So your Honor is able to look at that material.  I

5    think the Circuit has regularly recognized that as well,

6    including as recently as yesterday, your Honor, in the summary

7    order in *Smith Barney*.

8            In terms of why that is relevant on scienter, I would

9    just point out that the Second Circuit in the *Glaxo* case, on an

10   appeal from Judge Stanton -- that is cited in our brief.  It is

11   2008 WL 2073421 -- recognized for purposes of assessing

12   scienter, if the material is out there, that cuts against the

13   plausibility inference that something has been intentionally

14   withheld.

15           Your Honor, I would like just to touch very, very

16   briefly, if I could, on the one specific allegation that is in

17   the complaint with respect to motive.  Our briefs talk about

18   the confidential witnesses.  I won't go into that right now,

19   your Honor.  We have adequately I think explained why there is

20   nothing there.  But there is a lot of hoo-ha about TARP and a

21   motive to repay TARP.  And unless the court feels, Kasner, you

22   don't have to go into that, I understand it from the briefs, I

23   would appreciate the opportunity for a minute or two.  But I

24   don't want to do something that won't be of value to the court.

25           THE COURT:  I am not going to say no to a minute or

C3SHPIP1

1    two.

2             MR. KASNER:  OK.

3             THE COURT:  Then I will hear from some of your

4    colleagues.

5             MR. KASNER:  OK, your Honor.  I appreciate that.

6    Thank you.

7             In terms of assessing why was there a motive to commit

8    fraud on the part of the senior-most officers at one of the

9    largest financial institutions in the world, during a period of

10   time when we can all agree the world was an extremist, I would

11   like the court to focus on a chronology which demonstrates why

12   the idea that repaying TARP is a motive, is absolutely

13   preposterous both on the facts and on the law, and the law is

14   clear, of course, that if the inferences are implausible, they

15   are not to be taken for purposes of weighing the *Tellabs*

16   analysis.

17            So TARP was instituted in October of 2008.  TARP money

18   was paid to the Bank of America in two tranches.  First, in

19   October of 2008 and then again in January of 2009.

20            Now, plaintiffs would have this court believe that in

21   February of 2009 senior management at Bank of America decided

22   we need to get out from under TARP so badly that we will commit

23   securities fraud.  How did they commit securities fraud?  Well,

24   so that they could repay the money to TARP by the end of

25   December, they didn't adequately disclose MERS, they didn't

C3SHPIP1

adequately disclose the repurchase reserves.  And on that

point, your Honor, I will not spend the time now.

        The record is replete.  Every quarter Bank of America

disclosed in the footnotes to its financial statements how they

calculated the repurchase, rep and warranty reserves, the

increases that were made to those reserves in the next quarter,

the judgments upon which those reserves were set, because of

course it is not an objective fact, as we now know from both

the Second Circuit in *Fait* and Judge Kaplan in his Bank of

America decision on Magistrate Judge Pitman's report and

recommendation.  Those kinds of things are judgmental.  But it

was out there.

        So what was Bank of America hiding?  MERS was out

there.  The fact of these repurchase claims was out there.  And

now they wanted to get TARP repaid.

        So, your Honor, what they say is we hid it until

December of 2009.  And in December of 2009 TARP is repaid.

Bank of America is free as a bird to pay whatever compensation

it wishes, except as a matter of fact that didn't happen.  But

why it is so illogical, your Honor, is if TARP repayment was

the motive, that happened in December of 2009.  The class

period doesn't expire until October of 2010.  If that was the

motive, well, that motive was done.  And yet this fraud,

allegedly, continued for ten months.

        In addition, your Honor, I would point out that three

C3SHPIP1

1     of the individual defendants that allegedly engaged in this

2     fraudulent conduct were not even at Bank of America in a senior

3     executive capacity at the time that this scheme was hatched and

4     implemented.

5              So, for the record, Mr. Moynihan, who is the current

6     chief executive officer of Bank of America, he didn't become

7     CEO until January 2010.  Mr. Noski didn't become the chief

8     financial officer until May of 2010.  And Mr. Cotty did not

9     become interim CFO until February 2010.  All after this scheme

10    was hatched, allegedly, and then came to fruition because TARP

11    was repaid.

12             With that, your Honor, unless the court has additional

13    questions, I am content to pass the baton.

14             THE COURT:  All right.  Thank you very much,

15    Mr. Kasner.

16             Mr. Rudman, do you want to be heard?

17             MR. RUDMAN:  Very briefly, your Honor.  I am mindful

18    of the hour.

19             If your Honor please, thank you kindly.  My purpose is

20    only to argue the statute of limitations issue.  As to

21    everything else, including the questions of loss causation, I

22    rest on my brief.

23             I think there is no dispute the plaintiffs have one

24    year under Section 13 to either bring this action or to bring

25    it after they have discovered the wrong again within the year.

C3SHPIP1

If you ask me, sir, what is the latest date on which the

plaintiffs could have brought this action, assuming you give

them a lot of credit all along the way, the latest date is one

year after August 6, 2010.

How do I achieve that date?  That date is achieved by

looking at Exhibit O to Mr. Bongiorno's affidavit, in which

everything you would want to know about our risk to

Countrywide, our risk to GMOs, our risk to Monoline insurers

and the risk that we could be sued by private label buyers is

fully and finally disclosed.

It is there in the middle or the early part of August

2010.  They didn't sue until September 23, 2011.  And they

don't claim that this new suit relates back, nor could they.

So I would say to you as follows:  One, if you look at

page 2 of their brief, they say that we disclosed throughout

the class period our exposure to suits by Fannie and Freddie

and the Monolines.  The thing to which they cling to give them

life is that the risk of suit from the private folks wasn't

disclosed.  Well, first, they don't even allege that we were

sued by the private folks at any time in 2009.  You are given a

total number for late 2010.  But again, the risk of that suit

is there from the beginning.  I think the statute in truth

expired in, almost concurrently with the offering.  But you

don't have to believe that to believe their one year runs out

in August of 2011.  In other words, one year after

C3SHPIP1

1    Mr. Bongiorno's Exhibit O is filed.

2              Merck doesn't change anything.  It doesn't change

3    anything because there is plenty of law for the proposition

4    that Merck applies to Section 10 claims, not Section 11 claims.

