UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
PENNSYLVANIA PUBLIC SCHOOL          :
EMPLOYEES' RETIREMENT SYSTEM,
individually and on behalf of all others similarly   :
situated,
                                                  :      11 Civ. 733 (WHP)
                        Plaintiff,
                                                  :      MEMORANDUM & ORDER
        -against-
                                                  :
BANK OF AMERICA CORPORATION, et al.,
                                                  :
                        Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

WILLIAM H. PAULEY III, District Judge:

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/11/12

        Lead Plaintiff Pennsylvania Public School Employees' Retirement System

("Plaintiff") brings this putative securities class action lawsuit against Bank of America

Corporation ("BoA"), current and past officers and directors of BoA, twenty-seven underwriters,

and PricewaterhouseCoopers LLP ("PwC") (collectively, "Defendants").  Defendants move to

dismiss the Consolidated Class Action Complaint ("the Complaint").  For the following reasons,

Defendants' motions are granted in part and denied in part.


                                BACKGROUND

                This action concerns allegations of BoA's purposeful concealment of its reliance

on Mortgage Electronic Registration Systems, Inc. ("MERS") and attendant exposure to billions

of dollars of loan repurchase claims arising from the sale of mortgage-backed securities.

(Consolidated Class Action Complaint, dated Sept. 23, 2011 ("Compl.") ¶ 1.)  BoA allegedly

concealed this material information to facilitate the repayment of funds it borrowed from the

federal government in connection with the Troubled Asset Relief Program ("TARP").  (Compl. ¶ 1.)  The following is gleaned from the Complaint and assumed to be true for the purposes of this motion.

I. The Parties

BoA is the largest lender in the United States.  (Compl. ¶ 34.)  In July 2008, BoA acquired Countrywide Financial Corporation ("Countrywide")—one of the biggest originators of subprime mortgages.  (Compl. ¶ 35.)  Following this acquisition, BoA oversaw $2.09 trillion in loans as of September 2010.  (Compl. ¶ 94.)  This action implicates Countrywide's role in originating loans and selling them to third parties or for securitization into mortgage-backed securities ("MBS").  It also concerns BoA's role as servicer for mortgages in MBS trusts.

Plaintiff also brings this action against the following past and current BoA officers:  (1) Kenneth D. Lewis, Chief Executive Officer ("CEO") from April 2001 to December 2009; (2) Joseph Lee Price, II, Chief Financial Officer ("CFO") from January 2007 to January 2010; (3) Brian T. Moynihan, CEO from January 2010 to the present; (4) Neil Cotty, CFO from February 2010 to May 2010; and (5) Charles H. Noski, CFO from May 2010 through June 2011 (the "Executive Defendants," collectively with BoA, the "BoA Defendants").

The Complaint further names the following past and current BoA directors: William P. Boardman, Frank Paul Bramble, Sr., Virgis William Colbert, Charles K. Gifford, Jr., Charles Otis Holliday, Jr., Monica C. Lozano, Thomas John May, Thomas Michael Ran, and Robert W. Scully (collectively, the "Director Defendants," with Defendant Price, the "Securities Act Defendants").  Additionally, the Complaint names over twenty underwriters to BoA's Common Equivalent Securities offering, which is discussed below (the "Underwriter

Defendants"). Plaintiff also names PwC, the accounting firm that audited BoA's financial statements during the Class Period—February 27, 2009 to October 19, 2010.

Plaintiff is a public pension fund organized for the benefit of Pennsylvania public school employees. (Compl. ¶ 33.) It purchased BoA's securities during the Class Period, including the Common Equivalent Securities. (Compl. ¶ 33.) Plaintiff alleges that it suffered substantial damage as a result of these purchases. (Compl. ¶ 33.)

II. MERS

In almost every jurisdiction, a mortgagee must record the mortgage in the county where the property is located for it to take priority over other liens. (Compl. ¶ 2.) MERS is a private, computerized system for processing and tracking loans that purports to eliminate the need for physically recording mortgages. (Compl. ¶ 6.) When a mortgage is transferred from one MERS member to another, MERS only makes a notation of that transaction in its system. (Compl. ¶¶ 6, 76.) Thus, there is no public record of the transfer. (Compl. ¶ 76.) Additionally, instead of listing the name of the mortgagee, MERS lists itself as the mortgagee or the "nominee" for the mortgagee. (Compl. ¶¶ 6, 75.) However, MERS holds no interest in the loan. (Compl. ¶ 75.) Thus, the mortgage holder or servicer, and not MERS, receives payments on the loan. (Compl. ¶ 75.) BoA, Countrywide, and other financial institutions utilized MERS to avoid burdensome recording requirements and to ensure the speedy securitization of mortgages for sale on the secondary market. (Compl. ¶ 7.)

MERS operated seamlessly until 2008, when the country entered a recession and default rates rose sharply. (Compl. ¶ 5.) Then a number of courts made clear that it would be nearly impossible for mortgage holders or servicers to foreclose on loans processed or

transferred via MERS.  (Compl. ¶¶ 22, 84-85.)  To foreclose on a mortgage, a party must have

title to it.  (Compl. ¶¶ 85, 87.)  Courts reasoned that because MERS listed itself as the mortgagee,

mortgage holders and servicers did not have standing to foreclose.  (Compl. ¶ 85.)  Some of these

suits involved BoA and Countrywide in their capacities as a mortgage holder or servicer.

(Compl. ¶ 84.)  Plaintiff alleges that these publicly-filed court decisions were available to

insiders, such as the BoA Defendants, but not to the public.  (Compl. ¶ 87.)

   Plaintiff additionally alleges that Countrywide routinely failed to transfer

promissory notes when it sold mortgages.  (Compl. ¶ 78.)  To transfer a mortgage validly, an

assignor or seller must endorse the promissory note and physically transfer it to the new

mortgage holder.  (Compl. ¶ 80.)  If the promissory note is not endorsed and transferred, the loan

is unsecured.  (Compl. ¶ 80.)  Like the standing issue, this practice hindered BoA's ability to

foreclose on loans that it serviced.  (Compl. ¶ 84.)  Plaintiff contends that various judicial

decisions involving BoA or Countrywide informed BoA about a mortgage holder's inability to

foreclose on a mortgage when MERS was the nominee and the note was not properly assigned.

(Compl. ¶ 84.)  To remedy this problem, BoA enlisted employees, now known as robo-signers,

to falsify affidavits representing that they had personal knowledge of facts underlying loans and

that the notes supporting various loans had been properly transferred.  (Compl. ¶¶ 22, 83.)

III.  Repurchase Claims

   Following its acquisition of Countrywide, BoA was responsible for underwriting

17% of the mortgage-backed securities market, thereby constituting the largest share of the

market.  (Compl. ¶ 94.)  Plaintiff alleges that during the Class Period, BoA made representations

and warranties (or assumed liability for representations Countrywide made) regarding mortgages

it sold to third parties or bundled into mortgage-backed securities. (Compl. ¶ 11.) These representations and warranties included assurances that BoA had good title to the mortgages and that BoA and Countrywide adhered to certain underwriting standards. (Compl. ¶¶ 12, 104.) If BoA breached representations and warranties, purchasers could demand that BoA repurchase the loan. (Compl. ¶ 108.)

Plaintiff alleges that BoA breached its representation that it had good title because, as discussed above, courts said mortgage servicers and holders lacked standing to foreclose against borrowers in default due to the MERS system. (Compl. ¶ 107.) Similarly, Plaintiff alleges that BoA breached its representations concerning good title because Countrywide regularly failed to transfer promissory notes with their respective mortgages as required by law. (Compl. ¶ 107.)

Plaintiff also asserts that BoA breached because the underwriting standards utilized for those loans were far less stringent than represented. The lower standards resulted in unqualified borrowers obtaining loans and later defaulting. (Compl. ¶¶ 13-14.) Specifically, Plaintiff alleges that prior to the Class Period, Countrywide's priority was generating loans for securitization. (Compl. ¶ 100.) And because Countrywide transferred risks associated with its loans upon securitization, it cared little about whether borrowers could fulfill their loan obligations. (Compl. ¶ 100.)

Plaintiff claims that BoA is liable to investors for billions of dollars in repurchase claims as a result of these breaches and that the BoA Defendants misled investors about the magnitude of repurchase claims BoA faced. (Compl. ¶ 14.)

IV. Repaying TARP and Common Equivalent Securities

In 2008, BoA suffered significant financial setbacks due to the financial crisis, which were exacerbated by its acquisition of Countrywide. (Compl. ¶ 63.) To remain solvent, BoA accepted $25 billion in loans from the federal government in October 2008 and another $20 billion in January 2009 (the "TARP funds"). (Compl. ¶¶ 15, 63.) As a condition of these loans, the government imposed onerous restrictions on executive compensation. (Compl. ¶ 15.) Accordingly, repaying the TARP Funds was a high priority for the Executive Defendants. (Compl. ¶¶ 16, 65.) Indeed, Lewis publicly stated that the restrictions, which applied to top management as well as the next twenty highly-compensated employees, went "too far." (Compl. ¶ 65.) He was concerned that those highly-compensated employees would receive employment offers from competitors if BoA were unable to offer them adequate compensation, which in turn would hurt BoA's profits. (Compl. ¶ 65.) The need to remove compensation restrictions became more pressing when Lewis stepped down as CEO because BoA would have difficulty retaining an executive to replace him if those restrictions remained in place. (Compl. ¶ 67.)

BoA faced obstacles raising the capital required to repay TARP funds because it had already issued all the shares of common stock authorized under its certificate of incorporation. (Compl. ¶ 68.) Thus, in December 2009, the BoA Defendants undertook an "unorthodox" securities offering. (Compl. ¶¶ 68, 143.) The BoA Defendants issued Common Equivalent Securities, which would convert into BoA common stock upon shareholder approval of an amendment to BoA's certificate of incorporation (the "Offering"). (Compl. ¶¶ 16, 69.) The BoA Defendants allegedly concealed BoA's reliance on MERS and BoA's exposure to billions of dollars in repurchase claims to ensure the Offering's success. (Compl. ¶¶ 15-16, 69.)

