UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————
                                    :

PENNSYLVANIA PUBLIC SCHOOL      :      CIVIL ACTION NO.
EMPLOYEES' RETIREMENT SYSTEM,  :      11-CV-00733-WHP
individually and on behalf of all others   :
similarly situated,                      :

                                :      CLASS ACTION
                Plaintiff,   :
                                :

             v.                  :      **ECF CASE**
                                :

BANK OF AMERICA CORPORATION, et al., :
                                :
              Defendants.   :
                                :

——————————————————————:

**LEAD PLAINTIFF PENNSYLVANIA PUBLIC SCHOOL EMPLOYEES'
RETIREMENT SYSTEM'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT BRIAN T. MOYNIHAN'S MOTION FOR PARTIAL
RECONSIDERATION**

**BARRACK, RODOS & BACINE**
A. Arnold Gershon
William J. Ban
Michael A. Toomey
425 Park Avenue, 31st Floor
New York, NY 10022
Telephone: (212) 688-0782
Facsimile: (212) 688-0783

**BARRACK, RODOS & BACINE**
Leonard Barrack
Mark R. Rosen
Jeffrey A. Barrack
Jeffrey W. Gittleman
Chad A. Carder
Julie B. Palley
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-0600
Fax: (215) 963-0838

223595

## TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................ 1

ARGUMENT ................................................................................................................... 5

    I.     Defendant Moynihan's Motion to Reconsider is Improper ................................... 5

    II.    A Review of the Amended Complaint Confirms That the
          Information in the May 13th Letter Supports the Court's
          Finding of Defendant Moynihan's Scienter ........................................................ 8

    III.   The Information Confidentially Disclosed in the May 13th
          Letter to the FCIC Was Not Already Known in the Financial Market ................. 14

    IV.   Even if the Court Were to Disregard the Allegations
          Concerning the May 13th Letter, Defendant Moynihan Would
          Remain a Defendant on Both the Section 10(b) and Section 20(a)
          Claims Arising from the Repurchase Claims ....................................................... 17

CONCLUSION ............................................................................................................... 17

223595

# TABLE OF AUTHORITIES

**Page(s)**

<u>Cases</u>

*Ambac Assurance Corp. v. EMC Mortg. Corp.*,
No. 08 Civ. 9464(RMB), 2009 WL 734073 (S.D.N.Y. March 16, 2009) ........................... 7, 11

*City of Pontiac General Emps' Ret. Sys. v. Lockheed Martin Corp.*,
875 F.Supp.2d 359 (S.D.N.Y. 2012) ................................................................................. 9

*Equal Emp't Opportunity Comm'n v. Bay Ridge Toyota, Inc.*,
327 F.Supp.2d 167 (E.D.N.Y. 2004) ................................................................................. 7

*Hutchings v. Fed. Ins. Co.*,
No. 6:08-cv-305-Orl-19KRS, 2008 WL 4186994 (M.D. Fla. Sept. 8, 2008) ........................... 6

*In re Citigroup Inc. Bond Litig.*,
723 F.Supp.2d 568 (S.D.N.Y. 2010) ................................................................................ 16

*In re Moneygram Int'l, Inc. Sec. Litig.*,
626 F.Supp.2d 947 (D. Minn. 2009) ................................................................................ 16

*In re Netopia, Inc. Sec. Litig.*,
No. C-04-03364 RMW, 2005 WL 3445631 (N.D. Cal. Dec. 15, 2005) ................................... 6

*In re Smith Barney Transfer Agent Litig.*,
765 F.Supp.2d 391 (S.D.N.Y. 2011) ................................................................................ 16

*Lennon v. Seaman*,
63 F.Supp.2d 428 (S.D.N.Y. 1999) ................................................................................... 7

*Lipsky v. Commonwealth United Corp.*,
551 F.2d 887 (2d Cir. 1976) ............................................................................................ 7

*Lynch v. Southampton Animal Shelter Found. Inc.*,
278 F.R.D. 55 (E.D.N.Y. 2011) ........................................................................................ 7

*Miller v. Transamerican Press, Inc.*,
709 F.2d 524 (9th Cir. 1983) ........................................................................................... 5

*New Orleans Emps' Ret. Sys. v. Celestica, Inc.*,
455 Fed.Appx. 10, 14 (2d Cir. 2011) ................................................................................ 9

ii

*Pa. Pub. Sch. Emps' Ret. Sys. v. Bank of Am. Corp.*,
    874 F.Supp.2d 341 (S.D.N.Y. 2012) ................................................................ *passim*

*Pa. Pub. Sch. Emps' Ret. Sys. v. Bank of Am. Corp.*,
    No. 11 Civ.733 (WHP), ___ F.Supp.2d ___, 2013
    WL 1664696 (S.D.N.Y. April 17, 2013) ............................................................ *passim*

*Roe v. City of New York*,
    151 F.Supp.2d 495 (S.D.N.Y. 2001) ........................................................................ 7

*Slayton v. American Express Co.*,
    604 F.3d 758 (2d Cir. 2010) .................................................................................. 16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ...................................................................................... 14, 16

