# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| PENNSYLVANIA PUBLIC SCHOOL EMPLOYEES' RETIREMENT SYSTEM, individually and on behalf of all others similarly situated, | : : : : : | CIVIL ACTION NO. 11-CV-00733-WHP |
| Plaintiff, | : : | |
| v. | : : | CLASS ACTION |
| BANK OF AMERICA CORPORATION, et al., | : : : | |
| Defendants. | : : | |

**DECLARATION OF JEFFREY W. GOLAN IN SUPPORT OF
LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

I, Jeffrey W. Golan, declare as follows:

1.      I am a member of the law firm, Barrack, Rodos & Bacine, the Lead Counsel and counsel for the Lead Plaintiff (hereafter "Plaintiff") in this action.  I make this Declaration in support of Plaintiff's motion for class certification.

2.      The statements herein pertain to Plaintiff's assertion that the market for Bank of America Corporation ("Bank of America," "BofA" or the "Company") common stock ("Bank of America Common Stock" or "Common Stock" or "CS") and common equivalent securities ("Common Equivalent Securities" or "CES") was efficient during the Class Period.[1]  It is intended to supplement Defendants' position that they "do not contest the efficiency of the market for Bank of America CS and CES during the Class Period with respect to Lead Plaintiff's

---

[1] The proposed Class Period identified in the Amended Consolidated Class Action Complaint ("Complaint") is from February 27, 2009 through and including October 19, 2010.  Complaint at ¶ 1.

motion for class certification." *See* Joint Status Report Concerning Class Certification and Document Discovery, filed October 31, 2013, at ¶ 3.b [Docket No. 239].

## I.   OVERVIEW OF BANK OF AMERICA

3.     Bank of America is a bank holding company and a financial holding company that provides financial services and products in three business segments: "Global Consumer and Small Business Banking," "Global Corporate and Investment Banking" and "Global Wealth and Investment Management."[2] Prior to the Class Period, on January 1, 2009, Bank of America acquired Merrill Lynch.[3] In 2008, Global Consumer and Small Business Banking accounted for over $58 billion of revenue, Global Corporate and Investment Banking accounted for over $13 billion of revenue and Global Wealth and Investment Management accounted for nearly $8 billion in revenue.[4] For the year 2009, Deposits accounted for $14 billion of revenue, Global Card Services accounted for over $29 billion of revenue, Home Loans & Insurance accounted for approximately $17 billion, Global Banking accounted for over $23 billion, Global Markets accounted for over $20 billion, and Global Wealth and Investment Management accounted for nearly $18 billion in revenue.[5] At years' end 2008-2010, Bank of America held $1.8 trillion, $2.2 trillion and $2.3 trillion in assets, respectively, and had a retail banking footprint covering approximately 80% of the U.S. population.[6] Additionally, annual mortgage banking income was $4.4 billion, $9.3 billion and $3.1 billion, in 2008, 2009 and 2010 respectively.[7]

---

[2] 2008 Bank of America Corp. SEC Form 10-K, p. 1.

[3] 2009 Bank of America Corp. SEC Form 10-K, p. 1.

[4] 2008 Bank of America Corp. SEC Form 10-K, p. 13.

[5] 2009 Bank of America Corp. SEC Form 10-K, p. 19.

[6] 2008 Bank of America Corp. SEC Form 10-K, p. 1; 2009 Bank of America Corp. SEC Form 10-K, p. 16; 2010 Bank of America Corp. SEC Form 10-K, p. 24.

[7] 2009 Bank of America Corp. SEC Form 10-K, p. 43; 2010 Bank of America Corp. SEC Form 10-K, p. 35.

## II.      DISCUSSION OF RELIANCE REQUIREMENT

4.      Class members' reliance on the alleged misstatements and omissions is an element of Plaintiff's claims.  Plaintiff asserts the "fraud on the market" theory of reliance in this matter. The "fraud on the market" theory posits that in an efficient market (one in which widely-available public information is rapidly incorporated into the market price), purchasers implicitly rely on any material misrepresentations or omissions since the value of those misrepresentations or omissions is incorporated into each class member's purchase price.  The "fraud on the market" theory was first addressed by the United States Supreme Court in *Basic v. Levinson*:

> In an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business .... Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements .... The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.[8]

5.      As indicated in *Basic*, in an open, developed and efficient market, market prices reflect what is known about a company.  If a company provides the market with misleading information overstating its financial strength or business practices, the market price will be inflated compared to what the price would have been if the truth were known (but for the misleading information).  Thus, in an efficient market where the plaintiff proves there were material misrepresentations, all purchasers implicitly relied on those misrepresentations.

6.      The Nobel Prize winning economist Dr. Eugene Fama, in his seminal research, first outlined definitions of an "efficient market."[9]  He described different levels of efficiency which he called "weak form," "semi-strong form" and "strong form" efficiency.[10]

---

[8] *Basic v. Levinson*, 485 U.S. 224, 240 (1988).

