F1GVPIPC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

PIPEFITTERS LOCAL NO. 636
DEFINED BENEFIT PLAN, ET AL,

              Plaintiffs,

       v.                                11 CV 733 (WHP)

BANK OF AMERICA CORPORATION,
ET AL,

              Defendants.

------------------------------x

                          New York, N.Y.
                          January 16, 2015
                          11:40 a.m.

Before:

              HON. WILLIAM H. PAULEY III,

                         District Judge

                APPEARANCES

BARRACK RODOS & BACINE
     Attorneys for Plaintiff Pipefitters Local No. 636 Defined
      Benefit Plan, and Movant Pennsylvania Public School
      Employees' Retirement System
BY:  JEFFREY A. BARRACK
     MARK R. ROSEN
     JEFFREY B. GITTLEMAN

SKADDEN ARPS SLATE MEAGHER & FLOM
     Attorneys for Defendant Bank of America
BY:  SCOTT D. MUSOFF
     DAVID E. CARNEY
     CHRISTOPHER P. MALLOY

F1GVPIPC

1          (Case called)

2          THE COURT:  This is a premotion conference in which

3     I've reviewed the parties' joint submission to the Court.  Has

4     anyone reached out to the Office of Comptroller of the

5     Currency?

6          MR. ROSEN:  Your Honor, we did not.  It's my

7     understanding from the letter from the defendants' portion of

8     the joint letter that they said they were notifying the Office

9     of Comptroller of the Currency.  I don't know where they stand

10    on that.

11         MR. MUSOFF:  Your Honor, Scott Musoff.

12         We did, once the letter was finalized and submitted

13    forward it to the OCC, who indicated that they did want to

14    uphold the privilege and would weigh in if there was briefing.

15    That's our understanding from the bank's liaison with the

16    regulator.

17         THE COURT:  I'm going to issue an order inviting the

18    Office of the Comptroller of the Currency to take a position

19    here.  I just think it's surprising that over the last five or

20    six months, looking at the fairly sparse case law on this

21    issue, but considerable clarity, discretion being the better

22    part of valor, that the Office of the Comptroller has to be

23    afforded an opportunity to weigh in.  Whether it was the

24    defendant who was going to assert the privilege or the

25    plaintiff seeking it, someone should have reached out.

F1GVPIPC

1          So I get the sense that I need to bring a

2     defibrillator to this case, because not much is happening.

3     Looking back at my own notes -- and this is sort of beyond what

4     this conference is today -- I discussed with you back in July,

5     gentlemen, why I would not approve a particular clause in the

6     proposed confidentiality agreement.  And you all promised to

7     redraft something and send it to me, but you didn't, did you?

8          MR. MUSOFF:  Your Honor, we have that with us here.

9     We were hoping to see if we can avoid it altogether on that

10    issue.

11          But can I just, on this particular issue first, with

12    the OCC?

13          THE COURT:  Yes.

14          MR. MUSOFF:  We are also a little surprised, because

15    we produced our privilege logs, tens of thousands of pages of

16    them, with a few thousand entries asserting the bank examiner

17    privilege, which often happens in bank litigation, especially

18    Bank of America litigation all over the country, regulatory and

19    civil suits.  We produced those.  And not until December did we

20    have a meet-and-confer on not upholding the privilege.

21          And I think, your Honor, if there's going to be

22    further briefing, we could expound upon this, but we believe

23    that these documents aren't necessary to their case; so we

24    assumed they weren't going to push on that issue.  But if they

25    were going to, we think they need to avail themselves of the

F1GVPIPC

1   Administrative Procedures Act or at least to have briefed

2   months ago as to why that wouldn't apply here.  It's an issue

3   of first impression in this Circuit.  I know there's Judge

4   Scheindlin's decision.  But even in her reconsideration

5   decision, which plaintiffs didn't cite, she notes, it gives her

6   pause, there's no authority saying you don't have to.  And this

7   is a very first impression and a novel issue in the Second

8   Circuit.

9           But I also want to assure the Court that we've gone

10  through at least 16 now, maybe 18 or closer to 20, depositions,

11  millions and millions of pages exchanged.  We are all working

12  feverishly on this case and working very hard.  I think it's

13  actually somewhat of a credit to our relationship with

14  Mr. Rosen and the Barrack firm that we've had very few disputes

15  as we're coming towards the end.  We have this one, and I

16  anticipate unfortunately we may need your guidance on a few

17  other disputes as we are approaching the end of discovery.

18          Our lack of involvement with the Court has not been

19  because the case has not been proceeding; it's actually been

20  the opposite, that we've been all working very hard, working

21  very hard to resolve many, many disputes through compromises

22  over the last several months, and I mean on the phone and back

23  and forth a lot with plaintiffs' counsel.

24          MR. ROSEN:  Your Honor, if I might just address it

25  briefly.

F1GVPIPC

1          THE COURT:  Yes.

2          MR. ROSEN:  One of the reasons this issue has come to

3   a head now as opposed to several months ago is the defendants'

4   position on the bank examiner privilege has evolved.  My

5   partner Mr. Gittleman took a deposition in November where he

6   asked questions, and they did not object to topics directly

7   relating to things the bank examiner said.

8          The core, if there is a core of what is allegedly

9   covered by the bank examiner privilege, are what are called

10   matters requiring attention, MRAs, where the examiner says,

11   This is an issue you need to address, we have this concern,

12   whatever it is.

