UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____
                                              :
PENNSYLVANIA PUBLIC SCHOOL          :      CIVIL ACTION NO.
EMPLOYEES' RETIREMENT SYSTEM,       :      11-CV-00733-WHP
individually and on behalf of all others       :
similarly situated,                             :      CLASS ACTION
                                              :
                    Plaintiff,               :      **LEAD PLAINTIFF'S**
                                              :      **MEMORANDUM OF LAW IN**
                                              :      **SUPPORT OF FINAL**
            v.                               :      **APPROVAL OF SETTLEMENT**
                                              :      **AND APPROVAL OF**
                                              :      **PROPOSED PLAN OF**
BANK OF AMERICA CORPORATION, et al.,  :      **ALLOCATION**
                                              :
                    Defendants.             :
                                              :
                                              :
_____:

**BARRACK, RODOS & BACINE**
A. Arnold Gershon
William J. Ban
Michael A. Toomey
Eleven Times Square
640 8th Avenue, 10th Floor
New York, NY 10036
Telephone: (212) 688-0782
Facsimile: (212) 688-0783

**BARRACK, RODOS & BACINE**
Leonard Barrack
Mark R. Rosen
Jeffrey A. Barrack
Jeffrey B. Gittleman
Chad A. Carder
Julie B. Palley
2001 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-0600
Fax: (215) 963-0838

TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ........................................................................................1

ARGUMENT ..................................................................................................................8

    I.    FINAL APPROVAL OF THE SETTLEMENT SHOULD
          BE GRANTED ..............................................................................................8

          A.    The Standard for Approval of a Class Action Settlement...................................8

          B.    The Settlement is Substantively Fair Under *Grinnell*.........................................10

               1.    The Complexity, Expense and Likely Duration
                     of the Litigation ..........................................................................10

               2.    The Reaction of the Settlement Class to the Settlement ............................12

               3.    The Stage of the Proceedings and Amount of
                     Discovery Completed ....................................................................13

               4.    The Risks of Establishing Liability and Damages and
                     in Maintaining the Class Action Through Trial ...........................14

                5.    The Range of Reasonableness of the Settlement Amount
                     in Light of the Best Possible Recovery and the Risks
                     of Litigation ................................................................................17

           C.    The Proposed Settlement Is The Product Of Informed
               Arm's-Length Negotiations And Is Presumptively Fair ....................................19

    II.    THE NOTICE OF SETTLEMENT SATISFIES DUE PROCESS
          REQUIREMENTS AND IS REASONABLE ...........................................................21

    III.    THE PLAN OF ALLOCATION IS FAIR, REASONABLE
          AND ADEQUATE ......................................................................................22

CONCLUSION..............................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

*City of Detroit v. Grinnell Corp.*,
   495 F.2d 448 (2d Cir. 1974).................................................................................. *passim*

*D'Amato v. Deutsche Bank*,
   236 F.3d 78 (2d Cir. 2001)......................................................................................... 4

*Eisen v. Carlisle & Jacquelin*,
   417 U.S. 156 (1974)................................................................................................. 21

*In re "Agent Orange" Prod. Liab. Litig.*,
   611 F. Supp. 1396 (E.D.N.Y. 1985) ....................................................................... 17

*In re Am. Bank Note Holographics, Inc., Sec. Litig.*,
   127 F. Supp. 2d 418 (S.D.N.Y. 2001)............................................................... 16, 23

*In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*,
   909 F. Supp. 2d 259 (S.D.N.Y. 2012)..................................................................... 19

*In re Charter Commc'ns, Inc. Sec. Litig.*, No 4:02-CV-1186 (CAS),
   2005 WL 4045741 (E.D. Mo. June 30, 2005) ........................................................ 23

*In re Currency Conversion Fee Antitrust Litig.*,
   263 F.R.D. 110 (S.D.N.Y. 2009) ........................................................................ 4, 22

*In re EVCI Career Colls. Holding Corp. Sec. Litig.*,
   No. 05 Civ. 10240, 2007 WL 2230177 (S.D.N.Y. July 27, 2007) ........................... 9

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   No. 02-CV-3400 CM PED, 2010 WL 4537550 (S.D.N.Y. Nov. 8, 2010) .............. 10

*In re Giant Interactive Grp., Inc. Sec. Litig.*
   279 F.R.D. 151 (S.D.N.Y. 2011) ............................................................................ 19

*In re Gilat Satellite Networks, Ltd.*,
   No. CV-02-1510 CPS, 2007 WL 1191048 (E.D.N.Y. Apr. 19, 2007) .................... 10

*In re Global Crossing Sec. & ERISA Litig.*,
   225 F.R.D. 436 (S.D.N.Y. 2004) ......................................................... 13, 14, 17, 22

*In re Gulf Oil/Cities Serv. Tender Offer Litig.*,
   142 F.R.D. 588 (S.D.N.Y. 1992) ...................................................... 23

*In re Luxottica Grp. S.p.A. Sec. Litig.*,
   233 F.R.D. 306 (E.D.N.Y. 2006) ...................................................... 10

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
   No. 04 CIV. 8144 (CM), 2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009)................................. 23

*In re Merrill Lynch Tyco Research Sec. Litig.*,
   249 F.R.D. 124 (S.D.N.Y. Apr. 16, 2008) .............................................. 9

*In re NASDAQ Litig.*,
   No. 94 Civ. 3996 (RWS), 1999 WL 395407 (S.D.N.Y. June 15, 1999) .......................... 21, 23

*In re Nasdaq Market-Makers Antitrust Litig.*,
   187 F.R.D. 465 (S.D.N.Y. 1998) ...................................................... 20

*In re Omnicom Group, Inc. Sec. Litig.*,
   541 F. Supp. 2d 546 (S.D.N.Y. 2008), *aff'd*, 597 F.3d 501 (2d Cir. 2010) ......................... 6, 15

*In re PaineWebber Ltd. P'ships Litig.*,
   171 F.R.D. 104 (S.D.N.Y. 1997), *aff'd*, 117 F.3d 721 (2d Cir. 1997).................................... 17

*In re Prudential Ins. Co. Am. Sales Practice Litig.*,
   148 F.3d 283 (3d Cir. 1998)............................................................ 12

*In re Sumitomo Copper Litig.*,
   189 F.R.D. 274 (S.D.N.Y. 1999) ...................................................... 10

*In re Veeco Instruments Inc. Sec. Litig.*,
   No. 05 MDL 01695 (CM), 2007 WL 4115809 (S.D.N.Y. Nov. 7, 2007) ............................... 20

