UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————————
                                                   :
PENNSYLVANIA PUBLIC SCHOOL          :       CIVIL ACTION NO.
EMPLOYEES' RETIREMENT SYSTEM,        :       11-CV-00733-WHP
individually and on behalf of all others      :
similarly situated,                               :       CLASS ACTION
                                                   :
                        Plaintiff,               :       **LEAD PLAINTIFF'S**
                                                   :       **MEMORANDUM OF LAW IN**
                                                   :       **SUPPORT OF MOTION**
            v.                                     :       **FOR AWARD OF ATTORNEYS'**
                                                   :       **FEES AND REIMBURSEMENT**
BANK OF AMERICA CORPORATION, et al.,  :     **OF LITIGATION EXPENSES**
                                                   :
                        Defendants.           :
                                                   :
—————————————————————————:

**BARRACK, RODOS & BACINE**          **BARRACK, RODOS & BACINE**
A. Arnold Gershon                          Leonard Barrack
William J. Ban                               Mark R. Rosen
Michael A. Toomey                         Jeffrey A. Barrack
Eleven Times Square                       Jeffrey B. Gittleman
640 8th Avenue, 10th Floor               Chad A. Carder
New York, NY 10036                       Julie B. Palley
Telephone: (212) 688-0782                2001 Market Street
Facsimile: (212) 688-0783                Philadelphia, PA 19103
                                              Telephone: (215) 963-0600
                                              Fax: (215) 963-0838

# TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................................................................1

ARGUMENT ......................................................................................................................12

I.    The Requested Attorneys' Fees Are Reasonable
      and Should Be Granted ........................................................................................12

      A.    The Legal Standards Governing the Award of
            Attorneys' Fees ..........................................................................................12

      B.    The Fee Award Should Be Based on the Percentage
            Method .......................................................................................................14

      C.    The Requested Fee is Reasonable as Measured by the
            Second Circuit's *Goldberger* Factors .....................................................15

            1.    Time and Labor Expended By Counsel ............................................15

            2.    The Magnitude and Complexities of the Litigation ..........................18

            3.    The Risks of the Litigation ...............................................................19

            4.    The Quality of Representation ..........................................................22

            5.    The Results Achieved Justify the Requested Fee .............................23

            6.    Public Policy Considerations Support the Requested Fee ................24

      D.    The Requested Fee is Reasonable Under the Lodestar
            "Cross-Check" ...........................................................................................26

II.   Plaintiff's Counsel Should be Reimbursed for Expenses Reasonably
      Incurred in Connection with This Action ............................................................28

III.  Lead Plaintiff Should be Awarded Reasonable Costs and Expenses
      Incurred In connection with this action ..............................................................30

CONCLUSION ...................................................................................................................32

# TABLE OF AUTHORITIES

Page(s)

<u>**Cases**</u>

*American International Group, Inc. 2008 Sec. Litig.*,
   No. 08cv4772 (S.D.N.Y.) ........................................................... 28

*Batemen Eichler, Hill Richards, Inc. v. Berner*,
   472 U.S. 299 (1985).................................................................. 13

*Blum v. Stenson*,
   465 U.S. 886 (1984).................................................................. 26

*Boeing Co. v. Van Gemert*,
   444 U.S. 472 (1980).................................................................. 12

*City of Detroit v. Grinnell Corp.*
   495 F.2d 448 (2d Cir. 1974) ...................................................... 19

*Doglow v. Anderson*,
   43 F.R.D. 472 (E.D.N.Y. 1968)................................................. 12

*Goldberger v. Integrated Resources, Inc.*,
   209 F.3d 43 (2d Cir. 2000); ..................................... 12, 15, 26, 27

*Hicks v. Stanley*,
   No. 01 Civ. 10071(RJH), 2005 WL 2757792 (S.D.N.Y. Oct. 24, 2005) ................... 24, 25, 31

*In re Adelphia Commc'ns Corp. Sec. & Deriv. Litig.*,
   No. 03 MDL 1529 LMM, 2006 WL 3378705 (S.D.N.Y. Nov. 16, 2006) ........................ 23, 28

*In re Bank of Am. Corp. Sec., Derivative, & Employee Ret. Income
   Sec. Act (ERISA) Litig.*,
   772 F.3d 125 (2d Cir. 2014) ...................................................... 31

*In re Cardinal Health Inc. Sec. Litigations*,
   528 F. Supp. 2d 752 (S.D. Ohio 2007) ...................................... 24

*In re Comverse Tech. Inc. Sec. Litig.*,
   No. 06-CV-1825(NGG), 2010 WL 2653354 (E.D.N.Y. June 24, 2010)......................... 13, 23

*In re Currency Conversion Fee Antitrust Litig.*,
   263 F.R.D. 110, (S.D.N.Y. 2009) ........................................ *passim*

*In re EVCI Career Colleges Holding Corp. Sec. Litig.*,
    No. 05 Civ. 10240 (CM), 2007 WL 2230177 (S.D.N.Y. July 27, 2007) ................................. 13

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    No. 02-cv-3400 (CV) (PED), 2010 WL 4537550 (S.D.N.Y. Nov. 8, 2010) ............... 12, 24, 28

*In re Global Crossing Sec. Litig.*,
    225 F.R.D. 436 (S.D.N.Y. 2004) ...................................................................................... 22, 27

*In re Lucent Tech., Inc., Sec. Litig.*,
    327 F. Supp. 2d 426 (D.N.J. 2004) ........................................................................................ 24

*In re Marsh & McLennan Companies, Inc. Sec. Litig.*,
    No. 04 CIV. 8144 (CM), 2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009) ........................... 21, 31

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
    246 F.R.D. 156 (S.D.N.Y. 2007) ............................................................................................ 25

*In re Merrill Lynch Tyco Research Sec. Litig.*,
    249 F.R.D. 124 (S.D.N.Y. 2008) ...................................................................................... 14, 15

*In re Omnicom Group, Inc. Sec. Litig.*,
    541 F. Supp. 2d 546 (S.D.N.Y. 2008), *aff'd*, 597 F.3d 501 (2d Cir. 2010) ............................ 8

*In re Platinum & Palladium Commodities Litig.*,
    10cv3617, 2015 U.S. Dist. LEXIS 98691 (S.D.N.Y. July 7, 2015) ................................. *passim*

*In re Sumitomo Copper Litig.*,
    189 F.R.D. 274 (S.D.N.Y. 1999) ............................................................................................ 19

*In re Sumitomo Copper Litig.,*,
    74 F. Supp. 2d 393 (S.D.N.Y. 1999) ................................................................................ 14, 23, 28

*In re Twinlab Corp. Sec. Litig.*,
    187 F. Supp. 2d 80 (E.D.N.Y. 2002) ...................................................................................... 12

*In re Union Carbide Corp. Sec. Litig.*,
    724 F. Supp. 160 (S.D.N.Y. 1989) ........................................................................................ 25

*In re Veeco Sec. Litig.*,
    No. 05 MDL 01695 (CM), 2007 WL 4115808 (S.D.N.Y. Nov. 7, 2007) ................... 13, 28, 32

*In re WorldCom, Inc. Sec. Litig.*,
    No. 02 Civ. 3288 (DLC), 2004 WL 2591402 (S.D.N.Y. Nov. 12, 2004) ................... 12, 13, 26

*In re WorldCom, Inc. Sec. Litig.*,
   388 F. Supp. 2d 319 (S.D.N.Y. 2005) ....................................................... 12, 14, 25

*J.I. Case Co. v. Borak*,
   377 U.S. 426 (1964)...................................................................................... 13

*Kurzweil v. Philip Morris Cos., Inc.*,
   Nos. 94 Civ. 2373 (MBM), 94 Civ. 2546 (BMB),
   1999 WL 1076105 (S.D.N.Y. Nov. 30, 1999)................................................ 23

*Laffitte v. Robert Half Int'l Inc.*,
   Dkt. No. S222996, __ P.3d ___, 2016 WL 4238619 (Cal. Aug. 11, 2016)............. 27

*Maley v. Del Global Tech.. Corp.*,
   186 F. Supp. 2d 358 (S.D.N.Y. 2002) ........................................................ 14, 25

*Mills v. Elec. Auto-Lite Co.*,
   396 U.S. 375 (1970)...................................................................................... 12

*Missouri v. Jenkins*,
   491 U.S. 274 (1989)...................................................................................... 26

*New York State Ass'n for Retarded Children, Inc. v. Carey*,
   711 F.2d 1136 (2d Cir. 1983) ....................................................................... 26