5    America doesn't change anything in this case because this is

6    not a scienter case.  You don't have to spend more time trying

7    to do an investigation to figure out what the state of mind

8    was.  It is one year.  There is nothing else to add.  For that

9    reason, I do want to sit down early because I don't want to let

10   the time run the way the plaintiffs did.

11             Thank you, sir.

12             THE COURT:  All right.  Thank you, Mr. Rudman.

13             Ms. Weiss, do you wish to be heard?

14             MS. WEISS:  Briefly, your Honor.  Thank you.

15             Following your admonition about updates, I did want to

16   focus on Judge Kaplan's decision from last week a minute

17   because it has some significance.  In particular to where the

18   briefing landed as to my client, PricewaterhouseCooper.

19             The claim in this case as to PwC is quite a bit

20   narrower than everyone else because the plaintiffs tied

21   themselves to one statement, and that is PWC's opinion on a

22   2008 financial statement to Bank of America.  I don't think

23   there is any dispute that PWC's statements at issue in the

24   case, which are in the record, Weiss declaration Exhibit A,

25   page 109, are expressly statements of opinion.

C3SHPIP1

1          What plaintiffs do dispute is whether the *Fait* case

2     from the Second Circuit applies to those opinions.  And I think

3     what we did agree on in the briefing is that we both agree that

4     if it does, they lose, because they made no effort to argue in

5     any way that they could satisfy that standard.

6          Their argument was that that case should be narrowly

7     construed to specific types of accounting estimates at issue in

8     *Fait* and nothing further.  Your Honor, I don't think that

9     factual distinction works, but we briefed that.  Even if you

10    accept that, the facts here are not really distinguishable from

11    *Fait*.  But put that aside.  The opinion of the Second Circuit

12    is in no way so limited.  It very, very broadly applies to any

13    statement of belief or opinion, which Judge Kaplan emphasized

14    this week.

15         So as he said in the *NECA* case:  Section 11 and 12

16    claims premised on statements of belief or opinion are not

17    actionable absent legally sufficient allegations that the maker

18    at the time the statements were made did not in fact entertain

19    the opinions or hold the beliefs upon which the claims are

20    based.

21         He said that with some emphasis because there were six

22    or seven types of statements of opinion or belief, like our due

23    diligence on Countrywide was adequate, our internal controls

24    are sufficient, that he found to have that apply to.  So he

25    quite clearly, as the author of the *Fait* opinion, affirmed by

C3SHPIP1

 1   the Second Circuit, rejected the narrow reading that the

 2   plaintiffs are trying to give it.

 3           THE COURT:  Why shouldn't the court apply Merck to

 4   plaintiffs' Section 11 claim?

 5           MS. WEISS:  On the statute of limitations question?

 6           THE COURT:  Yes.

 7           MS. WEISS:  That would be a separate basis from the

 8   one I've been arguing, obviously.  The point that I've been

 9   making relates to whether they can allege misstatements at all

10   against PwC because they need to allege subjective falsity, and

11   they have not.

12           But as to the statute of limitations, I think Merck --

13   I agree with the underwriters' counsel that Merck doesn't make

14   a difference in this case.  So if the court were to apply it,

15   the standard articulated in Merck as applied here should have

16   the same result.

17           But the reason why the other courts in this district

18   have held that it does not apply is that in the Section 10

19   cases, the statutory language is different than in Section 11,

20   and the Section 13 statute of limitations triggers off express

21   language of inquiry notice that calls for a discovery or

22   should-have discovered standard as opposed to learned all the

23   facts.  Those are not exact words.  They are laid out in our

24   briefs.  But there is a distinction between the 10(b) statute

25   of limitations standard and the Section 13 one.

C3SHPIP1

1              THE COURT:  Perhaps I should have given Mr. Rudman a

2     chance to respond to that.

3              MS. WEISS:  Did I get that right?

4              THE COURT:  Do you want to add anything to your

5     colleague's response?

6              MR. RUDMAN:  All I would say, first, is there is law

7     that says Merck doesn't change a Section 13 analysis.  It was

8     construing a different statute.  Then I think common sense says

9     in this particular case you need not wait for elaboration.

10    This is just an omission case.  You know what is there and what

11    is not there.  So you would not have any extension of time.

12             And finally what makes this case reasonably egregious

13    are two things.  One, we are not talking about some minor

14    economic bubble that nobody was aware of.  We are talking about

15    the greatest economic meltdown of all time.  It is not as

16    though people didn't know there was a risk of litigation.  Fair

17    enough, if you please, sir.

18             And then this was so widely publicized in every

19    conceivable respect -- I do not wish you to tear your hair out

20    again over Gretchen Morgenson, but if you look at paragraph 85

21    of the plaintiffs' complaint, they say to you that all this

22    concern about MERS, for example, was not disseminated to the

23    investment community.  If publication on the business pages of

24    the New York Times is not dissemination to the investment or

25    business community, what on earth is?

C3SHPIP1

1          So at the last dash --

2          THE COURT:  What about Wachovia, though?  Didn't that

3    apply Merck to a Section 11 claim?

4          MR. RUDMAN:  I do understand that Merck has been

5    applied to some Section 11 claims.  I concede that.  I don't

6    remember standing here whether Wachovia did or not.

7          But this case, if you please, your Honor, is one of

8    the most palpably in the public domain cases on the two issues,

9    the only two issues that are before you.  One, the risk of

10   suits for failure to conform to underwriting criteria, and

11   MERS.  You look at paragraphs 84 and 85 of the complaint and

12   you see that list of litigation involving MERS.  It is not a

13   secret.  Leaving aside Gretchen Morgenson.  And then if you

14   look at the climate in late 2008, early 2009, does anybody

15   think Countrywide isn't being sued over reps and warranties

16   relating to underwriting criteria.

17         This is the worst case in the world to give them more

18   time, especially when it is such a simple open-and-shut

19   omissions case.

20         THE COURT:  All right.

21         MS. WEISS:  Your Honor, can I respond to your

22   question?  I have had time to do my homework over here.

23         THE COURT:  That's fine.

24         MS. WEISS:  Wachovia did say that Merck would be

25   applied in a Section 11 case, although in that case it made no

C3SHPIP1

1    difference.  So either one would have the same result in this

2    case, which was the clock starting at the same time.