And the Underwriter Defendants failed to ensure the truthfulness of statements the BoA

Defendants made in connection with the Offering.  (Compl. ¶ 42.)  In February 2010,

shareholders approved the amendment, and the funds the Offering generated enabled the BoA

Defendants to repay the TARP Funds.  (Compl. ¶ 146.)

      In September 2010, the U.S. Treasury Department announced it was investigating

improper foreclosure practices by lenders.  (Compl. ¶ 23.)  The following month, attorneys

general of all fifty states announced they were investigating the underwriting and foreclosure

practices of major banks.  (Compl. ¶ 25.)  That same month, BoA announced it was suspending

foreclosures and admitted that there were "technical issues" with its foreclosure practices.

(Compl. ¶¶ 24-25.)  On October 18, 2010, a group of private investors, including Pacific

Investment Management Company, LLC ("PIMCO"), demanded that BoA repurchase $47

billion worth of mortgage-backed securities (the "PIMCO demand"). [1]  (Compl. ¶ 159.)  The

following day, BoA disclosed the PIMCO demand and announced it had received an additional

$26 billion in repurchase claims, half of which had not been resolved.  (Compl. ¶¶ 162, 314-15.)

      The Complaint alleges that throughout the Class Period, the BoA Defendants

failed to disclose its reliance on MERS and the looming legal obstacles in various SEC filings,

press releases, and earnings calls, which rendered those disclosures misleading.  (Compl. ¶¶ 184-

86, 188-89, 192, 199, 201, 203, 205, 209-10, 212, 214, 216-17, 221-22, 231, 234, 237-38, 239,

---

[1] At oral argument, Plaintiff's counsel asserted that the PIMCO investors and others made
repurchase demands on BoA in June 2010 and that BoA did not disclose that demand until
October 2010.  (Transcript of Oral Argument, dated Mar. 28, 2012 ("Hr'g Tr.") at 24:11-13.)
But the Complaint alleges that the PIMCO investors made repurchase demands on October 18,
2010, and that BoA disclosed those demands on October 19, 2010.  (Compl. ¶¶ 159, 162, 314-
15.)  The date alleged in the Complaint informs this Court's analysis.  See Allen, 945 F.2d at 44
(noting that consideration on a motion to dismiss is limited to facts on face of the complaint).

245, 252, 256, 259-60, 262, 268-69, 272, 274, 276.)  Plaintiff alleges that the Class Period began

when the BoA Defendants issued its first misleading filing, its Form 10-K on February 27, 2009

("2008 10-K").  Similarly, Plaintiff alleges that throughout the Class Period, the BoA Defendants

failed adequately to disclose BoA's exposure to repurchase claims, making statements in the

2008 10-K and other disclosures misleading.  (Compl. ¶¶ 184-85, 188, 190-91, 199, 202, 206,

209, 213, 218, 219, 221, 224-25, 231, 232, 235, 241, 243, 245, 247-48, 253-54, 256-57, 259,

266, 267, 270, 273)  Plaintiff further claims that the 2008 10-K and BoA's Form 10-K filed

February 26, 2010, as well as interim filings, were false because the BoA Defendants represented

that BoA maintained effective disclosure controls and procedures and effective internal controls

over financial reporting, when BoA did not.  (Compl. ¶¶ 184-85, 193-95, 204, 213, 215, 223,

226-27, 249-50, 251, 261-64, 271, 289-92.)  Finally, Plaintiff contends that BoA violated

generally accepted accounting principles ("GAAP") and SEC regulations and that the failure to

comply with GAAP rendered those filings presumptively misleading.  (Compl. ¶¶ 283-85.)


DISCUSSION

## I. Legal Standard

On a motion to dismiss, a court must accept the material facts alleged in the

complaint as true and construe all reasonable inferences in plaintiff's favor.  See Grandon v.

Merrill Lynch & Co., 147 F.3d 184, 188 (2d Cir. 1998).  Nonetheless, "factual allegations must

be enough to raise a right of relief above the speculative level, on the assumption that all of the

allegations in the complaint are true."  Bell Atl. Corp. v. Twombly, 540 U.S. 544, 556 (2007)

(requiring plaintiff to plead "enough fact[s] to raise a reasonable expectation that discovery will

reveal evidence of [his claim]"). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 555 U.S. at 570). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." 556 U.S. at 678 (citation omitted). "A court ruling on such a motion may not properly dismiss a complaint that states a plausible version of the events merely because the court finds a different version more plausible." Anderson News, LLC, et al. v Am. Media Inc., et al., 680 F.3d 162, 185 (2d Cir. 2012). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555). A court's "consideration [on a motion to dismiss] is limited to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." Allen v. WestPoint-Pepperell, Inc., 945 F.2d 40, 44 (2d Cir. 1991). A complaint alleging securities fraud must meet the heightened pleading standard of Rule 9(b), which requires a plaintiff to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); see also ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007).

II.  Section 10(b) of the Exchange Act and Rule 10b-5

Plaintiff asserts that the BoA Defendants violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5. To state a claim for relief under Section 10(b) and Rule 10b-5, Plaintiff must allege "(1) a material misrepresentation or omission

by the defendant; (2)  scienter; (3) a connection between the misrepresentation or omission and

the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5)

economic loss; and (6) loss causation." Pac. Inv. Mgmt. Co. v. Mayer Brown LLP, 603 F.3d

144, 151 (2d Cir. 2010).  The parties dispute whether the Complaint adequately alleges that the

BoA Defendants made misstatements or omissions of material fact and whether the BoA

Defendants made any such misstatements or omissions with scienter.

A.  Material Omissions and Misstatements

The Private Securities Litigation Reform Act of 1995 ("PSLRA") "insists that

securities fraud complaints specify each misleading statement" and "that they set forth the facts

on which a belief that a statement is misleading was formed." Merrill Lynch, Pierce, Fenner &

Smith Inc. v. Dabit, 547 U.S. 71, 81-82 (2006) (internal alterations and quotation marks

omitted).  "When an allegation of fraud is based upon nondisclosure, there can be no fraud

absent a duty to speak." Chiarella v. United States, 445 U.S. 222, 235 (1980); see also In re

Marsh & McLennan Cos., Inc. Sec. Litig., 501 F. Supp. 2d 452, 469 (S.D.N.Y. 2006).

"Disclosure of an item of information is not required . . . simply because it may be relevant or of

interest to a reasonable investor." Resnik v. Swartz, 303 F.3d 147, 154 (2d Cir. 2002).  Indeed,

the Supreme Court recently reiterated that Section 10(b) and Rule 10b-5 "do not create an

affirmative duty to disclose any and all material information.  Disclosure is required under these

provisions only when necessary to make statements made, in the light of the circumstances under

which they were made, not misleading." Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309,

1321 (2011) (internal quotation marks and alterations omitted).  The undisclosed information

need not "completely negate[] the public statements," but need only render them materially misleading. In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 268 (2d Cir. 1993).

"[T]here is no duty to disclose information to one who reasonably should already be aware of it." Seibert v. Sperry Rand Corp., 586 F.2d 949, 952 (2d Cir. 1978), see also In re WorldCom, Inc. Sec. Litig., 346 F. Supp. 2d 628, 687 (S.D.N.Y. 2004). Additionally, defendants need not disclose matters that are merely speculative. See Acito v. Imcera Grp., 47 F.3d 47, 53 (2d Cir. 1995) (no duty to disclose negative consequences from a failed factory inspection when it was not a "foregone conclusion" that consequences would materialize); see also In re Par Pharm., Inc. Sec. Litig., 733 F. Supp. 668, 678 (S.D.N.Y. 1990) ("Defendants cannot be held liable for failing to disclose what would have been pure speculation[.]") (internal quotation marks omitted)). Plaintiffs allege that the BoA Defendants made misrepresentations and omissions regarding (1) BoA's use of MERS and the risks associated with it; (2) BoA's exposure to repurchase claims; (3) BoA's internal controls; and (4) GAAP and SEC regulations.

### 1. Use of and Risks Associated with MERS

Plaintiff adequately pleads that the BoA Defendants had a duty to disclose BoA's reliance on MERS and the risks associated with it. For example, in the 2008 10-K, the BoA Defendants reported BoA's loan assets. (Compl. ¶ 186.) While BoA's reliance on MERS does not render those figures false, it does make them misleading, which is sufficient to plead a material omission. See Time Warner, 9 F.3d at 268. Specifically, the BoA Defendants' representations that BoA held a particular amount of loan assets is rendered misleading by the BoA Defendants' failure to disclose that MERS "clouded" ownership for a substantial number of those loans. Cf. In re Gen. Elec. Co. Sec. Litig., No. 09 Civ. 1951 (RJH), 2012 WL 90191, at

-11-

*17 (S.D.N.Y. Jan. 11, 2012) (defendants did not have duty disclose that company made risky loans because it did not render misleading company's statement that it was a "senior secured and diversified lender").

Additionally, BoA stated in the 2008 10-K that it faced contractual liabilities if it breached representations and warranties concerning mortgages it sold or bundled into securities. (Compl. ¶ 190.)  It noted that it "attempts to limit its risk of incurring these losses by structuring its operations to ensure consistent production of quality mortgages and servicing those mortgages at levels that meet secondary mortgage market standards." (Compl. ¶ 190.)  BoA disclosed its efforts to limit repurchase claims, triggering its duty to disclose its reliance on MERS and the attendant breach of its representations concerning good title to mortgage loans. See Novak v. Kasaks, 216 F.3d 300, 315 (2d Cir. 2000) (duty to disclose contrary information when defendant reported that a problem with inventory was "in good shape"); see also In re Gen. Elec. Co., 2012 WL 90191, at *17 (duty to disclose problems with loan portfolios where defendant described its loan portfolio as "great").