*U. S. v. Billmyer*,
    57 F.3d 31 (1st Cir. 1995) ....................................................................................... 4

*Wallace v. Intralinks*,
    No. 11 CV 8861(TPG), 2013 WL 1907685 (S.D.N.Y. May 8, 2013) ........................ 9

## Statutes

18 U.S.C. § 1001 ...................................................................................................... 2, 14

28 U.S.C. § 1292(b) ....................................................................................................... 1

## Rules

Fed. R. Civ. P. 12(b)(6) ................................................................................................. 6

Fed. R. Civ. P. 12(f) .................................................................................................. 6, 7

## Treatise

9 *Moore's Federal Practice – Civil* §50.43 (2013) ....................................................... 5

223595

## INTRODUCTION

The motion before this Court constitutes the *fourth* challenge to the claims the Court-appointed Lead Plaintiff, the Pennsylvania Public School Employees' Retirement System ("Plaintiff"), has brought on behalf of a proposed class of investors defrauded by the conduct of Bank of America Corporation ("BoA" or "the Company") and its senior leadership: its current Chairman of the Board and Chief Executive Officer, Defendant Brian T. Moynihan, his predecessor in these posts, Defendant Kenneth D. Lewis, and the three executives who held the post of Chief Financial Officer during the class period: Joseph Lee Price, II, Neil Cotty and Charles H. Noski (collectively the "Executive Defendants").

Following its selection as Lead Plaintiff, Plaintiff filed a consolidated class action complaint ("Original Complaint" or "OC"), which all defendants challenged in a joint motion to dismiss.  After the Court sustained the Section 10(b) claim against BoA under the Securities Exchange Act of 1934 ("Exchange Act") and dismissed the claims against the Executive Defendants *solely* on the ground that the Original Complaint did not adequately plead their scienter, the Court granted Plaintiff leave to file an amended complaint to establish the scienter of the Executive Defendants.  *Pa. Pub. Sch. Emps' Ret. Sys. v. Bank of Am. Corp.*, 874 F.Supp.2d 341, 369 (S.D.N.Y. 2012).

Not content with this result, BoA filed a motion for reconsideration or, in the alternative, for certification for interlocutory appeal under 28 U.S.C. § 1292(b), arguing that the Court must somehow have been mistaken in sustaining the Exchange Act claims against the Company.  This Court carefully considered that motion for reconsideration or for interlocutory appeal, and rejected it in full.  *Id.*, 874 F.Supp.2d at 373.

As the Court had expressly authorized, Plaintiff filed the Amended Consolidated Class Action Complaint ("Amended Complaint" or "AC"), reasserting the Section 10(b) claim against

BoA and pleading in more detail claims under Sections 10(b) and 20(a) against the Executive

Defendants.  Because the Court's decision on the Original Complaint stated, *inter alia*, that, in

connection with its repurchase claims, the Original Complaint had failed to plead sufficient facts

establishing that Defendant Moynihan was aware of the information set forth in a May 13, 2010

letter written by counsel to the Financial Crisis Inquiry Commission ("FCIC"), the Amended

Complaint pleads, in detail, all of the reasons why Defendant Moynihan should be charged with

knowledge of its contents.  Significantly, this included the facts that the May 13th letter was

written in response to a February 2, 2010 letter personally addressed to Moynihan requesting

further information following his January 13, 2010 sworn testimony before the FCIC, and

specifically warned that the responses would be deemed part of his testimony and subject to the

penalties of 18 U.S.C. § 1001.  AC ¶¶86, 301.  The Amended Complaint also pleads other facts

demonstrating the scienter of Moynihan and the other Executive Defendants.  See AC ¶¶302-

305.

The Executive Defendants once again filed a motion to dismiss, this time arguing that the

new, more detailed allegations in the Amended Complaint were still insufficient to sustain the

Exchange Act claims against them.  As part of their moving papers, the Executive Defendants

submitted a declaration containing a number of exhibits, including the May 13th letter.  *See*

Declaration of Scott D. Musoff in Support of the Motion of Defendants Kenneth D. Lewis, Joe

L. Price, II, Brian T. Moynihan, Charles H. Noski and Neil Cotty to Dismiss the Amended

Consolidated Class Action Complaint ("Musoff Decl.")(filed Nov. 5, 2012) (Docket No. 175).

In extensive oral argument on the renewed motion to dismiss, counsel for the Executive

Defendants argued, at length, about the May 13th letter, asserting both (1) the Amended

Complaint still failed to establish Defendant Moynihan's knowledge of its contents and (2) even

if he were aware of its contents, the knowledge derived from that familiarity was not inconsistent with any public statements made during the class period and did not establish his scienter.

The Court considered and rejected both assertions, concluding  that the Amended Complaint adequately pleads Defendant Moynihan's knowledge of the subject matter of the May 13th letter and that the information contained in and derived from that correspondence conflicted with Defendants' public statements made around the time of that letter and afterwards.  *Pa. Pub. Sch. Emps' Ret. Sys. v. Bank of Am. Corp.*, No. 11 Civ.733 (WHP), ___ F.Supp.2d ___, 2013 WL 1664696 at *4 (S.D.N.Y. April 17, 2013).