[9] Eugene Fama, "Efficient Capital Markets: A Review of Theory and Empirical Work," *Journal of Finance,* Vol. 25, 1970, p. 383.

7.     The market efficiency standard adopted by *Basic* as necessary for the presumption of reliance conforms to Dr. Fama's "semi-strong form" efficiency. "Semi-strong form" efficiency means that all public information is reflected in a stock's current market price. This implies that security prices adjust to new publicly available information rapidly and in an unbiased fashion so that it is impossible to earn excess returns by trading on that information. *Basic* stated: "In an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business."[11]

## III.   *CAMMER* FACTORS

8.     In *Cammer v. Bloom*, the court identified the following factors as relevant to the determination of whether an efficient market exists for a given security: (1) average weekly trading volume; (2) analyst coverage; (3) market makers; (4) SEC Form S-3 eligibility; and (5) price reaction to unexpected information.[12] Courts in the Southern District of New York and elsewhere have generally followed *Cammer*'s consideration of these factors.[13]

---

[10] "Weak form" efficiency requires that historical prices are not predictive of future prices. Under this form of efficiency, excess returns cannot be earned using strategies based on historical prices. Therefore, technical analysis will not produce consistent excess returns over time. "Semi-strong form" efficiency implies that all public information is reflected in a stock's current market price. Security prices adjust to new publicly available information rapidly and in an unbiased fashion so that it is impossible to earn excess returns by trading on that information. Under this form of efficiency, neither fundamental nor technical analysis can produce consistent excess returns. "Strong form" efficiency implies all information in the market, whether public or private, is accounted for in the market price. In this market, investors cannot consistently earn excess returns over a long period of time even if they have inside information. *Id.* at 383, 388, 414.

[11] *Basic v. Levinson*, 485 U.S. at 240.

[12] *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989).

[13] *See, e.g., In re Dynex Capital Sec. Litig.*, 05 Civ. 1897 (HB), 2011 U.S. Dist. LEXIS 22484, at *11 (S.D.N.Y. Mar. 7, 2011) (citing *Teamsters Local 445 v. Bombardier*, 546 F.3d 196, 204 n.11, 210-11 (2d Cir. 2008)); *In re Pfizer Sec. Litig.*, 282 F.R.D. 38, 53 n.9 (S.D.N.Y. 2012); *Wilkof v. Caraco Pharm. Labs., Ltd.*, 280 F.R.D. 332, 342-43 (E.D. Mich. 2012); *In re Juniper Networks Sec. Litig.*, 264 F.R.D. 584, 591 n.8 (N.D. Cal. 2009).

## IV.   APPLICATION OF THE *CAMMER* FACTORS TO BANK OF AMERICA COMMON STOCK AND COMMON EQUIVALENT SECURITIES

9.     **Exhibit 1** displays the Common Stock closing price and trading volume for each day throughout the Class Period.

10.    On December 4, 2009, Bank of America issued 1.286 billion CES for a total market value of $19.29 billion. In its Prospectus Supplement dated December 4, 2009,[14] Bank of America stated that it intended to hold a special meeting of its stockholders within 105 days of the offering to seek stockholder approval to amend BofA's certificate of incorporation to increase its authorized common shares to at least accommodate the 1-for-1 conversion of the CES to Common Stock.[15] On February 23, 2010, Bank of America announced that stockholders voted to approve the amendment. On February 24, 2010, effective at 9:30 a.m., the Common Equivalent Securities automatically converted to BofA Common Stock on a 1-for-1 basis.

11.    In the three months prior to this conversion, the market appears to have considered each share of CES as effectively equivalent to one share of BofA Common Stock.  The holders of CES were afforded at least the same privileges as holders of BofA Common Stock in terms of voting rights, dividends and liquidation ranking. In particular: (1) CES shareholders were entitled to vote on an as-converted basis (i.e., a 1-for-1 basis where one share of CES holds the same voting power as one share of Common) on all matters except on the amendment to increase BofA's authorized Common Stock; (2) CES shareholders were entitled to dividends, payable 1-for-1 with Common Stock; and (3) CES ranked junior to all other preferred stocks but senior to Common Stock.[16]

---

[14] Bank of America Prospectus Supplement to Prospectus dated April 20, 2009 ("Prospectus Supplement").

[15] As noted in paragraph 128 of the Complaint, at the time of its CES offering, Bank of America had 8.7 billion common shares outstanding and approximately 1 billion reserved for convertibles, warrants and other uses.

[16] Prospectus Supplement.