13          Mr. Gittleman was allowed to question about that in

14   one deposition.  Then a week or so later, he takes the next

15   deposition and the following exchange took place:

16          He was conducting the deposition of Mr. Omer, who was

17   a senior executive.  He asked about MERS and the reaction of

18   the OCC.  And Mr. Malloy, who's here today representing the

19   bank and the witness, said, I'm going to instruct the witness

20   not to answer questions about communications with the OCC.

21          When Mr. Gittleman asked a follow-up question asking,

22   What communications did you have internally about OCC concerns,

23   we had the following exchange:

24          Mr. Malloy:  I'm going to instruct the witness not to

25   answer those questions, as well.

F1GVPIPC

1          Mr. Gittleman:  So can you explain to me where the

2     limit is on the bank examiner's privilege that you're

3     asserting.

4          Mr. Malloy:  Anything that reflects the inquiries or

5     views of the bank regulators and the bank's response to it.

6          Mr. Gittleman:  So any internal discussions about an

7     MRA you're saying are covered by the bank examiner's privilege?

8          Mr. Malloy responds:  That's my understanding, yes.

9          So we then hit this point in mid or late November,

10    where it becomes clear they are not only asserting privileged

11    claims, but they are not allowed any communication.  And the

12    issue came to a head, because it affects not just the

13    production of documents, but the conduct of depositions.

14         If their position is they have to, on a protective

15    basis, assert the bank examiner privilege, then every

16    deposition has to be taken twice, because we've asked the

17    question, they assert the privilege and instruct not to answer.

18    We then have to go through a meet-and-confer; we then have to

19    have a premotion conference; we then have to file a motion to

20    compel; and, if we are successful, take the deposition a second

21    time and go over it all.

22         And one of the concerns is they've gone so far as to

23    assert the bank examiner privilege as to communications with

24    the U.S. Department of Housing and Urban Development.  And I

25    found that absolutely remarkable, because HUD issued what can

F1GVPIPC

1    only be considered a scathing report -- and the title is "Bank

2    of America Corporation Foreclosures and Claim Process Review."

3    And I'll hand a copy to Mr. Musoff, and if I could hand up one

4    to your Honor --

5              THE COURT:  You may.

6              MR. ROSEN:  -- in which the Office of Inspector

7    General of the Department of Housing and Urban Development

8    makes scathing comments about robo signing, which is a key

9    issue your Honor noted in your earlier rulings on the motion to

10   dismiss, and gave findings that are totally consistent with

11   what the defendants have been saying up to now.

12             Last week I deposed Ms. Desoer, D-E-S-O-E-R, who was

13   president of the home loans and insurance division of Bank of

14   America, who reported directly to the CEO, which was first

15   Mr. Louis, and then Mr. Moynihan.

16             I asked her if there were any guidelines as to how

17   many foreclosure affidavits an employee could be expected to

18   complete in any time period; hourly, daily, weekly whatever.

19   She said I have no recollection.

20             Whereas if your Honor looks on page 8 of the HUD

21   report, they talk about employment reviews, employee reviews.

22   And if your Honor sees the last three bullet points on that

23   page, it quotes:  Your stats so far are as follows:

24   Affidavits, 46.97 per hour.  Then it says paren --

25             THE COURT:  Just go a little more slowly for my

F1GVPIPC

1    benefit, if not the court reporter's.

2            MR. ROSEN:  Your Honor, I began my career as a law

3    clerk.  And the court reporter in that case, across the river

4    in New Jersey, tried teaching me.  And I'm afraid I sometimes

5    get carried away.

6            So they said your stats so far this year are as

7    follows:  Affidavits, 46.97 per hour; standard is 49 per hour.

8    Assignments, 54.74 per hour; standard is 51 per hour.  Then it

9    goes on and on.

10           And so here's a case where an agency that is a

11   regulator or a pseudo-regulator of the bank finds information

12   that's totally inconsistent with what we are getting from any

13   other source from their witnesses.  And so one of the criteria

14   the Court talks about in determining whether the bank examiner

15   privilege applies is, is this information available from

16   another source.  And this is the perfect example.

17           Now, this particular document is a public document; we

18   got it off a website.  But when I took Ms. Desoer's deposition

19   last week, they asserted the bank examiner privilege and clawed

20   back a document from HUD which was a notice of violation.  You

21   would think that would be a public document.  But their

22   position is no, bank examiner privilege applies.  And this

23   inspector general report illustrates how when you peel back the

24   layers of the onion, you see a very different story.

25           And Mr. Musoff is right, we've had a generally

F1GVPIPC

1    collaborative and cooperative relationship.  But the reason

2    this issue was so important is short of your Honor's

3    disposition of the inevitable summary judgment motions, the

4    single event that will bring the parties closer to resolution

5    is a definitive ruling on the examiner privilege, because we

6    believe, based on documents they already produced to us and

7    then clawed back, and based on the depositions that we were

8    able to take on this topic, that the allegedly privileged

9    material will show beyond any doubt the defendants' *scienter*;

10   that it will show the defendants were on notice of these

11   problems with representations and warranties, they were on

12   notice of problems with MERS, and that their public statements

13   or, in some cases, failure to make statements about these

14   issues, was totally inconsistent with what the regulators were

15   raising.

16         So we think it's absolutely critical.  We think Judge

17   Scheindlin had it right when she said there are two different

18   standards.  She said there's one standard for when you are

19   going to the agency, and that's what the Second Circuit talked

20   about in *SEC v. Martha Stewart*, and that's what the other cases

21   talk about.