*In re Warner Commc'ns Sec. Litig.*,
   798 F.2d 35 (2d Cir. 1986)............................................................ 10

*In re WorldCom, Inc. Sec.*,
   347 B.R. 123 (Bankr. S.D.N.Y. 2006)................................................... 13

*In re WorldCom, Inc. Sec. Litig.*,
   388 F. Supp. 2d 319 (S.D.N.Y. 2005)........................................... 21, 22, 23

*Maley v. Del. Global Techs. Corp.*,
   186 F. Supp. 2d 358 (S.D.N.Y. 2002)........................................ 12, 14, 18, 22

*Maywalt v. Parker & Parsley Petro. Co.*,
    67 F.3d 1072 (2d Cir. 1995)........................................................................... 9

*Newman v. Stein,*
    464 F.2d 689 (2d Cir. 1972).......................................................................... 17

*Pennsylvania Pub. Sch. Emps' Ret. Sys. v. Bank of Am. Corp.*,
    874 F.Supp.2d 341 (S.D.N.Y. 2012)............................................................. 15

*Pennsylvania Pub. Sch. Emps' Ret. Sys. v. Bank of Am. Corp.*,
    939 F.Supp.2d 445 (S.D.N.Y. 2013) ............................................................ 15

*Strougo ex rel. Brazilian Equity Fund, Inc.  v. Bassini*,
    258 F. Supp. 2d 254 (S.D.N.Y. 2003)............................................................. 9

*Teachers' Ret. Sys. of La. v. A.C.L.N., Ltd.*, No. 01-CV-11814 (MP),
    2004 WL 1087261 (S.D.N.Y. May 14, 2004) ............................................. 17

*Trief v. Dun & Bradstreet Corp.*,
    840 F. Supp. 277 (S.D.N.Y. 1993) ................................................................. 9

*Varljen v. H.J. Meyers & Co., Inc.*,
    No. 97 Civ. 6742, 2000 WL 1683656 (S.D.N.Y. Nov. 8, 2000) ................... 9

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
    396 F.3d 96 (2d. Cir. 2005)............................................................... 8, 9, 21

*Weinberger v. Kendrick*,
    698 F.2d 61 (2d. Cir. 1983)............................................................................ 8

## **Statute**

Private Securities Litigation Reform Act of 1995, § 21D(a)(7), 15 U.S.C. § 78u4(a)(7) ........... 22

## **Rules**

Fed. R. Civ. P. 23 ........................................................................................... 1

Fed. R. Civ. P. 23(c)(2) ................................................................................ 21

Fed. R. Civ. P. 23(e) ..................................................................................... 22

**<u>Newspaper</u>**

*Wall Street Journal* ................................................................................................. 8, 21

**<u>Website</u>**

*PR Newswire* ...................................................................................................... 8, 21

Lead Plaintiff, the Commonwealth of Pennsylvania, Public School Employees' Retirement System ("PSERS" or "Lead Plaintiff"[1]), on behalf of itself and the certified Class, respectfully submits this memorandum of law in support of its motion for final approval of the proposed class action settlement between the Class and Defendant Bank of America Corporation ("BoA" or the "Company"), the Executive Defendants, the Director Defendants, the Underwriter Defendants, and PricewaterhouseCoopers LLP ("PwC") (the "Settlement") and for approval of the proposed Plan of Allocation.

## PRELIMINARY STATEMENT

After more than five years of intense litigation, including more than three years of extensive fact discovery and ten months of arm's-length negotiations under the auspices of former U.S. District Court Judge Layn Phillips, one of the most experienced mediators in securities class actions, Lead Plaintiff and Defendants have agreed to settle all claims against the Defendants that are based upon, arise out of, or relate to those asserted in this Action in exchange for payment of Three Hundred and Thirty-Five Million dollars ($335,000,000), which, pursuant to this Court's Preliminary Approval Order, has been deposited in the Court Registry Investment System maintained for the United States District Court of the Southern District of New York by the Federal Reserve Bank of New York.  Lead Plaintiff respectfully submits that the proposed Settlement represents an excellent result for the Class and plainly satisfies the standards for final approval of a settlement under Rule 23 of the Federal Rules of Civil Procedure.

The Settlement represents a substantial recovery in a securities class action rising from BoA's alleged involvement in misleading investors concerning the magnitude of its exposure to

---

[1] All capitalized terms not otherwise defined herein have the same meanings as set forth in Paragraph 1 of the Stipulation and Agreement of Settlement dated March 12, 2016, as amended on June 13, 2016 (the "Stipulation").

demands to repurchase or reimburse claimants with respect to residential mortgage-backed securities ("RMBS") issued or sold by Bank of America Corporation ("BoA" or "the Company") or Countrywide (Lead Plaintiff's "rep and warranty claims") and alleged institutional risks arising from BoA's and Countrywide's use of and reliance upon a national electronic database ("MERS") to track changes in mortgage servicing rights and beneficial ownership interests in loans secured by residential real estate (Lead Plaintiff's "MERS claims").  ¶¶2, 12.[2]  At the time the Settlement was reached, Lead Plaintiff and Lead Counsel had a full understanding of the strengths and weaknesses of Lead Plaintiff's claims and Defendants' defenses.

Indeed, throughout this hard-fought litigation, Lead Plaintiff, through Lead Counsel, vigorously prosecuted the claims of Class Members.  As set forth in greater detail in the Rosen Declaration, before the Settlement was reached, Lead Counsel (i) conducted an extensive investigation of both public and non-public sources of information relating to the claims and the underlying events prior to filing of both the Consolidated Complaint and Amended Complaint, including retaining and consulting multiple experts and using a private investigator to identify and obtain information from confidential witnesses to substantiate claims developed by Lead Counsel that were not included in the initial complaints filed in this action  (¶¶10, 11); (ii) drafted, filed and served the Consolidated Complaint and Amended Complaint (¶¶7-14, 19); (iii)

---

[2] Unless otherwise stated, all references to ¶__ herein are to the Declaration of Mark R. Rosen in Support of Lead Plaintiff's Motion For Final Approval of Class Action Settlement, For Approval of Proposed Plan of Allocation, and in Support of Motion For an Award of Attorneys' Fees and Reimbursement Of Litigation Expenses (the "Rosen Declaration" or "Rosen Decl.") that Lead Plaintiff is filing herewith. The Rosen Declaration provides a detailed description of the history of this litigation, the claims asserted, the investigation and discovery undertaken, the negotiation process, the substance of the Settlement and the Plan of Allocation, and the substantial risks in litigating the claims asserted against the Defendants.  It is an integral part of the submission and it is incorporated herein by reference.