*Pennsylvania Pub. Sch. Emps' Ret. Sys. v. Bank of Am. Corp.*,
   874 F.Supp.2d 341 (S.D.N.Y. 2012) ........................................................... 3, 4

*Pennsylvania Pub. Sch. Emps' Ret. Sys. v. Bank of Am. Corp.*,
   939 F.Supp.2d 445 (S.D.N.Y. 2013) ............................................................ 4

*Shaw v. Toshiba America Information Systems*, Inc.,
   91 F. Supp. 2d 942 (E.D. Tex. 2000)............................................................ 24

*Teachers' Ret. Sys. of La. v. A.C.L.N., Ltd.*,
   No. 01-CV-11814 (MP), 2004 WL 1087261 (S.D.N.Y. May 14, 2004)................ 29

*Wal-Mart Stores, Inc. v. Visa U.S.A.*,
   396 F.3d 96 (2d Cir. 2005) .......................................................................... 14

## **Statutes**

15 U.S.C. § 77z-1(a)(4).......................................................................................... 9

15 U.S.C. § 78u-4(a)(4) ................................................................................................ 30

15 U.S.C. § 78u-4(a)(6) ................................................................................................ 15

**Rules**

Fed. R. Civ. P. 23(c)(1)(C) ............................................................................................. 7

SEC Rule 10b-5 ............................................................................................................... 3

**Other Authorities**

NERA Economic Consulting, *Recent Trends in Securities Class Action Litigation:*
   *2015 Full-Year Review* ............................................................................................ 24

The Private Securities Reform Act of 1995, H.R. Conf. Report No. 104-369, 104th  Cong., 1st
   Sess. (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 1995 WL 709276 ................................... 10

The Private Securities Reform Act of 1995
   S. Rep. No. 104-98, S. Rep. No. 98, 104th Cong., 1st Sess., *reprinted in* 1995 U.S.C.C.A.N.
   679, 1995 WL 372783 (1995)..................................................................................... 30

**Website**

*PR Newswire* .................................................................................................................. 11

Court-appointed Lead Counsel,[1] Barrack, Rodos & Bacine, respectfully submits this memorandum of law in support of the motion for an award of attorneys' fees and reimbursement of litigation expenses ("Fee and Expense Application" or "Application"). As detailed below, this Application is being submitted with the prior approval of Lead Plaintiff. For the reasons set forth herein, Lead Counsel respectfully requests that the Fee and Expense Application be approved.

## **INTRODUCTION**

Lead Plaintiff, the Commonwealth of Pennsylvania, Public School Employees' Retirement System ("PSERS" or "Lead Plaintiff"), and Lead Counsel have succeeded in achieving a settlement that will resolve all claims asserted in this Action against the Defendants for a total recovery of $335 million, plus interest. ¶¶1-2,73, 92.[2] The Settlement represents an excellent recovery for the Class. Lead Counsel respectfully submits that this result was obtained through the hard work, persistence and skill of Lead Counsel, who prosecuted this case for more than five years on an entirely contingent basis, and the careful oversight of the litigation by PSERS, the Court-appointed Lead Plaintiff. As set forth more fully in the Rosen Declaration, this was a highly complex securities class action that involved BoA's alleged

---

[1] All capitalized terms not otherwise defined herein have the same meanings as set forth in Paragraph 1 of the Stipulation and Agreement of Settlement dated March 12, 2016, as amended on June 13, 2016 (the "Stipulation").

[2] Unless otherwise stated, all references to ¶__ herein are to the Declaration of Mark R. Rosen in Support of Lead Plaintiff's Motion for Final Approval of Class Action Settlement, For Approval of Proposed Plan of Allocation, and in Support of Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses (the "Rosen Declaration" or "Rosen Decl.") that Lead Plaintiff is filing herewith. The Rosen Declaration provides a detailed description of the nature of the claims asserted in the Amended Complaint, the mediation process, the risks of continued litigation, a description of the services Lead Counsel provided to the Class, and the role that Lead Plaintiff played in prosecuting this Action.

involvement in misleading investors in BoA's common stock and Common Equivalent Securities concerning the magnitude of BoA's exposure to demands to repurchase residential mortgage-backed securities ("RMBS") for breach of representations and warranties issued in connection with the securitization and sale of RMBS (Lead Plaintiff's "rep and warranty claims") and alleged institutional risks arising from BoA's use of and reliance upon a national electronic database ("MERS") to track changes in mortgage servicing rights and beneficial ownership interests in loans secured by residential real estate (Lead Plaintiff's "MERS claims"). ¶¶ 2, 12. Due to the complexity of this Action, Lead Counsel worked closely with experts in various fields including financial and mortgage markets, loss causation and damages, accounting and auditing, and market efficiency. ¶¶10, 94, 150.

As set forth more fully in the Rosen Declaration, the efforts of Lead Counsel in the prosecution of this Action have been substantial. Over the course of more than five years, Lead Counsel diligently prosecuted this Action against Defendants and, despite many significant obstacles, succeeded in achieving an outstanding recovery for the benefit of the Class.

On June 20, 2011, the Court consolidated the related actions, appointed PSERS as Lead Plaintiff, approved Lead Plaintiff's selection of Barrack, Rodos & Bacine as Lead Counsel, and denied all competing motions for appointment as Lead Plaintiff and Lead Counsel. The Court directed that Lead Plaintiff file a consolidated amended complaint ("Consolidated Complaint") by September 23, 2011. Prior to filing the Consolidated Complaint, Lead Counsel undertook an exhaustive investigation of both public and non-public sources in order to gather information regarding the claims to be asserted in the Complaint. Among other things, Lead Counsel consulted with experts in various fields relevant to the claims made in the Consolidated Complaint, and further retained an investigator who identified and interviewed numerous

confidential witnesses with first-hand knowledge of the subject matter of this Action, several of whom were thereafter cited by a "CW" designation in the Consolidated Complaint.  ¶11.

Lead Counsel drafted and filed a detailed 403 paragraph, 138 pages long Consolidated Complaint. ¶12; *see generally* ¶¶12-14.  As detailed in the Rosen Declaration, the Complaint included a significant amount of information that was not included or developed in the initial complaints filed in this Action to support its claims pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 ("1934 Act Claims") and new claims and defendants, including claims pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 ("1933 Act Claims") against the Director Defendants, Underwriter Defendants, and BoA's auditor, PricewaterhouseCoopers LLP ("PwC") in connection with BoA's class period offering of Common Equivalent Securities.  ¶8.

Thereafter, Lead Counsel successfully opposed voluminous motions to dismiss over two rounds of briefing, first with respect to the Consolidated Complaint and second with respect to the Amended Complaint, and motions for reconsideration that followed each.  ¶¶15-17, 20-22. Specifically, on July 11, 2012, this Court issued a Memorandum and Order (1) denying BoA's motion to dismiss Lead Plaintiff's 1934 Act Claims asserted against BoA; (2) granted, without prejudice, the Executive Defendants' motions to dismiss the 1934 Act Claims asserted against them; and (3) granted, with prejudice, all motions to dismiss Lead Plaintiff's 1933 Act Claims asserted in the Consolidated Complaint.  ¶16. *Pennsylvania Pub. Sch. Emps' Ret. Sys. v. Bank of Am. Corp*., 874 F.Supp.2d 341 (S.D.N.Y. 2012).  As a consequence of this Order, all claims against the Director Defendants, Underwriter Defendants and PwC were dismissed with prejudice.  *Id*., 874 F.Supp.2d at 369.  BoA moved for reconsideration of this Court's July 11,

2012 Order, or for certification of interlocutory appeal, which this Court denied on August 28, 2012.  *Id.*, 874 F.Supp.2d at 369-73.

After the Court's July 11, 2012 Order, and while simultaneously mounting a successful opposition to BoA's motion for reconsideration of that Order, Lead Counsel conducted a further investigation of the facts and circumstances surrounding the Executive Defendants' participation in the alleged violations of the federal securities laws, and included new information and details supporting 1934 Act Claims against the Executive Defendants in the Amended Complaint filed on August 13, 2012.  ¶¶18-19.  The Amended Complaint, which, pursuant to the Court's prior ruling, no longer included 1933 Act Claims, included 331 paragraphs and was 141 pages long. The Executive Defendants once again moved to dismiss the 1934 Act Claims against them, and on April 17, 2013, this Court denied in part the Executive Defendants' motion to dismiss.  ¶21. *Pennsylvania Pub. Sch. Emps' Ret. Sys. v. Bank of Am. Corp.*, 939 F.Supp.2d 445 (S.D.N.Y. 2013).   Lead Counsel thereafter mounted another successful opposition to a motion for reconsideration, as on June 12, 2013 this Court denied a motion for reconsideration of its April 17, 2013 Order that was filed by Defendant Brian Moynihan.  ¶22.  *Id.*, 939 F.Supp.2d at 453-56.