3         The courts that have noted the distinction and held

4    that Merck did not apply were the *Indie Mac* case and the

5    *Barclays* case, cited in our reply brief at page 8.  The

6    distinction that those courts are focusing on is the difference

7    between the 10(b) statute of limitations language, which

8    triggers when a plaintiff "discovers the facts constituting the

9    violation," as opposed to the Section 13 standard, which is

10   when "discovery of the untrue statement or omission should have

11   been made by the exercise of reasonable diligence."

12        So it is that should standard that gives rise to the

13   unfair notice that the Second Circuit has always recognized,

14   and I think it is clear that the district courts are wrestling

15   with the issue.  But I think courts have sort of, that have

16   considered it more thoroughly have decided that the inquiry

17   notice standard should continue to apply in Section 11 cases.

18        THE COURT:  Thank you, Ms. Weiss.

19        Anything further from defendants?

20        Mr. Rosen.

21        MR. ROSEN:  Thank you very much, your Honor.

22   Following such a distinguished group of counsel, it is an honor

23   to be here and address you, and I hope I can persuade you.

24        Starting with the last point first on the statute of

25   limitations, your Honor is correct, a number of courts applied

C3SHPIP1

Merck to '33 Act cases.  One of the best examples is what your
colleague Judge Rakoff said in the case *Public Employees*
*Retirement System of Mississippi v. Merrill Lync*h.  If your
Honor will allow me, I would just like to briefly quote what
Judge Rakoff said because I think it very neatly summarizes why
Merck applies.  This is a direct quotation.

          Although the Second Circuit has not yet had occasion
to determine whether Merck requires a change in how the Circuit
interprets Section 13" -- the statute of limitations
provision -- of the '33 Act, Merck, if anything, favors the
plaintiffs here.  Indeed, in Merck the court rejected arguments
of the defendants, quite similar to the arguments made by
defendants here, and held, in effect, that even if a plaintiff
had "inquiry notice" sufficient to warrant beginning to
investigate, a plaintiff would not be barred by the statute of
limitations unless a reasonably diligent plaintiff similarly
situated would have actually discovered the facts showing the
violation alleged in the plaintiff's complaint.

          THE COURT:  But assuming that I applied Merck, how is
it that a reasonably diligent plaintiff would not have been on
notice of the fraud as of 2009?

          MR. ROSEN:  Because the critical facts were not
disclosed until October 2010.  Here is the chronology that I
would respectfully submit is relevant to your Honor.

          On October 1st, Bank of America announces that --

C3SHPIP1

1    excuse me.  On October 1st, Bank of America -- let me get this

2    exactly right because I don't want to misstate it.  I noted the

3    exact date in my notes.  So I don't want to misspeak and give

4    anyone a chance of accusing me of misleading the court.

5              THE COURT:  They would never do that.

6              MR. ROSEN:  They're good advocates.  So if I misspeak,

7    I am sure they will catch me.

8              On October 1st, there is an announcement from Bank of

9    America that it is -- I don't see it in my notes so I will do

10   this from memory, and I apologize if I misspeak.

11             Bank of America announces that it is suspending

12   foreclosures in 23 states.  That was the day after, on October

13   30th, the first announcement of an investigation by state

14   attorneys general.

15             On October 8th, Bank of America announced it's

16   suspending foreclosure activities in all 50 states, and then

17   there are a series of disclosures culminating on October 19.

18             On October 19 something very important happens.  A

19   series of disclosures.  My learned counsel -- and I apologize

20   if I don't remember who said what, and I don't mean to treat

21   them as a group, but I hope they will forgive me -- said, gee,

22   there was enough known about the representation and warranty

23   claims.  In fact, disclosures were made about representation

24   and warranty claims that had been paid or that they had

25   accepted as out there.  But in fact, it wasn't until October

C3SHPIP1

1    that they disclosed a claim, with which your Honor is quite

2    familiar, the Walnut Place claim, in which a group called the

3    Pimco asserted a claim for $47 billion.  As your Honor recalls

4    from having had jurisdiction of that case for some time, there

5    was an attempt --

6               THE COURT:  The Second Circuit said I didn't.

7               MR. ROSEN:  Well, what is that famous line of Justice

8    Jackson of the Supreme Court is, infallible because it's final,

9    not final because it's infallible.  So they spoke and we move

10   on.

11              As your Honor knows, in that case, although the claim

12   was not disclosed until October, in that case Pimco had made a

13   demand upon Bank of America in June.  That is typical of these

14   sorts of things.  What we also know, and what we have alleged

15   in detail in the complaint -- and I apologize because I can't

16   recite it line and verse -- is that there was a pattern of

17   stonewalling, of not responding to inquiries, of not giving

18   notices.  And if I recall correctly, the allegation in Pimco

19   was that there were 17 groups of securitizations that had been,

20   that Pimco had invested in and been generated by Bank of

21   America or Bank of America loans had fed into them, and they

22   involved tens of thousands of mortgages, but they had not

23   gotten mortgage of a single mortgage that was not performed,

24   where obviously many were not.

25              So it wasn't until October 19th that you had the

C3SHPIP1

following disclosures.  They disclosed the existence of the

Pimco claim.  They then said, oh, and, by the way, setting

aside the Pimco claim, which they treat as coming in after

September 30th, for the quarter ended September 30th there are

$26 billion of additional claims and 13 billion that are as yet

unresolved.  And they said for one class of claims we can't

estimate the amount of liability out there.  There was nothing

put in perspective, put in dimension establishing the

materiality of that information.  That was one of the things

that was missing.

          Also on October 19, Mr. Moynihan, who at that point

was CEO and previously he had been general counsel -- I want to

just apologize to my colleagues and the court right now.  There

was a misstatement in our brief that they caught, and I

apologize we didn't catch it.  Mr. Moynihan did not move

immediately from being general counsel to CEO.  He held two

intermediate positions during Bank of America during the class

period before that, in between.  So I apologize for that

mistake.  One of them caught it and I should have caught it.

          Mr. Moynihan admitted, on October 19th, that there

were issues as to MERS, and one of the issues was, you need to

have possession -- you need to have title of the mortgage in

the name of the bank when you execute on it.