The statement is not inactionable puffery because it is "not merely an expression of opinion, expectation or declaration of intention." Lapin v. Goldman Sachs, 506 F. Supp. 2d 221, 239 (S.D.N.Y. 2006) (finding actionable Goldman Sachs' statement that integrity was "at the heart" of its business).  And more importantly, Plaintiff alleges that the BoA Defendants did not genuinely or reasonably believe these opinions. Lapin, 506 F. Supp. 2d at 239.  For example, Plaintiff alleges that BoA employees robo-signed loan documents in an attempt to fix the various problems created by MERS and Countrywide's failure to transfer notes with mortgages. (Compl. ¶ 83.)  Additionally, Plaintiff alleges that the BoA Defendants were aware of judicial

-12-

decisions questioning the ability of a mortgage holder or servicer to foreclose on mortgages transferred via MERS.  (Compl. ¶ 84.)

The BoA Defendants next argue that they had no duty to disclose BoA's use of MERS or its associated risks because (1) any risks associated with MERS were purely speculative, and (2) BoA disclosed its use of MERS in various SEC filings.  Both of these arguments are unavailing.  Plaintiff sufficiently pleads that beginning in 2008, courts found that mortgage holders and servicers could not foreclose on mortgages transferred via MERS.  (Compl. ¶¶ 84-85.)  These court decisions distinguish this case from Acito v. Imcera Group, 47 F.3d 47 (2d Cir. 1995).  In Acito, the Second Circuit found that defendant did not have a duty to disclose the speculative possibility that an FDA inspection of defendant's plant would have negative effects.  47 F.3d at 53.  That two prior FDA inspections of the plant had negative consequences did not render it a "foregone conclusion" that the plant would fail a third time.  Acito, 47 F.3d at 53.

Here, however, there was no speculation about whether courts would find problems with MERS.  As Plaintiff alleges, courts in fact had found problems with MERS.  Cf. In re Yukos Oil Co. Sec. Litig., No. 04 Civ. 5243 (WHP), 2006 WL 3026024, at *16 (S.D.N.Y. 2006) (no misrepresentation where defendant had no reason to know that law would change and render it in violation of a particular rule).  And to the extent that the BoA Defendants dispute the import of these judicial decisions, these arguments pose a question of fact that cannot properly be decided on a motion to dismiss.  See Iqbal, 556 U.S. at 678 (noting that court must accept facts as true for purposes of a motion to dismiss); see also Anderson News, 680 F.3d at 185 ("choice between two plausible inferences" should not be made on Rule 12(b)(6) motion to dismiss).

The SEC filings that the BoA Defendants cite to show that BoA disclosed its reliance on MERS are insufficient.  Indeed, BoA did not even file those documents.  One was filed by a Countrywide subsidiary prior to BoA's acquisition of Countrywide, and the other was issued by a BoA subsidiary.  And both prospectuses were intended for private investors, rather than BoA shareholders.  The BoA Defendants offer no convincing explanation why BoA shareholders should have been reasonably aware of those prospectuses.  See Seibert, 586 F.2d at 952; see also In re WorldCom, 346 F. Supp. 2d at 687 (no duty to disclose information to one who reasonably should already be aware of it); Fisher v. Plessy Co., 559 F. Supp. 442, 447-48 (S.D.N.Y. 1983) (American investors were not reasonably aware of matters covered heavily in British press).  Accordingly, the BoA Defendants' failure to disclose BoA's reliance on MERS and its associated risks constitutes a material misrepresentation.

### 2. Representation and Warranty Claims

Plaintiff cites various misrepresentations and omissions relating to BoA's exposure to repurchase claims for breaches of warranties.  Specifically, it contends that (1) BoA's stated reserves were unreliable because Defendants bypassed internal controls for establishing allowances for representation and warranty claims; (2) BoA concealed existing repurchase claims; (3) BoA misrepresented that it had resolved issues concerning Countrywide's assets when more repurchase claims were likely; and (4) the 2008 10-K misleadingly reported that BoA attempted to limit its liability by ensuring "consistent production of quality mortgages."

Plaintiff's contention that stated reserves were unreliable fails because estimating loan reserves is a matter of judgment.  Therefore, Plaintiff must allege that the BoA Defendants' "opinions were both false and not honestly believed when they were made."  Fait v. Regions Fin.

Corp., 655 F.3d 105, 113 (2d Cir. 2011); see also City of Omaha, Neb. Civilian Emps' Ret. Sys.
v. CBS Corp., 679 F.3d 64, 64 (2d Cir. 2012) (applying Fait to Section 10(b) claims). Plaintiff
maintains that it does not assert a claim for misstated loan loss reserves. Rather, Plaintiff alleges
that the BoA Defendants' stated reserve figures "could not be relied upon" because they
purposely bypassed internal controls to downplay the magnitude of losses. (Compl. ¶¶ 136(d),
(n).) Specifically, Plaintiff alleges that contrary to industry practice and GAAP, Moynihan failed
to record an allowance for repurchase claims until BoA received a formal demand or notice of
litigation. (Compl. ¶ 136(d).) While Plaintiff rejects the notion that it asserts a claim for
misstated loan loss reserves, this appears to be precisely what Plaintiff is pleading. Because
Plaintiff fails to comply with the requirements set forth in Fait, unreliable loan reserves cannot
form the basis of this claim.

Plaintiff's allegation that BoA concealed repurchase claims is factually
insufficient to plead a material misstatement or omission. Indeed, Plaintiff concedes that the
Executive Defendants disclosed repurchase claims by government-sponsored entities and
monoline insurers. (Lead Plaintiff's Brief in Opposition to Defendants' Motion to Dismiss,
dated Feb. 15, 2012, at 2.) Rather, Plaintiff insists that the BoA Defendants concealed
repurchase claims by private investors. On October 18, 2010, PIMCO demanded that BoA
repurchase $47 billion worth of RMBS. But BoA disclosed this development the following
day—October 19, 2010. (Compl. ¶¶ 159, 162, 314-15.) In addition to the PIMCO demand, BoA
revealed on October 19, 2010, that as of September 30, 2010, it had received $26 billion in
repurchase claims—nearly half of which were unresolved. (Compl. ¶ 162.) But Plaintiff does
not allege when investors demanded repurchase. Without these facts, Plaintiff does not plead a

claim that "is plausible on its face." Iqbal, 556 U.S. at 678. Moreover, in August 2010, BoA disclosed that as of June 30, 2010, it had $11.1 billion worth of unresolved repurchase claims. This disclosure undercuts any reasonable inference that up until October 2010, the BoA Defendants were concealing that BoA had nearly $13 billion worth of unresolved claims. (Declaration of Michael Bongiorno, dated Jan. 11, 2012 ("Bongiorno Decl.") Ex. O: 10-Q, dated Aug. 6, 2010 ("August 2010 10-Q") at 40 (estimating that BoA had $11.1 billion worth of unresolved repurchase requests).)[2] Nor does Plaintiff cite any repurchase claims that the Executive Defendants failed to disclose but should have.

   However, Plaintiff's other allegations adequately plead that the BoA Defendants made material misstatements or omissions concerning its vulnerability to repurchase claims. For example, Plaintiff asserts that Moynihan and Cotty's statements during an April 2010 conference were misleading. Moynihan and Cotty represented that BoA had resolved issues with toxic Countrywide assets by writing down the value of loan portfolios. (Compl. ¶¶ 255, 258.) Specifically, Moynihan stated:

> I think the results reinforce what I think will be the trends that we'll discuss over the next few quarters. Decreasing charge-offs, potential reserve releases, and those types of things that dominate the credit discussion . . . . With legacy asset write-downs now down to an immaterial amount, and that also shows the worst of the crisis is behind us we believe . . . .

("the 2010 Statement") (Compl. ¶ 255.) Plaintiff correctly asserts that these statements were misleading because BoA still remained vulnerable to a substantial number of repurchase claims.

---

[2] The Court may consider the August 2010 10-Q because it is "incorporated in the complaint by reference." Allen, 945 F.2d at 44.

The BoA Defendants argue that there was no duty to disclose the speculative possibility of litigation. But in contrast to In re Citigroup Securities Litigation, where the plaintiff failed to allege that litigation was not "substantially certain" to occur, Plaintiff adequately alleges the likelihood of litigation here. Cf. 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004); cf. also Acito, 47 F.3d at 53. Here, Plaintiff alleges that BoA breached representations and warranties for a substantial portion of their loans and that such breaches were obvious because of the failing economy. And in contrast to In re Par Pharmaceutical, Inc. Securities Litigation, where defendant had no duty to disclose speculation about the possible negative consequences of a bribery scandal, there is nothing speculative here. Cf. 733 F. Supp. at 678; cf. also Acito, 47 F.3d at 53. Rather, the consequences of multiple breaches of representations and warranties were clear—BoA would be vulnerable to repurchase demands.

The BoA Defendants further claim that Moynihan's forward-looking statement falls within the PSLRA's safe harbor provision. "Under the PSLRA, the defendants are not liable if the allegedly false or misleading statement is identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." Slayton v. Am. Express Co., 604 F.3d 758, 768 (2d Cir. 2010) (quoting 15 U.S.C. § 78u-5(c)(1)(A)(i)) (internal quotation marks and alterations omitted). In other words, "defendants must demonstrate that their cautionary language was not boilerplate and conveyed substantive information." Slayton, 604 F.3d at 772. "[A] defendant need not include the particular factor that ultimately causes its projection not to come true in order to be protected by the meaningful cautionary language prong of the safe harbor." Slayton, 604 F.3d at 772.

-17-

Prior to Moynihan's statement, a BoA executive informed analysts that future predictions could change depending on a variety of factors, including, "economic conditions, changes in interest rates, competitive pressures within the financial services industry, and legislative or regulatory requirements that may affect our businesses." (Declaration of Scott D. Musoff, dated Mar. 2, 2012 ("Musoff Decl.") Ex. I at 1.)  The BoA Defendants "carry the burden of demonstrating that they are protected by the meaningful cautionary language prong of the safe harbor," but but have failed to argue that any of the factors "identified were important factors that could realistically cause results to differ materially."  Slayton, 604 F.3d at 773.  "Absent such argument," this Court has "no way of knowing if" the factors identified could have caused results to differ materially.  Slayton, 604 F.3d at 773.  Accordingly, the PSLRA safe harbor does not shield Moynihan's misstatements.