The Court also considered the remainder of the Executive Defendants' arguments and concluded that the Amended Complaint properly alleged scienter as to Defendant Moynihan and the other Executive Defendants in a number of respects *in addition to* the allegations concerning the May 13th letter, and upheld the Amended Complaint.

More specifically, in addition to finding that the May 13th letter demonstrated Moynihan's scienter regarding repurchase claims, the Court also held that the Amended Complaint properly alleged Moynihan's scienter (and the scienter of the other Executive Defendants) regarding the Company's failure "to disclose the general nature of the potential liability [BoA] faced . . . [that] constituted a violation of FAS 5."  *Id.*, 2013 WL 1664696 at *6. The Court continued by concluding that by "certifying that they were complying with FAS 5 when they failed to disclose such potential liabilities, they knowingly made materially misleading statements."  *Id.*.  As this Court explained:

> The Amended Complaint alleges sufficient specific facts to demonstrate that the Executive Defendants were aware of the repurchase demands, even if they were not aware of the merits of each individual demand.  And the GAAP precept of Accounting for Contingencies ("FAS 5") requires disclosure of probable losses, even when the losses are not estimable, as long as there is a "manifestation by a potential claimant of an awareness of a possible claim or assessment." FAS 5,

3

¶10. Under FAS 5, BoA was obligated to disclose the general nature of the potential liability that it faced.  Its failure to do so constituted a violation of FAS 5.  The Executive Defendants were made aware of these potential liabilities by various demand letters and by their role in camouflaging those demands . . . . By certifying that they were complying with FAS 5 when they had failed to disclose such potential liabilities, they knowingly made materially misleading statements.  Accordingly, Plaintiff's allegations regarding the Executive Defendants' violation of GAAP and SEC regulations give rise to a strong inference of scienter.

*Id.*

On May 1, 2013, new counsel for Defendant Moynihan filed this motion asking for "partial reconsideration" of the ruling denying the Executive Defendants' motion to dismiss the Amended Complaint.  In  the current motion, Defendant Moynihan does not seek reconsideration of the Court's denial of the Executive Defendants' motion as to those FAS 5 allegations, conceding that the Court's April 17, 2013 ruling had sustained the Exchange Act claims under Sections 10(b) and 20(a) against all of the Executive Defendants, including Defendant Moynihan, based upon "the Executive Defendants' alleged violations of GAAP and SEC regulations," Moynihan Mem. at 5.  Moynihan, nevertheless, moves for "partial reconsideration" because, he claims, the Court's ruling "leaves Moynihan defending a *theory of liability* that has no place in this case."[1]  Moynihan Mem. at 1 (emphasis added).   Potential liability involving FAS 5, however, was directly related to the same repurchase claims that are implicated by the May 13th letter.  Thus, whether or not Defendant Moynihan's motion for "partial reconsideration" were granted, the Amended Complaint properly pleads all of the elements of liability, including scienter, for all of the Defendants, including Moynihan, under the Exchange Act for misrepresentations or material omissions relating to the failure to disclose growing

---

[1]  Defendant Moynihan's argument also repeatedly refers to the Court's action as a "grievous error," Moynihan Mem. at 11, 13, perhaps to lay the foundation for yet another attempted interlocutory appeal, or to imply as much in an attempt to persuade the Court to change its previous decision.  *See, e.g., U. S. v. Billmyer*, 57 F.3d 31, 37 (1st Cir. 1995) ("Mandamus is a discretionary writ available in extraordinary circumstances to redress grievous error.").

223595

liabilities arising from repurchase demands related to breaches of the representations and warranties issued in connection with the securitization of subprime mortgage loans.

It is clear that Defendant's self-styled motion for "partial reconsideration" is improper and that the May 13th letter provides part, but by no means all, of the factual support for Defendant Moynihan's scienter. *See* AC ¶¶118, 121, 302, 305. The Court correctly rejected the Executive Defendants' motion to dismiss the Amended Complaint, and should similarly reject Defendant Moynihan's latest legal maneuver.

## ARGUMENT

### I.       Defendant Moynihan's Motion to Reconsider is Improper

It is well established that Courts look at the substance, rather than the title of motions to determine whether they should be granted, 9 *Moore's Federal Practice – Civil* §50.43 (2013) ("It is the substance of the motion rather than its linguistic form that determines its nature and legal effect"); *Miller v. Transamerican Press, Inc.*, 709 F.2d 524, 527 (9th Cir. 1983), and a review of Defendant Moynihan's motion reveals that it does not constitute a proper motion for reconsideration of the denial of a motion to dismiss.

As the title implies, a motion for reconsideration is asking the Court for a "do over" of its earlier decision, in this case the April 17, 2013 ruling denying the Executive Defendants' motion to dismiss the Amended Complaint.[2] Defendant Moynihan's decision to style his application as a motion "for partial reconsideration" conceals a fatal flaw in his motion.