12.    Accordingly, the market prices of the CES closely tracked the market prices of the Common Stock, as shown in **Exhibit 2**. While the closing price of the Common Stock was generally slightly higher than the closing price of the CES, the difference in the closing prices converged toward zero leading up to the exchange of the CES for Common Stock. The average absolute value of the difference in the closing price of the two securities is $0.11, $0.06 and $0.03, in December 2009, January 2010 and February 2010, respectively. Further, as calculated by Plaintiff's financial consultant, the correlation coefficient of the closing prices is 0.9966, indicating a nearly perfect positive relationship in the changes in the closing price for CES and Common Stock, which is a further indication that the markets for both Common Stock and the CES were efficient.

13.    In summary fashion, as discussed more fully below, each of the *Cammer* factors supports that Bank of America Common Stock and CES traded in an efficient market. First, the average weekly trading volume of the Common Stock and CES during the Class Period far exceeded benchmarks that *Cammer* established. During the Class Period, the average daily trade volume for the Common Stock was approximately 258.9 million shares, the average daily trading volume for the CES was 18.7 million units, and their average weekly trading percentages were far above the threshold set in *Cammer* for a strong presumption of efficiency. Second, there were a large number of securities analysts following and reporting on Bank of America. Third, both the Common Stock and CES were traded actively on the NYSE, fulfilling the *Cammer* factor regarding market makers. Fourth, the Company was eligible to file Form S-3 during the Class Period because Bank of America had previously provided sufficiently high levels of public information to the market in its SEC filings. Fifth, there was a strong cause and effect relationship between new Company-specific information and the market prices of Common

Stock (and, by implication, CES) during the Class Period. These factors all support the conclusion that Bank of America Common Stock and Common Equivalent Securities traded in an open, developed, and efficient market throughout the Class Period.

### A.   *CAMMER* FACTOR 1: AVERAGE WEEKLY TRADING VOLUME

14.   The first *Cammer* factor is the average weekly trading volume of a security. According to one authority cited by the *Cammer* court:

> [T]urnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for a security is an efficient one; 1% would justify a substantial presumption.[17]

15.   High volume is generally indicative of continuity, liquidity, and market depth – which are highly suggestive of market efficiency.[18] As Thomas and Cotter explain, "[t]rading volume was also considered as an eligibility standard because it affects information dissemination to the market, and was an important criterion for investment analysts in deciding which stocks to follow."[19]

16.   Bank of America Common Stock easily surpasses the threshold level of average weekly trading volume indicative of an efficient market.  The average weekly turnover for the Common Stock was 15.94%.[20] Indeed, the average *daily* volume during the Class Period was 258.9 million shares.

---

[17] *Cammer v. Bloom*, 711 F. Supp. at 1293.(citing Bromberg, et al.).

[18] *See* William F. Sharpe, Gordon J. Alexander, and Jeffery V. Bailey, *Investments*, Prentice Hall, Fifth Edition, 1995, pp. 44-45; Bromberg & Lowenfels, Securities Fraud and Commodities Fraud, § 8.6 (Aug. 1988) as cited by *Cammer*, 711 F. Supp. at 1276; Yakov Amihud, Haim Mendelson and Lasse Heje Pedersen, 2006, "Liquidity and Asset Prices," *Foundations and Trends in Finance* Vol. 1(4) pp. 269-364.

[19] Randall S.  Thomas and James F. Cotter, "Measuring Securities Market Efficiency in the Regulatory Setting." *Law and Contemporary Problems,* Vol. 63, p. 108.

[20] The precise figures herein were calculated and supplied by Plaintiff's financial consultant.  For the purposes of this analysis, a "trading week" consists of 5 consecutive trading days (which may not follow the calendar week).

17.    Likewise, trading of Common Equivalent Securities easily surpasses the threshold level of average weekly trading volume indicative of an efficient market. The average weekly turnover for the CES was 7.17%. The average daily volume of the CES during the Class Period was 18.7 million shares, which similarly represents a very large quantity of shares trading hands.

18.    The volume of trading for the Common Stock and CES thus supports the conclusion that the market for these securities was efficient throughout the Class Period.

## B.    *CAMMER* FACTOR 2: ANALYST COVERAGE

19.    The *Cammer* decision stated the following related to analyst coverage:

> … it would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period. The existence of such analysts would imply, for example, the [auditor] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors.[21]

20.    Analyst coverage has also been found to provide confirmatory evidence of efficiency. Significant analyst coverage implies that there is sufficient interest in a company and its securities, that there is an active market for information regarding the company and its securities, and that the information is widely distributed.

21.    During the Class Period, there was an abundance of analyst coverage of Bank of America. **Exhibit 3** shows that there were at least 238 analyst reports issued during the Class Period by 19 separate equity analysts for Bank of America.[22] Major firms such as Credit Suisse, JP Morgan and Morgan Stanley issued analyst reports on Bank of America. These reports served the purpose of disseminating publicly available information along with commentary, news, updates, analysis and recommendations of the analysts to investors. In addition, there were

---

[21] *Cammer v. Bloom*, 711 F. Supp. at 1286.