22         When you're going to the agency, the issue is do you

23   have to go through the federal regulations, do you have to

24   exhaust your remedies.  But all the cases we went through --

25   and we highlighted them obviously in a very abbreviated way in

F1GVPIPC

1    the three pages in our six-page letter -- talk about a

2    different standard when you're seeking the documents from a

3    party as opposed to the regulator.

4           And the case law is clear that as far as the federal

5    courts are concerned, including courts in this Circuit,

6    including Judge Sessions' decision in the *Vescio* case, that

7    when you subpoena a party for documents, even if they're

8    documents relating to an OCC or other regulator action, it's

9    governed by the federal rules.  You are not required to go

10   through the administrative process.

11          And Judge Scheindlin made a faceting observation, when

12   you go through her decision in *Wultz*.  And it's a long opinion

13   with over 100 footnotes.  I think it was footnote 102, she

14   said, These are agencies that are the hallmark of a captive

15   agency that has been domineered and controlled by the

16   regulators.  And if the last six years history of living

17   through the financial crisis doesn't prove it, she underscores

18   that point.

19          So the fact that these regulators were raising these

20   issues at all is highly probative of showing their *scienter*.

21   And it's the contrast between the head of the bank saying, I

22   have no knowledge of these quotas or expectations, and the

23   report saying, line and verse, there were standards and they

24   were applied.  That illustrates why this is so critical and why

25   we would like your Honor to address this at your earliest

F1GVPIPC

1    possible convenience.

2            THE COURT:  Just to follow up for a second, Mr. Rosen,

3    first, I am going to tee up a motion and I am going to decide

4    the issue.  But I want to try to tee it up in a way that I

5    won't be offering an opinion in the abstract.

6            Now, in your remarks to the Court just now, you've

7    given me a concrete example relating to HUD.  How do you

8    propose that this application be teed up?  And I say that

9    against the backdrop that the defendants say that in the

10   meet-and-confers there was no effort on the plaintiffs' part to

11   narrow the focus.  And I'm also looking at that looming

12   20,000-page privilege log.

13           MR. ROSEN:  Right.

14           THE COURT:  So I just said a lot, and there's about

15   three or four parts to that question.  Take them in any order

16   you want.

17           MR. ROSEN:  Let me try to deal with them as well as I

18   can.  And if I omit anything, I trust your Honor will remind me

19   when I finish.

20           Respectfully, the 20,000-page privilege log could be

21   the key to the resolution for this reason:  Defendants are

22   absolutely correct that I declined an invitation to do it

23   document-by-document meet-and-confer process because, frankly,

24   your Honor, the sun would go nova before we finished.

25   Discovery would long since have concluded; trial would long

F1GVPIPC

1   since have concluded; the Second Circuit would have done

2   whatever it done; the Supreme Court, if it granted cert, would

3   have done whatever it done, and we'd still be

4   meet-and-conferring about the documents.  Because if it's a

5   20,000-page privilege log, at least five documents on a page,

6   conservatively 10, 15, 20 percent of those documents are

7   claimed as privilege based solely on the bank examiner

8   privilege, we'd be going at it forever.

9        But respectfully, there are three basic categories of

10  documents:  Communications from the regulator to the bank,

11  communications back from the bank to the regulator, and

12  internal communications amongst solely bank employees

13  discussing these issues.

14       And what Judge Scheindlin said and what the other

15  cases make pretty clear, at least as I read them, is as

16  follows:

17       The privilege does not apply to facts.  The privilege

18  applies, to the extent it applies, to opinions.  And let me

19  give you a perfect example of a distinction.  If the OCC said

20  to the Bank of America, We note that you have had 10 million

21  claims for a breach of representations and warranties, that's a

22  fact.  If the examiner says to Bank of America, We are

23  concerned that you're not competently handling this, that's an

24  opinion.  And what the courts talk about is -- and the courts

25  are very consistent -- facts are not privilege; opinions maybe.

1          The cases disagree as to whether the responses back

2     from the regulated entity, in this case Bank of America, to the

3     regulators, such as the OCC, are privilege.  We cited some that

4     say they are not; they cite some that say they are.  But even

5     if they are privileged -- and let me just stop for a second and

6     talk about the third category.

7          The third category, the internal deliberations, we

8     cite a number of cases.  When we brief this, we'll obviously be

9     able to extend on it in more detail.  The internal deliberation

10    is about what do we do, what do we say, how do we react to

11    this.  The cases are pretty clear that that's not protected.

12    So that's the first step.

13          And then what Judge Scheindlin talks about is the

14    second step is after you segregate the facts from the opinions,

15    even as to opinions, even as to the MRAs, which are the core,

16    if there is a core of anything that should be protected under

17    the bank examiner privilege, and we submit that it should not,

18    but even for those things, you can overturn it because it's

19    qualified privilege if you make a showing in good faith of a

20    basis for disclosing it.

21          And Judge Scheindlin follows Judge Weinstein's famous

22    decision in the *Franklin Securities* case.  And I say "famous"

23    because it's been cited and followed by at least three

24    different circuit courts -- the Second Circuit hasn't reached

25    it -- and by a number of district courts within this Circuit,

F1GVPIPC

 1    including, I believe, Judge Sweet, and certainly judges in the

 2    Eastern District across the river and elsewhere in the Second

 3    Circuit.

 4              And what they say is, you look at the relevance of the

 5    documents, the fact that you can't get this any other way.  And

 6    what I did with your Honor's permission to talk about the HUD

 7    report illustrates the problem.  We're taking depositions now

 8    in 2014 -- and now, believe it or not, it's 2015 -- about

 9    events that took place from 2008 to 2010.  The most diligent

10    witness, with the clearest memory of all, is challenged to

11    remember in 2015 or even a month ago, in 2014, what they did or

12    what they said in 2008 or 2009.