opposed the motions to dismiss filed by BoA and the Executive Defendants through two rounds of briefing, first on the Consolidated Complaint and second on the Amended Complaint, as well as motions for reconsideration in a process that spanned nearly a year and a half, with the final result being that Lead Plaintiff was able to maintain claims under the Securities Exchange Act of 1934 against both the Company and the Executive Defendants (¶¶15-17, 20-22); (iv) served document requests on Defendants and conducted dozens of meet-and-confer sessions with BoA's counsel in order to obtain more than 8 million pages of documents produced by Defendants, and served subpoenas on non-parties to obtain more relevant documents (¶¶28, 32, 37); (v) reviewed and analyzed the documents produced by Defendants as well as the documents produced by non-parties by expanding its litigation team and conducting training sessions on the types of specialized documents being produced by the Defendants and non-parties; (vi) prepared for and took 23 fact witness depositions, and defended and/or attended 11 depositions noticed by Defendants including depositions of Lead Plaintiff's representatives, outside investment advisors that transacted in BoA stock on behalf of Lead Plaintiff, and certain of the confidential witnesses whose information was included in the Consolidated Complaint and/or Amended Complaint (¶¶32-33, 43); (vii) responded to Defendants' discovery requests addressed to Lead Plaintiff by ensuring that PSERS identified and produced all relevant and responsive documents, and by ensuring that the outside investment managers were also producing relevant and responsive documents in response to the subpoenas served on them by Defendants (¶¶39-41); (viii) filed detailed papers in support of Lead Plaintiff's class certification motion, but also worked diligently to narrow the issues in dispute concerning class certification and, ultimately, secured a stipulation certifying the class proposed by Lead Plaintiff (¶¶56-63); and (ix) challenged Defendants' document "clawback" requests on the eve of Lead Plaintiff's depositions, as well as

BoA's assertion of the bank examination privilege as a basis for withholding production of tens of thousands of documents to Lead Plaintiff (¶¶48-51).[3]

Moreover, the Settlement is the result of ten months of arm's-length in-person mediation sessions facilitated by former U.S. District Court Judge Layn Phillips.  ¶¶68-74.  The mediation process began in April 2014, when Lead Plaintiff and BoA agreed to engage in a mediation process.  Prior to the first mediation session held on October 2, 2014, each side made several detailed submissions to Judge Phillips, where they outlined their respective views of the merits of the claims and defenses in the Action.  ¶71.  Additional mediation sessions were held before Judge Phillips on February 27, 2015 and August 12, 2015.  ¶¶72-73.  At the conclusion of the third all-day mediation session on August 12, 2015, counsel for BoA and Lead Counsel, on behalf of their respective clients, accepted the mediator's proposal to settle and release all claims asserted in the Action in return for a cash payment by BoA of $335 million.  ¶73.

In addition to the many reasons stated in this Memorandum and in the Rosen Declaration, the settlement process itself supports a strong presumption of fairness and approval of the Settlement.  *See D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) (presumption of fairness found where the settlement was the product of "arm's-length negotiations and that plaintiffs' counsel have possessed the experience and ability, and have engaged in the discovery, necessary to effective representation of the class's interests" and that "mediator's involvement in . . . settlement negotiations helps to ensure that the proceedings were free of collusion and undue pressure"); *In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. 110, 122 (S.D.N.Y. 2009) (Pauley, *J.*) (where a settlement is the production of arm's length negotiations conducted by

---

[3] Lead Plaintiff's motion concerning the bank examination privilege had been briefed but undecided at the time the parties entered into the Stipulation of Settlement.

4

experienced counsel knowledgeable in complex class litigation, the negotiation enjoys "a presumption of fairness.").  Moreover, the Settlement was negotiated under the direction and with direct and substantial involvement of Lead Plaintiff, whose representatives attended the mediations.  *See* Declaration of Steven Skoff in Support of Final Approval of Class Action Settlement, Plan of Allocation, Award of Attorneys' Fees and Reimbursement of Expenses, and Reimbursement of Expenses of Lead Plaintiff ("Skoff Decl."), attached as Exhibit A to the Rosen Declaration, at ¶¶8, 10-12.

The Settlement represents a particularly excellent result when considered in light of the considerable risks associated with this Action.  ¶¶75-91.  As set forth in greater detail in the Rosen Declaration, throughout the litigation, Defendants maintained a series of defenses that, if successful, could well have undercut Lead Plaintiff's ability to maintain certification of the class, to defeat motions for summary judgment and/or secure a meaningful recovery, or even any recovery at all, on behalf the Class.  *Id.*

For instance, Lead Plaintiff faced considerable risks in establishing liability, in that Defendants strenuously argued that the statements Lead Plaintiff claimed were materially misleading were truthful at the time they were made, or that Defendants had no duty to disclose the allegedly withheld information.  ¶¶77-79.  Further, Defendants would likely have contested any allegation of scienter by pointing to the fact that BoA's outside auditor, PwC, reviewed each of BoA's quarterly financial statements before they were issued (as well as auditing BoA's year-end financial statements) and did not recommend any changes to these statements.  ¶80.  Both BoA and the Executive Defendants could also have asserted an "advice of counsel" defense for not disclosing the magnitude of the unpaid principal balance of the outstanding loans for which BoA and Countrywide had provided representations and warranties.  ¶81.

5

Lead Plaintiff also faced considerable risks in establishing loss causation and damages, as Defendants would have raised a series of issues concerning loss causation and damages that Lead Plaintiff might have asserted at trial, including that the alleged curative information that entered the market on Lead Plaintiff's identified disclosure dates did not constitute the disclosure of previously undisclosed material information or that factors other than those disclosures caused the stock price drops on those dates.  ¶¶83-90.   There was also a substantial risk that Defendants would have relied on expert testimony in arguing, among other things, that the size of the stock price declines on Lead Plaintiff's identified disclosure dates, after controlling for other unrelated disclosures by BoA or other industry or market factors, was not statistically significant and could not form the basis for liability under the loss causation and damages requirements of a Section 10(b) claim. ¶87.