Even before the automatic stay of discovery imposed by the PSLRA was lifted, Lead Counsel took steps to lay the foundation for its extensive investigation of the claims and preparation for trial.  ¶23.  Specifically, on October 3, 2012, this Court endorsed Lead Counsel's request to raise the issue of serving document preservation subpoenas on certain non-parties, and by Order dated October 10, 2012, this Court authorized Lead Plaintiff to serve document preservation subpoenas on certain non-parties requiring them to preserve relevant documents. Dkt. Nos. 170, 171; ¶24.   Thereafter, Lead Counsel served document preservation subpoenas on several non-parties. *Id.*

4

On May 17, 2013, on behalf of Lead Plaintiff, Lead Counsel served a First Request for Production of Documents Addressed to All Defendants.  The discovery process, including obtaining, reviewing and analyzing over 8 million pages of documents produced by Defendants and certain non-parties, was an enormous task. ¶28, 37.  Among other things, Lead Counsel: (i) conducted and participated in dozens of meet-and-confer conferences with defense counsel to establish search terms, custodians and time periods for which Defendants would produce various types of documents and to establish protocols for the production of certain documents by Defendants (¶29); (ii) served subpoenas on numerous non-parties and engaged in meet-and-confer conferences with counsel for those non-parties to obtain documents (¶32); (iii) reviewed and analyzed more than 8 million pages of documents produced by Defendants and non-parties (¶33);  (iv) prepared for and took 23 fact witness depositions from June 2014 through June 2015 (¶43); (v) worked extensively with representatives of the Lead Plaintiff to respond to discovery served upon Lead Plaintiff by Defendants, including interrogatories (¶39-41); (vi) worked with representatives of PSERS's outside investment managers that transacted in BoA securities to ensure that those non-parties were also producing documents responsive to subpoenas served upon them by Defendants (¶41); (vii) prepared for, helped coordinate and facilitate, and attended and/or defended Defendants' 11 depositions of Lead Plaintiff representatives, certain confidential witnesses, and certain of PSERS's outside investment managers (¶44); (viii) successfully challenged Defendants' numerous last-minute attempts to "clawback" documents previously produced by requesting, and securing, an amendment of the existing confidentiality order (¶¶48-49); and (ix) filed a motion challenging BoA's assertion of the bank examination privilege as the basis for the withholding or redaction of tens of thousands of documents (¶¶50-51).  Indeed, the productive work of Lead Counsel in ongoing good faith discovery negotiations

with counsel for Defendants led to the resolution of almost every discovery dispute without need for judicial intervention.  (¶¶29-30).

In the midst of merits discovery, Lead Counsel was also engaged in attempting to secure certification for the litigation to proceed as a class action.  ¶¶56-63.  On July 30, 2013, the Court issued an Order concerning class certification that established a schedule for the filing of materials with respect to a class certification motion and directed, *inter alia*, that the parties submit a joint report regarding the proposed class certification motion by October 31, 2013.  ¶56. Counsel for the parties engaged in considerable back-and-forth in an effort to narrow the issues relating to the class certification motion, and at that time Defendants, subject to reserving certain rights, agreed that they would not at that time contest numerosity and commonality requirements of Federal Rule of Civil Procedure 23(a), the predominance and superiority requirements of Federal Rule of Civil Procedure 23(b)(3), and the efficiency of the market for BoA stock or Common Equivalent Securities during the class period.  ¶57.  After Lead Plaintiff filed its class certification motion with an extensive opening memorandum and detailed declaration supporting class certification on November 15, 2013, Defendants conducted depositions of two designees of Lead Plaintiff on a variety of topics.  ¶60.  Following this discovery, on December 13, 2013, Defendants filed a letter setting forth their continuing reservation of rights but also advising the Court and Lead Plaintiff that, at that time, they did not intend to contest that PSERS's claims or defenses were typical of the claims or defenses of the class or that PSERS could fairly and adequately represent the interests of the class.  ¶61.  At the conclusion of this process, the parties filed a stipulation to certification of the class, and on February 14, 2014, this Court issued an Order approving that stipulation and certifying the class sought by PSERS in its motion, certifying PSERS as the class representative, and appointing Barrack, Rodos & Bacine as Lead

Counsel, while reserving defendants' right, pursuant to Fed. R. Civ. P. 23(c)(1)(C), to subsequently move for decertification.  ¶62.  In short, as a result of Lead Counsel's diligent step-by-step development of the factual record on each element required for class certification, Lead Plaintiff was eventually able to secure Defendants' stipulation to the Class without requiring judicial action on the class certification motion, even though at the outset they had not yet agreed to any of these elements.

The settlement negotiation process was also long and arduous.  The parties did not agree to mediation until April 2014 – long after discovery was underway and the class had been certified.  ¶68.  Thereafter, the first two mediation sessions, in October 2014 and February 2015, resulted in no agreements being reached.  ¶¶ 71-72.  At the conclusion of the parties' third mediation session on August 12, 2015, counsel for BoA and Lead Counsel, on behalf of their respective clients, accepted a mediator's proposal from former U.S. District Judge Layn Phillips to settle and release all claims asserted in the Action in exchange for a cash payment by BoA of $335 million.  ¶73.  In all, the parties entered into the Settlement only after engaging in ten months of negotiations under the auspices of Judge Phillips, one of the most experienced mediators in securities and other class actions.  ¶¶63-71.

The Settlement amount represents an outstanding result for the Settlement Class, particularly when viewed against the numerous and significant risks that Lead Plaintiff faced going forward in this litigation.  ¶¶75-91.  As set forth in greater detail in the Rosen Declaration, throughout the litigation, Defendants raised, or explored the bases for, a series of defenses that, if successful, could well have undercut Lead Plaintiff's ability to defeat motions for summary judgment and/or obtain a meaningful recovery, or any recovery at all, on behalf the Class.  *Id.* For instance, Lead Plaintiff faced considerable risks in establishing liability, in that Defendants

strenuously argued that the statements Lead Plaintiff claimed were materially misleading were truthful at the time they were made and that Defendants had no duty to reveal the information Lead Plaintiff charged Defendants with failing to disclose.  ¶¶77-79.  Further, Defendants could have contested scienter by pointing to the fact that BoA's outside auditor, PwC, reviewed each of BoA's quarterly financial statements before they were issued (as well as auditing BoA's year-end financial statements) and did not recommend any changes to these statements.  ¶80. Defendants could also have claimed that scienter could not be established since crucial information relevant to demonstrating their awareness of certain problems was not developed until the summer of 2010 and did not reach senior management until near the end of the Class Period, and that they acted with appropriate speed in subsequently disclosing this to the market. ¶81.  Both BoA and the Executive Defendants could also have asserted an "advice of counsel" defense for not disclosing the magnitude of the unpaid principal balance of the outstanding loans for which BoA had provided representations and warranties.  *Id.*.

Lead Plaintiff also faced considerable risks in establishing loss causation and damages, as Defendants could have raised a series of issues concerning loss causation and damages claims that Lead Plaintiff might have asserted at trial, including that the alleged curative information that entered the market on the disclosure dates identified by Lead Plaintiff did not constitute the disclosure of material information that had never been previously disclosed or that factors other than those disclosures caused the stock price drops on those dates.  ¶¶83-90.  As it relates to loss causation and whether a statement that relates to or builds upon previously disclosed information can constitute a corrective disclosure, the parties were particularly aware of this Court's prior decision in *In re Omnicom Group, Inc. Sec. Litig.*, 541 F. Supp. 2d 546 (S.D.N.Y. 2008) (Pauley, *J.*), *aff'd*, 597 F.3d 501 (2d Cir. 2010), a securities case in which this Court granted summary

8

judgment in favor of defendants and against plaintiffs, holding that the alleged corrective disclosures in that case did not reveal any new information and, even if they had, plaintiffs had failed to show that any of the loss was attributable to the alleged fraud.  Defendants undoubtedly would have relied on this Court's and the Second Circuit's prior *In re Omnicom Group* decisions to challenge Lead Plaintiff's theory of loss causation by arguing, among other things, that the alleged curative information that entered the market at those times did not constitute new information because (1) BoA's exposure to rep and warranty claims in an analyst report had previously been disclosed when that analyst report was first presented at a conference in August 2010; and (2) market participants were well-aware of the use of MERS by financial institutions like BoA.  ¶88.