          Now, Mr. Kasner gave a brief speech -- soliloquy, if

you will -- about MERS and how good it is.  The issue isn't is

C3SHPIP1

1   MERS good, is MERS efficient, does MERS allow banks to avoid

2   paying millions of dollars in recording fees to various

3   counties.  It is how did Bank of America handle MERS.

4          One of the things we cited was sworn testimony in the

5   bankruptcy court for the District of New Jersey before Chief

6   Judge Wizmur by, I believe the woman's name was Linda

7   Demartine.  Linda Demartine was a supervisor handling

8   foreclosures.  She testified that it was not routine practice

9   to forward notes to go along with a mortgage.

10         Now, why is that relevant?  The law, as I understand

11   it -- and I'm not an expert, but I have read up on this -- is

12   that the adage is the mortgage follows the note.  And what the

13   courts have said, some of the courts that have raised issues as

14   to MERS have said, is that a mortgage becomes an unsecured

15   debt, not a secured debt, if you don't have the note.

16         So what did we learn?  We learned that in the

17   bankruptcy court opinion, which came out in October 2010, that

18   they did not routinely transfer the note.  We also learned that

19   at the end of the class period that there was an excessive

20   practice of what has been referred to in the vernacular as

21   robo-signing.  Now, what is robo-signing?  That is not when you

22   get a charitable solicitation that is personally signed by your

23   favorite politician or celebrity asking you to save the ants or

24   contribute to their cause.  That is a practice in which the

25   banks, because they either did not transfer the note or had

C3SHPIP1

1    lost the note, were now falsely attesting, in papers they had

2    filed with courts, typically state courts in the 23 states in

3    which foreclosures require judicial action, sometimes in other

4    courts, such as bankruptcy courts, that in fact they had the

5    title, that in fact they had proof that they had ownership of

6    this claim.  And in fact, one of the announcements that came

7    out in October 2010, which answers, I believe it was

8    Mr. Rudman's or Ms. Weiss' argument as to when the statute of

9    limitations started, was that the bank was going to redo -- I

10   apologize if I don't get the number exact -- 102,000

11   foreclosure papers, sets of paperwork, because they had not

12   been properly reviewed.

13            There are a lot of allegations in the complaint how

14   people were signing declarations or affidavits attesting to

15   facts that they had no personal knowledge of, that notaries

16   were signing, were attesting to signatures when it had not been

17   signed in front of them.

18            THE COURT:  All right.  Let's turn to the scienter

19   question.

20            MR. ROSEN:  Certainly, your Honor.

21            THE COURT:  Wouldn't it be irrational for the

22   defendants to continue to use MERS if they knew that it

23   rendered the mortgages unenforceable?

24            MR. ROSEN:  Here is the short answer.  It is not

25   irrational if you use it properly.  It is not irrational -- one

C3SHPIP1

1    of the allegations and one of the things I believe we alleged

2    and it is in the complaint -- again, I apologize because I

3    can't cite line and verse where -- is there were findings after

4    the event -- there was something called a Financial Crisis

5    Inquiry Commission.  I believe it found, or it may be another

6    source, but it is alleged in the complaint, that they did not

7    devote adequate resources to properly service and foreclose on

8    debts.

9            So if you properly handled MERS, if you properly

10   recorded the mortgages and properly recorded the transfers and

11   forwarded the notes and had them properly executed, there is

12   nothing wrong per se.  But using MERS as a shortcut, by not

13   forwarding the notes, by routinely losing the notes, by

14   routinely engaging in robo-signing -- and one of the documents

15   that we came across -- it is not in our papers, but I just saw

16   it the other day -- was an Inspector General report for the

17   Department of Housing and Urban Development and it talks about

18   how pervasive that was.

19           THE COURT:  Doesn't that sound more like a

20   mismanagement claim than a fraud claim?

21           MR. ROSEN:  Your Honor, it can be both.  But it is not

22   asserted as a mismanagement claim.  But MERS is relevant.

23           There are two things that go together here, that are

24   very critical to understanding this case.  One is MERS and one

25   is the representations and warranties with respect to the

29

C3SHPIP1

1    mortgages.

2          The basic way the system worked was -- Mr. Kasner is

3    absolutely right.  MERS has been around for a while.  The

4    change in this decade from the way it was, say, 40 or 70 years

5    ago, when 40 or 50 years ago your parents bought a mortgage it

6    was probably with a local bank that held onto the mortgage

7    until they paid it off.  Now mortgages are turned into

8    securities and passed off and securitized and all that.

9          But what happened here is in order to sell the

10   mortgages you need to get representations and warranties.  One

11   of the representations and warranties is that you have good

12   title.  Another critical representation and warranty, which was

13   significantly false in a significant number of cases, is that

14   the loans complied with secondary mortgage market financing

15   standards, because the buyers of these notes, whether it is a

16   private institution such as Pimco, whether it is a government

17   entity such as Fannie Mae or Freddie Mac, don't want to buy

18   debt that is not likely to be paid.  So they set standards.

19         (Continued on next page)

20

21

22

23

24

25

C3snpip2

```
 1          MR. ROSEN:  These by the way are objectivity
 2    standards; there is no issue of subjectivity on this.
 3    Defendant, and I quoted this in the complaint, made specific
 4    express representations that the mortgages were made in
 5    compliance with secondary mortgage market requirements.
 6          Purchasers of those securities relied upon that fact.
 7          Here's another critical fact that gets buried in all
 8    of the defendants' papers.  That is, it's clear defendants did
 9    something -- and I don't mean counsel personally -- Bank of
10    America did something very clever, but wrong.
11          They tried to -- and I am not saying they learned this
12    from their securities lawyers -- but they tried to inject into
13    the mortgage representation and warranty requirement a loss
14    causation element.
15          What do I mean by that?  In securities, loss causation
16    means it is not enough that you show they made a material
17    misstatement.  You have to show as a result of the disclosure
18    of the material misstatement the stock price fell or whatever
19    happened therefore, q.e.d., you have been injured.  The
20    defendants -- by defendants I mean Bank of America --
21    consistently took the position that it is not enough that the
22    representations and warranties were false, you need to show
23    that you have been injured.
24          What is the significance of that?  If I am a purchaser
25    of a securitized collection of mortgages, and I have to show
```

C3snpip2

1    that not only did you misrepresent the facts to me and tell me

2    that these complied with secondary market standards and they

3    didn't, and did you ever represent to me, and you did falsely,

4    that you had clean title to them and the various other

5    representations and warranties, if I have to also show that I

6    have been injured, then the bank takes the position, Well until

7    you show me they are not paying on the underlying debts that

8    fund the trust that ends up sending a check to you every month

9    from the trust, you are not injured.