Additionally, BoA's representation that it ensures "consistent production of quality mortgages" was rendered misleading by the BoA Defendants' failure to disclose that BoA inherited from Countrywide loans with "origination defect[s]." (Compl. ¶ 155.)  Indeed, Plaintiff alleges that as early as 2007, Lewis knew that 89% of Countrywide's loans originated from 2005 to 2006 were ineligible for origination under BoA's standards.  (Compl. ¶ 114.)  BoA's assurances concerning the quality of its mortgages were not puffery because Plaintiff alleges that some of the BoA Defendants did not genuinely or reasonably believe these opinions.  See Lapin, 506 F. Supp. 2d at 239; (Compl. ¶¶ 114; 155).  Indeed, the Complaint alleges that BoA knowingly securitized loans that did not comply with its underwriting guidelines. (Compl. ¶ 128.)

-18-

### 3. Internal Controls

Plaintiff argues that Lewis and Price's certification in the 2008 10-K that BoA maintained adequate internal controls over financial reporting was materially misleading. (Compl. ¶ 193.) Specifically, Plaintiff alleges that BoA's reliance on MERS constituted a weakness in its financial reporting. (Compl. ¶¶ 286-91.) The BoA Defendants counter that these allegations miss the mark because reliance on MERS does not implicate internal controls over financial reporting. Rather, the BoA Defendants assert that MERS only impacted the operation of BoA's mortgage business. But, as Plaintiff explains, BoA utilized MERS as a control that tracked and disclosed the dollar value of mortgages on BoA's books. And because MERS allegedly failed to transfer title to mortgage loans properly, the accuracy of BoA's financial statements was undermined. (Compl. ¶ 290.)

Plaintiff also claims that BoA's accounting practices for calculating repurchase losses constituted a material weakness because BoA circumvented formal procedures requiring committee approval and left decisions concerning repurchase losses to Lewis and Price. (Compl. ¶ 136(a).) The BoA Defendants respond that these allegations are insufficient because Plaintiff fails to allege why estimating loan amounts in this manner is a material weakness. But Plaintiff pleads a plausible theory because it demonstrates the problematic nature of this practice—that it left BoA without adequate reserves. (Compl. ¶ 136(e)-(f).)

### 4. GAAP Violations

Finally, Plaintiff asserts that BoA failed to prepare its financial statements in accordance with GAAP. (Compl. ¶¶ 280-85.) SEC regulations dictate that where financial statements are not prepared in compliance with GAAP, they are presumed to be misleading. See

17 C.F.R. § 210.4-01(a)(1)).  The BoA Defendants argue that GAAP violations require

fraudulent intent to be actionable.  Novak, 216 F.3d at 309.  But, as discussed below, Plaintiff

adequately pleads fraudulent intent on the part of BoA, and accordingly, this argument fails.

Plaintiff undergirds its claims on two GAAP precepts: (1) "Guarantor's

Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of

Indebtedness of Otheres ("FIN 45") and (2) Accounting for Contingencies ("FAS 5").  The BoA

Defendants contend that Plaintiff does not allege a violation of FIN 45, which requires that a

"guarantor" disclose the nature and amount of a "guarantee."  The BoA Defendants argue that

there is no basis for inferring that representation and warranty claims constitute "guarantees."

But representation and warranty claims need not amount to "guarantees" for Plaintiff to allege a

FIN 45 violation.  It is clear from the Complaint that BoA made guarantees independent of

representations and warranties.  For example, the 2008 10-K noted that certain securitizations of

BoA include a corporate guarantee.  (Compl. ¶ 190.)  It further stated that BoA records its

liability for representation and warranty claims and guarantees together.  (Compl. ¶ 190.)

Accordingly, the BoA Defendants' argument fails.

The BoA Defendants also argue that they did not violate FAS 5 because it

"requires accrual or disclosure of a loss contingency when it is 'probable' or 'reasonably

possible' that a loss has already been incurred."  Charter Twp. of Clinton Police & Fire Ret. Sys.

v. KKR Fin. Holdings LLP, No. 08 Civ. 7062 (PAC), 2010 WL 4642554, at *19 (S.D.N.Y. Nov.

17, 2010).  The BoA Defendants maintain that because Plaintiff cannot point to any existing,

undisclosed repurchase claim, a violation of FAS 5 cannot form the basis of this claim.

However, the BoA Defendants' argument misses the mark.  While Plaintiff fails to plead

sufficient facts to support its contention that the BoA Defendants concealed repurchase claims, Plaintiff alleges that the BoA Defendants purposely prohibited BoA's accountants from recording accruals on the repurchase allowance until BoA received a formal demand through a trustee or litigation. (Compl. ¶ 136(d).) Plaintiff alleges that forestalling in this way is contrary to accounting principles and industry practices. (Compl. ¶ 136(d).) Thus, by failing to record repurchase claims until the occurrence of a later event, BoA did not disclose loss contingency when it was "probable" or "reasonably possible" that the loss already occurred.

Because Plaintiff pleads that the BoA Defendants made material misstatements and omissions, this Court now considers the question of scienter.

B. Scienter

The PSLRA requires that the plaintiff "plead 'with particularity facts giving rise to a strong inference that the defendant acted'" with an "intent to deceive, manipulate, or defraud" or acted recklessly. ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co., 553 F.3d 187, 198 (2d Cir. 2009). Here, "[r]ecklessness is defined as at the least, an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." ECA, 553 F.3d at 198 (internal quotation marks and alternations omitted). "The inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Tellabs Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 323 (2007). In assessing whether a plaintiff has stated a claim, "a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." Tellabs, 551 U.S. at 323. "A complaint will survive . . . only

if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, 551 U.S. at 324. "[S]cienter can be established by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." ECA, 553 F.3d at 198.

### 1. Motive and Opportunity

To plead scienter under the "motive and opportunity" prong, Plaintiff must allege that the BoA Defendants "benefitted in some concrete and personal way from the purported fraud." ECA, 553 F.3d at 198. "Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation" are insufficient. ECA, 553 F.3d at 198. But motives common to most corporate officers may be sufficient if defendants derived a "unique" benefit from the fraud. ECA, 553 F.3d at 201 n.6; see also In re Worldcom, Inc. Sec. Litig., 294 F. Supp. 2d 392, 416 (S.D.N.Y. 2003) (requiring plaintiff to plead that defendant derived "unique and substantial benefit from the fraud).

Plaintiff theorizes that the BoA Defendants concealed BoA's reliance on MERS and its exposure to repurchase claims so that BoA could repay TARP and lift restrictions on executive compensation. This theory does not plead motive adequately because Plaintiff does not allege that the BoA Defendants benefited in "some concrete and personal way from the purported fraud." ECA, 553 F.3d at 198. Indeed, Plaintiff relies on Lewis' statement that it was important to remove TARP's compensation restrictions to prevent employees outside of top management from leaving BoA for a competitor. (Compl. ¶ 65-66.) A desire to increase

-22-

executive compensation to retain qualified executives is plainly "common to most corporate officers." ECA, 553 F.3d at 198. And Plaintiff does not allege particularized facts suggesting that the Executive Defendants derived a "unique and substantial benefit" from any fraud. Cf. In re Worldcom, 294 F. Supp. 2d at 416 (unique and substantial benefit where success of company crucial to defendant's personal finances).

Moreover, the alleged chronology of events undermines the plausibility of Plaintiff's theory. The BoA Defendants were aware of various judicial decisions issued in early to mid-2008 that questioned the validity of MERS. (Compl. ¶ 85.) Prior to the Class Period, BoA allowed loans that did not comply with its underwriting standards to be securitized. (Compl. ¶ 127.) Thus, it appears that the BoA Defendants were concealing information about MERS and representation breaches prior to BoA's receipt of TARP funds. But a theory in which fraudulent conduct predates motive is not plausible. See U.S. Educ. Loan Trust III, LLC v. RBC Capital Mkts. Corp., 11 Civ. 860 (NRB), 2011 WL 6778480, at *10 (S.D.N.Y Dec. 21, 2011) (finding motive insufficient where alleged fraudulent scheme predated motive).

Additionally, the high turnover among the Executive Defendants further underscores the implausibility of Plaintiff's theory. According to Plaintiff, in February 2009, Lewis and Price conceived of a scheme to repay TARP Funds. Lewis stepped down as CEO in December 2009, and Price stepped down as CFO in January 2010. (Compl. ¶¶ 36-37.) In early 2010, when Moynihan and Cotty became CEO and interim CFO, respectively, they allegedly continued the scheme that Lewis and Price started. (Compl. ¶¶ 38, 40.) Additionally, Noski joined the scheme in May 2010 when he replaced Cotty. (Compl. ¶ 39.) In considering nonculpable explanations for the conduct alleged here, Plaintiff's theory is not at least as

compelling as the opposing inference drawn from the facts alleged—that the BoA Defendants acted in good faith. Tellabs, 551 U.S. at 324.

2. Strong Circumstantial Evidence of Conscious Misbehavior or Recklessness

"[T]he strength of the circumstantial allegations [of conscious misbehavior or recklessness] must be correspondingly greater if there is no motive." ECA, 553 F.3d at 198-99 (internal quotation marks omitted). A "strong inference" of scienter "may arise where the complaint sufficiently alleges that the defendants: (1) benefited in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." S. Cherry St., LLC v. Hennessee Grp. LLC, 573 F.3d 98, 110 (2d Cir. 2009) (internal alterations omitted). To demonstrate that the BoA Defendants knew facts or had access to information contradicting their public statements, Plaintiff must identify specific contradictory information that was available to the BoA Defendants at the time they made their misleading statements. See Shields v. Citytrust Bancorp., 25 F.3d 1124, 1129-30 (2d Cir. 1994) (no allegations that disclosures were contradicted by other information that defendants knew at the time disclosures made); see also Novak, 216 F.3d at 309; In re PXRE Grp., Ltd., Sec. Litig., 600 F. Supp. 2d 510, 536 (S.D.N.Y. 2009) (plaintiff must allege "(1) specific contradictory information was available to the defendants (2) at the same time they made their misleading statements"); Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co., 724 F. Supp. 2d 447, 461-62 (S.D.N.Y. 2010). Additionally, a plaintiff "must specifically identify the reports or statements containing this information." Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 196 (2d

Cir. 2008).