_____

[2] Given the Court's familiarity with the issues, Plaintiff will incorporate, rather than repeat, its analysis of the legal authority relating to motions for reconsideration and the application of the law of the case doctrine, which were addressed in Plaintiff's earlier legal memoranda, Plaintiff's Mem. of Law in Opp. to the Motion of Defendant Bank of America Corp. for Reconsideration or, in the Alternative, to Certify Ruling on Motions to Dismiss for Interlocutory Appeal Pursuant to 28 U.S.C. §1292(b) (Docket No. 156 filed Aug. 13, 2012); Mem. of Law of Lead Plaintiff, Pennsylvania Public School Employees' Retirement System, in Opp. to the Executive Defendants' Motion to Dismiss the Amended Class Action Complaint (Docket No. 178 filed

Under Rule 12(b)(6), a motion to dismiss can be properly brought *only* to ask the Court to dismiss either (a) a particular claim (or all claims) or (b) a particular party (or all parties).  As one court explained:

> A motion to dismiss under Federal Rules of Procedure 12(b)(6) for failure to state a claim upon which relief can be granted applies only to "claims."  . . . . Partial dismissal of a complaint is permissible but is generally limited to those situations in which an entire claim or count is dismissed rather than a portion of a claim . . . .
>
> A motion to strike under Rule 12(f) applies to "a pleading," . . . . ***In other words, whereas an entire claim or count may be dismissed, portions of a claim or count may be stricken.***  *Compare* Fed. R. Civ. P. 12(b)(6) with Fed. R. Civ. P. 12(f). If a party has improperly labeled a motion to strike as a motion to dismiss, a court may treat the improperly labeled motion to dismiss as a motion to strike.

*Hutchings v. Fed. Ins. Co.*, No. 6:08-cv-305-Orl-19KRS, 2008 WL 4186994, *1-*2 (M.D. Fla. Sept. 8, 2008) (internal case citations omitted and emphasis added).  *See In re Netopia, Inc. Sec. Litig.*, No. C-04-03364 RMW, 2005 WL 3445631, *3 (N.D. Cal. Dec. 15, 2005) ("By its own terms, there does not appear to be any way to grant partial dismissal of a claim under Fed.R.Civ. P. 12(b)(6).") In other words, Defendants are not entitled to file "mini" motions to dismiss – or motions for reconsideration of the denial of a prior motion to dismiss – in order to challenge particular factual allegations or theories of liability that, even if granted, would not result in either the complete dismissal of a party or the dismissal of an entire claim.  Because Defendant Moynihan concedes, Moynihan Mem. at 5, as he must, that his motion would *not* result in the complete dismissal of either the Section 10(b) claim or the Section 20(a) claim against him, as he would remain a defendant on both the Section 10(b) and 20(a) claims relating to the representations and warranties that were issued in securitizing billions and billions of dollars of

---

Dec. 12, 2012),  as well as in this Court's prior rulings.  *See Pa. Pub. Sch. Emps' Ret. Sys. v. Bank of Am. Corp.*, 874 F.Supp.2d at 370 (denying BoA motion for reconsideration); *Pa. Pub. Sch. Emps' Ret. Sys. v. Bank of Am. Corp.*, 2013 WL 1664696 at *4 (denying motion of Executive Defendants to dismiss Amended Complaint).

223595

subprime mortgage debt and their related repurchase demands, *see Pa. Pub. Sch. Emps' Ret. Sys. v. Bank of Am. Corp.*, 2013 WL 1664696 at *5-7; AC ¶¶ 90-95, 111-120, 126, 149-150, 170, 176, 231-232, 261, 269-283, 302(b),  his motion is more akin to a Rule 12(f) motion to strike, *Hutchings*, *supra*, and would have to be judged on that basis.  Of course, here, a motion to strike was never filed by Moynihan and thus it would be improper to ask the Court "reconsider" it.

Courts in this Circuit have repeatedly stressed that motions to strike are disfavored, *Lennon v. Seaman,* 63 F.Supp.2d 428, 446 (S.D.N.Y. 1999); *Lynch v. Southampton Animal Shelter Found. Inc.*, 278 F.R.D. 55, 63 (E.D.N.Y. 2011); and should be granted *only* where "there is a strong reason for doing so," *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976); *Roe v. City of New York*, 151 F.Supp.2d 495, 510 (S.D.N.Y. 2001).  Motions to strike "should be denied absent a showing that the challenged portion of the pleading has no bearing on the subject matter of the litigation and that its inclusion would prejudice the defendant." *Ambac Assurance Corp. v. EMC Mortg. Corp.*, No. 08 Civ. 9464(RMB), 2009 WL 734073, *2 (S.D.N.Y. March 16, 2009) (internal quotation marks omitted).  Not surprisingly, the decision whether to grant a motion to strike is committed to the District Court's discretion. *Equal Emp't Opportunity Comm'n v. Bay Ridge Toyota, Inc.*, 327 F.Supp.2d 167, 180 (E.D.N.Y. 2004).  Thus, even if Moynihan had styled his motion as one to strike, he made no effort to show that he meets its demanding standard.[3]

An additional problem with Moynihan's motion is that it is vague and unclear.  It asks the Court to "dismiss the allegations regarding repurchase claims against him."  The accounting claims relating to the repurchase claims, however, have already been upheld by the Court, *see*

---

[3]   In considering a motion to strike, a court is obligated to review the challenged allegations to determine if they "provide background context for the events at issue."  *Ambac*, 2009 WL 734073 at *2.  At the very least, the May 13th letter clearly does that.