[22] This almost certainly understates the total amount of analyst coverage since many analyst reports are not available through third party data providers.

8

reports by credit rating agencies and others that evaluated Bank of America's creditworthiness and other publicly-traded securities. Under *Cammer,* the extensive coverage of Bank of America by securities analysts provides support for the conclusion that BofA Common Stock and CES traded in an efficient market throughout the Class Period.

22.   In addition to the substantial analyst coverage of Bank of America, there were many other sources of information dissemination. For example, there was substantial public press regarding Bank of America.  A search for articles classified as related to Bank of America by Factiva over the Class Period results in thousands of articles. There were 153 SEC filings that are available online at EDGAR at no out-of-pocket cost.[23] This degree of news coverage and publicly available information further supports that there was substantial supply and demand for information regarding Bank of America in the public arena throughout the Class Period.

23.   Finally, related to the above-described large trading volumes and extensive analyst and press coverage, a review of public sources reveals that institutional investors held well over a majority of all Bank of America Common Stock during the Class Period.  These investors include mutual funds, pension funds, investment banks and other types of large financial institutions.  Most institutions that hold over $100 million in assets are required to report their equity holdings on a quarterly basis on SEC Form 13F.[24]  As **Exhibit 4** shows, for the quarter ending dates from December 31, 2008 through December 31, 2010 (which includes the entire Class Period), institutions held, on average, 63.2% of the shares of outstanding Common Stock. This high level of institutional ownership of Bank of America Common Stock during the Class

---

[23] This excludes SEC Forms 3, 4 and 5, which relate only to equity ownership by directors, officers, and owners of more than ten percent of a class of the Company's equity.

[24] See http://www.sec.gov/about/forms/form13f.pdf.

Period, coupled with the high trading volumes and analyst and press coverage, further supports a conclusion of market efficiency.

### C.   *CAMMER* FACTOR 3: MARKET MAKERS

24.   The third *Cammer* factor states:

> For over the counter markets without volume reporting, the number of market makers is probably the best single criterion. Ten market makers for a security would justify a substantial presumption that the market for the security is an efficient one; five market makers would justify a more modest presumption.[25]

25.   Throughout the Class Period, BofA Common Stock and Common Equivalent Securities traded on the NYSE, which is a more advanced and efficient market than an over-the-counter market described for this *Cammer* factor. The NYSE is one of the largest and most liquid security exchanges in the world with billions of shares traded each day, and many courts, including in the Second Circuit, have found that trading on the NYSE creates a powerful presumption that a security trades in an efficient market.[26]

26.   Rather than having decentralized market makers providing liquidity for trading (which was the case for the security at issue in *Cammer*), the NYSE conducts trading on a continuous auction system where an assigned specialist is physically present at all times during

---

[25] *Cammer v. Bloom*, 711 F. Supp. at 1293.

[26] *See, e.g., Wagner v. Barrick Gold Corp.*, 251 F.R.D. 112, 119 (S.D.N.Y. 2008) ("if a security is listed on the NYSE ... or a similar national market, the market for that security is presumed to be efficient") (internal quotation omitted); *Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 183 (S.D.N.Y. 2008) ("no argument could be made that the New York Stock Exchange is not an efficient market"); *In re DVI Inc. Sec. Litig.*, 639 F.3d 623, 634 (3d Cir. 2011) ("[T]he listing of a security on a major exchange such as the NYSE or the NASDAQ weighs in favor of a finding of market efficiency"). Moreover, in *In re Bank of America Corp. Sec, Derivative and Emp. Ret. Income Security Act (ERISA) Litig.*, 281 F.R.D. 134 (S.D.N.Y. 2012), the court certified a class of Bank of America stock purchasers from September 18, 2008 through January 21, 2009, finding that BofA Common Stock traded in an efficient market during that time. 281 F.R.D. at 142-44. This finding by Judge Castel lends further support that BofA Common Stock and CES traded in an efficient market during the Class Period in the present action, which is February 27, 2009 through October 19, 2010.

open trading.[27]  These "specialists" are required by exchange rules to maintain a "fair and orderly" market and to take the other side of a trade even if it means having to buy or sell from their own accounts.[28]

27.     Thus, the NYSE has a market structure that combines both an auction system and electronic trading and does not rely on the less efficient mechanism of decentralized market makers to provide liquidity. Therefore, Bank of America Common Stock and CES, by virtue of trading on the NYSE, as well as the more than 450 firms that brokered Bank of America securities,[29] easily meet this *Cammer* factor throughout the Class Period.