13              And so I would depose, just by way of example, when I

14    deposed Ms. Desoer last week, I'd say, Here's a document with

15    your name on it that says, I'm meeting with so-and-so on this

16    topic.

17              And I'd say to her, Did you attend this meeting?

18              And she'd say, I don't remember.

19              Do you recall anything about the meeting?

20              She'd say no.

21              I'm not challenging her veracity, but I'm dealing with

22    a practical problem that we have witnesses who don't recall it.

23    And whereas in this case what the bank examiners do is they are

24    reacting on an iterative basis constantly with the regulated

25    entities, in this case Bank of America.  And they are raising

F1GVPIPC

1      issues.  And because they are raising issues, it is showing on

2      a if not minute-by-minute, day-by-day basis what issues are

3      being presented to the bank, and that can be lined up or not

4      lined up, what the bank is saying or not saying.

5              So when the defendants say you have no evidence of

6      *scienter*, that is the best evidence of *scienter*, because it's

7      putting them on notice.  And it's particularly relevant because

8      some of the reactions and dealings with the regulators are at

9      the highest most level.

10             For example, Ms. Desoer dealt with the OCC and the

11     other regulators.  She was a direct report to two defendants:

12     Mr. Lewis and Mr. Moynihan.  The fact that they had these

13     communications, the fact that if we can get our hands on them

14     and show what the regulators were raising, the red flags they

15     were raising, even if they were later talked back into stepping

16     back from some of their positions, will absolutely address the

17     *scienter* issue.

18             The way I think your Honor can deal with this issue is

19     take their own privilege log, have them reproduce the subset

20     from the log where they claim only bank examiner privilege,

21     nothing else.  And then it falls into three categories:  Is it

22     a document from the regulator to them; is it a document from

23     them to the regulator; or is it an internal document in which

24     they are discussing all this.

25             And one of the cases, I believe it's *Feinberg v.*

F1GVPIPC

*Hibernia* -- and I can provide your Honor's clerk with the

citation if you need it, because I don't know if we cited it in

the six-page letter -- talks about if there's an issue as to

whether -- the only thing that might be protected from

disclosure, according to that judge, was if the document

contains a verbatim statement of what the regulator said.

Other than that, you get it.

        And so take their privilege log, have them reproduce

it as to items that are solely claiming Bank of America bank

examiner privilege, then have them break it into three things:

Was this a communication from the regulator, was this a

communication to the regulator, and was this an internal

deliberation amongst themselves.

        THE COURT:  Aren't those three categories so general,

if I'm understanding you correctly, you'll be asking me to rule

with respect to those categories?

        MR. ROSEN:  And there's a way to deal with that.

        THE COURT:  Even Judge Scheindlin had more specificity

in the *Wultz* case, right?  There were certain investigative

reports.

        MR. ROSEN:  Right.

        Therein the problem is perhaps the function of the

detail of their privilege log.

        But one solution may be -- and I believe the case

*General Electric v. Johnson*, which I did not cite and could

1   provide your Honor's clerk with a citation to it -- talks about

2   doing a statistical sampling.  Agreeing upon a method to

3   generate independently out of the logs say 100 documents in

4   category one, 100 documents in category two, 100 documents in

5   category three, to get a manageable number and to review those

6   and say fish or fowl, fair or not fair.  And I think that can

7   do it.

8           But certainly I would respectfully suggest, at a

9   minimum, the internal documents, that is, Mr. Lewis is talking

10  to Ms. Desoer, or Mr. Cotty is talking to someone else in the

11  bank about how do we deal with this issue.  That's not

12  privileged.

13          And respectfully, I have never seen -- and I have a

14  pile of cases here, and there are a few more I didn't bring,

15  but all these are cases that I read and I have tried to

16  digest -- I have never seen a case that said internal

17  deliberations; that is, talking amongst themselves about issues

18  that have been raised by the regulator or how do we respond to

19  the regulator is not covered.

20          The other point to make -- and I just want to

21  underscore this, your Honor -- the cases draw a very clear line

22  between when you're trying to get the regulator to produce and

23  when you're trying to get a party to produce.  We're not asking

24  the OCC or the Federal Reserve or anybody else, or in the case

25  I pointed out earlier, HUD, to give us a single piece of paper.

F1GVPIPC

```
 1   I have faith that Bank of America has a good collection of

 2   records.  And if your Honor says turn over those documents,

 3   we'll get all that we need.  And when you're asking the party

 4   for documents, you don't have to go through the administrative

 5   process.  I absolutely agree the privilege belongs to the

 6   regulator.  And I absolutely agree with your Honor that it's

 7   appropriate to have the regulator come in.

 8            And I understand why the defendants are doing what

 9   they are doing.  Because they say, Gee, we're at risk of

10   sanction if we disclose something the regulators say we

11   shouldn't disclose.  But the solution to that is for your Honor

12   to say, You know what?  I've looked at this; I make a ruling.

13   It's my determination privilege applies here and not there.  At

14   that point, they are at no risk; you've given them the free

15   pass to do what your Honor determines they should do, and we

16   can conduct the deposition so it's productive.

17            Right now we are two and-a-half months from the

18   conclusion of depositions.  We're approaching the most critical

19   period of those depositions, because we are trying to depose

20   some of the senior-most executives of the company, and

21   including the five individual defendants.  We're still trying

22   to get the defendants to commit to dates of those defendants.

23   We've been asking them, but I trust they will.  And for those

24   depositions, it's even more critical that we get these

25   documents; because those documents will show *scienter*.
```