As it relates to loss causation and whether a statement that relates to or builds upon previously disclosed information can constitute a corrective disclosure, the parties were particularly aware of this Court's and the Second Circuit's prior decisions in *In re Omnicom Group, Inc. Sec. Litig.*, 541 F. Supp. 2d 546 (S.D.N.Y. 2008) (Pauley, *J.*), *aff'd*, 597 F.3d 501 (2d Cir. 2010), a securities case in which this Court granted summary judgment in favor of defendants and against plaintiffs, holding that the alleged news on the disclosure dates did not constitute corrective disclosures and, even if it did, there was no way for a juror to determine whether any of the loss was attributable to the alleged fraud.   As set forth in the Rosen Declaration, Lead Plaintiff identified three dates toward the end of the class period when the market allegedly learned of facts indicating that Defendants' prior statements or omissions were false or materially misleading and that this resulted in statistically significant declines in the prices of BoA stock.  ¶84.  But Defendants undoubtedly would have challenged Lead Plaintiff's

theory of loss causation by arguing, among other things, that the alleged curative information that entered the market at those times did not constitute new information they were obligated to disclose because (1) BoA's exposure to rep and warranty claims in an analyst report had previously been disclosed when that analyst report was first presented at a conference in August 2010; (2) market participants were well-aware of the use of MERS by financial institutions like BoA; and (3) they intended to demonstrate that the drop in the price of BoA's common stock on October 19, 2010, the final day of the Class Period, was due to the subsequent disclosure later that day of the *identities* of the claimants who had demanded repurchases or reimbursement from BoA, rather than the earlier disclosure of the *magnitude* of their claims itself ($47 billion), and that Defendants had no duty to disclose their identities to the market.  ¶¶85-87.  As such, based on this, there was the distinct possibility that Defendants may have been able to persuade either this Court in future motion practice, or the fact-finder at trial, or an appellate court, that the disclosures contained no new material information or that they were not the cause of the drop in BoA's stock price and, therefore, that loss causation had not been shown.  Any of the above arguments, if credited by this Court a jury, or an appellate court, could have materially limited or eliminated the Class's recovery.

The proposed Settlement, if approved, provides an immediate, certain recovery for the claims asserted in this Action, without incurring the risk that Defendants would succeed either in de-certifying the Class or prevailing at summary judgment, trial, or in subsequent appeals. ¶93. Lead Plaintiff, a sophisticated institutional investor with prior experience serving as a lead plaintiff and with a significant financial stake in the outcome of the Action, has closely supervised and monitored both the prosecution and the settlement of the Action, including attendance at Court hearings and participation in the mediation sessions.  ¶¶112-116; Skoff Decl.

¶¶6-13.  Moreover, Lead Counsel, who is experienced in prosecuting securities class actions, believes that this Settlement is in the best interest of the Class.

By Court Order dated June 15, 2016, the Court granted preliminary approval of the Settlement ("Preliminary Approval Order").  In accordance with the Preliminary Approval Order, on July 14, 2016, the Court-authorized claims administrator, Heffler Radetich & Saitta L.L.P. ("Heffler" or the "Claims Administrator"), began its notice campaign.  On July 21, 2016, the Notice was published in the *Wall Street Journal* and *PR Newswire*.  In addition, the Claims Administrator placed banner notices of the settlement on the Internet from July 21 through August 4, 2016.  ¶97, n.5.  As ordered by the Court and stated in the Notice, any objections to the Settlement, the Plan of Allocation or the request for attorneys' fees and reimbursement of litigation expenses must be submitted by September 13, 2016.

In light of the relevant considerations detailed below and under the standards articulated by the Second Circuit in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974), Lead Plaintiff respectfully submits that the Settlement and the Plan of Allocation are fair, reasonable, and adequate, and should be approved by the Court.

## ARGUMENT

## I.    FINAL APPROVAL OF THE SETTLEMENT SHOULD BE GRANTED

### A.    The Standard for Approval of a Class Action Settlement

As a matter of public policy, courts strongly favor the settlement of lawsuits.  *Weinberger v. Kendrick,* 698 F.2d 61, 73 (2d. Cir. 1983).  This is particularly true in connection with complex class action litigation.  *See Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d. Cir. 2005).  When evaluating a proposed settlement under Rule 23(e), a court must determine whether the settlement, taken as a whole, is fair, reasonable and adequate, and was not

the product of collusion.  *Maywalt v. Parker & Parsley Petro. Co.*, 67 F.3d 1072, 1079 (2d Cir. 1995); *Varljen v. H.J. Meyers & Co., Inc.*, No. 97 Civ. 6742, 2000 WL 1683656, at *3 (S.D.N.Y. Nov. 8, 2000); *In re Merrill Lynch Tyco Research Sec. Litig.*, 249 F.R.D. 124, 132 (S.D.N.Y. Apr. 16, 2008).   A proposed class action settlement is entitled to a presumption of fairness where, as here, it was the product of arm's-length negotiations conducted by capable, experienced counsel.  *See, e.g., In re EVCI Career Colls. Holding Corp. Sec. Litig.*, No. 05 Civ. 10240, 2007 WL 2230177, *4 (S.D.N.Y. July 27, 2007); *Strougo ex rel. Brazilian Equity Fund, Inc.  v. Bassini*, 258 F. Supp. 2d 254, 257 (S.D.N.Y. 2003).  Indeed, "absent evidence of fraud or overreaching, [courts] consistently have refused to act as Monday morning quarterbacks in evaluating the judgment of counsel."  *Trief v. Dun & Bradstreet Corp.*, 840 F. Supp. 277, 281 (S.D.N.Y. 1993) (citation omitted).  The principal factors in evaluating the fairness of a proposed settlement in the Second Circuit are well-settled:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Wal-Mart*, 396 F.3d at 117 (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d at 463).[4]  In weighing these factors, courts recognize that settlements usually involve a significant amount of give and take between the negotiating parties; therefore, courts do not attempt to rewrite

---

[4] Lead Plaintiff recognizes that BoA is a very large company and, therefore, Defendants' ability to withstand a greater judgment was not a significant factor in Lead Plaintiff's decision to enter into the Settlement.

settlement agreements or try to resolve issues that are left undecided as a result of the parties' compromise. *See, e.g., In re Warner Commc'ns Sec. Litig.*, 798 F.2d 35, 37 (2d Cir. 1986).

Lead Plaintiff respectfully submits that the proposed Settlement is eminently fair, reasonable and adequate when measured under the foregoing criteria. The negotiated settlement with BoA was reached only after capable counsel with extensive experience in complex securities litigation: (i) had fully explored the substantial risks associated with continued litigation of the Action and the strengths and weaknesses of the parties' respective positions; and (ii) had engaged in lengthy arm's-length settlement negotiations with counsel for Defendants, overseen by former Judge Phillips. The Settlement represents an excellent and immediate result for the Class and should be approved by this Court.