There is also a substantial risk that Defendants could have produced expert testimony in arguing, among other things, that the magnitude of the stock price declines on Lead Plaintiff's identified disclosure dates, after controlling for other industry or market factors, was not great enough to be statistically significant and could not form the basis for liability under the loss causation and damages requirements of a Section 10(b) claim. ¶90.

Any of the above arguments, if credited by this Court or a jury, or later adopted by an appellate court, could have materially limited or eliminated the Class's recovery.

It was in the face of these and other risks that Lead Counsel achieved for the benefit of the Settlement Class the $335 million Settlement now pending before the Court.  As compensation for their efforts expended to achieve this outstanding result for the Settlement Class, Lead Counsel is applying for a fee of $51,675,000, slightly less than 15.5% of the Settlement Fund, and reimbursement of litigation expenses in the amount of $1,386,167.33. ¶¶117-127.  Pursuant to 15 U.S.C. § 78u-4(a)(4), Lead Counsel is also seeking reimbursement of

PSERS's reasonable costs and expenses incurred directly in connection with its service as Lead Plaintiff in this Action and representation of the Class in the amount of $130,323.70. ¶¶154-157.  In view of the substantial risks, the complexity of the case, the difficulties in achieving the proposed Settlement, the quality of the legal work performed, and the amount of time and effort expended by Lead Counsel, the Fee and Expense Application is fair and reasonable under the applicable standards in this Circuit and District and is well within the range of awards made in contingent fee matters in comparable securities class actions.

The Fee and Expense Application has been reviewed and approved by Lead Plaintiff, an institutional investor with experience serving as a lead plaintiff in prior securities litigation, and with a significant financial stake in the outcome of the Action, which is fully consistent with the role of a class fiduciary that Congress envisioned when it enacted the PSLRA.[3]  ¶¶112-116; Declaration of Steven Skoff in Support of Final Approval of Class Action Settlement, Plan of Allocation, Award of Attorneys' Fees and Reimbursement of Expenses, and Reimbursement of Expenses of Lead Plaintiff ("Skoff Decl."), attached as Exhibit A to the Rosen Declaration, and discussed at ¶¶144, 155-156.

---

[3] As the Court is aware, Congress enacted the PSLRA in large part to encourage sophisticated institutional investors to assume control of securities class actions and "increase the likelihood that parties with significant holdings in issuers, whose interests are more strongly aligned with the class of shareholders, will participate in the litigation and exercise control over the selection and actions of plaintiff's counsel."  *See* "The Private Securities Reform Act of 1995," H.R. Conf. Reo. 104-369, H.R. Conf. Rep. No. 369, 104th Cong., 1st Sess. 1995, 1995 U.S. Code Congressional and Administrative News 730, 1995 WL 709276, at *32.  Congress believed that institutions would be in the best position to monitor the ongoing prosecution of the litigation and to assess the reasonableness of counsel's fee request.

In accordance with the Court's Preliminary Approval Order,[4] a printed Notice, in the form approved by the Court,[5] advising Class Members of the pendency of the Action and the proposed Settlement, the date of the Settlement Fairness Hearing, and Lead Counsel's Fees and Expense Application, was mailed beginning on July 14, 2016.   A Notice was also published in the *Wall Street Journal* and *PR Newswire* on July 21, 2016.   In addition, the Claims Administrator arranged for banner notices of the proposed Settlement to run on the Internet from July 21, 2016 through August 4, 2016, and mailed the Long Form Notice and Proof of Claim Form to a list, which the Claims Administrator has developed and maintained over the years, of 468 of the largest banks, brokerage firms, and institutions.   ¶97, n. 5.  The Notice advised Class Members of the proposed Settlement, the proposed Plan of Allocation, and the request for an award of attorneys' fees and reimbursement of litigation expenses.  The Notice further advised Class Members of their right to object or seek exclusion from the Class, and explained that any Settlement Class Member wishing to exercise these rights needed to do so by September 13, 2016. *Id.*

Lead Counsel respectfully submits that, given the risks attendant in this Action, which were greater than the risks entailed in a run-of-the-mill securities action in which defendants may quickly offer to settle following denial of their motions to dismiss, and the substantial benefit

---

[4] On June 15, 2016, the Court preliminarily approved the Settlement, set a hearing for November 29, 2016, to determine the fairness, reasonableness, and adequacy of the Settlement, and to consider Lead Plaintiff's Plan of Allocation and Lead Counsel's Fee and Expense Application ("Fairness Hearing"), and directed that Notice of the Fairness Hearing be given to the Class.

[5] Both the language and manner of providing notice were also reviewed and approved prior to submission to the Court by Professor Francis McGovern, who has extensive expertise dealing with issues of notice and class administration. *See, e.g., In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. 110, 119, 125 (S.D.N.Y. 2009) (Pauley, *J.*).

conferred on the Class by the proposed Settlement, the Fee and Expense Application is fair and reasonable, comports with applicable precedent, and should be approved.

## ARGUMENT

## I. THE REQUESTED ATTORNEYS' FEES ARE REASONABLE AND SHOULD BE GRANTED

### A. The Legal Standards Governing the Award of Attorneys' Fees

It is well-established that attorneys who represent a class and achieve a benefit for the class members are entitled to be compensated for their services. The Supreme Court has recognized that "a lawyer who recovers a common fund for the benefit of persons other than ... his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 392-93 (1970). The Second Circuit and District Courts within this Circuit have consistently recognized these teachings. *See, e.g., Goldberger v. Integrated Res., Inc.,* 209 F.3d 43, 47 (2d Cir. 2000); *In re Twinlab Corp. Sec. Litig.,* 187 F. Supp. 2d 80, 84 (E.D.N.Y. 2002); *In re WorldCom, Inc. Sec. Litig.,* 388 F. Supp. 2d 319, 354 (S.D.N.Y. 2005) ("When attorneys create a common fund from which members of a class are compensated for a common injury, they are entitled to a reasonable fee - set by the court - to be taken from the fund.") (internal quotation omitted).

Awards of attorneys' fees from a common fund serve the dual purpose of encouraging representatives to seek redress for damages caused to an entire class of persons, as well as discouraging future misconduct of similar nature. *Dolgow v. Anderson,* 43 F.R.D. 472, 481-84 (E.D.N.Y. 1968), *rev'd on other grounds*, 438 F.2d 825 (2d Cir. 1970); *In re Flag Telecom Holdings, Ltd. Sec. Litig.,* No. 02-cv-3400 (CV) (PED), 2010 WL 4537550, at *23 (S.D.N.Y. Nov. 8, 2010) ("awards of attorneys' fees from a common fund serve to encourage skilled

counsel to represent those who seek redress for damages inflicted on entire classes of persons, and to discourage future misconduct of a similar nature") (internal citations omitted).  The Supreme Court has emphasized that private securities actions "provide 'a most effective weapon in the enforcement' of the securities laws and are 'a necessary supplement to [SEC] action.'" *Bateman Eichler, Hill Richards, Inc. v. Berner,* 472 U.S. 299, 310 (1985) (quoting *J.I. Case Co. v. Borak,* 377 U.S. 426, 432 (1964)).

Moreover, since the passage of the PSLRA, in reviewing fee applications, courts have given great weight to fee awards whose rates of compensation were negotiated at the commencement of the litigation between fully informed lead plaintiffs and their counsel.  *See, e.g., In re Comverse Tech. Inc. Sec. Litig.,* No. 06-CV-1825(NGG), 2010 WL 2653354, at *2-3 (E.D.N.Y. June 24, 2010) ("the Second Circuit directs district courts to give serious consideration to negotiated fees because PSLRA lead plaintiffs often have a significant financial stake in the settlement, providing a powerful incentive to ensure that any fees resulting from that settlement are reasonable.") (internal quotations omitted); *In re Veeco Sec. Litig.*, No. 05 MDL 01695 (CM), 2007 WL 4115808, at *8 (S.D.N.Y. Nov. 7, 2007) ("Since passage of the PSLRA, courts-including this Court have found that in a PSLRA case, a fee request which has been approved and endorsed by a properly-appointed lead plaintiff is 'presumptively reasonable,' especially where the lead plaintiff is a sophisticated institutional investor.") (quoting *In re EVCI Career Coll. Holding Corp. Sec. Litig.*, No. 05 Civ. 10240 (CM), 2007 WL 2230177, at *8 (S.D.N.Y. July 27, 2007)); *In re WorldCom, Inc. Sec. Litig.,* No. 02 Civ. 3288 (DLC), 2004 WL 2591402, at *20 (S.D.N.Y. Nov. 12, 2004) (applying presumption of reasonableness where lead plaintiff conscientiously supervised the work of lead counsel and endorsed the fee request).  As

discussed below, Lead Plaintiff and Lead Counsel negotiated such an agreement concerning fees at the outset of Lead Plaintiff's involvement in this Action.