10        The Court of Appeals, excuse me, the Appellate

11   Division of the New York State Supreme Court confirmed in the

12   NPIA case there is no such requirement.  But defendants

13   consistently took the position that there was.  So what

14   happened, they were not recognizing the existence of billions

15   of dollars of representation and warranty liabilities because

16   their position was you haven't yet shown me you are injured.

17        What is the significance of that?  And let me tie it

18   back to scienter, which was another major point defendants made

19   today.

20        This relates to the argument Mr. Kasner and somebody

21   else made about whether the scheme is rational, whether it

22   makes sense.  There were two underlying motivations here in

23   their scheme.  One clearly was to repay TARP.  But a related

24   and mirror motivation here was to prevent a run on the bank.

25        Because if you disclosed -- if you are Bank of America

C3snpip2

1    and you disclosed there are billions of dollars in securitized

2    loans which principally originated from Countrywide during the

3    years 2004 to 2007, for which the representations and

4    warranties have been breached and in fact you are obligated, as

5    the representations and warranties say, to buy them back, if

6    there is a breach and if in fact, as the Appellate Division

7    confirmed in NPIA that is not contingent upon showing an

8    underlying failure to pay those mortgages, then when they

9    disclose that liability, there will be literally a run on the

10   bank.

11           So, their motivation from the beginning of the class

12   to the end of the class was not simply to raise the $19 billion

13   to pay back the $45 billion plus interest to TARP.  Theirs was

14   to prevent a further deterioration of the bank's financial

15   condition, because if they disclosed that there were billions

16   of dollars of representations and warranties liability

17   throughout on those home loan and these mortgage-backed

18   securities, then a rational investor would have said, I want my

19   money back too.  That is one of the basic issues here that

20   think has not been addressed.

21           There are a number of other points I made, and I

22   apologize if it sounds scatter shod, but I am looking at my

23   notes, and I want to address them one by one.

24           Your Honor asked Mr. Kasner about the private

25   securitization disclosures.  Your Honor, is correct.  Those are

C3snpip2

 1    not deemed the public.  We cited the Countrywide decision from

 2    the Central District of California that directly addresses it.

 3          There was also some extensive discussion about what

 4    should the plaintiff know or be on notice of under a reasonable

 5    standard.  The Second Circuit answered that in part in the

 6    Staehr case, at 547 F.3d 406.

 7          Judge Cote also answered it in one of her WorldCom

 8    opinions.  I believe we cited them both in our brief.  What

 9    they say is, in terms of would the plaintiff be on notice, ask

10    whether a reasonable plaintiff of ordinary intelligence would

11    be notice of information.  And Staher also specifically said,

12    in contradiction of what Mr. Kasner said, is that the court

13    does not expect plaintiffs to be on notice of articles in

14    specialty or trade press.

15          They make an argument, gee, if it is in the business

16    section of New York Times, shouldn't that be on notice?

17          The issue is, if your Honor agrees with me and, more

18    importantly, with Judge Rakoff and four out of six or six out

19    of eight opinions in the Southern District addressing this

20    issue that Merck applies to a '33 Act claim, the issue is when

21    did the plaintiff know enough not just to inquire, but to be

22    able to plead an actionable claim?  They did not know enough at

23    that time.  It is a matter of connecting the dots.

24          Yes, your Honor.

25          THE COURT:  Once again, why would the outcome here be

1      different under Merck.

2                  MR. ROSEN:  The outcome would be different under Merck

3      because we did not know until the defendants confessed -- and I

4      use that term loosely -- the disclosures that were made in

5      October of 2010, the magnitude of the exposure because we all

6      agree if the exposure on the representations around warranties

7      was a hundred million instead of in the tens of billions, it

8      might not be material, and therefore there may not be a

9      reasonable basis for a plaintiff to have a grievance.

10                 We also did not know until October 2010 that Bank of

11     America admitted that it had problems with performing under

12     MERS.  We did not know these facts because they were not

13     disclosed, and the proof of that -- and, your Honor, I

14     apologize.  I suppose we should all send flowers to Gretchen

15     Morgenson tonight or tomorrow, because everyone is citing her,

16     but I am looking at a New York Times arming by Ms. Morgenson

17     dated July 17, 2010.

18                 It refers to action by the Federal Housing Finance

19     Agency which is the overseer of Fannie Mae and Freddy Mac, and

20     her second paragraph begins as follows, and I quote:  The

21     agency" -- that is the FHFA -- announced last Monday that it

22     had issued 64 subpoenas to a throng of unidentified financial

23     services institutions.  What this relates to is the government

24     hadn't put it together yet.  The information was being

25     withheld.

C3snpip2

1            We have alleged in detail in the complaint how Bank of

2    America was stonewalling on disclosures, not providing

3    information, so it is not enough simply to say somewhere out

4    there in the broad universe -- we all watched your Honor this

5    afternoon before our hearing, your trial involving Google and

6    Google Scholar and what you can find on the Internet.  I found

7    it quite interesting.  But the issue isn't simply could someone

8    had have done a Google search and somehow found out that MERS

9    is out there.

10           The issue connecting the dots, and there was not

11   sufficient information for which plaintiffs could have pled an

12   actionable claim.

13           The one guarantee I will give your Honor is, if we had

14   filed suit not after October 2010, but July 2010, or January

15   2010, all of these very skilled defense attorneys would be

16   standing up and saying, They can't plead a claim.  They don't

17   have all the allegations to state an actionable claim.  We

18   can't then, we can now.

19           I think that is very significant.  I want to talk for

20   a minute about Judge Kaplan's decision in Price Waterhouse.

21           And, first of all, I want to commend the defendants on

22   their victory in front of Judge Kaplan.  I think it is

23   obviously a significant accomplishment.  But, you know, if you

24   have a hammer, everywhere you see nails, and if you're a

25   general, you think about winning the last war.

C3snpip2

         1          Judge Kaplan's decision dealt with loss reserves, and

         2   his opinion addressed that in fact the plaintiffs could not

         3   state a claim for loss reserves.