To support its allegations of conscious misbehavior or recklessness, Plaintiff contends that the BoA Defendants: (1) tolerated robo-signing (Compl. ¶¶ 83, 175); (2) failed to disclose BoA's vulnerability to repurchase claims (Compl. ¶¶ 101, 115, 120, 124-25, 133; 136(c), (e), (i), (j)-(m)); (3) deliberately circumvented internal controls in establishing allowances for repurchase claims (Compl. ¶¶ 136(c), (n)); (4) kept reserves for repurchase claims low to forestall additional repurchase claims (Compl. ¶ 136(e), (f), (i)-(m)); (5) fought repurchase claims to discourage investors from asserting additional ones (Compl. ¶ 136(d)); (6) resisted investor attempts to examine loan files (Compl. ¶¶ 326, 148); (7) concealed BoA's use of MERS (Compl. ¶¶ 148, 155-59); and (8) failed to notify MBS purchasers of breaches (Compl. ¶ 162.) Plaintiff further cites the magnitude of the alleged fraud as an additional basis for establishing scienter. These allegations taken together fail to raise strong circumstantial evidence of conscious misbehavior or recklessness as to the Executive Defendants, but raise a strong inference of scienter as to BoA.

### a. Executive Defendants

Plaintiff's allegation that the Executive Defendants tolerated robo-signing is conclusory because Plaintiff does not plead that any of the Executive Defendants were even aware of the practice. Plaintiff relies on Confidential Witness 1 ("CW-1"), a foreclosure specialist, who reports that he witnessed BoA employees, "including a [BoA] vice president and assistant vice president," falsely signing affidavits representing that they personally reviewed hundreds of loan files. (Compl. ¶ 83.) But Plaintiff does not allege that CW-1 had "any contact with . . . [BoA Executives] or would have knowledge of what they knew or should have known

-25-

during the Class Period." In re Am. Express Co. Sec. Litig., No. 02 Civ. 5533 (WHP), 2008 WL

4501928, at *8 (S.D.N.Y. Sept. 26, 2008); see also Am. Express Co., 724 F. Supp. 2d at 461-62.

      Plaintiff additionally alleges that the Executive Defendants concealed BoA's

exposure to repurchase claims. But Plaintiff does not allege that the Executive Defendants knew

of specific contradictory information at the same time they made misleading statements. See

Shields, 25 F.3d at 1129-30; see also PXRE Grp., 600 F. Supp. 2d at 536. For example, Plaintiff

points to a May 13, 2010 letter that counsel for BoA sent to the Financial Crisis Inquiry

Commission ("FCIC") to demonstrate BoA and Countrywide's emphasis on generating mortgage

loans for securitization into MBS at the cost of prudent lending practices (the "FCIC letter"). In

that letter, BoA informed the FCIC that in 2006 and 2007, Countrywide sold mortgage-backed

securities with a total par value of $118 billion. (Compl. ¶ 101.) The letter further noted that the

par value of the interest held by BoA was only $2 billion as of February 2010. (Compl. ¶ 101.)

The letter also stated that 37% of Alt-A loans and 52% of Countrywide's subprime loans were

delinquent. However, there is no allegation that the Executive Defendants saw the letter or knew

of its contents. Similarly, Plaintiff relies on a confidential witness, CW-3, who claims that

"senior managers" received an audit report revealing errors in amortization schedules generated

by MERS. (Compl. ¶¶ 118-20.) But Plaintiff fails to allege that the Executive Defendants

reviewed this audit report. See PXRE Grp., 600 F. Supp. 2d at 536; cf. Novak, 216 F.3d at 311-

12.

      Likewise, Confidential Witness 4 ("CW-4") reports that BoA's CFO and

President received reports detailing events within securitized loan portfolios for which BoA was

a securitization trustee or servicer. CW-4 maintains that in 2008, these reports made clear "that

there were going to be issues" with mortgage-backed securities. (Compl. ¶¶ 123-25.) This establishes only that the CFO and the President were aware of risks, not that they knew that their disclosures were false or misleading. See Am. Express Co., 2008 WL 4501928, at *7 (allegations that management was aware of risks associated with high yield debt not sufficient to establish that company was not properly valuing its debt). For the same reason, Confidential Witness 5's ("CW-5") contention that the CFO received reports reflecting "performance characteristics" of all the MBS that BoA serviced is unavailing. (Compl. ¶ 136(e).) And CW-5's claim that Moynihan had ultimate decision-making authority relating to accruals for repurchase demands does not suggest that Moynihan was aware of BoA's omissions. See Am. Express Co., 2008 WL 4501928, at *7 (allegation that defendant was responsible for particular investment strategy does not establish that he knew company's disclosures were false).

Confidential Witness 8's ("CW-8") allegations suffer from similar deficiencies. CW-8 reports that Cotty, as part of the Allowance Committee, received reports concerning loss forecasts and was involved in reporting values of loan portfolios and mortgage servicing rights. (Compl. ¶ 136 (j)-(m).) But again, Plaintiff does not allege that information Cotty gleaned from these reports alerted him that any disclosures were false or misleading. Additionally, CW-8's overly-generalized allegations that "management" could view information concerning any pool of loans that BoA held or serviced does not raise a strong inference of scienter. See Dynex, 531 F.3d at 196 (plaintiff must "specifically identify the reports or statements" containing contradictory information); see also Plumbers & Steamfitters Local 773 Pension Fund v. CIBC, 694 F. Supp. 2d 287, 299 (S.D.N.Y. 2010) ("broad references to raw data" insufficient to establish that defendants should have known particular information). Moreover, knowledge of

-27-

negative economic trends "does not equate to harboring a mental state to deceive, manipulate, or defraud." CIBC, 694 F. Supp. 2d at 300; see also In re Societe Generale Sec. Litig., No. 08 Civ. 2495 (RMB), 2010 WL 3910286, at *8 (S.D.N.Y. Sept. 29, 2010).

Plaintiff also alleges that BoA's CEO and CFO received notification of repurchase requests. (Compl. ¶ 133.) However, as discussed above, Plaintiff does not allege facts suggesting that the Executive Defendants concealed known repurchase claims. See supra Part II.A.2. To the contrary, in August 2010, BoA revealed that as of June 30, 2010, it had $11.1 billion worth of unresolved repurchase claims. (Bongiorno Decl. Ex. O: August 2010 10-Q at 40.) Additionally, any inference of wrongdoing is further undermined by the fact that the Executive Defendants disclosed losses BoA incurred in settling those claims. (Musoff Decl. Ex. A: 2008 10-K, dated Feb. 27, 2009 ("2008 10-K") at 135; Ex. C: 2009 10-K, dated Feb. 26, 2010 at 5, 144 (2009 10-K")[3]); see also Borochoff, 2008 WL 2073421, at *8.

Accordingly, Plaintiff's failure to allege adequately any misstatements or omissions about already-accrued claims renders many of its scienter allegations improbable. For example, Plaintiff theorizes that the Executive Defendants circumvented internal controls to conceal the true magnitude of repurchase claims that BoA faced. However, it does not make sense that the Executive Defendants would circumvent internal controls to manipulate allowance levels while being forthright in disclosing losses on repurchase claims. See Borochoff, 2008 WL 2073421, at *8. And to the extent that Plaintiff relies on the fact that the Executive Defendants later increased BoA's repurchase allowances following the Class Period, that is fraud by

---

[3] The Court may consider these documents to the extent "they inform the competing inference analysis required by [Tellabs]." CIBC, 694 F. Supp. 2d at 297 n.2. Accordingly, Plaintiff's motion to strike these documents is denied.

hindsight and cannot be the basis for scienter.  See Am. Express Co., 724 F. Supp. 2d at 463

(allegation that loss reserves were too low is fraud by hindsight); see also PXRE Grp., 600 F.

Supp. 2d at 545-46 (underestimating reserves by 80% did not establish scienter).

   Plaintiff's allegations that the Executive Defendants fought repurchase claims and

resisted providing investors with loan files also fail to raise a strong inference of scienter for

similar reasons.  See Borochoff, 2008 WL 2073421, at *8.  It is not plausible that the Executive

Defendants would simultaneously conceal repurchase claims through these means while also

disclosing repurchase claims in their public filings.  See Borochoff, 2008 WL 2073421, at *8.

   These allegations are also inadequate to raise a strong inference of scienter for

other, independent reasons.  For example, Plaintiff's allegation that BoA resisted providing

investors with loan files is too thin to raise an inference of scienter because Plaintiff does not

allege which, if any, of the Executive Defendants were aware of this practice.  (Compl. ¶ 326);

see also Yukos Oil, 2006 WL 3026024, at *20; In re Cross Media Mktg. Corp. Sec. Litig., 314 F.

Supp. 2d 256, 264 (S.D.N.Y. 2004).  And Plaintiff's allegation that Moynihan contravened

accounting principles and industry practice when he fought every repurchase request does not

raise an inference of scienter.  "[A]llegations of . . . accounting irregularities, standing alone, are

insufficient to state a securities fraud claim.  Only where such allegations are coupled with

evidence of corresponding fraudulent intent might they be sufficient."  In re JP Morgan Chase

Sec. Litig., No. 02 Civ. 1282 (SHS), 2007 WL 950132, at *13 (S.D.N.Y. Mar. 29, 2003)

(internal alterations omitted) (citing Novak, 216 F.3d at 309). Here, Plaintiff fails to cite any additional facts evincing Moynihan's fraudulent intent.[4]

Plaintiff also makes much of the fact that Price told analysts in a January 10, 2010 conference call that private representation and warranty claims were "unenforceable" and that they should not put those private claims on their "radar screen." (Compl. ¶ 21.) But Plaintiff alleges no facts suggesting that Price knew or should have known the falsity of that statement. See Am. Express Co., 2008 WL 4501928, at *7.