*supra* at 3-5, and *Pa. Pub. Sch. Emps' Ret. Sys. v. Bank of Am. Corp.*, 2013 WL 1664696 at \*5-6. Thus, those allegations should not be dismissed.

Moreover, as Plaintiff will show below, even if the Court were to reconsider its earlier ruling, Defendant Moynihan's motion should be rejected because the Amended Complaint adequately pleads his scienter.

## II.   A Review of the Amended Complaint Confirms That the Information in the May 13th Letter Supports the Court's Finding of Defendant Moynihan's Scienter

The May 13th letter does not stand alone, but was submitted in the context of the investigation by the FCIC into the financial crisis that nearly brought the entire global economy to its knees.  Moynihan testified before the Commission on January 12, 2010, about, among other things, the cause of the crisis, stating that a major source of the problem was the "originate-to-distribute" mortgage model, where the lender that originated the loan and then sold it and thus retained no risk that the loan would not be paid.  According to Moynihan, that "reduced the incentives for some lenders to apply as strict credit underwriting standards for securitized loans than they may have applied if they were required to hold and service those loans in portfolio." Musoff Decl., Ex. H at 3 (Docket Entry 175-9).  Moynihan stated: "[s]ecuritization structures developed by investment banks took all the risks of a subprime loan and multiplied them, by leveraging that asset." *Id*. at 4.  FCIC Executive Director Thomas Greene followed up by letter on February 2, 2010, seeking further information from Moynihan.  Musoff Decl., Ex. A (Docket Entry 175-1) at 11-14 (Greene's Feb. 2, 2010 letter).  The May 13th letter constituted part of Moynihan's response to the FCIC.

The allegations in the Amended Complaint that Defendant Moynihan was aware of "the consequences of overemphasis" by BoA and its legacy entities "on generating [mortgage] inventory for securitization rather than on making prudent lending decisions," AC ¶86, OC ¶101,

are fully borne out by a review of the May 13 letter in the context of the other allegations of the Amended Complaint.

One of the topics addressed in the May 13th letter was BoA's pooling and securitization of subprime mortgages. These constituted part of the Company's core operations, AC ¶79, for which the senior executives of BoA, including its CEO, were responsible and, therefore, may provide further support for the inference of Defendant Moynihan's scienter. *New Orleans Emps' Ret. Sys. v. Celestica, Inc.*, 455 Fed.Appx. 10, 14 n.3 (2d Cir. 2011); *Wallace v. Intralinks*, No. 11 CV 8861(TPG), 2013 WL 1907685 (S.D.N.Y. May 8, 2013) (Griesa, J.); *City of Pontiac General Emps' Ret. Sys. v. Lockheed Martin Corp.*, 875 F.Supp.2d 359, 371 (S.D.N.Y. 2012) (Rakoff, J.). In the process of pooling and securitizing subprime mortgages, the Company sold a substantial portion of its mortgage loans to trusts that were created for the purpose of selling interests in the mortgage loans to investors. The trusts sold those interests through trust certificates known as mortgage-backed securities (MBSs). In selling the loans, BoA, and its legacy entities, Countrywide and Merrill Lynch, made representations and warranties to the purchasers about the quality of the loans and remained responsible for compliance with those representations and warranties. However, as Plaintiff alleged in the Original and Amended Complaints, these representations and warranties were frequently unfounded, which gave rise to demands that BoA and its legacy entities repurchase these loans or otherwise compensate the investors or insurers. OC ¶¶11, 14, 19, 102-110, 126-136; AC ¶¶11, 14, 19, 87-95, 111-121.

It was in this context that, following Moynihan's testimony, the FCIC asked him for more information to allow the Commission to evaluate the exposure of the major mortgage securitization players – BoA (including its legacy Countrywide and Merrill subsidiaries) being the largest. A thrust of the inquiry was BoA's exposure to subprime mortgages. And BoA's

9

223595

major exposure to subprime mortgage liabilities was from repurchase demands based on alleged violations of representations and warranties. While the words "representations" and "warranties" were not mentioned by name in the May 13th letter, they constituted an important reason for BoA's involvement in the inquiry.

Because loans that were sold or securitized as MBSs would not appear on BoA's balance sheet, the principal consequence for BoA of the issuance of subprime MBSs was felt in the effect of repurchase demands relating to the representations and warranties that BoA (and its legacy entities) made in connection with the sale and securitization of these loans.[4] When loans that should not have been made — because they did not meet the stated underwriting standards, AC ¶¶89-90, 111-114, 121, 155, 168, 231, 305 — went into default, as noted above, purchasers of loans or MBSs composed of such loans began to seek recourse from BoA and make repurchase demands for breach of the representations and warranties that had been given.