### D.     *CAMMER* FACTOR 4: SEC FORM S-3 ELIGIBILITY

28.     The fourth *Cammer* Factor is SEC Form S-3 Eligibility, which states,

> It would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met.  Again, it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency.[30]

29.     Through Form S-3, the SEC allows certain companies that have previously provided sufficiently high levels of public information to incorporate prior SEC filings by reference into current filings and not repeat the information, since it is already deemed to be widely publicly available.[31] In order to be eligible to issue a Form S-3, among other things, a company (1) must be subject to the Securities Exchange Act of 1934 reporting requirements for

---

[27] William F. Sharpe, Gordon J. Alexander, Jeffery V. Bailey, *Investments*, Prentice Hall, Fifth Edition, 1995, pp. 45-53.  Frank J. Fabozzi, Franco Modigliani, Frank J. Jones, *Foundations of Financial Markets and Institutions*, Prentice Hall, Fourth Edition, 2010, Chapter 18 – Appendix A.

[28] Frank J. Fabozzi, Franco Modigliani, Frank J. Jones, *Foundations of Financial Markets and Institutions*, Prentice Hall, Fourth Edition, 2010, Chapter 18 – Appendix A.

[29] Data derived from information obtained through Bloomberg.

[30] *Cammer v. Bloom*, 711 F. Supp. at 1287.

[31] For additional information, see www.sec.gov/about/forms/forms-3.pdf.

11

more than one year, (2) must have filed all documents in a timely manner for the past twelve months, and (3) must show that it has not failed to pay dividends or sinking funds nor defaulted on debts or material leases.

30.    Bank of America was S-3 eligible and, in fact, filed a Form S-3ASR during the Class Period, which is an automatic shelf registration statement for use by well-known seasoned issuers.[32] A Form S-3ASR allows a company to register unspecified amounts of different specified types of securities using a single form.

31.    Therefore, Bank of America meets this *Cammer* factor.

**E.     *CAMMER* FACTOR 5: PRICE REACTION TO NEW INFORMATION**

32.    The fifth *Cammer* factor relates to how the price of a security reacts to new information and states:

> …one of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price.[33]

33.    As noted previously, for purposes of the class motion, Defendants do not contest that the market for Bank of America CS and CES was efficient throughout the Class Period.

34.    Absent Defendants' position, Plaintiff would have submitted an event study from an expert in the field of finance to establish a causal connection between new company-specific news events and movements in the market price.

35.    However, even without a formal event study, observations about the reactions of Band of America CS and CES to new, material information also fully support Plaintiff's allegation – not contested by Defendants for purposes of the class motion – that Bank of America Common Stock and Common Equivalent Securities (given its high correlation with Common

---

[32] Bank of America Corp. SEC Form S-3ASR dated April 20, 2009.

[33] *Cammer v. Bloom*, 711 F. Supp. at 1291.

Stock price movements during the three months it was outstanding) traded in an efficient market throughout the Class Period.

36.     This is shown clearly by examining a series of BofA Common Stock movements to news events, while factoring out other market and industry factors.  Examples of this include the following:

37.     **March 9, 2009.** On the morning of March 9, 2009, news reached the market that Bank of America was planning to sell debt due in September 2010 and June 2012 through the Federal Deposit Insurance Corporation's Temporary Liquidity Guarantee Program.[34] In addition, before the market open, Barron's published an article which positively highlighted that BofA believed it could reach its tangible equity goals in order to avoid a situation like Citigroup's, in which common shares were diluted.[35]

38.     As further noted in ¶40, *infra,* this information appears to have been interpreted positively as signaling to the market a path of recovery for Bank of America that might not harm shareholders as much as the market saw with Citigroup. Especially taken together, these stories painted a picture of Bank of America having positive expectations for 2009.

39.     Indeed, the return on this day, after controlling for general market and industry effects, was 13.67%, which was statistically significant at the 95% confidence level.[36]

40.     Contemporaneous commentary attributed the reaction to the news as well. For example, one summary of market movers from the morning of March 9 ties the large positive movement in BofA's stock price to the news:

---

[34] "Bank of America to Sell FDIC-Guaranteed Debt Due in 2010, 2012," *Bloomberg News,* March 9, 2009.

[35] "BAC: Bank of America mentioned positively in Barron's," *Wire: Briefing.com,* March 9, 2009.

[36] The precise figures and findings of statistical significant herein were calculated and supplied by Plaintiff's financial consultant based on the consultant's analysis of the trading market for Bank of America Common Stock over the course of the Class Period, the Common Stock's average volatility in the time periods surrounding the identified events, and appropriate general market and industry benchmarks.

Bank of America Corp. (BAC US) rose the most in the Dow Jones Industrial Average, gaining 16 percent to $3.64. The largest U.S. bank by assets plans to sell debt due in September 2010 and June 2012 that will be backed by the Federal Deposit Insurance Corp., according to a person familiar with the offering.[37]

41.   Thus, the significant company-specific positive price movement on this day was reasonably expectable based on the content of news on this day and contemporary commentary, and therefore provides support that the market for BofA Common Stock was efficient.