F1GVPIPC

1              And so I think, your Honor, have them break their

2       privilege log into the three categories, exclude every document

3       for which they claim another privilege, as well, like

4       attorney-client or whatever, and then say make a statistical

5       sample from the regulator's letters to them, from their

6       responses to the regulator, and from the internal documents,

7       and your Honor can review it.  Alternatively, you can appoint a

8       special master to do it.  But based on a relatively small

9       sample, as long as it's fairly and statistically selected, your

10      Honor will be able to get a pretty good feel of what's going

11      on.  And I think resolving that issue will be the best thing

12      you can do, short of resolving the summary judgment motions

13      which are inevitable in getting us to settlement, because I

14      think it will illuminate everyone's state of mind if they know

15      what evidence there is out there on *scienter*.

16              So I don't know if I've answered your questions.

17              THE COURT:  I think you have.

18              MR. ROSEN:  Thank you, your Honor.

19              THE COURT:  Thank you.

20              MR. MUSOFF:  Your Honor, Scott Musoff again.

21              Mr. Rosen said a lot, and I'll try and break down some

22      of it.  I think there's a little bit of mixing apples and

23      oranges with what he said.

24              First of all, again, they've had these logs since July

25      that identify recipients to, from, in these categories.  Not

F1GVPIPC

1   once, including in the December meet-and-confer, when we

2   offered document-by-document, category-by-category, give us

3   something other than your saying the bank examination privilege

4   doesn't apply, because we all agree it does, and we can't do

5   anything about it.  If it's HUD, they never raised HUD until

6   the deposition; if in December they had raised the HUD issue,

7   we would examine that.

8          As your Honor might be aware, Judge Cote recently held

9   that it applies to the FHFA.  This is a little bit of a murky

10  area, and we're treading very carefully here.

11         But more importantly, your Honor asked for examples.

12  The example he gave about claims of rep and warrants, we didn't

13  withhold the underlying claims.  So if the OCC is looking at

14  the total number of claims, they have that information.  That

15  was the one specific example Mr. Rosen gave was, Well, the OCC

16  says there were -- and, of course, he exaggerates with a little

17  hyperbole -- thousands or tens of thousands of claims.  How

18  would we know that?  You know that because we turned over

19  millions of pages about rep and warranty claims.

20         So I think we have to separate this into a couple of

21  more specific categories, as opposed to six months later coming

22  to us and now suggesting we excerpt the log, we do certain

23  things.

24         We asked them if it's a time period they are concerned

25  about.  Some of these documents that are logged are post class

F1GVPIPC

 1    period review.  So it can have nothing to do with *scienter* and

 2    interactions with the regulators.

 3            I also want to just take a step back for a moment,

 4    because I think the regulators --

 5            THE COURT:  Right.  Just before you do, what would be

 6    wrong with generating from the privilege log that you've

 7    already created, a privilege log that contains only those

 8    documents for which the sole assertion of privilege is the bank

 9    examiner privilege, and then taking that group of documents,

10    whatever that may be, that subset of privilege documents, and

11    then creating three subsets as suggested by Mr. Rosen.

12            MR. MUSOFF:  Mechanically, we can do that and we're

13    happy to do that.  It's more a question of the next step from

14    there, which I would like to address.

15            THE COURT:  I assume you've probably already done it.

16    Can you tell me approximately how many documents we would be

17    talking about that fall within -- where the only privilege

18    asserted was the bank examiner privilege?

19            MR. MUSOFF:  Probably between six and 10,000, your

20    Honor.

21            THE COURT:  All right.

22            MR. MUSOFF:  But it's certainly less than the broad

23    base.  And again, they could have asked us to do this August

24    1st.

25            THE COURT:  There's lots of could haves, but we're

F1GVPIPC

1      beyond that.

2              MR. MUSOFF:  But the only reason I also raise that,

3      your Honor, is because the issue of the regulator's involvement

4      and their opportunity to review those documents, as well.  And

5      again, they cite Judge Scheindlin's decision in *Wultz v. Bank*

6      *of China*.  They didn't cite her reconsideration decision where

7      she does say it gives me pause about whether the Touhy

8      regulations do apply or not.  And that is an issue we would

9      like to address in this motion practice, and why they should

10     have gone that route.

11             And again, for why the OCC's involvement hasn't been

12     brought to date, I just want to clarify what I said earlier is

13     the bank gets document requests, of course, in many cases.  It

14     can't send every document request to the OCC and say there

15     might be documents.  It logs them.  And then if and when

16     somebody says, We want to pierce that privilege, it then gets

17     the OCC involved.  So we did, as soon as we had a ripe dispute

18     in December.  That could have been done in August.

19             And Mr. Barrack and I sat at a deposition in August in

20     Charlotte where we raised the same objections we did in

21     November, and instruct the people not to answer.  So it didn't

22     just happen in November; it happened as early as August

23     depositions following our privilege log.

24             So I think we're sitting here close to the end of

25     discovery, we would assert, not because of our actions, but

 1   because plaintiffs sat back not objecting.

 2            I'm not going to get into all the merits about the HUD

 3   report, but Ms. Desoer was not instructed not to answer; she

 4   didn't recall those interactions with HUD.