**B.     The Settlement is Substantively Fair Under *Grinnell***

**1.     The Complexity, Expense and Likely Duration of the Litigation**

"[I]n evaluating the settlement of a securities class action, federal courts, including this Court, 'have long recognized that such litigation is notably difficult and notoriously uncertain.'" *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, No. 02-CV-3400 CM PED, 2010 WL 4537550, at *15 (S.D.N.Y. Nov. 8, 2010) (quoting *In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 281 (S.D.N.Y. 1999)). Because "[s]ecurities class actions are generally complex and expensive to prosecute," *In re Gilat Satellite Networks, Ltd.*, No. CV-02-1510 CPS, 2007 WL 1191048, at *10 (E.D.N.Y. Apr. 19, 2007), such actions "readily lend themselves to compromise because of the difficulties of proof, the uncertainties of the outcome, and the typical length of the litigation." *In re Luxottica Grp. S.p.A. Sec. Litig.*, 233 F.R.D. 306, 310 (E.D.N.Y. 2006).

As reflected in the Rosen Declaration, this prosecution has required exhaustive efforts. The parties briefed numerous motions, including two sets of motions to dismiss, motions for

reconsideration of this Court's orders on each of those motions, and a motion concerning BoA's assertion of the bank examiner privilege to shield the production of tens of thousands of documents.   ¶¶15-17, 20-22, 48-54.  In addition, Lead Counsel reviewed and analyzed over 8 million pages of documents, took 23 fact witness depositions and engaged in discovery in connection with class certification, including attending and/or defending an additional 11 depositions noticed by Defendants, including the depositions of Lead Plaintiff's outside investment advisors.  As reflected by the more than 77,000 hours Plaintiffs' attorneys and paralegals spent litigating this case, the litigation effort has been enormous.  ¶125.  While Defendants' motions to dismiss had already been decided, a stipulated class had been certified, and fact discovery nearly completed, Defendants reserved the right to mount a renewed challenge to class certification at the time of the Settlement and inevitable summary judgment and *Daubert* motions had yet to be filed by the parties.  The resolution of each of these issues would require an additional investment of time and expense on behalf of each of the parties.

The complexity of the substantive issues in this Action also weighs in favor of approving the Settlement.  Lead Plaintiff's 141-page Amended Complaint alleged that Defendants violated the federal securities laws by misrepresenting and concealing (a) the magnitude of BoA's potential exposure to rep and warranty claims based upon demands to repurchase or reimburse counterparties involved with RMBS and other mortgage loans that had been sold and securitized by BoA and Countrywide and (b) the risks to BoA arising from BoA's and Countrywide's use of and reliance upon MERS, a national electronic database that tracks changes in mortgage servicing rights and beneficial ownership interests in loans secured by residential real estate, causing the prices of BoA securities to be artificially inflated over the course of the Class Period. Moreover, this case involved accounting and financial issues that required a thorough

11

understanding of the GAAP provisions at issue, and required extensive consultation with forensic accounting and auditing experts. If the Action were to continue, Lead Plaintiff would undoubtedly face multifaceted defenses from Defendants concerning liability, loss causation and damages, which would have required Lead Plaintiff to engage in expert discovery. ¶¶75-91.

Furthermore, absent the Settlement, there would have been significant additional necessary resources and costs expended to prosecute the claims against the Defendants. Trial on these issues would be both lengthy and costly, and would require expert testimony, further adding to the expense and duration of the Action. *See In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 318 (3d Cir. 1998) (settlement favored where "trial of this class action would be a long, arduous process requiring great expenditures of time and money on behalf of both the parties and the court"). Moreover, even if the Class were able to recover a judgment at trial, there is always additional delay caused by not only the trial, but by the inevitable appeals of any judgments. Thus, the Settlement provides a substantial immediate benefit for the Class without the expense and delay of further litigation.

### 2. The Reaction of the Class to the Settlement

The reaction of the Class to the Settlement is another factor favoring its approval by the Court. *See Grinnell*, 495 F.2d at 462. The deadline for filing objections is September 13, 2016. As of August 29, 2016, no objections to the settlement or plan of allocation have been received by Lead Counsel or the Claims Administrator. Lead Plaintiff respectfully submits that the positive reaction of the Class to date supports approval of the Settlement. *See Maley v. Del. Global Techs. Corp.*, 186 F. Supp. 2d 358, 362 (S.D.N.Y. 2002) ("It is well-settled that the reaction of the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy.").

### 3.      The Stage of the Proceedings and Amount of Discovery Completed

"[T]he stage of the proceedings and the amount of discovery completed" are other factors to be considered in determining the fairness, reasonableness and adequacy of a settlement. *Grinnell*, 495 F.2d at 463.  "[F]ormal discovery is not a prerequisite; the question is whether the parties had adequate information about their claims."  *In re Global Crossing Sec. & ERISA Litig.,* 225 F.R.D. 436, 458 (S.D.N.Y. 2004); *see also In re WorldCom, Inc. Sec.*, 347 B.R. 123, 145 (Bankr. S.D.N.Y. 2006) ("This factor is attuned to the parties' knowledge and awareness of the relative strength or weakness of each party's respective arguments and positions.").  This factor strongly supports the Settlement.

Here, after more than five years of litigating this Action, Lead Plaintiff and Defendants have gained a thorough understanding of the strengths and weaknesses of the claims and the obstacles to success.  As set forth in greater detail in the Rosen Declaration, the Settlement was reached only after completion of: (i) Lead Plaintiff's initial pre-filing factual investigation (¶9); (ii) Lead Plaintiff's analysis of BoA's public filings and public statements (*id.*); (iii) Lead Plaintiff's review of news articles, analyst reports and transcripts of public hearings concerning BoA (*id.*); (iv) Lead Plaintiff's interviews of several confidential witnesses in connection with drafting the Complaint (¶11.); (v) exhaustive briefing of Defendants' motions to dismiss and related motions for reconsideration (¶¶15-17, 20-22); (vi) the review and analysis of over 8 million pages of documents produced by Defendants (¶¶28, 37); (vii) consultations with experts on loss causation and damages, accounting and auditing, and housing finance and the recording and securitization of mortgage loans (¶¶10, 70); (viii) Lead Plaintiff's briefing of its motion for class certification and negotiation of a stipulation for class certification (¶¶56-63) ; (ix) class-related discovery, including attending and/or defending 11 depositions noticed by Defendants,

13

two of whom were representatives of PSERS, five were confidential witnesses, and another four were Lead Plaintiff's outside investment advisors (¶44); (x) the depositions of 23 fact witnesses (¶43); and (xi) intensive settlement negotiations facilitated by Judge Phillips, where the parties aired their significant differences concerning the strengths and weaknesses of each side's claims and defenses, as well as the potential damages that might be presented by each side to a jury (¶¶68-73).  Thus, the Settlement was not achieved until the Parties had sufficient familiarity with the issues in the case in order to evaluate its merits and agree on a settlement amount that was acceptable to Defendants and reasonable, fair and adequate to the Class.  Lead Plaintiff and Lead Counsel therefore had the requisite information to make an informed decision about the relative benefits of litigating or settling the Action and "developed an informed basis from which to negotiate a reasonable compromise."  *Global Crossing*, 225 F.R.D. at 459; *see also Maley*, 186 F. Supp. 2d at 363-64.