### B.  The Fee Award Should Be Based on the Percentage Method

The Second Circuit and District Courts within this Circuit have recognized that in the case of a common fund, the "trend in this Circuit" is to award a fee to class counsel on a percentage-of-recovery basis. *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.,* 396 F.3d 96, 121 (2d Cir. 2005) (citation omitted).  As this Court recently explained:

> A court may calculate reasonable attorneys' fees either by determining the lodestar amount, or by awarding a percentage of the settlement. The overwhelming trend, however, is to award a percentage of the fund.  In addition to being simpler, awarding a percentage of the fund aligns the interest of the class and their counsel by encouraging counsel to resolve cases at an early stage, if possible, while still obtaining the largest possible recovery.

*In re Platinum & Palladium Commodities Litig.*, 10cv3617, 2015 U.S. Dist. LEXIS 98691, *7 (S.D.N.Y. July 7, 2015) (Pauley, *J.*) (internal citations and quotation marks omitted).  *In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. 110, 128 (S.D.N.Y. 2009) (Pauley, *J.*) (same).  *See also In re Merrill Lynch Tyco Research Sec. Litig.*, 246 F.R.D. 124, 136 (S.D.N.Y. 2008); *In re WorldCom,* 388 F. Supp. 2d at 355 (noting the "practical and policy advantages of the percentage method, as well as the PSLRA's express contemplation that the percentage method will be used to calculate attorneys' fees in securities fraud class actions"); *Maley v. Del Global Tech. Corp.*, 186 F. Supp. 2d 358, 370 (S.D.N.Y. 2002) ("[T]he trend within this Circuit is to use the percentage of recovery method to calculate fee awards to class counsel" in common fund cases.); *In re Sumitomo Copper Litig.*, 74 F. Supp. 2d 393, 397 (S.D.N.Y. 1999) ("Support for the lodestar/multiplier approach in common fund cases has eroded, and there has been a groundswell of support for *mandating* a percentage-of-the-fund approach in the common fund

14

cases.") (internal citations omitted). The PSLRA also implicitly supports the use of the percentage of the fund method. *See* 15 U.S.C. § 78u-4(a)(6) (directing courts to ensure that the "[t]otal attorneys' fees and expenses awarded by the court to counsel for the plaintiff class … not exceed a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class"); *see also In re Merrill Lynch Tyco Research*, 249 F.R.D. at 136 (use of the percentage method "comports with the statutory language" of the PSLRA); *Maley,* 186 F. Supp. 2d at 370 (noting that in amending the PSLRA, Congress "indicated a preference for the use of the percentage method").

### C. The Requested Fee is Reasonable as Measured by the Second Circuit's *Goldberger* Factors

In determining a reasonable fee, the Second Circuit has enumerated six factors that courts should consider when determining the reasonableness of a request for attorneys' fees in a common fund action:

> (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation ...; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations.

*Goldberger*, 209 F.3d at 50 (2d Cir. 2000) (internal quotations omitted). Each of these factors supports the fee requested here.

### 1. Time and Labor Expended By Counsel

The efforts expended by Lead Counsel in the prosecution of this Action have been substantial. The Rosen Declaration sets forth the many tasks undertaken by Lead Counsel, the time and labor expended, and the favorable results achieved as a result of those efforts. For example, Lead Counsel undertook an exhaustive investigation of both public and non-public sources in order to gather information regarding the claims to be asserted in the Consolidated

Complaint, and through that process gathered a wealth of new information that was included for the first time in that Complaint.  ¶¶9-11.  During the pre-complaint investigation, counsel also hired and consulted with experts in the fields of financial markets and accounting and auditing, and retained an investigator whose personnel identified and interviewed numerous confidential witnesses with first-hand knowledge of the subject-matter of this Action, several of whom were thereafter cited by a "CW" designation in the Consolidated Complaint. ¶11.  Thereafter, Lead Counsel successfully opposed two rounds of voluminous motions to dismiss, and related motions for reconsideration, while also engaging in a similar investigative process to develop allegations to support Lead Plaintiff's 1934 Act Claims against the Executive Defendants in the Amended Complaint.  ¶¶15-22.

Moreover, formal discovery in this Action, which spanned more than three years, was an enormous undertaking.  As noted above, among other things, Lead Counsel: (i) conducted and participated in dozens of meet-and-confer conferences with defense counsel to establish search terms, custodians and time periods for which Defendants would produce various types of documents and to set protocols for the production of certain documents by Defendants (¶29); (ii) served subpoenas on numerous non-parties and engaged in meet-and-confer conferences with counsel for those non-parties to obtain documents (¶32); (iii) reviewed and analyzed more than 8 million pages of documents produced by Defendants and non-parties (¶33);  (iv) prepared for and took 23 fact witness depositions from June 2014 through June 2015 (¶43); (v) worked extensively with representatives of the Lead Plaintiff to respond to discovery served upon Lead Plaintiff by Defendants, including interrogatories (¶¶39-41); (vi) worked with representatives of PSERS's outside investment managers that transacted in BoA securities to ensure that those non-parties were also producing documents responsive to subpoenas served upon them by Defendants

(¶41); (vii) prepared for, helped coordinate and facilitate, and attended and/or defended Defendants' 11 depositions of Lead Plaintiff representatives, certain confidential witnesses, and certain of PSERS's outside investment managers (¶44); (viii) successfully challenged Defendants' last minute "clawbacks" of documents by securing an amendment of the parties' existing confidentiality order (¶¶48-49); and (ix) filed and briefed a motion challenging BoA's assertion of the bank examination privilege as the basis for the withholding or redaction of tens of thousands of documents (¶¶50-51).

Lead Counsel also was successful in securing Defendants' agreement on a stipulation to class certification.  ¶¶57-63.  After the Court issued an Order on July 30, 2013, concerning class certification that established a schedule for the filing of materials with respect to a class certification motion and directed, *inter alia*, that the parties submit a joint report regarding the proposed class certification motion by October 31, 2013, counsel for the parties engaged in considerable back-and-forth in an effort to narrow the issues relating to the class certification motion.  As a result of their initial discussions, Defendants, subject to reserving certain rights, agreed that they would not at that time contest certain elements of class certification, but it was only after Lead Plaintiff filed its class certification motion with an extensive opening brief and detailed declaration supporting class certification  and Defendants conducted depositions of two designees of Lead Plaintiff on a variety of topics, that Defendants ultimately stipulated to certification of the class and the Court entered an Order approving the stipulation.  ¶¶57-63.

The negotiations leading up to the Settlement also required extensive time and effort on the part of Lead Counsel.  Indeed, Lead Counsel engaged in negotiations for ten months under the auspices of former Judge Phillips.  Throughout this process, Lead Counsel participated in three separate mediation sessions, prepared several extensive submissions for use in the

mediation, prepared and made in-person *ex parte* presentations to Judge Phillips and engaged in briefing and argument before Judge Phillips. ¶¶68-75.  Additionally, Lead Counsel negotiated and drafted various documents related to the Settlement, including the Stipulation, the proposed Preliminary Approval Order, and the Notice to Settlement Class Members.

The number of hours spent by Lead Counsel also attests to the extensive effort put forth. Lead Counsel spent a total of more than 77,000 hours over more than five year in the prosecution of this action, ¶126, the vast majority of those hours (approximately 71%) performed by associates or paralegals under the supervision of partners (who were responsible for only 29% of Lead Counsel's hours).[6]  Lead Counsel's lodestar is $34,450,696.50.  *Id.*  Lead Counsel supervised every aspect of the prosecution of this Action and diligently worked to avoid duplication and ensure effective and efficient prosecution of the Action.  ¶125.  Moreover, only a single law firm performed all of the work prosecuting this Action on behalf of the Class, thereby eliminating any possible concern that the involvement of multiple firms caused a duplication of work.  Accordingly, the time and labor expended by Lead Counsel in prosecuting this highly complex Action, supports the requested fee.