         4          One thing I can cite by number before your Honor is

         5   paragraph 136 of the consolidated complaint expressly disclaims

         6   any claim about the adequacy of the loss reserves.  So while

         7   defendants make their arguments about Fait, that is not a

         8   battle we made.

         9          Your Honor can scour all 100 -- I apologize for the

        10   length -- probably 130, 140 pages of the complaint.  We talk

        11   about inadequacy of controls, but we do not allege inadequate

        12   reserves as a basis for a cause of action.

        13          So Fait does not apply, first of all, I submit because

        14   it is not a claim for which Fait refers, which are subjective

        15   things.  We say these things with respect to that.

        16          THE COURT:  If it does, if Fait does apply to your

        17   Section 11 claims against Price Waterhouse --

        18          MR. ROSEN:  Yes, your Honor.

        19          THE COURT:  -- do you state a claim?

        20          MR. ROSEN:  Let me answer it in two parts.

        21          A, it depends on how you interpret Fait.  But if you

        22   interpret Fait the way defendants interpret Fait, I don't

        23   believe the complaint currently does.  I would have to at that

        24   point revisit the allegations and the information that came out

        25   since we filed the complaint as to whether we could replead

C3snpip2

1    that allegation, and I would have to revisit that and go back

2    to our continuing investigation.

3           One of the things that we found very interesting, I

4    mentioned earlier, your Honor, is the inspector general's

5    report from the Department of Housing and Urban Development,

6    which talks about a number of issues that we think would help

7    us.

8           But one of the terms in terms of the application of

9    Fait is how does Fait apply.  We have a claim here with respect

10   to two issues.  One is provision of one of the accounting

11   principles, which is FIN 45 and one is FAS 5.  FIN 45

12   specifically says, if you have given a guarantee, you have an

13   obligation to disclose, even though there's been no call on the

14   guarantee yet, and excluding certain things like product

15   guarantees, if I warrant your iPhone or iMac, that is

16   different.

17          But if I am given a guarantee outside of that area and

18   some other exclusions don't apply, I have an obligation to

19   disclose the entire maximum possible exposure.  And if I can't

20   say what the maximum possible exposure is, I'm supposed to say

21   it's not estimable, and here is why.

22          That is an objective test and here's why.

23          Under the representations and warranties, if the

24   company was in breach, and we allege there is an awful lot of

25   evidence that it was, if it was in breach of those

C3snpip2

representations and warranties, then it is liable to a claim by

the holder of those notes or the loans to buy them back, to, in

effect, refund their monies, so dollar for dollar.

That is a measurable amount.  If I said to you what

is -- I can't make it personal, because Bank of America is not

a personal entity.  But if Bank of America were applying for a

loan and you said, What are your liabilities out there, and you

said, well, we've guaranteed, we have given a thousand

representations and warranties, and the total exposure in each

representation and warranty is $500, then the answer is, under

FIN 45 they would have an obligation too say there is a

possible claim against us for $500,000.  Namely, the $500

maximum exposure times 1,000 liabilities.

That's what they should do.

If they can't determine that amount, they have to say

that.  One of the things they did in October 2010 that they did

not do before, which is why we couldn't have asserted a claim

before, and they said first they disclosed the Pimco claim, the

$47 billion that they were trying to settle for eight and a

half and went in front of your Honor and now is back in state

court.  Then they said, in addition, apart from that, there are

$26 billion of representation and warranty claims on a certain

class, of which $13 billion are still unresolved.  And then

they say there is another category of such claims and we can't

quantify it.  That is what they were supposed to do, and that's

C3snpip2

what they should have done.

By the way, as further confirmation that this is what their obligation is the SEC has issued a series of what are called "Dear CFO letters."

They post them on their website and make them available.  In October 2010, they don't change the law.  They simply amplify and confirm what the law says, because they are not adopted by regulation.  But it specifically talks about the need to disclose this sort of exposure, including representations around warranties.

So, to give your Honor a very long answer to what I thought was a very direct question, the reason why I don't think Fait ought to apply is because the sort of claims that should have been disclosed are objectively quantifiable, involves no judgment.

That's what distinguishes this -- if we had pled this as a loss reserve case, they would be absolutely right and I would be out of court, and I wouldn't be able to amend.

When you are talking about FIN 45 and an absolute obligation to repay -- because that is what these things are, these are guarantees, if I breach the representations and warranties, I have to buy them back -- then that is and objective standard that needs to be provided.

If I could make a couple of other comments, and then, unless your Honor has any questions, I would be happy to sit

C3snpip2

1   down.

2          Defendants talked about all the publicity out there,

3   all the articles out there.  I read most of them.  Most of them

4   don't mention Bank of America.  Most of them talk about other

5   issues.  So the question is, and the Staehr case from the

6   Second Circuit talks about how specific is the information, how

7   applicable is it to that particular investment to put a

8   reasonable investor -- not a hedge fund, not someone who is

9   buying in and out every two seconds as a speculator, but a

10  reasonable investor on knowledge.

11         And one of the things they talked about what what were

12  the words of comfort or the words of denial.  One of the

13  things -- we pointed this out in the memorandum that my partner

14  Mr. Barrack wrote relating to the motion to strike -- and I

15  agree with Mr. Kasner.  I see no need to argue that.  Your

16  Honor will do what your Honor believes appropriate.  We talked

17  about in that memorandum that this information -- I am trying

18  to think of the best way to put this.  This information -- you

19  know, there were denials of responsibility.  In some of the

20  very exhibits that Mr. Bongiorno attached, it contains a

21  quotation from either the bank or from the company that

22  operates MERS.  It says there is no problem, or it says we deny

23  all liability.

24         So the courts talk about, when you look at what notice

25  is out there, not just what statements are made, but what is

C3snpip2

1   the company's response.

2          And until October, starting with October 1, when they

3   suspended foreclosures in 23 states, and then October 8, I

4   believe, or 13th when they suspended them in all 50 states, and

5   then on October 18 and 19 when they basically said, open

6   kimono, here's what we should have said all along, and they

7   identify by vintage -- that is, 2004, 2005, 2006, 2007, GSE,

8   that's government-sponsored, private purchasers and monolines,

9   which are claims by insurance companies that insure these

10  instruments, how much the claims are out there and so forth.