Plaintiff's allegations that the Executive Defendants concealed their use of MERS from the public also do not raise a strong inference of scienter. Plaintiff cites a series of judicial decisions from as early as February 2008 that raise concerns about the validity of MERS, and argues that these decisions were known to an "exclusive group of insiders within the secondary mortgage and mortgage servicing markets." (Compl. ¶¶ 84-85.) Specifically, Plaintiff contends that courts had found that BoA could not foreclose on mortgages where it used MERS but did not properly assign the note. (Compl. ¶ 84 (citing cases).) Plaintiff suggests that the Executive Defendants concealed BoA's reliance on MERS because of these adverse decisions. However, it is implausible that the Executive Defendants would perpetrate a fraud predicated on concealing publicly available adverse judicial opinions. See Borochoff, 2008 WL 2073421, at *8.

Additionally, Plaintiff fails to raise a cogent inference of fraud as to the Executive Defendants in view of "plausible, nonculpable explanations for the defendant's conduct." Tellabs, 551 U.S. at 323. The judicial decisions that Plaintiff cites do not render assignments

---

[4] Likewise, Plaintiff fails to raise a strong inference of scienter by arguing that BoA Defendants acted in contravention of the "Dear CFO" letters that the SEC sent to BoA and other banks. (Compl. ¶ 138); see In re JP Morgan Chase, 2007 WL 950132, at *13.

through MERS ineffective per se. Rather, those cases found that assignments via MERS were invalid when the promissory note was not properly assigned. See, e.g., Bellistri v. Ocwen Loan Servicing, LLC, 284 S.W.3d 619 (Mo. App. Mar. 3, 2009); In re Mitchell, No. BK-S-07-16226-LBR, 2009 WL 1044368 (Bankr. D. Nev. Mar. 31, 2009); In re Hawkins, No. BK-S-07-13593-LBR, 2009 WL 901766 (Bankr. D. Nev. Mar. 31, 2009). Indeed, Plaintiff's counsel conceded at oral argument that there is "nothing wrong" with MERS if it is used properly. (Hr'g Tr. at 28:9-18.) It makes little sense that the Executive Defendants would purposely conceal BoA's reliance on MERS when MERS itself was not problematic. And moreover, the Executive Defendants cite various cases finding that MERS was a perfectly valid system for transferring loans.[5] See e.g., Suss v. JP Morgan Chase Bank, N.A., No. WMN-09-1627, 2010 WL 2733097, at *5 (D. Md. July 9, 2010) (citing cases); Mortg. Elec. Registration Sys., Inc. v. Coakley, 838 N.Y.S. 2d 622 (2d Dep't 2007). A more plausible inference from this evidence is that the Executive Defendants did not believe it was necessary to disclose their reliance on MERS when no Court had ruled it invalid per se, and when there was competing authority about the validity of assignments via MERS.

Plaintiff's allegation that the Executive Defendants failed to inform MBS purchasers of BoA's breaches of representations and warranties, without more, fails to establish scienter. Courts in this jurisdiction routinely require more. See, e.g., In re Scholastic Corp. Sec.

---

[5] Pursuant to Tellabs, the Court may consider these judicial decisions. CIBC, 694 F. Supp. 2d at 297 n.2. Plaintiff argues that even if the Court considers these judicial decisions, the decisions do not suggest that BoA Defendants lacked scienter because MERS was providing "reliable words of comfort" to investors. Newman v. Warnaco Group, 335 F. 38 187, 193 (2d Cir. 2003), on which Plaintiff relies, is inapposite. While reliable words of comfort are relevant to determining whether Plaintiff was on notice of any fraud for statute of limitations purposes, they do not bear on the BoA Defendants' state of mind. Cf. Newman, 335 F. 38 at 193.

Litig, 252 F.3d 63, 76-77 (2d Cir. 2011) (strong inference of scienter established when complaint "contain[ed] detailed allegations as to what defendants knew on a daily, weekly and monthly basis about the retail trade of Goosebumps books, while at the same time making public statements that painted a different picture"); Hall v. Children's Place Retail Stores, Inc., 580 F. Supp. 2d 212, 232-33 (S.D.N.Y. 2008) (strong inference of scienter where confidential witnesses occupied positions that allowed them to observe failures in company and management and offered sufficiently particular allegations).

Similarly, Plaintiff's allegation that the large number of repurchase claims raise a strong inference of scienter also fails. While the court in In re Leslie Fay Cos., Inc. Securities Litigation, 835 F. Supp. 167, 175 (S.D.N.Y. 1993), found that plaintiff raised an inference of scienter where it alleged "tidal waves" of fraud, the magnitude of the fraud alone was not enough to plead scienter. Rather, Judge Connor made clear that he was considering not only the magnitude of the fraud alleged, but other convincing allegations in the complaint. See In re Leslie Fay Cos., 835 F. Supp. at 175 ("Alleged fraud of this magnitude, coupled with plaintiffs' other allegations, creates an implication of recklessness . . . ."); see also In re Worldcom, 294 F. Supp. 2d at 416 (stating that "size alone does not necessarily create an inference of scienter" and considering other circumstantial evidence in addition to size of alleged fraud). Other persuasive allegations of scienter are lacking here. Accordingly, Plaintiff fails to allege a strong inference of scienter against the Executive Defendants through the conscious misbehavior or recklessness prong, and its section 10 and Rule 10b-5 claims against the Executive Defendants are dismissed without prejudice. Plaintiff is granted leave to amend the Consolidated Class Action Complaint to cure the foregoing defects.

b. Bank of America

To plead scienter for a corporate entity, "the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." Dynex, 531 F.3d at 195. "[T]he most straightforward way to raise such an inference for a corporate defendant will be to plead it for an individual defendant." Dynex, 531 F.3d at 195. In their briefs, the parties tacitly consider this the only way to raise an inference of scienter with respect to a corporate defendant. "But it is possible to raise the required inference with regard to a corporate defendant without doing so with regard to a specific individual defendant." Dynex, 531 F.3d at 195. As the Second Circuit explained,

> [If] General Motors announced that it had sold one million SUVs in 2006, and the actual number was zero . . . [t]here would be a strong inference of corporate scienter, since so dramatic an announcement would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false.

Dynex, 531 F.3d at 195-96 (quoting Makor Issues & Rights, Ltd. v. Tellabs, Inc., 513 F.3d 702, 710 (7th Cir. 2008)). "Courts routinely impute to the corporation the intent of officers and directors acting within the scope of their authority." In re Ambac Fin. Grp., Inc. Sec. Litig., 693 F. Supp. 2d 241, 265 (S.D.N.Y. 2010). While Plaintiff's allegations are not sufficient to allege scienter as to the Executive Defendants, several of the allegations, taken together, raise a strong inference of scienter as to BoA.

For example, Plaintiff's allegation that a BoA vice president and assistant vice president signed false affidavits representing that they personally reviewed hundreds of loan files raises a strong inference of scienter. (Compl. ¶ 83.) Such fraudulent conduct suggests that BoA knew that it or Countrywide had not properly transferred or assigned mortgages. S. Cherry St., 573 F.3d at 110. And while Plaintiff does not allege that any of the Executive Defendants

-33-

reviewed an audit report indicating serious errors in amortization schedules, the fact that BoA's senior managers saw these reports is sufficient to impute knowledge of their contents to BoA. (Compl. ¶ 120.)  The discrepancies related to the amortization schedules impacted BoA's ability to perform its accounting responsibilities and suggest that BoA knew about this weakness. (Compl. ¶ 120.)

Additionally, Plaintiff's allegations concerning BoA's knowledge of repurchase claims also raises a strong inference of scienter on BoA's part.  For example, the Court can impute the knowledge of BoA's general counsel to BoA.  The FCIC letter drafted by BoA's general counsel summarized the negative effects flowing from BoA's overemphasis on generating loans for securitization without due regard to prudent lending.  (Compl. ¶ 101.) Plaintiff has adequately pled scienter as to BoA's misstatements and omissions concerning its reliance on MERS, vulnerability to repurchase claims, internal controls, and compliance with GAAP and SEC regulations.  Thus, BoA's motion to dismiss the Section 10(b) and Rule 10b-5 claim against it is denied.

IV.  Section 11 of the Securities Act of 1933

Plaintiff asserts claims under section 11 of the Securities Act of 1933 ("Securities Act") against BoA, the Securities Act Defendants, the Underwriter Defendants, and PwC. "Section 11 of the Securities Act prohibits materially misleading statements or omissions in registration statements filed with the SEC."  In re Morgan Stanley Info. Fund. Sec. Litig., 592 F.3d 347, 358 (2d Cir. 2010).  Plaintiff contends that the registration statements filed in connection with the Offering were materially misleading.

Section 11 claims must be "brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m. The parties agree that because Plaintiff filed its Complaint on September 23, 2011, claims that accrued prior to September 23, 2010 are barred. The Second Circuit has construed "discovery" to include "constructive and inquiry notice as well as actual notice." Dodds v. Cigna Sec., 12 F.3d 346, 349 (2d Cir. 1993). A plaintiff is deemed on inquiry notice "when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded." Dodds, 12 F.3d at 350. "Such circumstances are often analogized to storm warnings." Dodds, 12 F.3d at 350 (internal quotation marks omitted). When faced with storm warnings, "a duty of inquiry arises, and knowledge will be imputed to the investor who does not make such an inquiry." Dodds, 12 F.3d at 350. Where a complaint alleges several types of misconduct, an "investor need not know the details of each" to be placed on inquiry notice. Staehr v. Hartford Fin. Servs. Grp., 547 F.3d 406, 434 (2d Cir. 2008). But "[f]or inquiry notice to exist, the triggering information must relate directly to the misrepresentations and omissions [plaintiff] later allege[s] in [its] action against the defendants." Staehr, 547 F.3d at 427 (internal quotation marks and alterations omitted).