Paragraph 86 of the Amended Complaint alleges – and a review of the May 13th letter, which was attached as part of Exhibit A to the Musoff Decl. confirms – that in 2006 and 2007, Countrywide alone had sold MBSs made up of approximately *$118 billion of subprime mortgages*. Musoff Decl., Ex. A, May 13th letter, p. 7, response to question 15. An examination of the same response in the May 13th letter further reveals that another entity BoA had acquired before the start of the class period – Merrill Lynch, AC ¶34 – had also issued approximately *$57 billion* in subprime MBSs, and that BoA itself had issued an additional *$6 billion* in subprime

---

[4] The issuance of these subprime MBSs did have an impact on BoA's financial statements in terms of the income stream that BoA expected to earn from continuing to service the loans after they were sold. BoA would calculate the likely stream of income it would earn from charging for mortgage servicing and recognized the present value of this income stream as mortgage servicing rights ("MSR") on its income statement. AC ¶84. Once these subprime loans began to go into default, which large numbers did, the MSR associated with those loans was significantly reduced. AC ¶¶125-126, 173-174.

MBSs.  Thus, between these three entities, BoA had issued or assumed responsibility for approximately ***$181 billion*** in MBSs composed of subprime mortgage loans in 2006 and 2007. AC ¶305.

The confidential admission to the FCIC in the May 13th letter of the ***magnitude*** of the securitization of subprime mortgages in 2006 and 2007 was not publicly disclosed at that time. AC ¶¶86, 221-222, 305.  When considered in conjunction with the Amended Complaint's allegations that, contrary to the representations and warranties issued in connection with the sale of the subprime MBSs, massive quantities of these subprime mortgage loans did not meet the underwriting standards cited in the MBS offering documents, *see* AC ¶¶89-90, 111-112, 121, 168, 231, 305, the May 13th letter links Moynihan to knowledge that BoA faced repurchase claims that were far larger than what Defendants had disclosed to the public during the class period.

Moreover, when viewed in the context of other relevant allegations, *see Ambac*, 2009 WL 734073 at *2, the admissions in the May 13th letter served to underscore "[t]he harmful consequences of the overemphasis" by BoA and its legacy entities "on generating inventory for securitization rather than on making prudent lending decisions," as alleged in paragraph 86 of the Amended Complaint.[5]

The nexus between the allegations in AC ¶86 (regarding BoA's overemphasis on generating mortgage inventory for securitization rather than on making prudent lending

---

[5]  This is *not* to say that Defendants made absolutely no disclosure of demands arising from the breaches of representations and warranties.  However, Defendants' class period statements consistently failed to disclose that the standard underwriting practices of legacy Countrywide, Merrill Lynch and BoA violated these representations and warranties issued in connection with the securitization of MBSs, AC ¶¶112-116, and that the total amount of guarantees issued to cover these defective MBSs was far greater than Defendants had suggested by their piecemeal disclosures.

decisions) and the failure to disclose the true magnitude of the exposure to repurchase demands, *see* AC ¶305, may be seen in reviewing other allegations in the Amended Complaint that place these allegations into perspective.  For example:

11.  During and prior to the Class Period, BAC and its legacy entities were in the business of lending money for residential home purchases and then packaging these mortgage loans into MBS, which they sold to investors.  ***To sell MBS to investors, BAC and its legacy entities made a series of representations and warranties about these loans*** and, inter alia, the validity of the title of the promissory notes and mortgages that made up these mortgage-backed securities. Over the course of a few years, BAC and its legacy entities had together sold trillions of dollars of MBS to investors.

* * *

14.  ***Defendants knew, but failed to disclose, that these improper lending practices resulted in mortgage loans that were structurally unsound when issued during the years from 2004 through 2007 to a record numbers of borrowers***, in complete disregard of BAC's duty to reasonably evaluate the risks of default and the unavailability of foreclosure. ***Many of these borrowers would have never qualified for their mortgages if the Company and its legacy entities had engaged in appropriate underwriting.  Defendants watched in "real-time" as the extraordinary default rates on these mortgages exacerbated BAC's foreclosure woes and (1) exposed BAC to billions of dollars in MBS repurchase claims from MBS investors based on BAC's untrue representations and warranties in the original sale of the MBS . . . .***

* * *

19.  Before and throughout the Class Period, ***many of the purchasers of MBS did so in reliance upon the representations and warranties that BAC and its legacy entities had made about the quality and title of the underlying loans discovered that the loans were not nearly as safe as the Company had represented and that there were problems in foreclosing on the mortgages. These MBS purchasers began to complain to the Company about its representations and warranties and to threaten legal action*** if the Company did not repurchase the mortgage loans. As discussed herein, ***each of the Executive Defendants . . . . were aware of these so called "repurchase demands" and intentionally concealed the risks they posed to BAC, its earnings, and other financial results.***

* * *

87.  The securitization process did not allow for the transfer of all the risks of loss, however, since ***BAC was responsible for guarantees, in the form of***

12

*recourse obligations upon violation of representations and warranties, given to investors of mortgage-backed securities as terms of MBS transactions* . . . .

* * *

89.     In each MBS composed of loans originated by BAC or its legacy entities, ***BAC as the seller provided (or in the case of prior sales by the Company's legacy entities, BAC assumed liability for) representations and warranties to induce investors to purchase these securities subject to recourse guarantees.  These representations encompassed compliance with the underwriting standards and guidelines used to originate the mortgages comprising the securities,*** the nature of the appraisals used to determine the value of the underlying properties, the mortgages' loan-to-value ("LTV") ratios, and other facts material to the investment decisions of purchasers of mortgage-backed securities.