42.   **June 11, 2009.** After market hours on June 10, 2009, Morgan Stanley published a research report in which the analysts announced that they were increasing their EPS estimates for 2009 and 2010, citing recent meetings with management and stronger prospects in investment banking and retail brokerage businesses.[38]

43.   The Morgan Stanley analyst report would be expected to be positive news for BofA's stock price. In the report, Morgan Stanley stated:

> We recently met with Brian Moynihan, President of Global Banking and Wealth Management, and Dan Sontag, Head of Retail Brokerage. Our meetings give us higher conviction in the earnings power of the investment bank and wealth management. We are raising our 2009 estimates 9c and 2010 estimates 10c on higher expected fee income in the IB and retail brokerage. 2c higher 09 provisions is a partial offset. [39]

44.   Also, during the day on June 11, 2009, Bank of America CEO Kenneth Lewis testified before a committee of the U.S. House of Representatives that was investigating the role of the government in Bank of America's acquisition of Merrill Lynch.[40] One analyst interviewed by Bloomberg during the day on June 11 stated that Lewis' testimony before Congress was a positive for the stock:

---

[37] "Bank of America, International Game, WMS: U.S. Equity Movers," *Bloomberg News,* March 9, 2009.

[38] "Increasing EPS Estimates on Higher Expected Top Line in the IB and Retail Broker," *Morgan Stanley,* June 10, 2009.

[39] "Increasing EPS Estimates on Higher Expected Top Line in the IB and Retail Broker," *Morgan Stanley,* June 10, 2009.

[40] "Bank of America CEO Cites Possible U.S. Action, Suits on Merrill," *Bloomberg News,* June 11, 2009.

**Q:** Alan, let me just first get your reaction to the testimony here. I'm hearing from some other shareholders, some other investors and they are actually very impressed with Ken Lewis' testimony.

**ALAN VILLALON, ANALYST, FIRST AMERICAN FUNDS:** I'd have to agree with that. I think he had a lot of composure in Capitol Hill today. I think he tried answering the questions to the best of his ability and tried to basically point out the struggles he had in the last several months here, especially during these very tough and troubling times in the recession. So, I think he did a very good job on Capitol Hill today.[41]

45.    Given the positive news, one would expect BofA's stock price to increase.  And the return on June 11, 2009, after removing general market and industry effects, was 8.09%, which was significant at the 95% confidence level, which is further suggestive of an efficient market for Bank of America Common Stock.

46.    **December 3, 2009.** After market hours on December 2, 2009, it was disclosed that Bank of America would repay the balance of the TARP investment of $45 billion, $18.8 billion of which would be raised through the issuance of CES.[42]

47.    The repayment of TARP signaled the removal of a potential overhang on BofA and would be viewed positively by the market. Analysts and news commentators generally hailed the news as a positive for investors in BofA. For instance, a Deutsche Bank report entitled "TARP Repayment Positive, but Costly; Implications on Others," stated that the Company's actions were "a big step in the right direction."[43] Analysts with Collins Stewart similarly wrote under the title "Overhang Relief":

> **BAC announces approval to repay entire $45Bil TARP investment** In a surprise announcement, BAC disclosed that it had received regulatory approval to repay its entire $45Bil TARP investment. As part of the ann., mgmt outlined plans to raise $18.8Bil in common stock over the course of the coming week. While the

---

[41] "First American Funds Analyst Alan Villalon Interviewed Bloomberg," *Congressional Quarterly Transcripts,* June 11, 2009.

[42] "Bank of America to Repay Entire $45 Billion in TARP to U.S. Taxpayers," *PR Newswire,* December 2, 2009.

[43] "TARP Repayment Positive, but Costly; Implications on Others," *Deutsche Bank,* December 2, 2009.

timing of this ann. is unexpected, **that BAC was able to repay 100% of TARP at a much earlier date than anticipated represents a significant positive for the company.** In addition to improving BAC's financial flexibility and strengthening the company's balance sheet, the exit from onerous governmental oversight materially reduces potential challenges in finding a successor for CEO Ken Lewis--all positives in our view.[44]

48.    RBC Capital Markets wrote:

**Repaying TARP.** BofA announced plans to repay its $45.0 billion in TARP funds with $26.2 billion of excess liquidity and $18.8 billion from the issuance of "common equivalent securities". We view this as positive news since it removes a key overhang on the shares and allows BofA to free itself of certain government restrictions including those over compensation, which will likely make it easier to bring in a new CEO and retain talent at Merrill.[45]

49.    Other analysts and news articles referred to the event as "largely positive,"[46] "another step forward,"[47] "an incremental positive,"[48] "positive for the stock,"[49] and "a big positive."[50]

50.    The return for Bank of America Common Stock on December 3, 2009, after removing general market and industry effects, was 3.40%, which was significant at the 95% confidence level, providing further evidence of an efficient market.