 5            THE COURT:  Right.  He didn't say there was any

 6   instruction not to answer; he said she didn't recall.

 7            MR. MUSOFF:  She didn't recall.

 8            THE COURT:  I take it that his point is, that is,

 9   Mr. Rosen's point is that if he had the document, he could

10   refresh her recollection or his recollection about what he or

11   she said or did.

12            MR. MUSOFF:  Right.  We can brief this, but I'm not

13   sure that gets to the level of piercing the regulator's bank

14   privilege, but I think they'll want to weigh in on that, as

15   well.

16            But also, the document he points to involves very

17   low-level people; not surprising, the head of that division

18   wouldn't have been aware of certain actions there.  But that,

19   again, I agree, is on the merits of if they give us examples,

20   we're happy to address them.  We've asked for those in

21   December.  I assume in whatever briefing we do, they'll go

22   first, we'll have an opportunity to address those examples.

23            But that's what you can do.  You can sit there and

24   say, Okay, there's a time period where this and this happened.

25   Look at the log and say, These 20 documents might be helpful to

F1GVPIPC

1   me.  At least that's something we could then work with as

2   opposed to what they told us in December, which is the bank

3   examination privilege shouldn't apply at all.

4           And again, I didn't respond on the merits to each of

5   those allegations; I don't think I need to here.

6           THE COURT:  It's not necessary.  We're trying to come

7   up with a method of addressing the issue.

8           Now, the one factor that you've added to the equation,

9   if I'm hearing you correctly, is focusing on a couple of time

10  periods as opposed to a statistical sampling.

11          What about that, Mr. Rosen?

12          MR. ROSEN:  Your Honor, I'd be glad to talk to

13  Mr. Musoff about it.  I'm not trying to go on a fishing

14  expedition at this stage in the litigation.

15          THE COURT:  I think the very first thing that should

16  be done is the defendant should generate a privilege log that

17  is simply a log of all those documents where it was the bank

18  examiner privilege that was the basis for the withholding.  And

19  then I think the bank should also divide it into the three

20  subsets that you've proposed, that is, communications from the

21  regulator to the bank, communications from the bank to the

22  regulator, and communications that were entirely within the

23  bank.  It seems to me that that would be a fairly

24  straightforward thing to be able to do.

25          MR. ROSEN:  I think so.

F1GVPIPC

1          MR. MUSOFF:  Yes, your Honor.  And then I think

2     however we divide some subset --

3          THE COURT:  Right.  And then you'll be looking at a

4     smaller universe.  That universe can be sent also to the OCC,

5     because I'm going to include -- I'm going to invite the OCC to

6     participate in the briefing on this application.  And it would

7     give you a template to look and see how to go about selecting

8     some documents so that the Court -- or if I designate someone

9     else to conduct the document review, they'll have a limited

10    narrow universe to look at.

11         MR. ROSEN:  I think that's exactly the right way to

12    go, your Honor.

13         MR. MUSOFF:  Your Honor, with one clarification, but I

14    think you've addressed it.  In this invitation to the OCC, they

15    should review the documents.  If they don't assert the

16    privilege or they draw a line different from where we do,

17    perhaps that could also resolve the issue.  And then if the

18    plaintiffs have an objection to that, the OCC's position may be

19    that they need to follow the Touhy regulations to challenge

20    their determination.  That's the issue that's novel or

21    certainly hasn't been addressed by the Second Circuit, and we'd

22    be happy to brief that if that comes up.

23         THE COURT:  We'll bring it here.

24         And if, for example, the OCC says, We have no horse in

25    the race with respect to the communications that are strictly

1    among bank personnel, that may go a long way here.

2             MR. ROSEN:  Your Honor, they've done that in prior

3    cases.  I have one in my hand right now where they litigated

4    over the bank examiner privilege, and the OCC waived any

5    privilege as to documents it did not create.  So as to two and

6    three, the second and third categories, the documents came from

7    the bank, and the internal documents they took that position.

8             MR. MUSOFF:  We cited cases where they did.

9             THE COURT:  This Court knows that agencies are very

10   fickle, all right.  And they change their minds not only from

11   month-to-month, but sometimes day-to-day.  Certainly I want to

12   see the authorities that you're both going to be relying on in

13   the motion.

14            So first, let's fix a briefing schedule.  And in

15   fixing that briefing schedule, I also have another question,

16   and that is, whether any of the senior depositions should

17   proceed until we've teed this issue up and resolved it.  And

18   I'd like to hear what the parties have to say about that.

19            MR. ROSEN:  Your Honor, I think these documents are so

20   critical to the senior depositions, I would like to have the

21   motion resolved before we take them.

22            THE COURT:  What do the defendants say?

23            MR. MUSOFF:  Your Honor, we don't think these

24   documents -- we think they are going to be primarily redundant,

25   to the extent they are looking for facts, of stuff we've

F1GVPIPC

1    already produced.  If they do want them before the senior

2    depositions, I don't think we are necessarily going to be able

3    to hold to the March dates that we're doing for the senior

4    depositions; because, again, this process -- the OCC has to

5    look at the documents, they have the chance to weigh in, and

6    maybe through administrative procedures first.  And again, they

7    waited with these logs.  So the question is if they are going

8    to insist on it being done before the depositions, there's a

9    little bit of a chicken-and-egg issue there.