4.  **The Risks of Establishing Liability and Damages and in Maintaining the Class Action Through Trial**

*Grinnell* holds that, in assessing the fairness, reasonableness, and adequacy of a settlement, courts should also consider the "risks of establishing liability," "the risks of establishing damages," and "the risks of maintaining the class action through the trial."  *Grinnell*, 495 F.2d at 463.   In so doing, the Court is not called on to adjudicate disputed issues or decide unsettled questions, but instead should "assess the risks of litigation against the certainty of recovery under the proposed settlement."  *Global Crossing*, 225 F.R.D. at 459 ("Courts approve settlements where plaintiffs would have faced significant legal and factual obstacles to proving their case.").  While the claims asserted in this Action were brought in good faith and Lead Plaintiff believes they have merit, as detailed in the Rosen Declaration at ¶¶76-87 there were

14

significant risks that Lead Plaintiff would have faced in attempting to achieve a better result through continued litigation.

Although the claims asserted in the Amended Complaint survived Defendants' multiple motions to dismiss, as well as multiple motions for reconsideration,[5] and Defendants had stipulated to certification of the Class, Defendants reserved their right, pursuant to Fed.R.Civ.P. 23(c)(1)(C), to move to alter or amend the Court's class certification order.  There were also numerous other risks that could have prevented Lead Plaintiff from achieving any recovery on behalf of the Class, or at least a recovery of the magnitude of the amount achieved through the proposed Settlement, including the possibility of the Court finding in favor of Defendants at summary judgment on the basis of liability and/or loss causation.  Indeed, it is likely that Defendants would have moved for summary judgment on issues relating to liability, loss causation and/or damages, relying, in part, on this Court's and the Second Circuit's prior decisions in *In re Omnicom Group*, which as noted in more detail above was a securities case with certain facts that bore similarities to certain facts in this case where this Court entered

---

[5] On July 11, 2012, this Court issued a Memorandum and Order (1) denying BoA's motion to dismiss Lead Plaintiff's claims pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 ("1934 Act Claims") asserted against BoA; (2) granted, without prejudice, the Executive Defendants' motions to dismiss the 1934 Act Claims asserted against them; and (3) granted, with prejudice, all motions to dismiss Lead Plaintiff's claims pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 ("1933 Act Claims") asserted in the Consolidated Complaint.  ¶16.  *Pennsylvania Pub. Sch. Emps' Ret. Sys. v. Bank of Am. Corp.*, 874 F.Supp.2d 341 (S.D.N.Y. 2012). As a consequence of this Order, all claims against the Director Defendants, Underwriter Defendants and PwC were dismissed with prejudice.  *Id*.  After Lead Plaintiff filed its Amended Complaint, the Executive Defendants moved to dismiss the 1934 Act Claims against them, and on April 17, 2013, this Court denied in part the Executive Defendants' motion to dismiss.  ¶16.  The Court denied Defendants' motions for reconsideration of each of its orders on the motions to dismiss, first on August 28, 2012 (denying BoA's motion for reconsideration) and again on June 12, 2013 (denying Brian Moynihan's motion for reconsideration).  ¶¶17, 22.  *Pennsylvania Pub. Sch. Emps' Ret. Sys. v. Bank of Am. Corp.*, 939 F.Supp.2d 445 (S.D.N.Y. 2013).

judgment in favor of defendants and against the plaintiff on loss causation grounds.  Further, even if the Court had permitted the claims to proceed to trial after what clearly would have been lengthy and contentious expert witness disputes and summary judgment motions, a jury could have either ruled against Lead Plaintiff or awarded damages in an amount less than those sought by Lead Plaintiff.

Moreover, there was further risk that even if Lead Plaintiff were successful in overcoming summary judgment and establishing liability at trial and having the judgment upheld on appeal, Lead Plaintiff's damages could still be substantially reduced or eliminated based on Defendants' arguments with respect to, among other things, the magnitude and statistical significance (or lack thereof) of the stock drops on Lead Plaintiff's alleged disclosure dates and/or confounding information in the market on the disclosure dates.  ¶¶86, 87.  Proof of damages in a securities fraud case is always difficult and invariably requires highly technical expert testimony.  The experts retained by Lead Plaintiff and Defendants could be expected to have widely divergent views on loss causation and damages issues in this case.  Courts have recognized the need for compromise where it is impossible to predict which expert's testimony or methodology would be accepted by the jury.  *See generally In re Am. Bank Note Holographics, Inc., Sec. Litig.,* 127 F. Supp. 2d 418, 426-27 (S.D.N.Y. 2001) (stating that "[i]n such a battle, Plaintiffs' counsel recognize the possibility that a jury could be swayed by experts for Defendants, who could minimize or eliminate the amount of Plaintiffs' losses"); *see also In re PaineWebber Ltd. P'ships Litig.,* 171 F.R.D. 104, 129 (S.D.N.Y. 1997), *aff'd,* 117 F.3d 721 (2d Cir. 1997).  Indeed, at the time of the Settlement, Lead Plaintiff already knew that damages would be a hotly contested issue in the litigation through the extensive and detailed mediation sessions and submissions by the parties to Judge Phillips.   ¶74.

Given all of the risks of establishing liability, damages and maintaining the class action through trial, this factor weighs in favor of approval of the Settlement.