### 2.  The Magnitude and Complexities of the Litigation

The magnitude and complexities of the Action also favor approval of the fee request. The 141-page Amended Complaint details the claims that Defendants violated the federal securities laws by making materially false and misleading statements concerning the magnitude of BoA's exposure to demands to repurchase RMBS and alleged institutional risks arising from BoA's

---

[6] This compares favorably to other cases in which this Court critically noted that the lodestar was heavily weighted toward the work of partners rather than associates.  *See In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. at 128; *In re Platinum & Palladium Commodities Litig.*, 2015 U.S. Dist. LEXIS 98691, at *13-14.

extensive use of and reliance upon MERS, a national electronic database to track changes in mortgage servicing rights and beneficial ownership interests in loans secured by residential real estate, causing the price of BoA stock to be artificially inflated over the course of the Class Period.   ¶¶12-13, 18-19.   To litigate this case, Lead Counsel had to become deeply knowledgeable about complex issues including housing finance and the recording and securitization of mortgage loans, which required extensive consultation with experts.  Moreover, Lead Counsel had to gain a deep understanding about not only the practices of BoA with respect to RMBS, but also Countrywide's practices before it was acquired by BoA, given that many of the repurchase or reimbursement requests made by private investors, monoline insurers and the government-sponsored enterprises   involved loans underwritten by Countrywide before its acquisition by BoA.

Both the magnitude and complexity of the Action support approval of the fee requested.

### 3.   The Risks of the Litigation

This Court has noted that "the 'risk of litigation' is 'perhaps the foremost factor to be considered in determining' a reasonable fee award.'" *In re Platinum & Palladium Commodities Litig.*, 2015 U.S. Dist. LEXIS 98691, *8, *quoting In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. at 129.

As the Second Circuit recognized in *City of Detroit v. Grinnell Corp.*, "despite the most vigorous and competent of efforts, success is never guaranteed."  495 F.2d 448, 471 (2d Cir. 1974).  Federal courts have long recognized that securities class action litigation "is notably difficult and notoriously uncertain."   *In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 281 (S.D.N.Y. 1999).  High quality legal work and an aggressive pursuit of a case provide no assurance that plaintiffs' counsel will prevail on summary judgment, at trial, or achieve a

satisfactory settlement or even any settlement at all.  This is confirmed by the substantial risks that Lead Counsel assumed in commencing and prosecuting this Action.

This Court has found that there were significant hurdles facing the litigation where, *inter alia*, the parties had not yet moved for summary judgment and damages were uncertain, even before considering the uncertain results of a future trial.   *In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. at 129.  As Lead Plaintiff will discuss below, Lead Plaintiff and the Class faced similar risks in this Action at the time they agreed to the proposed settlement.

Although Lead Plaintiff's claims as articulated in the Amended Complaint had largely survived multiple motions to dismiss, as well as the motions for reconsideration, and, following Lead Plaintiff's discussions with defense counsel and detailed submissions, Defendants had stipulated to certification of the Class, Defendants reserved their right to move to alter or amend the Court's class certification order.   There were also numerous other risks that could have prevented Lead Plaintiff from achieving any recovery on behalf of the Class, or at least a recovery of the magnitude of the amount achieved through the proposed Settlement, including the possibility of the Court finding in favor of Defendants at summary judgment on the issues of liability and/or loss causation.   Indeed, it is likely that Defendants would have moved for summary judgment raising questions of liability, loss causation and/or damages, relying on this Court's and the Second Circuit's prior decisions in *In re Omnicom Group*, which, as noted in more detail above, was a securities case with certain facts that bore some similarities to certain facts in this case where this Court granted summary judgment in favor of defendants and against the plaintiff on loss causation grounds.

 Further, in addition to arguing that the alleged curative information that entered the market on Lead Plaintiff's identified disclosure dates did not constitute the disclosure of

20

previously undisclosed material information that defendants were obligated to disclose, or that factors other than those disclosures caused the stock price drops on those dates, ¶85, there was also a substantial risk that Defendants would have relied on expert testimony in arguing, among other things, that the size of the stock price declines on Lead Plaintiff's identified disclosure dates, after controlling for other industry or market factors, was not statistically significant and could not form the basis for liability under the loss causation and damages requirements of a Section 10(b) claim. ¶¶85-88.

Lead Counsel also faced the considerable risks in establishing liability, in that Defendants strenuously argued that the statements Lead Plaintiff claimed were materially misleading were true at the time they were made and that Defendants had no duty to disclose the allegedly withheld information.  ¶¶77-79.  Further, Defendants would likely have contested any allegation of scienter by pointing to the fact that BoA's outside auditor, PwC, reviewed each of BoA's quarterly financial statements before they were issued (as well as auditing BoA's year-end financial statements) and did not recommend any changes to these statements.  ¶80.  Both BoA and the Executive Defendants could also have asserted an "advice of counsel" defense for not disclosing the magnitude of the unpaid principal balance of the outstanding loans for which BoA or Countrywide had provided representations and warranties.  ¶¶81.

Despite these risks and uncertainties, Lead Counsel prosecuted this Action for over five years on an entirely contingent nature, without receiving any reimbursement, knowing that they may never be compensated for the substantial time and expenses spent prosecuting the Action. ¶127. "In numerous class actions, including complex securities cases, plaintiffs' counsel have expended thousands of hours and advanced significant out-of-pocket expenses and received no remuneration whatsoever." *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, No. 04 CIV. 8144

(CM), 2009 WL 5178546, at *18 (S.D.N.Y. Dec. 23, 2009).  Despite these risks, Lead Counsel worked tirelessly "facing the real and heightened risk that they would receive nothing for their efforts."  *Id.*  Accordingly, this factor weighs in favor of granting Lead Counsel's Application.

### 4.  The Quality of Representation

The fourth criterion for evaluating the fee request is the quality of the representation.  To determine the "quality of the representation," courts review, among other things, the recovery obtained and the backgrounds of the lawyers involved in the lawsuit.  *See In re Global Crossing Sec. Litig.*, 225 F.R.D. 436, 467 (S.D.N.Y. 2004).  Here, Lead Counsel succeeded in obtaining a substantial $335 million recovery for the benefit of the Class through Lead Counsel's hard work, persistence and skill in a highly complex case that presented very significant litigation risks.

Lead Counsel achieved the Settlement by developing rep and warranty and MERS claims that were far more extensive and detailed than anything that had previously been alleged, and indeed the theory of the case developed by Lead Counsel was significantly different from the theory advanced in the initial complaints filed in this Action.  ¶12-13. Through its prosecution of the Action, Lead Counsel independently developed substantial evidence to support Lead Plaintiff's claims and convince Defendants to settle, independent of the status of any litigation between any Defendants and any government agency.  The fact that Lead Counsel achieved this result through its independent efforts further demonstrates that the quality of representation here was outstanding.  ¶130.

Courts also recognize that the quality of the opposition faced by plaintiffs' counsel should be considered in assessing counsel's performance.  *See, e.g., In re Adelphia Commc'ns Corp. Sec. & Deriv. Litig.,* No. 03 MDL 1529 LMM, 2006 WL 3378705, at *3 (S.D.N.Y. Nov.

16, 2006) ("The fact that the settlements were obtained from defendants represented by 'formidable opposing counsel from some of the best defense firms in the country' also evidences the high quality of lead counsel's work") (internal citations omitted).  Here, as is known to the Court and as identified in the Rosen Declaration, Defendants were represented by some of the most prestigious and experienced securities defense firms nationwide, which vigorously and ably defended the Action on behalf of their respective clients for more than five years.  Even against this formidable opposition, Lead Counsel presented a case that was sufficiently strong to allow the Lead Plaintiff and Lead Counsel to negotiate the outstanding recovery reflected in the proposed Settlement.  ¶134.

### 5.  The Results Achieved Justify the Requested Fee

The fee request of $51.675 million, corresponding to slightly less than 15.5% of the Settlement Fund, which equates to a multiple of just 1.5 times Lead Counsel's lodestar in the case, is well within the percentage range that this Court, other courts within this Circuit and elsewhere have awarded in comparable cases.  *See, e.g., In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. at 130 (this Court awarded fee of 15.25%, which represented lodestar multiple of 1.6 on $336 million settlement); *In re Adelphia*, 2006 WL 3378705, at *3 (awarding attorneys' fees constituting 21.4% of $455 million settlement fund); *In re Comverse Tech.*, 2010 WL 2653354, at *2-3 (awarding 25% of $225 million settlement); *In re Sumitomo*, 74 F. Supp.2d at 399-40 (awarding attorneys' fees constituting 27.5% of the $116.6 million settlement amount); *Kurzweil v. Philip Morris Cos., Inc.*, Nos. 94 Civ. 2373 (MBM), 94 Civ. 2546 (BMB), 1999 WL 1076105 (S.D.N.Y. Nov. 30, 1999) (awarding attorneys' fees constituting 30% of nearly $124 million settlement fund)*; In re Platinum & Palladium Commodities Litig.*, 2015 U.S. Dist. LEXIS 98691, at *15  (awarding attorneys' fees constituting 22.5% of two settlements totaling