11  So it is not until then that there was enough information to

12  state a claim.

13         I have never quoted Orson Wells before in court, but

14  it seems appropriate at this point.  Do remember that old

15  commericial, "I will sell no wine until its time"?

16         I can't bring a suit before its time and my client

17  can't bring a suit before its time.  Not until October 2010 was

18  there sufficient information in the record to make available.

19         So I think those are the principal points.

20         One other thing I do want to address.  We spoke in our

21  brief -- and, again, I apologize if I am repeating myself --

22  about failures of internal controls.  This is an additional

23  reason why Fait doesn't apply, because we specifically alleged

24  in detail in the complaint how Bank of America circumvented the

25  established procedure for recognizing liabilities on

C3snpip2

representations and warranties, that they had an established

committee that was supposed to do it.  Instead, this was done

on an ad hoc basis by the CEO, the CFO, and other senior

executives in consultation with counsel.

          We also cited -- I believe it was the SEC v. Spiegel

case, which said circumventing this system, not the particular

system, but circumventing an existing system is something that

courts consider as evidence of a securities violation, as

evidence of a failure of internal controls.

          THE COURT:  How do you distinguish between a

mismanagement claim and a fraud claim?  What is it that

transports mismanagement into a fraud?

          MR. ROSEN:  Well, it depends on whether you are

talking about a '33 or '34 Act claim.  If you are talking about

a '34 Act claim, there is obviously the issue of scienter.  On

a '33 Act there isn't.  But mismanagement can be.  There is a

famous Supreme Court decision, that is Santa Fe V. Green, that

said mere mismanagement is not securities fraud.  Black letter

law, no question about it.

          But if you were hiding mismanagement -- it is not that

just that you are failing to accuse yourself.  I am not saying

you need to stand up and say mea culpa, mea maxima culpa, and

engage in self-flagellation on Wall Street in front of Gretchen

Morgenson or anybody else.  But if you have financial

liabilities -- which the accounting principles under FIN 45 say

C3snpip2

```
 1    you should recognize, which the Appellate Division of the New
 2    York Supreme Court confirmed are liabilities out there whether
 3    or not you have a default -- and if you know, as we allege they
 4    knew, that if they disclosed this information there would be a
 5    run on the bank, so not only would they not be able to raise
 6    the $19 billion they raised in December 2009, but there would
 7    be additional claims on their assets as people were saying hold
 8    on I want a refund, then we think that states a claim.
 9              THE COURT:  All right.
10              I think I have your arguments, Mr. Rosen.
11              MR. ROSEN:  Thank you, your Honor.  I appreciate your
12    patience.  I know the hour is late.  Again, I want to apologize
13    to my adversaries for those couple of misstatements in our
14    brief.
15              THE COURT:  Mr. Kasner.
16              MR. KASNER:  Your Honor, with regret, while my opening
17    was brief, there are a couple of points, with the Court's
18    indulgence, that I would like to respond.
19              THE COURT:  Yes, but just literally a couple of
20    minutes.
21              MR. KASNER:  OK.  I promise your Honor, please, as
22    Chuck Barris used to do, if I'm overstaying my welcome, ring
23    that gong, your Honor, and I will sit down.
24              THE COURT:  When you see me get restless.
25              MR. KASNER:  I will your Honor.  I appreciate that.
```

C3snpip2

1              THE COURT:  The court reporter and I are on the verge.

2              MR. KASNER:  Your Honor, at the risk of absolute

3       outrage, and I apologize, Bank of America Corporation is a

4       public company.  It has shareholders all over the world.

5              From my friends on the plaintiffs' side to put on a

6       public record that their basis for inferring fraud on the part

7       of senior management was because in the absence of hiding there

8       would have been a run on the bank is absolutely irresponsible.

9              Not surprisingly, the complaint, which carries with it

10      Rule 11 obligations, says absolutely no such thing.  I realize

11      counsel wants to grab a little bit of a headline here, but I

12      have to say, your Honor, publicly on behalf of the bank and all

13      of its hundreds and thousands of employees that was an

14      incredibly irresponsible thing to put on a public record.

15             And what's the proof of the pudding that that is

16      absolute poppycock, well, counsel says everything was disclosed

17      in October of 2010.  I would like to come back for a moment to

18      what everything is.

19             Was there a run on the bank, your Honor, in October of

20      2010 when all of this stuff came out?  To the contrary, Bank of

21      America's stock price has increased 65 percent this year alone.

22             So I apologize for getting a little bit agitated, your

23      Honor, but that is nowhere in their complaint.  If what he is

24      saying now is, well, you know what, I really don't feel so good

25      about these TARP allegations, I can understand it.  But don't

C3snpip2

go grabbing for things that aren't in your pleading and suggest
that the management of Bank of America was motivated to avoid a
run on the bank.

          Your Honor, counsel also suggests that Bank of America
was hiding reserve information and repurchase information.

          Very quickly, your Honor, and I know your Honor has
seen this before, I'm holding up the demand letter that led to
the eight and a half billion dollar settlement.  For the
record, that letter is dated October 18, 2010 and it is
undisputed on this record, including in the complaint, that
disclosure about that was made the very next day.

          Now, your Honor, there is a critically important
concession in paragraph 136 insofar as this issue of the
repurchase reserve is concerned.

          I would invite the Court, please, as I mentioned when
I rose to present my argument, information about the
methodology that was used to set reserves for rep and warranty
claims was disclosed fully by Bank of America in every single
quarter during this proposed class period.

          In the 10-Q for the period ended June 30, 2010, which
was the quarter immediately before this epiphany that saved the
run on the bank, according to plaintiff's counsel, there is
full disclosure about the manner in which the representation
and warranty reserves were established.