The parties dispute whether this inquiry notice standard still applies following the Supreme Court's decision in Merck & Co. v. Reynolds, 130 S. Ct. 1784 (2010). There is conflicting law in this district on this point. Compare In re Wachovia Equity Sec. Litig., 753 F. Supp. 2d 326, 370-71 & n.39 (S.D.N.Y. 2011) (applying Merck to section 11 claim but finding same result if inquiry notice standard applied), with In re IndyMac Mortgage-Backed Sec. Litig., 793 F. Supp. 2d 637, 645 (S.D.N.Y. 2011) (applying inquiry notice standard to section 11 claim),

In re Barclays Bank PLC Sec. Litig., No. 09 Civ. 1989 (PAC), 2011 WL 31548, at *6 (S.D.N.Y. Jan. 5, 2011) (same), and Pub. Employees Ret. Sys. of Miss. v. Merrill Lynch & Co., Inc., 714 F. Supp. 2d 475, 480 (applying inquiry notice standard and noting that Second Circuit has not addressed whether Merck applies in Section 11 context). The majority of courts in this district declined to apply Merck to Section 11 claims, and Plaintiff offers no convincing argument for why this Court should decide otherwise.

As the courts in IndyMac and Barclays Bank observed, the Merck Court construed 28 U.S.C. § 1658(b)—the limitations statute applicable to Section 10(b) claims. See IndyMac, 793 F. Supp. 2d at 648; Barclays, 2011 WL 31548, at *6. The text of Section 1658(b) is different from Section 77m, in that it provides that a Section 10(b) claim must be brought "not later than . . . two years after the discovery of the facts constituting the violation." 28 U.S.C. § 1658(b). In contrast, Section 77m requires that a Section 11 claim be "brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m. The Supreme Court held that the limitations period in Section 1658(b) began to run "once the plaintiff did discover or a reasonably diligent plaintiff would have discovered the facts constituting the violation—whichever comes first." Merck, 130 S. Ct. at 1798. Thus, the Supreme Court read into Section 1658(b) a constructive inquiry standard that was already included in the text of Section 77m. It further noted that in determining whether a plaintiff discovered facts "terms such as 'inquiry notice' and 'storm warnings' may be useful to the extent that they identify a time when the facts would have prompted a reasonably diligent plaintiff to begin investigating." Merck, 130 S. Ct. at 1798. "But the limitations period does not begin to run until the plaintiff thereafter discovers or

-36-

a reasonably diligent plaintiff would have discovered the facts constituting the violation." Merck, 130 S. Ct. 1798.

The parties' arguments over this issue are largely superfluous because the application of Merck makes no difference in this action. There is no difference because of the more relaxed requirements for pleading a Section 11 claim than pleading a Section 10-b claim. A Section 11 claim requires that: "(1) the defendant have an affirmative duty to disclose the information but fails to do so, and (2) the untrue or omitted information was material." In re Agria Corp. Sec. Litig., 672 F. Supp. 2d 520, 526 (S.D.N.Y. 2009). Unlike Plaintiff's Section 10(b) claims, Plaintiff "need not allege scienter, reliance, or loss causation" here. Morgan Stanley, 592 F.3d at 359. Indeed, "[d]etermining when the plaintiff should have uncovered an untrue assertion in a registration statement or prospectus is much simpler than assessing when a plaintiff should have learned that the defendant deliberately misled him using a deceptive device covered by [Section 10(b)]." Merck, 130 S. Ct. at 1801 (Scalia, J. concurring). And because Plaintiff's Section 11 claim does not sound in fraud, Plaintiff need not comply with the heightened pleading standard of Rule 9(b). See Fed. R. Civ. P. 9(b).

Here, BoA, Securities Act Defendants, Underwriter Defendants, and PwC rely on news articles, SEC filings, and various lawsuits to demonstrate that a reasonably diligent plaintiff would have discovered the facts constituting the violation prior to September 23, 2010. [6]

---

[6] It is proper for the Court "to take judicial notice of the fact that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents, in deciding whether so-called storm warnings were adequate to trigger inquiry notice." Staehr, 547 F.3d at 425 (emphasis in original) (internal quotation marks omitted).

Specifically, they cite three lawsuits filed between November 2007 and October 2009 asserting that Countrywide or its subsidiaries breached representations and warranties made in connection with MBS they sold ("the State Lawsuits"). (Bongiorno Decl. Exs. H, I, J.)  Specifically, the State Lawsuits alleged that Countrywide or its subsidiaries misrepresented both the underwriting standards used to originate the loans underlying MBS and the quality of those loans. (Bongiorno Decl. Ex. H ¶¶ 7-9, 59; Ex. I ¶ 5; Ex. J ¶¶ 136, 178-79.)  To support its claims, a plaintiff in one action described how state attorneys general were investigating Countrywide's loan origination practices. (Bongiorno Decl. Ex. I ¶ 7.)  And in another suit, the plaintiff cited to an SEC complaint alleging that Countrywide was aware of its underwriting deficiencies. (Bongiorno Decl. Ex. J ¶ 180.)  In sum, the State Lawsuits alleged widespread, systemic abrogation of underwriting standards at Countrywide and its subsidiaries. (Bongiorno Decl. Ex. H ¶ 55(b); Ex. I ¶¶ 7-8, 66, 68; Ex. J ¶¶ 180-87).

   The State Lawsuits were reasonably accessible to an ordinary investor because BoA described them in various disclosures. (Bongiorno Decl. Ex. B: 2008 10-K at 150-51; Ex. K: Annual Report, dated Feb. 26, 2010, ("2010 Annual Report") at 160-63); see also In re Ultrafem Inc. Sec. Litig., 91 F. Supp. 2d 678, 692 (S.D.N.Y. 2000) (public filing provided storm warnings).  And various news articles reported on the State Lawsuits and other related litigation. (Bongiorno Decl. Ex. L at 2; Ex. M at 1); see also LC Capital Partners, LP v. Frontier Ins. Grp., Inc., 318 F.3d 148, 155 (2d Cir. 2003) (finding plaintiff was on inquiry notice when information directly related to allegation appeared in financial publication).  Additionally, BoA disclosed additional lawsuits following the Offering. (Bongiorno Decl. Ex. N: 10-Q, dated May 7, 2010 at 53; Ex. O: August 2010 10-Q at 58-59.)  BoA explained in August 2010 that repurchase claims

primarily stemmed from breaches of representations and warranties pertaining to underwriting standards. (Bongiorno Decl. Ex. O: August 2010 10-Q at 40.)  It reported that it had approximately $11.1 billion worth of unresolved repurchase claims as of June 30, 2010. (Bongiorno Decl. Ex. O: August 2010 10-Q at 40.)

Thus, by August 2010, the State Lawsuits and BoA's disclosures not only put Plaintiff on inquiry notice of the facts underlying its Section 11 claim, but also allowed a diligent plaintiff to plead facts constituting the violation. (Bongiorno Decl. Ex. O: August 2010 10-Q at 40; Musoff Decl. Ex. A: 2008 10-K at 135; Ex. C: 2009 10-K at 5, 144).  By August 2010, a reasonably diligent plaintiff should have known that BoA faced staggering repurchase liability, which rendered its filings related to the Offering misleading. See In re Wachovia Sec. Litig., 753 F. Supp. 2d at 371 (finding media coverage of Wachovia's deterioration would have triggered a duty of inquiry and would have allowed an investor to plead Securities Act liability). Plaintiff does not need to plead more facts than that to state a Section 11 claim. See Merck, 130 S. Ct. at 1801 (Scalia, J. concurring); see also Morgan Stanley, 592 F.3d at 359.  And tellingly, nowhere in its brief does Plaintiff explain how applying Merck would lead to a different result.

Alternatively, Plaintiff argues that if the inquiry notice standard still applies, the State Lawsuits were insufficient to alert Plaintiff of misrepresentations.  Contrary to Plaintiff's conclusory argument, the State Lawsuits "relate directly to the misrepresentations and omissions" that Plaintiff alleges. Staehr, 547 F.3d at 427.  The State Lawsuits alleged that Countrywide consistently misrepresented the quality of the loans it sold and therefore breached representations.  And the repurchase claims arose from those precise breaches. See LC Capital Partners, 318 F.3d at 155 (defendant's disclosure of three reserve charges related to allegations

that defendant misrepresented the adequacy of reserve levels and internal controls). The cases on which Plaintiff relies are distinguishable because the storm warnings in those cases were not germane to the alleged misrepresentations and omissions. See Pub. Emp. Ret. Sys. of Miss. v. Goldman Sachs Grp, Inc., 09 Civ. 1110 (HB), 2011 WL 135821, at *9 (S.D.N.Y. Jan. 12, 2011) (public documents indicating that certificates were performing poorly did not directly relate to plaintiff's allegation that defendants misrepresented the quality of the underlying loans); see also N.J. Carpenters Vacation Fund v. Royal Bank of Scot. Grp., 720 F. Supp. 2d 254, 267 (S.D.N.Y. 2010) (public information discussing the general weakening of underwriting standards by subprime originators did not relate directly to plaintiff's allegations that defendant misrepresented its underwriting standards).

Plaintiff also argues that if the inquiry notice standard applies, management's reliable words of comfort excuse Plaintiff's failure to inquire here. "[I]nvestors may not be considered to have been placed on inquiry notice" where "the warning signs are accompanied by reliable words of comfort from management." LC Capital Partners, 318 F.3d at 155. "[R]eassuring statements will prevent the emergence of a duty to inquire or dissipate such a duty only if an investor of ordinary intelligence would reasonably rely on the statements to allay the investor's concern." LC Capital Partners, 318 F.3d at 155. "Whether reassuring statements justify reasonable reliance that apparent storm warnings have dissipated will depend in large part on how significant the company's disclosed problems are, how likely they are of a recurring nature, and how substantial are the 'reassuring' steps announced to avoid their recurrence." LC Capital Partners, 318 F.3d at 155. Plaintiff argues that the the April 2010 statement provided reliable words of comfort. (Compl. ¶ 255.) Additionally, Plaintiff asserts that Moynihan's

-40-

October 8, 2010 announcement that BoA was suspending all foreclosures to "clear the air" also dissipated storm warnings ("the October 2010 statement").