90.     ***The representations and warranties given by BAC and its legacy entities played a  crucial role in the sale of MBS.  Typical representations and warranties assured buyers that the loans being packaged complied with underwriting standards and met certain criteria relevant to the riskiness of the loan***, such as the borrower's creditworthiness, the LTV ratio in the mortgaged property, and the ratio of the borrower's total indebtedness to income or assets, and whether the loans were for the purchase of owner-occupied residences. BAC and its legacy entities has received, and paid billions on, claims for breach of these representations and warranties.

* * *

93.     ***The MBS agreements provided that if the representations and warranties were not accurate, then the purchasers may demand the rescissionary remedy*** that BAC either (a) buy back the mortgage-backed securities and refund the purchase price to the investors, or (b) make settlement payments to the purchasers to otherwise indemnify them.

(Emphasis added.)

Thus, Defendant Moynihan's knowledge of the facts set forth in paragraph 86 of the

Amended Complaint (corresponding to paragraph 101 of the Original Complaint, which the

Court considered on Defendants' original motion to dismiss), together with the other allegations

quoted above, demonstrates that Defendant Moynihan knew: (1) BoA and its legacy entities –

Countrywide and Merrill Lynch – had originated billions upon billions of dollars of subprime

mortgage loans; (2) these entities had proceeded to package and sell these loans in MBSs; (3) an

13

integral part of selling these MBSs was issuing representations and warranties, including that the loans being packaged complied with underwriting standards and met certain criteria relevant to the riskiness of the loan; (4) but the reality was that the underwriting practices had ignored these standards and instead originated massive amounts of risky loans that now were in default; and (5) as a result, BoA faced massive repurchase demands from MBS purchasers for breach of the representations and warranties made in the securitization of these subprime MBSs far greater than Defendants publicly disclosed during the class period.

This Court found these allegations sufficient in sustaining BoA's scienter in reliance upon ¶101 of the Original Complaint, *Pa. Pub. Sch. Emps' Ret. Sys. v. Bank of Am. Corp.*, 874 F.Supp.2d at 363-64. The Amended Complaint then added facts demonstrating that the May 13th letter was written (a) in response to questions posed in a letter addressed directly to Defendant Moynihan (b) after being cautioned that the responses would constitute a continuation of his testimony under the same oath he took before testifying and (c) be subject to penalty under 18 U.S.C. §1001, and (d) Defendant Moynihan made public statements inconsistent with this information. Viewed holistically, as required by *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 326 (2007), this was clearly sufficient to plead Defendant Moynihan's scienter under Section 10(b) of the Exchange Act.

## III.   The Information Confidentially Disclosed in the May 13th Letter to the FCIC Was Not Already Known in the Financial Market

Going beyond his challenge to the Court's scienter determination, Moynihan also argues that regardless of his scienter, there is nothing in the May 13th letter that contradicted any of his public statements. This argument was fully considered and properly rejected by the Court in ruling upon the earlier motion to dismiss filed by the Executive Defendants, including Defendant

14

Moynihan.  *Pa. Pub. Sch. Emps' Ret. Sys. v. Bank of Am. Corp.*, 2013 WL 1664696 at *4.  But even if this Court elected to revisit the matter again, this argument is still mistaken.

Both the Original and Amended Complaints alleged – and Defendant Moynihan cannot deny – that, at BoA's request, the correspondence with the FCIC was treated as confidential and not disclosed to the public until the conclusion of the FCIC's investigation after the close of the class period.  OC ¶101; AC ¶86.  Nevertheless, Defendant Moynihan attempts to downplay the significance of the disclosures in the May 13th letter by asserting that "the basic information contained in the FCIC Letter was disclosed by [BoA] and well-known in the market."  Moynihan Mem. at 10.  A review of the facts confidentially disclosed to the FCIC in the May 13th letter reveals otherwise.

In the May 13th letter, the answer to question 15 states that BoA, Merrill and Countrywide in the aggregate issued and securitized $181 billion in subprime mortgage loans.  Moynihan cannot point to the Defendants' making a public disclosure of this *magnitude* of BoA's exposure to subprime loans.  *See, e.g.,* AC ¶¶302, 305.  Instead, without any citation to authority, Moynihan attempts to excuse his failure to share with the public this critical confidential disclosure he made to the FCIC, arguing that "[t]he FCIC letter merely gives *further metrics* on the change in retained value of these mortgages over a four-year period and recounts information relating to delinquency rates unsurprising to anyone familiar with the market-wide housing collapse."  Moynihan Mem. at 10 (emphasis added).