51.    **February 17, 2010.** On the morning of February 17, 2010, the SEC disclosed in a court filing that the firing of Bank of America general counsel Timothy Mayopoulos in

---

[44] "Overhang Relief," *Collins Stewart,* December 3, 2009 (emphasis added).

[45] "Raising Capital to Repay TARP Sooner than Expected," *RBC Capital Markets,* December 3, 2009.

[46] "TARP Buyback a Positive, Despite Greater-Than-Expected Cap Raise," *The Buckingham Research Group,* December 3, 2009.

[47] "Small Dilution from Large Cap Raise, Overhang Removed," *JP Morgan,* December 3, 2009.

[48] "Raising Capital and Exiting TARP," *Credit Suisse,* December 3, 2009.

[49] "BAC: Plans to Repay TARP; Share Issuance 4% Accretive-Lower 09E Steps Remove Cloud from Over BAC's Shares," *Wells Fargo,* December 3, 2009.

[50] "Quick Comment: Catalyst #1 Comes Through; TARP Repayment a Big Positive," *Morgan Stanley,* December 3, 2009.

December 2008 was unrelated to any legal advice regarding BofA's eventual acquisition of Merrill Lynch.[51]

52.     This information appeared to contradict another lawsuit against Bank of America that was brought by then New York Attorney General Andrew Cuomo, who had alleged, among other things, that Mayopoulos had been terminated after he learned about Merrill Lynch's losses and advised that BofA disclose them to investors.[52] With the SEC filing contradicting that part of NYAG Cuomo's claims, it would have been reasonable to expect that the market would react positively to this information.

53.     In fact, the return for BofA Common Stock on February 17, 2010, after removing general market and industry effects, was 3.32%, which was significant at the 95% confidence level, further supporting that Bank of America Common Stock traded in an efficient market.[53]

54.     **July 16, 2010.** Prior to the market opening, Bank of America reported its second-quarter earnings which exceeded expectations by $0.03 while revenues missed expectations by $0.95. Credit Suisse summarized the events reported as follows.

> BAC reported 2Q'10 earnings of $3.1 billion or $0.27 which compares to CS EPS estimate of $0.26. Reported earnings included several one-time items that netted to approx. $0.02/shr, as well as a tax benefit of $0.02/shr. While earnings reflected improving credit quality trends and reserve drawdown, top line results were weak. Furthermore, the revenue outlook remains challenging. While CARD Act and Reg E will negatively impact revenues, mgmt sized the potential impact of the Durbin Amendment which is estimated to reduce revenues by an incremental $1.8 to $2.3 billion beginning in 3Q'11.[54]

---

[51] "Ken Lewis Said Mayopoulos' Firing Unrelated to Merrill Deal," *Bloomberg News,* February 17, 2010.

[52] "BofA Counsel Not Fired for Advice: SEC," *Associated Press,* February 17, 2010.

[53] The CES, which were in the market from December 4, 2009 to February 24, 2010, also reacted to the new information on February 17, 2010, increasing in value by the same amount as the Common Stock. *See* Exhibit 2. This further supports that the Common Stock and CES traded in an efficient market.

[54] 2Q'10 Earnings; Credit Quality Improves but Top Line Disappoints," Credit Suisse, July 16, 2010.

55.   This information, headlined by BofA's less-than-expected revenues and a revenue outlook that "remain[ed] challenging," appears to have been viewed as negative by the market.

56.   The return for Bank of America Common Stock on July 16, 2010, after removing general market and industry effects, was a negative 4.83%, which was significant at the 95% confidence level, further supporting that BofA Common Stock traded in an efficient market.

57.   **October 19, 2010.** Prior to the market open, Bank of America held a conference call with analysts to discuss its third quarter 2010 results. While earnings exceeded expectations, Bank of America highlighted areas of investor concern, including a potential $47 billion loan put-back. An analyst at Wells Fargo summarized the BofA announcement as follows:

> **Uncertainty trumps Q3 results.** BAC reported EPS of $0.27 - excluding an expected sizeable goodwill impairment charge - that exceeded our estimate of $0.18 and consensus of $0.14. The stock reacted very negatively to a news story suggesting investors could put back $47B of loans.[55]

58.   BofA's disclosure on October 19, 2010, marks the end of the Class Period.  It further demonstrates the market's grave concerns with the potential size of put back claims against Bank of America, which was new information to the market.

59.   The return for Bank of America Common Stock on October 19, 2013, after removing general market and industry effects, was a negative 2.95%, which was significant at the 95% confidence level, further supporting that BofA Common Stock traded in an efficient market through the end of the Class Period.