10            THE COURT:  Right.  I don't see how, if they want

11    these documents -- they want the question resolved prior to the

12    depositions, how discovery can be completed by the end of

13    March.  But we can fix that.  We can deal with that.

14            Are there any other regulators other than the Office

15    of the Comptroller of the Currency who are involved in the

16    "bank examiner privilege"?

17            MR. MUSOFF:  Your Honor, there are.  I should have

18    brought the list with me.  I think there are about six to eight

19    of them.

20            THE COURT:  Would you provide me with a letter later

21    today with their identities, because I would like to include it

22    in the order.

23            MR. MUSOFF:  We will do that, your Honor.

24            THE COURT:  All right.

25            MR. ROSEN:  Your Honor, I guess the first question is

F1GVPIPC

 1   how soon before they can give us the tripartite privilege log.

 2           THE COURT:  That's my next question.

 3           MR. MUSOFF:  Your Honor, if it's possible, could we

 4   let both the Court and them know by the end of the day in a

 5   letter?  The concern we have is it's not just --

 6           THE COURT:  Fine.

 7           MR. MUSOFF:  -- taking the documents.  There are going

 8   to be some sampling.

 9           THE COURT:  Fine.  Take a look.  Please confer.

10   Propose a reasonable briefing schedule to me, recognizing that

11   I'm going to extend the cutoff for the taking of depositions,

12   because it probably doesn't make sense to subject certain

13   individuals to the possibility of being deposed twice, right,

14   and having counsel travel wherever they may be.

15           MR. MUSOFF:  We agree, your Honor.

16           MR. ROSEN:  I absolutely agree with your Honor.

17           THE COURT:  All right.  If you can do it by the end of

18   today and propose a schedule to me, that would be great.  If I

19   have a question about it, I'll get you on the telephone on

20   Tuesday of next week.  Then I'll enter an order on the matter

21   early next week.

22           MR. ROSEN:  Thank you very much, your Honor.

23           THE COURT:  Anything further, since we are altogether

24   and we haven't been together since July?

25           What's happening?

F1GVPIPC

1          MR. MUSOFF:  We have language that I believe everybody

2     is -- I'll let my colleague Mr. Carney address it.  And just

3     the issue, your Honor, was not a federal/state issue; it was

4     just -- and I'll let Mr. Carney address it.  But we think we

5     have language that covers it.  And we would have brought it to

6     the Court's attention sooner if we needed it at that time, and

7     we didn't since we're going to be here.

8          MR. CARNEY:  Your Honor, you expressed a federalism

9     concern about the third of the three frameworks.  And what

10    we've proposed is some additional language I can hand up to the

11    Court, to the order, to try to address the Court's concern that

12    the protective order does not direct you to do anything in

13    contravention of state law.

14          The additional language, your Honor, is on page 2 of

15    the draft order, starting at the fourth line up from the

16    bottom.  We added the language:  "Consistent with the relevant

17    nonparty borrower information law."

18          The purpose there is to address your Honor's concern

19    that you were being asked to do something inconsistent with the

20    individual state laws.  We are not asking for that.  The orders

21    that we're asking for is contemplated within those laws.  And

22    we are just trying to make that clear with that additional

23    language.

24          THE COURT:  All right.  I'll look at this after the

25    hearing.

1          MR. MUSOFF:  And, your Honor, just as a reminder, the

2     reason why this is in there is because at some point these

3     involve breaches of reps and warranties of a loan.  The

4     person's Social Security number, their name isn't going to be

5     necessary for what we're doing.  And we've agreed with

6     plaintiffs as to what can be redacted from that point of view.

7     So that's what this primarily addresses, this loan

8     identification information.

9          THE COURT:  All right.  I'm going to ask you,

10    Mr. Carney, to submit this on ECF today with a short letter.

11         MR. CARNEY:  We will, your Honor.

12         MR. ROSEN:  Your Honor, I have no objection to that.

13    But there's a related issue as to the confidentiality order,

14    which is, due to oversight, I suppose, on my part, the

15    confidentiality order does not have in it a deadline for

16    clawing back documents before giving deposition.

17         And I could hand up to your Honor just a simple chart

18    we made.  In these six depositions, which were all taken

19    relatively recently, we noticed the depositions usually

20    approximately six weeks before they were taken, and we took

21    them.  And then, as your Honor can see, if you look at the

22    second column, it says "date of deposition," and third column

23    is "clawback date," we started -- in Mason's case we got a

24    clawback a few days before her deposition; but in the next five

25    depositions, literally one or two days before, we're getting

1   clawback notices.

2          Now, by that point, we've already written our outline,

3   copied our documents, preshipped them to where we were going to

4   take the deposition.  And literally the evening or the

5   afternoon before the deposition, we get a notice that they are

6   clawing back certain documents in their entirety, and then they

7   are going to redact certain other documents.  And I've

8   experienced that problem.  And we've asked defendants to agree

9   to change the confidentiality order to have some deadline by

10  which they have to do it before deposition if it relates to

11  that witness.  Certainly if it's documents that are in that

12  witness's files, we've asked them that, they've declined to

13  agree to that.

14          MR. MUSOFF:  We offered, your Honor.  They told us

15  which exhibits they wanted to use, we would do it.

16          Can I explain the situation?

17          We produced millions and millions of pages.  You

18  prepare a witness very close to their deposition.  And we're

19  talking about out of millions of pages for some deposition, a

20  sentence here, five or six documents here, ten there.  If they

21  weren't supposed to get them in the first place, there could be

22  no prejudice here.  So that's what's a little bit confusing

23  about this.  They looked at a document that they now can't use

24  two sentences of that they shouldn't have gotten in the first

25  place, but because we produced tens of millions of pages.