5.    **The Range of Reasonableness of the Settlement Amount in Light of the Best Possible Recovery and the Risks of Litigation**

The final two *Grinnell* factors - the reasonableness of the settlement in light of the best possible recovery and the risks of litigation - also weigh in favor of approval of the Settlement.  As the Second Circuit has explained, there is "a range of reasonableness with respect to a settlement" that "recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion."  *Newman v. Stein,* 464 F.2d 689, 693 (2d Cir. 1972).  A fairness determination turns not on a "mathematical equation yielding a particularized sum ... but rather ... [on] the strengths and weaknesses of the plaintiff's case."  *In re PaineWebber*, 171 F.R.D. at 130.

In assessing the reasonableness of a settlement amount, the legal and practical obstacles to obtaining a larger recovery at trial must be weighed against the certainty of the proposed settlement.  *See Global Crossing,* 225 F.R.D. at 461.  The prompt, guaranteed payment of the settlement money now increases the settlement's value in comparison to "some speculative payment of a hypothetically larger amount years down the road."  *Teachers' Ret. Sys. of La. v. A.C.L.N., Ltd.*, No. 01-CV-11814 (MP), 2004 WL 1087261, at *5 (S.D.N.Y. May 14, 2004); *see also Global Crossing,* 225 F.R.D. at 461; *In re "Agent Orange" Prod. Liab. Litig.*, 611 F. Supp. 1396, 1405 (E.D.N.Y. 1985).

As set forth above, Defendants would have made arguments that would have called into question whatever damages Lead Plaintiff might have sought at trial.  Even if the amount of "potential damages" is greater than the amount of a proposed settlement, however, this does not

17

preclude approval of a lesser settlement.  *See Grinnell*, 495 F.2d at 455 ("[T]he fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved.").

The reasonableness of the Settlement in light of the risks of litigation, thus, weighs heavily in favor of approval of the Settlement.  Given the declines in the prices of BoA stock on the dates of the alleged curative disclosures and the number of shares outstanding, the best possible recovery that might have been achieved by successfully taking the case to trial and through the inevitable appeals, might have been multiples of the amount that Lead Plaintiff obtained through the Settlement.  However, as summarized in the Rosen Declaration, Lead Plaintiff faced very significant risks pertaining to liability, loss causation and damages.  ¶¶76-90.  Moreover, getting the case to a position where such a trial could have taken place, not to mention the inevitable appeals, would have subjected all Class members to years of additional delay before any recovery might have been achieved.  Among other things, the Parties could have taken a large part of a year for expert discovery and the inevitable *Daubert* motions; Lead Plaintiff would likely have faced motions for summary judgment; and the Parties would likely have also briefed numerous *in limine* motions, brought by each side.  *See Maley,* 186 F. Supp. 2d at 366 ("Settling avoids delay as well as uncertain outcome at summary judgment, trial and on appeal. The legal and factual difficulties inherent in this case…coupled with the unpredictability of a lengthy and complex trial, and the appellate process that would follow, with the risk of reversal, make the fairness of this substantial settlement readily apparent.").

Lead Plaintiff faced risks at each of these stages, which the mediator took into account in making the mediator's proposals for the Settlement, and which Lead Plaintiff and Lead Counsel took into account in accepting the proposal.  Thus, when the benefits of the immediate guaranteed

recovery are weighed against the risks of continued litigation and potential for recovery after trial, it is clear that approval of the Settlement is warranted on the basis of this factor.

### C.     The Proposed Settlement Is The Product Of Informed Arm's-Length Negotiations And Is Presumptively Fair

The record demonstrates the Settlement's procedural fairness.   The Settlement negotiations, which spanned nine months and were conducted at arm's-length between Lead Counsel and counsel for the Defendants under the auspices Judge Phillips, is entitled to a presumption of fairness.  ¶¶63-71. *See In re Giant Interactive Grp., Inc. Sec. Litig.,* 279 F.R.D. 151, 160 (S.D.N.Y. 2011) (settlement approved where the "settlement was the product of prolonged, arms-length negotiation, including as facilitated by [Judge Phillips] a respected mediator"); *In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.,* 909 F. Supp. 2d 259, 265 (S.D.N.Y. 2012) ("The parties, represented by highly experienced and capable counsel, engaged in extensive arm's length negotiations, which included multiple sessions mediated by retired federal judge Layn R. Phillips, an experienced and well-regarded mediator of complex securities cases.").

In April 2014, Lead Plaintiff and BoA agreed to a mediation of the Action before Judge Phillips.  In advance of mediation, Lead Plaintiff and BoA made several detailed submissions to Judge Phillips, and on October 2, 2014, representatives of Lead Plaintiff and BoA and their respective counsel participated in a mediation session with Judge Phillips.  ¶71; Skoff Decl. ¶9-12.  Because the first mediation session did not result in an agreement to resolve the Action, additional mediation sessions were held in February and August 2015.  ¶¶72, 73.   At the conclusion of the mediation session on August 12, 2015, counsel for BoA and Lead Counsel, on

behalf of their respective clients, accepted a mediator's proposal from Judge Phillips to settle the claims for a cash payment of $335 million. *Id.*

Lead Plaintiff was intimately involved in the negotiation process. Among other things, Lead Plaintiff approved the decision to enter into settlement negotiations, participated in each of the mediation sessions, was intimately involved in the negotiations, accepted and approved the settlement recommendation proposed by the mediator, and approved the final Stipulation and Agreement of Settlement. ¶¶155-156; Skoff Decl. ¶¶9-12. These facts also weigh in favor of approving the Settlement. *See In re Veeco Instruments Inc. Sec. Litig.*, No. 05 MDL 01695 (CM), 2007 WL 4115809, at *5 (S.D.N.Y. Nov. 7, 2007) ("under the PSLRA, a settlement reached — as this one was under the supervision and with the endorsement of a sophisticated institutional investor…is entitled to an even greater presumption of reasonableness…Absent fraud or collusion, the court should be hesitant to substitute its judgment for that of the parties who negotiated the settlement") (internal citations omitted).

Lead Counsel, who made the presentations during mediation sessions, participated in other communications with the mediator and Lead Plaintiff, and negotiated the final Settlement on behalf of the Class, has extensive experience in successfully prosecuting some of the largest and most complex securities class actions in history. See ¶133 & Exhibit F to Rosen Declaration. Lead Counsel, who have served as lead counsel in other historic securities class actions settlements and had the benefit of three years of extensive discovery, and was therefore in a position to assess the strengths and weaknesses of the claims and defenses, also recommends that the Court approve the Settlement. ¶79. Such a recommendation should be accorded "great weight." *See In re Nasdaq Market-Makers Antitrust Litig.,* 187 F.R.D. 465, 474 (S.D.N.Y. 1998)

("'Great weight' is accorded to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation.").