$84.6 million, made up of $72.5 million settlement for Futures Class and $12.1 million for Physical Class, which represented lodestar multiple of 1.9 for Futures Class and 1.4 for Physical Class); s*ee also In re Lucent Tech., Inc., Sec. Litig*., 327 F. Supp. 2d 426, 442-43 (D.N.J. 2004) (awarding 17% of $517 million settlement); *Shaw v. Toshiba Am. Info. Sys., Inc.*, 91 F. Supp. 2d 942, 972, 981 (E.D. Tex. 2000) (court approved a fee of $147.5 million, constituting over 14% of the value of that settlement, which consisted of $597.5 million in cash and other benefits for a total settlement "conservatively estimated at $1 billion"); *In re Cardinal Health Inc. Sec. Litigations*, 528 F. Supp. 2d 752 (S.D. Ohio 2007) (awarding 18% of $600 million settlement). A recent study by NERA Economic Consulting, *Recent Trends in Securities Class Action Litigation: 2015 Full-Year Review*, at 36, summarized the trend by noting that the median plaintiffs' attorneys' fees awarded in securities class actions with settlement values between $100 and $500 million as 22.5% in 1996-2010, and as 20.0% in 2011-2015) (attached as Exhibit C to Rosen Decl.).

Under the percentage of recovery approach, the fee Lead Counsel seeks is fair and reasonable in litigation of this kind and consistent with the decisions of courts in this Circuit.

### 6.  Public Policy Considerations Support the Requested Fee

Public policy considerations also weigh in favor of approval of the Settlement.  Private lawsuits such as this Action serve to further the objective of the federal securities laws to protect investors and consumers against fraud and other deceptive practices.  *See Hicks v. Stanley*, No. 01 Civ. 10071(RJH), 2005 WL 2757792, at *9 (S.D.N.Y. Oct. 24, 2005) ("Private actions to redress real injuries further the objectives of the federal securities laws by protecting investors and consumers against fraud and other deceptive practices."); *In re Flag Telecom Holdings,* 2010 WL 4537550, at *29 (if the "important public policy [of enforcing the securities laws] is to be

24

carried out, the courts should award fees which will adequately compensate Lead Counsel for the value of their efforts, taking into account the enormous risks they undertook.").  As a practical matter, such lawsuits can be maintained only if competent counsel can be obtained to prosecute them.  This will occur if courts award reasonable and adequate compensation for their services where successful results are achieved.  As Judge Cote stated in *In re WorldCom*:

> In order to attract well-qualified plaintiffs' counsel who are able to take a case to trial, and who defendants understand are able and willing to do so, it is necessary to provide appropriate financial incentives.

388 F. Supp. 2d at 359; *see also Hicks,* 2005 WL 2757792, at *9 ("To make certain that the public is represented by talented and experienced trial counsel, the remuneration [in a securities class action] should be both fair and rewarding."); *In re Union Carbide Corp. Consumer Prod. Bus. Sec. Litig.,* 724 F. Supp. 160, 169 (S.D.N.Y. 1989) ("A large segment of the public might be denied a remedy for violations of the securities laws if contingent fees awarded by the courts did not fairly compensate counsel for the services provided and the risks undertaken").

Here, where many of the Class members are individual investors, a class action was the most efficient manner in which to prosecute their claims and this Action was likely their only hope of obtaining compensation for the losses they suffered as a result of the alleged misconduct that took place at BoA.  In this circumstance, "public policy supports an award sufficient to encourage counsel to act on behalf of such investors."  *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 246 F.R.D. 156, 175 (S.D.N.Y. 2007).  "Private attorneys should be encouraged to take the risks required to represent those who would not otherwise be protected from socially undesirable activities like securities fraud."  *Maley*, 186 F. Supp. 2d at 374.

Finally, the fact that a sophisticated, well-qualified Lead Plaintiff which has previously served as a court-appointed lead plaintiff has approved this Application is particularly

appropriate to consider when judging the public policy of approving the fee award.  As Judge Cote stated in *In re WorldCom,* 2004 WL 2591402, at *20, there is a presumption of reasonableness where a lead plaintiff has conscientiously supervised the work of lead counsel and endorsed the fee request.

### D.  The Requested Fee is Reasonable Under the Lodestar "Cross-Check"

The Court may also consider whether the requested fee determined under the percentage approach is consistent with an award that would result under the lodestar/multiplier approach. The lodestar/multiplier method involves calculating the product of the number of hours worked and counsel's respective hourly rates, *i.e.,* the "lodestar," and adjusting the lodestar for contingency, risk and other factors by applying a "multiplier" to the lodestar.  *Goldberger,* 209 F.3d at 47.[7]

As the California Supreme Court recently observed, since the Third Circuit issued its 1985 Task Force Report on attorneys' fee awards, which "recommended courts generally use a percentage-of-the-fund method in common fund cases," its views "have gained general acceptance in federal and state courts," and have been endorsed by the American Law Institute. *Laffitte v. Robert Half Int'l Inc.*, Dkt. No. S222996, __ P.3d ___, 2016 WL 4238619, *6-7  (Cal.

---

[7] In computing the lodestar, the hourly billing rate to be applied is the "market rate," *i.e.*, the hourly rate that is normally charged in the community where counsel practices. *See, e.g., Blum v. Stenson,* 465 U.S. 886, 895 (1984).  In addition, the Supreme Court and the Second Circuit have held that the use of current rates for calculating the lodestar is proper since such rates more adequately compensate for inflation and loss of use of funds. *Missouri v. Jenkins,* 491 U.S. 274, 283-84 (1989); *New York State Ass'n for Retarded Children, Inc. v. Carey,* 711 F.2d 1136, 1153 (2d Cir. 1983) (use of current rates appropriate where services were provided within two to three years of fee application).  Nevertheless, pursuant to Lead Counsel's agreement with Lead Plaintiff, Lead Counsel's motion is based upon historic rates in effect at the time it began to render its services, and Lead Counsel agreed with Lead Plaintiff not to raise those rates for the first three years of this litigation, and thereafter only within certain pre-set parameters.  *See* Rosen Decl. ¶124.

Aug. 11, 2016).  Accordingly, the use of the lodestar cross check has been made optional in some jurisdictions, *Lafitte v. Robert Half Int'l Inc.*, 2016 WL 4238619, *17.  Even where it is still utilized, this Court has stressed its limited role in assessing the reasonableness of a fee award based on the percentage of recovery approach, explaining "[w]here the lodestar is 'used as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district court.'" *In re Platinum & Palladium Commodities Litig.*, 2015 U.S. Dist. LEXIS 98691 at 11, *quoting Goldberger,* 209 F.3d at 50.  As this Court noted in rejecting suggestion that the Court audit Class Counsel's lodestar and reduce the fee, "Culling through the minutiae of the time records each time a fee petition is submitted in this case would be impossible lest [the Court] abdicate the remainder of its judicial responsibilities for an indefinite period," *In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. at 130 (internal citations and quotation marks omitted).  *See also In re Global Crossing*, 225 F.R.D. at 468 ("where used as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district court.  Instead, the reasonableness of the claimed lodestar can be tested by the court's familiarity with the case.") (internal citations and quotation marks omitted).

As set forth in the Rosen Declaration, Lead Counsel has expended a total of 77,026.25 hours,[8] with 54,553.50 of the hours (or 71%) attributable to associates and paralegals and 22,472.75 of the hours (or 29%) attributable to partners, in the investigation, prosecution and settlement of this Action, for a total lodestar of $34,450,696.50.  ¶¶125-126.  The requested

---

[8] Lead Counsel has excluded from their hours and lodestar calculations time spent working on their application for an award of attorneys' fees and reimbursement of litigation expenses. ¶128.  And, of course, the Application, this brief and the accompanying declarations do not take into account the many hours that Lead Counsel expect to incur leading up to and for the final settlement hearing as well as the considerable time and efforts that will be expended in the settlement claims process, should be Settlement be approved.

$51,675,000 fee, which is slightly less than 15.5%, yields a multiplier of 1.5.  ¶¶126-127.  This multiplier is well below the range of multipliers commonly awarded in securities class actions. *See Maley,* 186 F. Supp. 2d at 369 (4.65 multiplier was "well within the range awarded by courts in this Circuit and courts throughout the country"); *In re Sumitomo*, 74 F. Supp. 2d at 399 (approving a multiplier of 2.5 and noting that multiples of between 3 and 4.5 have been common in federal securities cases).[9]

The 1.5 multiplier in this Action is, in fact, well within the range of multipliers derived from settlements approved by this Court, other courts in this Circuit, and nationwide in cases involving settlements of significant magnitude, such as this one.  *See, e.g., In re Currency Conversion Fee Antitrust Litig*., 263 F.R.D. at 130 (multiplier of 1.6 on settlement of $336 million); *In re Platinum & Palladium Commodities Litig.*, 2015 U.S. Dist. LEXIS 98691 at *11-15 (multipliers of 1.9 and 1.4 of portions of settlement totaling $84.6 million); *In re Adelphia*, 2006 WL 3378705, at *3 (2.89 multiplier awarded in $455 million settlement).