          There is full disclosure, by way of example, about the

C3snpip2

```
1    various factors that go into the inherently judgmental decision

2    of how to establish a repurchase reserve.

3              Now, I am advising a number of clients on these

4    repurchase demands, your Honor, and clients in good faith

5    believe that they have defenses to these repurchase demands.

6              There are causation issues.  I don't know what

7    Appellate Division decision counsel is referring to that

8    addresses this issue.  But Justice Branston in the MDIA case,

9    which did address this causation question, declined to rule on

10   it.

11             There are judges in this court, Judge Crotty, Judge

12   Rakoff, that are sitting on decisions where this is going to be

13   an issue.  They may be right, they may be wrong.  Counsel may

14   be right, the bank may have been wrong.

15             But to suggest that there aren't good faith defenses

16   that the bank in good faith believes exist to these claims is

17   sheer fabrication.

18             That's disclosed here, your Honor.  And it informs why

19   paragraph 136 is so devastating.

20             Counsel concedes that they are not asserting that the

21   reserves are insufficient.  If they truly believed that Bank of

22   America was withholding information from the public quarter by

23   quarter by quarter, then the reserves would be understated

24   quarter by quarter by quarter.

25             But they are conceding that the reserves are not
```

C3snpip2

```
1    understated, your Honor.  Therefore, we submit, since setting
2    the reserves is so judgmental, if those numbers are right, you
3    can't at the same time be saying, well, you didn't disclose the
4    receipt of letters.
5            That is our position anyway, your Honor.
6            Lastly, your Honor, with respect - your Honor, I would
7    like to just pause momentarily on MERS and the foreclosure
8    suspensions because there was a fair amount of discussion on
9    that.
10           For about a week in October the Bank of America
11   suspended foreclosures in order to get their arms around what
12   had been identified as some issues.  Robosigning we heard
13   about.
14           If your Honor looks, however, at Exhibit FF to
15   Mr. Bongiorno's declaration, which is in the record, that is a
16   transcript of an earnings call that took place which is
17   excerpted, not quoted in full, excerpted from in the
18   plaintiff's complaint, paragraph 148 and 149.
19           If your Honor reads that transcript in its entirety,
20   when it comes to MERS -- actually, your Honor, the transcript
21   says "marriage," when plaintiffs excerpted it in the complaint
22   they didn't put MERS in brackets, they put MERS as if
23   Mr. Moynihan was saying MERS rather than marriage, but I will
24   assume it is a transcription error at the time.
25           Mr. Moynahan told the investing public as follows
```

C3snpip2

1    about MERS:  "We don't see the issues that people were worried

2    about, quite frankly, but we're taking them seriously.  We're

3    making sure we're right.  For example, one of the issues was

4    you needed to take title in your own name prior to foreclosure

5    and we've done that.  That's been our policy.

6            "So there is nuances in how all these things play out.

7    But I think you're right.  I think the best way to think about

8    it -- I don't think the technical issue's the bigger deal."

9            Accepting the truth of the allegations, accepting the

10   fact that because of these paper issues, your Honor, that

11   emerged in October that there was a suspension of foreclosures

12   for a brief period of time, that is not the stuff of which

13   fraud is made, your Honor.  They have to have the goods.

14           Your Honor asked counsel twice why isn't this simply

15   mismanagement.  I won't concede this was mismanagement, your

16   Honor, but at best, at best that's what's going on here.  There

17   was nothing that you heard that amounts to out and out fraud,

18   and certainly not a fraud motivated by a desire to avoid a run

19   on the nation's second or third largest financial institution.

20           Thank you, your Honor.

21           THE COURT:  All right.  Anything further.

22           MR. RUDMAN:  Unless you are exhausted if I could beg

23   for two minutes and I mean it.  I will be very brief.  I

24   promise.

25           Two quick points.  First, you never heard from

C3snpip2

1 Mr. Rosen what they did by way of investigation.  You never

2 heard a real explanation as to why they couldn't figure this

3 thing out until October of 2010.

4    So that's the first infirmity.

5    Second, you never heard about what wasn't disclosed in

6 Exhibit O to Mr. Bongiorno's affidavit, which was filed in

7 August of 2010.

8    Finally, Mr. Rosen concluded by referring to Orson

9 Wells.  Let me just go up the cultural food chain one notch.

10 Somebody once asked Henry James, Why do you find this American

11 so tedious?  And James replies because he persists in writing

12 the word horse under the picture.

13    In this case, sir, the horse was fully visible, and it

14 cannot be the case that the statute doesn't run until somebody

15 writes the word horse under the image.

16    Thank you, sir.

17    MR. ROSEN:  Your Honor, if I may very briefly respond,

18 unless Ms. Weiss --

19    MS. WEISS:  I was going to ask for a moment to respond

20 to their argument that was specifically addressed to PNC.  But

21 if your Honor --

22    THE COURT:  Is it really necessary?

23    MS. WEISS:  If your Honor prefers, I will sit.

24    THE COURT:  It is not.

25    MR. ROSEN:  Your Honor, may I make a very quick

C3snpip2

1 rejoinder?

2           THE COURT:  One minute.

3           MR. ROSEN:  Thank you.

4           The answer to Mr. Rudman's question about the why we

5 didn't plead as to our inquiry is that is because that is under

6 the old standard.  The notice inquiry standard which we contend

7 Merck supersedes and no longer applies.

8           That is the short answer to that.

9           Mr. Kasner claims we misquoted and instead put MERS

10 instead of marriage in the quotation, we submitted a

11 declaration that Mr. Barrack prepared which showed they used

12 the wrong transcript.  There were two different sources for

13 that transcript -- one was Lexis and one was Bloomberg -- we

14 submitted to your Honor and it showed, in fact -- at least the

15 transcript we found had the term MERS in it.

16           Finally, this is my very last point:  The fact that we

17 are not challenging, we are not making a claim that the

18 reserves are at issue, that doesn't mean that we are conceding

19 that the reserves were adequate.

20           What we are saying is, with respect to Mr. Kasner, if

21 they had disclosed this issue, more claims would have been

22 made.

23           Whether that constitutes a run on the bank, not run on

24 the bank, I intend no slander of Mr. Kasner or his clients, but

25 our point simply is, if they had disclosed the problem, it

C3snpip2

1    would have been harder to continue operating.  There would have

2    been more demands, not fewer demands, under the representations

3    and warranties.

4          With that, I thank your Honor for your time and your

5    patience and we will stand on our argument and briefs.

6          THE COURT:  Counsel, thank you for your arguments and

7    all of your submissions.  Decision reserved.

8          I appreciate the accommodation of you adjusting your

9    schedules so that I could put in a full trial day.  We are

10   trying to move this trial toward a conclusion next week.  And

11   we need all the time we can get to finish it.

12         Have a good evening.

13         (Adjourned)

14

15

16

17

18

19

20

21

22

23

24

25