The April 2010 statement and the October 2010 statement are similar to the reassurances in LC Capital , which the Second Circuit held did not dissipate storm warnings. 318 F.3d at 155. In LC Capital, defendants stated that the problem of under-reserving "is now behind us." 318 F.3d at 155. The Second Circuit concluded that the statement in LC Capital concerning under-reserving was "obviously" a significant issue to any insurance company. 318 F.3d at 155. Like that statement, the statements here concerned matters that were material to BoA—i.e., BoA's financial well-being and its ability to foreclose on loans. See LC Capital, 318 F.3d at 155. And the under-reserving problems in LC Capital were likely to recur because the company had taken three reserve charges in four years, which indicated that there were deep-rooted problems with the company's reserve-setting practices. See LC Capital, 318 F.3d at 156. Similarly, it was likely that BoA would continue to suffer losses because it faced $11.1 billion worth of unresolved repurchase claims and the U.S. Treasury Department had commenced an investigation into foreclosure practices. (See Bongiorno Decl. Ex. B: 2008 10-K at 150-51; Ex. K: Annual Report, at 160-63; Compl. ¶ 147); see LC Capital, 318 F.3d at 155. Additionally, like defendants' bare statement in LC Capital, the statements here do not discuss how BoA would avoid future problems. Rather, "[t]he reassuring statements by management were mere expressions of hope." LC Capital, 318 F.3d at 155; cf. Siebert v. Nives, 871 F. Supp. 110, 114 (D. Conn. 1994) (storm warnings concerning reserves were dissipated when company's annual report described in detail how it was fixing problem with reserves). Accordingly, because "an investor of ordinary intelligence" would not have reasonably relied on the statements to allay his

concerns, those statements did not relieve Plaintiff of its duty to inquire.

Although there are fewer disclosures about BoA's reliance on MERS, Plaintiff's Section 11 claim is nonetheless still barred. The only evidence suggesting that Plaintiff was on notice of the problems with MERS is a July 2010 article, appearing in the <u>Reno Gazette</u>. That article described two lawsuits against MERS, Countrywide, and BoA in which defendants faced liability of "$6 billion to $12 billion in Nevada alone." (<u>See</u> Bongiorno Decl. Ex. X at 2.) This Court need not resolve whether this article put Plaintiff on notice of problems with MERS because Plaintiff need not have notice of all the misconduct it alleges in the Complaint to trigger inquiry notice. <u>Staehr</u>, 547 F.3d at 434. For example, in <u>Staehr</u>, plaintiff alleged that defendants, <u>inter alia</u>, accepted kickbacks and participated in a price manipulation scheme. <u>Staehr</u>, 547 F.3d at 408. The Second Circuit found that plaintiff's claims were barred because a previously-filed California lawsuit informed investors that defendants accepted kickbacks. <u>Staehr</u>, 547 F.3d at 434. It did not matter that plaintiff did not have notice of all the misconduct it alleged in his complaint, such as defendant's price manipulation scheme. <u>Staehr</u>, 547 F.3d at 434. Similarly, Plaintiff was on notice of issues with repurchase claims, which is central to its complaint. <u>Staehr</u>, 547 F.3d at 434. Accordingly, Plaintiff's claim is barred, even if it did not have notice of BoA's reliance on MERS.

III. <u>Section 20(a) of the Exchange Act and Section 15 of the Securities Act</u>

Plaintiff asserts claims against the Executive Defendants for violations of Section 20(a) of the Exchange Act and Section 15 of the Securities Act. Plaintiff's Section 20(a) claim is premised on violations of Section 10(b) of the Exchange Act, and Plaintiff's Section 15 claim is premised on Section 11 of the Securities Act. "[T]he Court considers the analysis of [Section

-42-

20(a) and Section 15] interchangeable" because those provisions are "substantially the same." In re AOL Time Warner, Inc. Sec. & ERISA Litig., 381 F. Supp. 2d 192, 233 (S.D.N.Y. 2004). For either claim to survive a motion to dismiss, plaintiff must allege: (1) "an underlying primary violation by the controlled person"; (2) "control over the controlled person"; and (3) "particularized facts as to the controlling person's culpable participation in the fraud perpetrated by the controlled person." In re AOL Time Warner, 381 F. Supp. 2d at 233.

While Plaintiff has alleged an "underlying primary violation" for its Section 20(a) claim, that claim is dismissed nonetheless because Plaintiff has failed to allege "particularized facts" of the Executive Defendants' "culpable participation in the fraud perpetrated by the controlled person." In re AOL Time Warner, 381 F. Supp. 2d at 233. "The culpable participation element is subject to the heightened pleading requirements of the PSLRA." See Steed Finance LDC v. Nomura Sec. Int'l, Inc., No. 00 Civ. 8058 (NRB), 2001 WL 1111508, at *10 (S.D.N.Y. Sept. 20, 2001); see also 15 U.S.C. § 78u-4 (where "plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind"). "While the Second Circuit has not yet addressed the meaning of culpable participation at length, other than to state that a determination of § 20(a) liability requires an individualized determination of a defendant's particular culpability, courts have required a showing of both fraudulent conduct and a culpable state of mind." In re Emex Corp. Sec. Litig., No. 01 Civ. 4886 (SWK), 2002 WL 31093612, at *10 (S.D.N.Y. Sept. 18, 2002) (internal quotation marks omitted); see also Steed Finance, 2001 WL 1111508, at *10. For the reasons stated above at II.B.2.a, Plaintiff has failed to plead a culpable state of mind with respect

-43-

to the Executive Defendants.  Accordingly, Plaintiff's Section 20(a) claim is dismissed without prejudice.  See Emex, 2002 WL 31093612, at *11; see also In re AOL Time Warner, 381 F. Supp. 2d at 235 (dismissing claims against defendants that plaintiffs failed to plead acted with scienter).

   And Plaintiff has not alleged an "underlying primary violation" for its Section 15 claim because its Section 11 claim is time-barred.  Plaintiff's Section 15 claim is dismissed with prejudice.

CONCLUSION

   For the foregoing reasons, Defendants' motions to dismiss the Consolidated Class Action Complaint are granted in part and denied in part.  Defendants Kenneth D. Lewis, Joseph Lee Price, II, Brian T. Moynihan, Neil Cotty, and Charles H. Noski's motion to dismiss Plaintiff's claims under Sections 10(b) and 20(a) of the Exchange Act of 1934 and Rule 10b-5 is granted, and those claims are dismissed without prejudice.  Plaintiff must file and serve its amended complaint by July 31, 2012.  Defendants Lewis, Price, Moynihan, Cotty, and Noski's motion to dismiss Plaintiff's claims under Section 15 of the Securities Act of 1933 is granted, and those claims are dismissed with prejudice.

   Plaintiff's claims under Section 11 of the Securities Act of 1933 claims against Defendants Bank of America, William P. Boardman, Frank Paul Bramble, Sr., Virgis William Colbert, Charles K. Gifford, Jr., Charles Otis Holliday, Jr., Monica C. Lozano, Thomas John May, Thomas Michael Ran, Robert W. Scully, Joseph Lee Price, Cantor Fitzgerald & Co., CCB International Capital Ltd., Cowen & Company, LLC, Daiwa Capital Markets America Inc.,

-44-

Deutsche Bank Securities Inc., Gleacher & Company Securities, Inc., Goldman & Sachs & Co., Keefe Bruyette & Woods, Inc., KeyBanc Capital Markets Inc., Macquarie Capital Inc., Merrill Lynch Pierce Fenner & Smith Inc., Mizuho Securities USA Inc., Morgan Stanley & Co. LLC, National Australia Bank Limited, RBS Securities Inc., Samsung Securities Co., Ltd., Samuel A. Ramirez & Co., Inc., Sanford C. Bernstein & Co. LLC, Santander Investment Securities, Inc., SG Americas Securities LLC, Southwest Securities, Inc., Stifel Nicholaus & Company, Inc., SunTrust Robinson Humphrey, Inc., UBS Securities LLC, UniCredit Capital Markets, Inc., Wells Fargo Securities, LLC., ICBC International Securities Limited, and PricewaterhouseCoopers are dismissed with prejudice.

   Bank of America's motion to dismiss the Complaint is granted with prejudice with respect to Plaintiff's claim under Section 11 of the Securities Act of 1933 and is denied with respect to Plaintiff's claims under Sections 10(b) of the Exchange Act of 1934 and Rule 10b-5. The Clerk of the Court is directed to terminate the motions pending at ECF Nos. 103, 111, 112, and 116.

Dated: July 11, 2012
   New York, New York

           SO ORDERED:


             WILLIAM H. PAULEY III
             U.S.D.J.

-45-

*Counsel of Record:*

Mark Robert Rosen
Barrack, Rodos & Bacine
3300 Two Commerce Square, 2001 Market Street
Philadelphia, PA 19103
*Lead Counsel for Plaintiff*

Jay B. Kasner
Skadden, Arps, Slate, Meagher & Flom LLP (NYC)
Four Times Square
42nd floor
New York, NY 10036
*Counsel for Bank of America and Defendants Moynihan, Noski, and Cotty*

Charles S. Duggan
Davis Polk & Wardwell L.L.P.
450 Lexington Avenue
New York, NY 10017
*Counsel for Defendants Boardman, Bramble, Colbert, Gifford, Holliday, Lozano, May, Ryan, Scully*

James J. Capra, Jr
King & Spalding LLP
1185 Avenue of the Americas
New York, NY 10036
*Counsel for PricewaterhouseCoopers LLP*

Fraser Lee Hunter, Jr
Wilmer, Cutler, Hale & Dorr, L.L.P.
399 Park Avenue
New York, NY 10022
*Counsel for Underwriter Defendants*