Of course, quantifiable information demonstrating the *magnitude* of BoA's securitization of nonperforming subprime loans, with its concomitant exposure to the claims of disgruntled investors and monoline insurers who relied upon representations and warranties concerning the underwriting of these loans, constitutes a textbook example of the sort of information that is

material to investors, particularly when Defendant Moynihan is at the same time assuring the public that "the worst of the crisis is behind us."  AC ¶¶245, 301(b)(ii).  As Judge Stein recently explained in sustaining a Section 11 claim, even though defendants had made some disclosures concerning the company's exposures to subprime-backed CDOs, "defendants' statements regarding Citigroup's exposure to subprime-backed CDOs" were materially untrue or misleading and actionable "because they failed to disclose *the full extent* of the risk Citigroup faced." *In re Citigroup Inc. Bond Litig.*, 723 F.Supp.2d 568, 589 (S.D.N.Y. 2010) (emphasis added); *see In re Moneygram Int'l, Inc. Sec. Litig.*, 626 F.Supp.2d 947, 977 (D. Minn. 2009) ("failure to disclose more detailed information" about company's investment portfolio's "content and exposure to the subprime and Alt-A market . . . may have misled a reasonable investor").

Moreover, while Defendant Moynihan may still harbor the hope that "[t]here are any number of more compelling opposing inferences to be drawn from the FCIC Letter, each of which supports dismissal of the Repurchase Claims allegations against Moynihan," *Id*. at 12, plaintiff is not required to plead facts establishing that defendants' scienter is the *only* possible inference; just that it is *at least as likely* as any contrary non-fraudulent inference. *Tellabs,* 551 U.S. at 323-324; *Slayton v. American Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010);  *In re Smith Barney Transfer Agent Litig.*, 765 F.Supp. 2d 391, 402 (S.D.N.Y. 2011) (Pauley, J.).

With this knowledge about the 2006 and 2007 securitizations of subprime mortgages and the magnitude of the resulting problems, which they confidentially disclosed to the FCIC, the Executive Defendants made contradictory public statements.  Examples of this include Defendant Moynihan's public assurance in an April 16, 2010 conference call that "legacy asset write-downs [are] now down to an immaterial amount, and . . . *the worst of the crisis is behind us,*" AC ¶¶245, 301(b)(ii) (emphasis added), and the Executive Defendants'  ongoing failure to

16

disclose this information in various public statements, including the quarterly 10-Q report filed

with the SEC in August 2010.

**IV.    Even if the Court Were to Disregard the Allegations Concerning the May 13th Letter, Defendant Moynihan Would Remain a Defendant on Both the Section 10(b) and Section 20(a) Claims Arising from the Repurchase Claims**

While Defendant Moynihan asks the Court to disregard the allegations concerning the

May 13th letter, he has conceded that he would remain a defendant in this action on both the

Section 10(b) and Section 20(a) claims regardless of the Court's disposition of his current

motion.  Moynihan Mem. at 5.  However, his acknowledgement that the Amended Complaint

properly states a claim for violation of GAAP (including FAS 5) and SEC regulations (including

Regulation S-K), skillfully omits the fact that these accounting claims implicate the same

repurchase demands, based on alleged violations of representations and warranties, that are

implicated by the May 13th letter.  *See* discussion *supra* at 3-5, 9-11.  Accordingly, if scienter is

properly alleged for the accounting claims, it is property alleged for any claim relating to the

repurchase demands.

**CONCLUSION**

Defendant Moynihan's motion for "partial reconsideration" is improper and should be

rejected.  In the event the Court considers it, it is clear that the Amended Complaint properly

pleads Defendant Moynihan's scienter based, among other things, upon the contents of the May

13th letter, when examined in the context of the other relevant allegations.  Defendant

223595

Moynihan's motion should be denied, and any further exploration of the issue of his scienter should be left for the discovery process, which should commence without delay.

Dated:  May 20, 2013                     Respectfully submitted,

                                         **BARRACK, RODOS & BACINE**
                                         A. Arnold Gershon
                                         William J. Ban
                                         Michael A. Toomey
                                         425 Park Avenue, 31st Floor
                                         New York, NY 10022
                                         Telephone: (212) 688-0782
                                         Facsimile: (212) 688-0783

                                                 -and-

                                         **BARRACK, RODOS & BACINE**


                                         By: /s/ Mark R. Rosen
                                         Leonard Barrack
                                         Mark R. Rosen
                                         Jeffrey A. Barrack
                                         Jeffrey B. Gittleman
                                         Chad A. Carder
                                         Julie B. Palley
                                         3300 Two Commerce Square
                                         2001 Market Street
                                         Philadelphia, PA 19103
                                         Telephone: (215) 963-0600
                                         Fax: (215) 963-0838

                                         *Attorneys for Lead Plaintiff*
                                         *Pennsylvania Public School Employees'*
                                         *Retirement System and Lead Counsel*
                                         *for the Class*

223595

Michele Ferencz
Chief Counsel
Steven Skoff
Assistant Counsel
Pennsylvania Public School Employees'
    Retirement System
5 North Fifth Street, 5th Floor
Harrisburg, PA  17101
Telephone:  (717) 720-4912
Fax:  (717) 783-8010

Sarah Yerger
Senior Deputy Attorney General
Civil Litigation Section
Office of Attorney General
15th Floor Strawberry Square
Harrisburg, PA  17120
Telephone:  (717) 705-2503
Fax:  (717) 772-4526

*Attorneys for Lead Plaintiff*
*Pennsylvania Public School Employees'*
*Retirement System*

19