60.   These analyses demonstrate a clear cause and effect relationship between new material public information about Bank of America and the market price of its Common Stock throughout the Class Period and its Common Equivalent Securities during the portion of the Class Period when the CES were outstanding.

---

[55] "BAC: Q3 – Mortgage Putback Losses Appear Manageable – Adj. Ests." *Wells Fargo*, October 20, 2010.

61.   In sum, every factor analyzed supports that Bank of America Common Stock and Common Equivalent Securities traded in an efficient market throughout the Class Period.

I declare, under penalty of perjury, that the foregoing facts are true and correct.

Executed on November 14, 2013.

_____
Jeffrey W. Golan

# EXHIBIT 1



Exhibit 1

Bank of America Common Stock Closing Price & Volume

2/27/2009 - 10/19/2010

Source: Bloomberg

Notes: Prices are not adjusted for dividends.

# EXHIBIT 2



Exhibit 2

Bank of America Common Equivalent Securities Closing Price & Volume
12/4/2009 - 2/23/2010

Correlation Coefficient of
Common Stock and CES
Price: 0.9966

CES Volume — CES Price — Common Stock Price

Source: Bloomberg

Notes: Prices are not adjusted for dividends.

# EXHIBIT 3

# Exhibit 3
# Bank of America - Summary of Securities Analyst Reports Issued During the Class Period

| | Analyst Name | Reports Issued |
|---|---|---|
| [1] | ARGUS INSTITUTIONAL PARTNERS | 5 |
| [2] | BLUE WATER CAPITAL MARKETS LLC | 2 |
| [3] | BUCKINGHAM RESEARCH GROUP, INC. | 23 |
| [4] | BUSINESS INSIGHTS COMPANY REPORTS | 1 |
| [5] | BX FINANCES | 1 |
| [6] | COLLINS STEWART LLC | 16 |
| [7] | CREDIT SUISSE - NORTH AMERICA | 18 |
| [8] | DEUTSCHE BANK SECURITIES INC. | 11 |
| [9] | FOX PITT KELTON COCHRAN CARONIA WALLER | 32 |
| [10] | GUGGENHEIM SECURITIES LLC | 2 |
| [11] | HSBC GLOBAL RESEARCH | 2 |
| [12] | JPMORGAN | 19 |
| [13] | LADENBURG, THALMANN & CO. INC. | 3 |
| [14] | MACQUARIE RESEARCH | 22 |
| [15] | MORGAN STANLEY | 31 |
| [16] | OPPENHEIMER AND CO | 11 |
| [17] | RBC CAPITAL MARKETS (CANADA) | 16 |
| [18] | SUSQUEHANNA FINANCIAL GROUP LLLP | 3 |
| [19] | WELLS FARGO SECURITIES, LLC | 20 |
| | **Total** | **238** |

Source: Investext.

Note: The Class Period is from 2/27/2009 to 10/19/2010.

# EXHIBIT 4

## Exhibit 4

## Bank of America Shares Outstanding, Insider Holdings and Institutional Holdings

| Date | Shares Outstanding (in 000s) | Insider Holdings (in 000s) | Public Float: Shares Outstanding Less Insider Holdings (in 000s) | Insider Holdings % of Shares Outstanding | Total Institutional Holdings (in 000s) | Institutional Holdings % of Shares Outstanding | Institutional Holdings % of Public Float |
|---|---|---|---|---|---|---|---|
| 12/31/2008 | 5,017,579 | 35,437 | 4,982,142 | 0.71% | 3,223,763 | 64.25% | 64.71% |
| 3/31/2009 | 6,401,388 | 36,647 | 6,364,741 | 0.57% | 3,446,676 | 53.84% | 54.15% |
| 6/30/2009 | 8,356,967 | 36,647 | 8,320,320 | 0.44% | 5,548,621 | 66.40% | 66.69% |
| 9/30/2009 | 8,651,595 | 37,059 | 8,614,536 | 0.43% | 5,535,968 | 63.99% | 64.26% |
| 12/31/2009 | 8,650,244 | 7,821 | 8,642,423 | 0.09% | 5,694,619 | 65.83% | 65.89% |
| 3/31/2010 | 10,032,006 | 9,891 | 10,022,115 | 0.10% | 6,556,510 | 65.36% | 65.42% |
| 6/30/2010 | 10,032,945 | 9,959 | 10,022,986 | 0.10% | 6,552,223 | 65.31% | 65.37% |
| 9/30/2010 | 10,033,845 | 9,164 | 10,024,681 | 0.09% | 6,330,638 | 63.09% | 63.15% |
| 12/31/2010 | 10,085,147 | 6,075 | 10,079,072 | 0.06% | 6,126,984 | 60.75% | 60.79% |
| Average: | | | | 0.29% | | 63.20% | 63.38% |

Sources: Thomson Reuters; Bloomberg.