F1GVPIPC

1       THE COURT:  How are they supposed to know that until

2   you notify them that you're clawing it back?

3       MR. MUSOFF:  We clawed back, we provide them with the

4   redacted version.  And they haven't challenged any of the

5   clawbacks yet.  So the question is if their concern is getting

6   further notice, they could say these are the hundred documents

7   that we think we're going to use, and we'd at least look --

8   because we are looking at a universe of millions.

9       THE COURT:  I understand that.  But they don't have to

10  telegraph what they are going to question a witness about.

11      Mr. Rosen, what are you proposing as a reasonable

12  interval for clawback?

13      MR. ROSEN:  Your Honor, I'd like ten days, but at

14  least five business days before deposition.  If they have

15  documents -- again, when we get their documents --

16      THE COURT:  All right.  I understand your point.

17      MR. ROSEN:  Thank you.

18      THE COURT:  I think five business days, especially

19  given the fact that the notices I'm looking at are generally

20  noticed roughly two months in advance of the deposition date, I

21  don't see any reason why you can't provide a clawback five

22  business days before the deposition, so that the plaintiffs'

23  counsel is in a position to prepare.

24      MR. MUSOFF:  Your Honor, the only thing we'd like to

25  put in there is if for good cause there is a reason why it was

F1GVPIPC

1    inadvertent.  Because the issue we have is we try and start

2    narrowing the documents.  Somebody's name may be on 50,000

3    documents.  They're winnowing it down till the day before, I'm

4    sure they are working the night before the deposition; we are

5    working the night before the deposition.

6              THE COURT:  I'm sure they're working the morning of

7    the deposition.

8              MR. MUSOFF:  Right.  And that's what we are doing at

9    the same time.

10             THE COURT:  Obviously there's good cause as part of

11   common sense, okay.  But good cause wouldn't mean that you've

12   clawed back 100 documents or portions of documents five

13   business days prior to the deposition, and then you claw back

14   another 75 documents the day before the deposition.

15             MR. MUSOFF:  And we also ask that it wouldn't be a

16   subject matter waiver if we miss a certain document as opposed

17   to just their use of that document.

18             THE COURT:  We're really skating on sort of thin ice,

19   because I've got no submissions before me, and I'm doing

20   something that I've always told myself afterward I shouldn't

21   do.

22             MR. MUSOFF:  We didn't know they were raising this

23   either.

24             THE COURT:  I shouldn't be the deli clerk taking lunch

25   orders here, whatever comes into people's minds as they're in

F1GVPIPC

1    the courthouse.

2            Why don't you add this provision to the

3    confidentiality order with respect to deposition clawbacks and

4    submit something to me next week.

5            MR. ROSEN:  That would be perfectly fine, your Honor.

6            THE COURT:  All right.

7            MR. ROSEN:  We're not trying to bring more complaints

8    than needed.  I've been doing this for a long time.  And I

9    realized yesterday the best explanation of my philosophy is

10   litigation is like parenting; you have to pick your fights

11   well.  And we've had a good relationship; we haven't had a

12   perfect relationship.  We are not trying to fight over

13   everything for the sake of fighting.  But it's become

14   disruptive, and that's why we'd like to address it.

15           THE COURT:  Look, I'm putting the defibrillator away.

16           MR. MUSOFF:  Thank you, your Honor.

17           THE COURT:  But in preparing for this conference, we

18   last were together in July.  You submitted an extensive report

19   to me at the end of September.  And there was reference in the

20   report to the fact that I think that you were going to a

21   mediation.  And so I put this matter to the side for a while.

22           I take it that the mediation has not gone through or

23   is that still going on?

24           MR. ROSEN:  Your Honor, I'm going to be extra careful

25   in what I'm saying, because we have an obligation of

F1GVPIPC

1   confidentiality.

2          We did go through a mediation, the first session of

3   the mediation, a full-day mediation.  At the conclusion of the

4   mediation, we did not reach agreement.  I think we are

5   obligated to simply say we didn't reach agreement.  I can tell

6   you my personal view is I'm not terribly optimistic, but things

7   may change.

8          THE COURT:  Things will change as I decide this motion

9   and depositions go forward or summary judgment motions are

10   made.

11          MR. ROSEN:  Absolutely.  And that's why we're here.

12          Thank you, your Honor.

13          MR. MUSOFF:  I concur with that; although I think I'm

14   less pessimistic than Mr. Rosen.  I presume we will be speaking

15   again on those types of topics throughout the litigation.

16          THE COURT:  You'll tee up, you'll propose a briefing

17   schedule.  You can propose an oral argument date.  If it's

18   convenient for me, we'll do it.  I might put it on a separate

19   day than my customary motion day on Friday so that we can

20   really spend a little time on it.  But, otherwise, I'll try to

21   find sufficient time on a Friday to deal with it.

22          Ultimately, you're also obligated to let me know about

23   expert discovery, but I think we should just park that for a

24   moment until we deal with this issue and we fix a date for the

25   completion of fact discovery.

F1GVPIPC

1          MR. ROSEN:  I would agree with your Honor's views on

2     that.

3          MR. MUSOFF:  Likewise, your Honor.  And as I alluded

4     to, there may be a few other disputes, including about

5     confidential witnesses.  We are trying to work those out and

6     present those to your Honor promptly.

7          THE COURT:  Thank you very much for coming in.

8          Have a great weekend.

9                              *    *    *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25