## II.   THE NOTICE OF SETTLEMENT SATISFIES DUE PROCESS REQUIREMENTS AND IS REASONABLE

Rule 23(c)(2) requires "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173-75 (1974)  (class notice is designed to fulfill due process requirements); *In re NASDAQ Litig.,* No. 94 Civ. 3996 (RWS), 1999 WL 395407, at *2 n. 3 (S.D.N.Y. June 15, 1999).   The standard for measuring the adequacy of a class action settlement notice is reasonableness.  *See In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 340 (S.D.N.Y. 2005); *Wal-Mart,* 396 F.3d at 114.  "There are no rigid rules to determine whether a settlement notice to the class satisfies constitutional or Rule 23(e) requirements; the settlement notice must fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings."  *Id*. at 114 (internal citation omitted).  "Notice is adequate if it may be understood by the average class member." *Id.* (internal citation omitted).

Here, in accordance with the Court's Preliminary Approval Order, starting on July 14, 2016, Heffler caused the Notice and Proof of Claim packets, as approved by the Court, following the input from Professor McGovern, to be mailed by first class mail to potential Class Members. On July 21, 2016, the Notice was published in the *Wall Street Journal* and released over *PR Newswire*.  Heffler also arranged to place banner ads concerning the settlement on the Internet from July 21 through August 4, 2016  *Id.* ¶97, n. 5 & Exhibit B.  The Notice references the accompanying Long Form Notice, which contains a thorough description of the Settlement, the

Plan of Allocation, and Class Members' rights to participate in and object to the Settlement, or exclude themselves from the Class. *Id,* Exhibit B. Downloadable copies of the Notice and Proof of Claim Form and Long Form Notice and other information regarding the Settlement were posted on a website devoted solely to the administration of the Settlement (*BoASecuritiesSettlement.com*), as well as on Lead Counsel's website (*www.barrack.com*). *Id.*

The notice program, which combined an individual, mailed Notice and Proof of Claim packet to all potential Class Members who could be reasonably identified, as well as to custodian holders, a downloadable Long Form Notice, and the publication of the Notice in the nation's pre-eminent national business publication and over the Internet, including a banner notice, contained all of the information required by § 21D(a)(7) of the PSLRA, 15 U.S.C. § 78u4(a)(7), and is adequate to meet the due process and Rule 23(c)(2) and (e) requirements for providing notice to the Class.

## III.    THE PLAN OF ALLOCATION IS FAIR, REASONABLE AND ADEQUATE

"To warrant approval, the plan of allocation must meet the standards by which the … settlement was scrutinized — namely, it must be fair and adequate." *In re Currency Conversion Fee Antitrust Litig*., 263 F.R.D. at 126, *quoting Maley v. Del Global Techs. Corp*., 186 F. Supp. 2d at 367. *See  WorldCom,* 388 F. Supp. 2d at 344 (to be approved, a plan of allocation for a class recovery must be fair and reasonable). "When formulated by competent and experienced class counsel," a plan of allocation "need have only a reasonable, rational basis.'" *Global Crossing,* 225 F.R.D. at 462 (internal citations omitted). *See also Maley,* 186 F. Supp. 2d at 367 ("The proposed Plan of Allocation, which was devised by experienced plaintiffs' counsel who are familiar with the relative strengths and weaknesses of the potential claims of Class members, satisfies the same standards of fairness, reasonableness, and adequacy that apply to the overall

settlement."); *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, No. 04 CIV. 8144 (CM), 2009 WL 5178546, at *13 (S.D.N.Y. Dec. 23, 2009).  In determining whether a plan of allocation is fair, courts look largely to the opinion of counsel.  *Am. Bank Note*, 127 F. Supp. 2d at 429-30; *In re NASDAQ Litig.,* No. 94 Civ. 3996 (RWS), 2000 WL 37992, at *2 (S.D.N.Y. Jan. 18, 2000).

Here, the Plan of Allocation is designed to achieve an equitable distribution of the Net Settlement Fund.  Lead Counsel worked closely with Lead Plaintiff's damages expert in establishing the Plan of Allocation and believes that the Plan of Allocation is a fair and reasonable method to allocate the Net Settlement Fund among Class Members.  ¶¶102-103. Lead Plaintiff also believes that the Plan of Allocation represents a fair and reasonable method of valuing claims submitted by Class Members.  Skoff Decl. ¶13.

The Plan of Allocation for BoA's common stock and BoA Common Equivalent Securities calculates the Recognized Loss amount based on the level of alleged artificial inflation in the prices of BoA's common stock at the time a particular claimant purchased and sold shares, or retained shares beyond the end of the Class Period.  ¶¶102-103.  This method of allocating settlement proceeds based on the timing of the purchases and sales of the securities at issue have been repeatedly accepted by the courts.  *See, e.g., WorldCom,* 388 F. Supp. 2d at 348; *In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 142 F.R.D. 588, 596 (S.D.N.Y. 1992); *In re Charter Commc'ns, Inc. Sec. Litig.*, No 4:02-CV-1186 (CAS), 2005 WL 4045741, at *2 (E.D. Mo. June 30, 2005).

For these reasons, as more fully stated in the Rosen Declaration, Lead Plaintiff and Lead Counsel believe that the Plan of Allocation is a fair and reasonable way to apportion the Net Settlement Fund to Class members who timely file valid Proofs of Claim.

## <u>CONCLUSION</u>

For all of the foregoing reasons, Lead Plaintiff respectfully requests that this Court: (i) grant final approval of the proposed Settlement as fair, reasonable and adequate; (ii) approve the proposed Plan of Allocation as fair and reasonable; and (iii) grant such additional and different relief as the interests of justice or equity may require.

Dated:  August 30, 2016

Respectfully submitted,

**BARRACK, RODOS & BACINE**
A. Arnold Gershon
William J. Ban
Michael A. Toomey
425 Park Avenue, 31st Floor
New York, NY 10022
Telephone: (212) 688-0782
Facsimile: (212) 688-0783

-and-

**BARRACK, RODOS & BACINE**

By:   /s/ Mark R. Rosen
Leonard Barrack
Mark R. Rosen
Jeffrey A. Barrack
Jeffrey B. Gittleman
Chad A. Carder
Julie B. Palley
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-0600
Fax: (215) 963-0838

*Attorneys for Lead Plaintiff*
*Commonwealth of Pennsylvania,*
*Public School Employees'*
   *Retirement System and Lead*
*Counsel for the Class*

24