Thus, the "cross-check" confirms the reasonableness of the percentage sought here.

## II.  LEAD COUNSEL SHOULD BE REIMBURSED FOR EXPENSES REASONABLY INCURRED IN CONNECTION WITH LITIGATING THIS ACTION

"It is well established that counsel who create a common fund are entitled to the reimbursement of expenses that they advance to a class."  *In re Veeco*, 2007 WL 4115808, at *10; *In re Flag Telecom Holdings,* 2010 WL 4537550, at *30 ("It is well accepted that counsel

---

[9] As noted above, Lead Counsel agreed to cap its hourly rates during the first three years of the litigation, and thereafter limit increases in its rates.  The firm's rates have been approved consistently by courts in this District and elsewhere.  For example, last year in awarding the fee sought by BR&B and its co-counsel in *American International Group, Inc. 2008 Sec. Litig.*, No. 08cv4772 (S.D.N.Y.), Judge Swain found that the legal work in the case  "was performed and billed in an appropriate manner."  Transcript of Hearing, March 20, 2015, at 38, attached as Exhibit G to the Rosen Declaration.

who create a common fund are entitled to the reimbursement of expenses that they advanced to a class."); *Teachers' Ret. Sys. of La. v. A.C.L.N., Ltd.*, No. 01-CV-11814 (MP), 2004 WL 1087261, at *6 (S.D.N.Y. May 14, 2004).

As set forth in the Rosen Declaration and Exhibit E thereto, Lead Counsel incurred $1,386,167.33 in litigation expenses on behalf of the Class in the prosecution of this Action. ¶119.  Such expenses were essential to the successful prosecution and resolution of this Action and have been approved by Lead Plaintiff.  Lead Counsel maintained strict control over these expenses.

Lead Counsel has incurred considerable expenses for experts and consultants they retained.  These include: a financial and mortgage markets expert, an expert on loss causation and damages, an accounting and auditing expert, and a market efficiency expert.  ¶¶149-150. The total incurred for services of experts exceeded $700,000.  *Id.*

Another significant part of the litigation expenses, over $290,000, was necessary to maintain a reliable, interactive system for Lead Counsel's electronic document discovery. Defendants and third parties produced over 8 million pages of documents in this Action either in electronic format or through the production of documents that were converted to electronic format.  Thus, it was necessary for Lead Counsel to retain the services of a specialist firm to host a secure, Internet-based electronic document database that could be used to search, review, code and organize the relevant documents.  ¶151; Exhibit E.

Other costs for which Lead Counsel seek reimbursement are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour.   ¶152; Exhibit E.  These expenses include, among others, travel, long distance telephone and facsimile

charges, postage and delivery expenses, computerized research, court reporters for depositions, filing fees and photocopying.

The Notice informed the Settlement Class Members that Lead Counsel would apply for reimbursement of litigation expenses not to exceed $2,135,000. ¶157. Lead Counsel's request for reimbursement of $1,386,167.33 in expenses and the PSLRA award sought by Lead Plaintiff in the amount of $130,323.70, discussed more fully below, is well below the amount set forth in the Notice. Lead Counsel respectfully submit that all of the foregoing reimbursement requests are appropriate, fair and reasonable, and respectfully seek the Court's approval of the reimbursement of these expenses out of the Settlement Fund.

## III.   LEAD PLAINTIFF SHOULD BE AWARDED REASONABLE COSTS AND EXPENSES INCURRED IN CONNECTION WITH THIS ACTION

Lead Plaintiff is also seeking reimbursement of litigation costs and expenses in the amount of $130,323.70, that Lead Plaintiff itself incurred in connection with the prosecution of this Action. ¶¶154-157; Skoff Decl. ¶18. The PSLRA permits "the award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of the class." 15 U.S.C. § 78u-4(a)(4). Congress, in fact, intended to grant courts discretion to approve awards in appropriate cases. *See* Private Securities Litigation Reform Act, H.R. Conf. Rep. No. 104-369, at 35, 104th Cong., 1st Sess. (1995), *reprinted in* U.S.C.C.A.N. 730, 1995 WL 709276 ("[L]ead plaintiffs should be reimbursed for reasonable costs and expenses associated with service as lead plaintiff, including lost wages, and [the committee] grants the courts discretion to award fees accordingly."); Private Securities Litigation Reform Act, S. Rep. 104-98 at 10, S. Rep. No. 98, 104th Cong., 1st Sess. 1995, *reprinted in* 1995 U.S.C.C.A.N. 679, 1995 WL 372783 (1995) ("[T]he Committee grants courts

discretion to award the lead plaintiff reimbursement for 'reasonable costs and expenses (including lost wages) directly relating to the representation of the class'."). Courts in the Second Circuit "routinely award such costs and expenses both to reimburse the named plaintiffs for expenses incurred through their involvement with the action and lost wages, as well as to provide an incentive for such plaintiffs to remain involved in the litigation and to incur such expenses in the first place." *Hicks*, 2005 WL 2757792, at \*10; *In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 772 F.3d 125, 132-33 (2d Cir. 2014) (affirming the award of PSLRA expense and costs to lead plaintiffs totaling $453,000).

As set forth in the Rosen Declaration and Skoff Declaration, Lead Plaintiff has actively and effectively fulfilled its obligations as the Lead Plaintiff and as a representative of the Class, complying with all of the many demands placed upon PSERS and its personnel during the litigation and settlement of this Action. ¶¶155-156; Skoff Dec. ¶¶5-6, 8-12.   Lead Plaintiff has devoted significant time and resources to this Action.   Among other things, Lead Plaintiff: (i) reviewed case filings, case status reports, and other case-related materials; (ii) prepared for and attended the hearing for appointment of Lead Plaintiff; (iii) participated in discovery, including searching for and producing nearly 2,000 pages of documents maintained by PSERS that were responsive to Defendants' document requests; (iv) prepared for and testified in depositions; (v) attended hearings and depositions; and (vi) participated in the mediation sessions and actively consulted with Lead Counsel with respect to the final negotiations leading up to the Settlement. Skoff Decl. ¶¶8-12.

The efforts of Lead Plaintiff are precisely the type that Courts find support reimbursement to the class representatives.   *See, e.g., In re Marsh & McLennan Cos.*, 2009 WL 5178546, at \*21 (noting that the similar efforts of the lead plaintiff are "precisely the types of

activities that support awarding reimbursement of expenses to class representatives"); *In re Veeco,* 2007 WL 4115808, at *12 (granting lead plaintiff reasonable costs and expenses, including lost wages, directly relating to its representation of the class).

The Notice states that Lead Counsel's overall request of litigation expenses will include a request for an award to Lead Plaintiff for reimbursement of its reasonable costs and expenses. As such, Lead Counsel respectfully request that the Court award Lead Plaintiff $130,323.70 as reimbursement of its costs and expenses, including lost wages.

## CONCLUSION

For all of the foregoing reasons, Lead Counsel, supported by the Lead Plaintiff, respectfully request that this Court:  (i) grant in its entirety Lead Counsel's petition for an award of attorneys' fees in the amount of $51,675,000.00, and reimbursement of litigation expenses in the amount of $1,386,167.33; and (ii)   grant in its entirety Lead Plaintiff's request for reimbursement of its costs and expenses in the amount of $130,323.70.

Dated:  August 30, 2016                                  Respectfully submitted,

**BARRACK, RODOS & BACINE**
A. Arnold Gershon
William J. Ban
Michael A. Toomey
425 Park Avenue, 31st Floor
New York, NY 10022
Telephone: (212) 688-0782
Facsimile: (212) 688-0783

-and-

**BARRACK, RODOS & BACINE**

By:   /s/ Mark R. Rosen
Leonard Barrack
Mark R. Rosen

32

Jeffrey A. Barrack
Jeffrey B. Gittleman
Chad A. Carder
Julie B. Palley
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-0600
Fax: (215) 963-0838

*Attorneys for Lead Plaintiff
Commonwealth of Pennsylvania,
Public School Employees'
    Retirement System and Lead
Counsel for the Class*