UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————————
:
PENNSYLVANIA PUBLIC SCHOOL                    :        CIVIL ACTION NO.
EMPLOYEES' RETIREMENT SYSTEM,                 :        11-CV-00733-WHP
individually and on behalf of all others      :
similarly situated,                           :        CLASS ACTION
                                              :
                          Plaintiff,          :        **LEAD PLAINTIFF'S**
                                              :        **POST-HEARING SUBMISSION**
                                              :
              v.                              :
                                              :
BANK OF AMERICA CORPORATION, et al.,          :
                                              :
                          Defendants.         :
                                              :
—————————————————————————
:

## BARRACK, RODOS & BACINE

A. Arnold Gershon                    Leonard Barrack
William J. Ban                       Mark R. Rosen
Michael A. Toomey                    Jeffrey A. Barrack
Eleven Times Square                  Jeffrey B. Gittleman
640 8th Avenue, 10th Floor           Chad A. Carder
New York, NY 10036                   Julie B. Palley
Telephone: (212) 688-0782            2001 Market Street
Facsimile: (212) 688-0783            Philadelphia, PA 19103
                                     Telephone: (215) 963-0600
                                     Fax: (215) 963-0838

*Attorneys for Lead Plaintiff, Commonwealth of Pennsylvania, Public School*
*Employees' Retirement System, and Lead Counsel for the Class*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................. 1

SECTION A:  RESPONSES TO THE COURT'S INQUIRIES ................................. 2

1. The Responses to the Motions to Dismiss and Motions for
   Reconsideration ........................................................................................ 2

2. Preparation of Lead Plaintiff's Mediation Statements, Attendance
   at Mediation Sessions, and Finalizing the Settlement ............................. 4

3. Litigation Activities From the Agreement to Engage in Mediation
   to the Settlement of the Case ................................................................... 7

   A. Pursuing Discovery from Defendants ....................................... 8

   B. Disputes that Barrack Resolved Without Court Intervention ................. 11

   C. Disputes that Barrack Was Forced to Bring to the Court ........................ 13

   D. The Time Spent in Litigation Activities from April 1, 2014
      to August 12, 2015 .................................................................... 14

4. The Firm's Use and Billing of Associate Attorneys ............................................. 14

5. The Basis for Different Billing Rates for the First Three Years of
   the Litigation and the Subsequent Three Years .................................... 20

6. The Firm's Use and Billing of Paralegals ............................................. 21

7. Authority for the Rule 11 Findings in the Proposed Final Judgment
   and Order ................................................................................................ 22

SECTION B:  DISCUSSION OF ISSUES FROM *DIAL CORP. V. NEWS CORP.* .................. 23

1. Case Law Inside and Outside the Second Circuit Supports Plaintiff's
   Treatment of the Time of All Associates, Including Attorneys
   Specifically Hired for this Litigation, as Part of the Calculation for
   the Lodestar Cross-Check ...................................................................... 23

2. The Hourly Rates Utilized in the Time and Lodestar Calculations Were
   Reasonable and Have Been Approved by Judges in this Court and
   Throughout the Country .......................................................................... 28

i

CONCLUSION .......................................................................................................................... 32

# TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

*Andrews v. Lawrence Livermore Nat'l Sec., LLC,*
    No. C11-cv-3930-CW, 2012 U.S. Dist. LEXIS 5571 (N.D. Cal. Jan. 18, 2012) .................... 26

*Basic Inc. v. Levinson,*
    485 U.S. 224 (1988)................................................................................................ 12

*Carlson v. Xerox Corp.,*
    596 F.Supp.2d 400, 409 (D. Conn.), *aff'd,* 355 Fed. Appx. 523 (2d Cir. 2009)...................... 25

*Dial Corp. v. News Corp.,*
    No. 13cv6802, 2016 WL 6426409 (S.D.N.Y. Oct. 31, 2016) .................................. 2, 23, 27, 32

*Henig v. Quinn Emanuel Urquhart & Sullivan LLP,*
    151 F.Supp.3d 460 (S.D.N.Y. 2015)........................................................................ 18

*In re American International Group, Inc. 2008 Sec. Litig.,*
    No. 08-cv-4772-LTS-DCF (S.D.N.Y.) .................................................... 22, 28, 29, 32

*In re AOL Time Warner S'holder Deriv. Litig.,*
    No. 02 Civ. 6302(CM), 2010 WL 363113 (S.D.N.Y. Feb. 1, 2010) ........................... 25

*In re Apollo Group Inc. Sec. Litig.,*
    Nos. CV 04-2147-PHX-JAT, CV 04-2204-PHX-JAT,
    CV 04-2334-PHX-JAT 2012 WL 1378677 (D. Az. Apr. 20, 2012) ......................... 25

*In re Bank of America Corp. Sec. Deriv. & ERISA Litig.,*
    Master File No. 1:09-MDL-2058 (PKC) (S.D.N.Y. 2013)...................................... 29

*In re Citigroup Bond Sec. Litig.,*
    988 F.Supp.2d 371 (S.D.N.Y. 2013)................................................................... 30, 31

*In re Enron Corp. Sec., Deriv. & "ERISA" Litig.,*
    586 F.Supp.2d 732 (S.D. Tex. 2008) .................................................................... 25

*In re Lehman Bros. Sec. & ERISA Litig.,*
    No. 09-MD-2017 (LAK) (S.D.N.Y. 2012) .......................................................... 29

*In re The Mills Corp. Sec. Litig.,*
    265 F.R.D. 246 (E.D. Va. 2009) ......................................................................... 26

*In re Wachovia Preferred Sec. & Bond/Notes Litig.*,
   Master File No. 09-cv-06351 (RJS) (S.D.N.Y. 2011 ) ............................................................ 29

*In re WorldCom, Inc. Sec. Litig,*
   No. 02 Civ. 3288 (DLC), 2004 WL 2591402 (S.D.N.Y. Nov. 21, 2004)................................ 26

*Missouri v. Jenkins*,
   491 U.S. 274 (1989)................................................................................................................ 25

*Morris v. Potter*,
   No. 06-cv-432-MSK, 2008 U.S. Dist. LEXIS 105409 (D. Col. Dec. 22, 2008) ...................... 26

*Public Employees' Ret. Sys. of  Miss. v. Merrill Lynch & Co.*,
   No. 08-cv-10841-JSR-JLC (S.D.N.Y. 2012)........................................................................... 29

*Takeda Chem. Indus. v. Mylan Labs., Inc.,*
   Nos. 03 Civ. 8253 (DLC), 04 Civ. 1996 (Civ.), 2007 U.S. Dist. LEXIS 19614
   (S.D.N.Y. Mar. 21, 2007) ...................................................................................................... 25

## Statutes

15 U.S.C. § 78u-4(c)(1) ................................................................................................................ 22

## Other Authorities

American Bar Ass'n, Standing Comm. on Ethics & Professional Responsibility,
   Formal Op. 08-451 (Aug. 5, 2008) ....................................................................................... 26

## INTRODUCTION

Lead Plaintiff and Class Representative, Commonwealth of Pennsylvania Public School Employees' Retirement System (PSERS), and its Court-appointed Lead Counsel, Barrack, Rodos & Bacine (Barrack), respectfully tender this Post-Hearing Submission to address in detail the questions raised by the Court at the November 29, 2016 final settlement hearing in this Action.

During the hearing, the Court indicated its approval of the settlement and plan of allocation, but asked for authority supporting the parties' request for the Court to make Rule 11 findings, as reflected in the proposed final judgment and order.

The Court also raised the following series of questions concerning the fee application: (1) who worked on Lead Plaintiff's responses to the motions to dismiss (which responses were filed February 25, 2012 and December 12, 2012) and motions for reconsideration (which responses were filed on August 13, 2012 and May 20, 2013), and how many hours did they devote to those tasks; (2) who worked on preparing mediation statements and/or attended mediation sessions (which took place on October 2, 2014, February 27, 2015, and August 12, 2015), and how many hours did they devote to those tasks; (3) what litigation activities were conducted during the period from the time Lead Plaintiff agreed to mediate (*i.e.*, April 2014) until the agreement to settle the case was achieved (*i.e.,* August 12, 2015), and thereafter until the end of the case, and how many hours were expended during those times; (4) were all of the associate attorneys truly full-time, salaried employees, or were they actually attorneys who worked at Barrack essentially on an hourly basis for very short time periods; (5) what is the basis for the different billing rates utilized for the first 3 years of the litigation after PSERS's appointment (inception through June 19, 2014) and for the subsequent time spent on the case (June 20, 2014 through July 31, 2016); and (6) what justification does the firm have for the hourly rates billed for its paralegals.

Finally, the Court asked counsel to address certain issues stemming from the decision the Court handed down a few weeks earlier in *Dial Corp. v. News Corp.*, No. 13cv6802, 2016 WL 6426409 (S.D.N.Y. Oct. 31, 2016).

### SECTION A:  RESPONSES TO THE COURT'S INQUIRIES

**1.  The Responses to the Motions to Dismiss and Motions for Reconsideration**

PSERS was appointed to lead the prosecution of this Action, and Barrack was approved to serve as Lead Counsel, on June 20, 2011.  Even prior to the appointment, Barrack had undertaken an extensive analysis and investigation of facts and claims that could be asserted on behalf of Bank of America investors, and continued with that investigation through the filing of the Consolidated Complaint on September 23, 2011.  Defendants filed their motions to dismiss on January 11, 2012.

On February 25, 2012, Barrack filed an omnibus brief in opposition to the four sets of motions to dismiss that had been filed by Bank of America, the Executive Defendants, the Director Defendants, and the Underwriter Defendants.  As shown more fully in Exhibit A, Barrack attorneys – who had begun their analysis, research and responses to the anticipated arguments that Defendants would likely raise during the pre-motion phase – spent a total of 1,279.5 hours in order to respond to the motions.  Partners M. Richard Komins,[1] Mark Rosen, Jeffrey Barrack, and Chad Carder headed up the writing of the brief, with assistance on the legal

---

[1] Mr. Komins, who had joined the Firm in 1984, retired from Barrack and from the practice of law on February 28, 2013.  Another former Barrack partner, Regina Calcaterra, left the firm on December 31, 2011, to go into government service, first with Suffolk County, New York, and then as an appointed member of New York's Moreland Commission.  Various associates also left Barrack during the pendency of this six-year long case.  While the service of all attorneys who assisted in the prosecution of this action is included in the fee petition, names of attorneys not currently at Barrack do not appear on the firm's website, which is regularly updated after attorneys join or leave the firm.

research from Michael Toomey and Julie Palley. The total lodestar incurred on this task was $728,005.00.

The Court issued its decision on July 11, 2012, granting in part and denying in part the motions. In response to the ruling, Barrack commenced an additional investigation and began to prepare an Amended Complaint in order to plead further facts pertaining to the scienter of the five Executive Defendants. On July 25, 2012, Bank of America moved for reconsideration of the ruling to the extent it had sustained the 1934 Act claims against BoA. While continuing to work on the Amended Complaint, Barrack immediately commenced its research and written response to BoA's motion.

Barrack filed its brief in opposition to BoA's motion for reconsideration on August 13, 2012 – the same day we filed the Amended Complaint. As shown more fully in Exhibit B, Barrack attorneys spent a total of 203.5 hours researching and writing the brief. Messrs. Rosen and Carder and Ms. Palley did the bulk of the work, including legal research, on the brief. The total lodestar incurred in this task was $111,670.00.

Although the Amended Complaint specifically addressed the deficiencies identified in the Court's decision of July 11, 2012, with respect to the scienter allegations against the Executive Defendants, each of the Executive Defendants nonetheless moved to dismiss the Amended Complaint with a motion and brief filed on November 5, 2012. Barrack responded in opposition to the motion on December 12, 2012. As shown more fully in Exhibit C, Barrack attorneys spent a total of 578.5 hours researching and writing the brief. The primary attorneys who researched and wrote the opposition brief were Messrs. Komins, Rosen, and Jeffrey Barrack and Ms. Palley. The total lodestar incurred was $330,490.00.

On April 17, 2013, this Court heard argument on the Executive Defendants' motion to dismiss the Amended Complaint. The Court denied the motion and upheld the Complaint with respect to all 1934 Act claims against Bank of America and the Executive Defendants. Not content to leave the ruling alone, on May 1, 2013, Defendant Moynihan – Bank of America's CEO – moved for reconsideration of the April 17, 2013 ruling. In response, Barrack conducted the necessary research, wrote and filed Lead Plaintiff's opposition to the reconsideration motion on May 20, 2013. The Court denied the motion on June 12, 2013. As shown more fully in Exhibit D, Barrack attorneys spent a total of 191.75 hours researching and writing the brief, which was primarily handled by Mr. Rosen. The total lodestar incurred for this task was $115,553.75.

Thus, as shown above and in the attached Exhibits A - D, Barrack attorneys spent a total of 1,858.00 hours in responding to the motions to dismiss (for a cumulative lodestar of $1,058,495) and spent a total of 395.25 hours responding to the motions for reconsideration (for a cumulative lodestar of $227,223.75). The 2,253.25 hours spent on these assignments are 2.9% of the total time expended in the case and the combined lodestars constitute 3.7% of the total lodestar in the case.

### 2. Preparation of Lead Plaintiff's Mediation Statements, Attendance at Mediation Sessions, and Finalizing the Settlement

PSERS and Barrack participated in three day-long mediation sessions before retired Judge Layn Phillips over a ten month period. The sessions were held on October 2, 2014, February 27, 2015, and August 12, 2015 – all after Barrack received, reviewed and analyzed millions of pages of document discovery from Bank of America, the Executive Defendants and many non-parties, and during the time periods when Barrack was (a) taking 23 fact witness depositions (which were taken from June 24, 2014 to July 17, 2015) and (b) preparing for and

attending depositions of 5 of the confidential witnesses and 4 of PSERS's investment advisors (which were taken from September 18, 2014 to July 9, 2015). Other depositions would have been scheduled and taken had all parties not agreed to the mediator's $335 million settlement proposal put forth at the third mediation session.

In preparation for each mediation session, Barrack drafted detailed written submissions setting forth Lead Plaintiff's evaluation of the case and advocating why Defendants should agree to a substantial payment to settle all claims. The mediation statements were, in many respects, akin to briefs and supporting exhibits that a party plaintiff would file in support of a summary judgment motion or in response to a defendant's summary judgment motion. The statements synthesized the key allegations and claims in the case; matched up evidence from Barrack's investigation and on-going discovery efforts; and included further analysis and legal argument going to all of the required elements of Lead Plaintiff's claims. As the mediation proceeded, both sides and the mediator focused not only on the evidence as it was developing through the document review and deposition programs, but also on the complex loss causation and damages issues in this case. This required in-depth discussions with Lead Plaintiff's loss causation and damages expert and careful analyses of the inflation allegedly put into the market for BoA stock and the impact of the three alleged curative disclosures at the end of the Class Period.

Neither of the first two mediation sessions, on October 2, 2014 and February 27, 2015, resulted in the parties making any significant headway towards resolving the litigation. However, during the spring and summer leading up to the third session on August 12, 2015, and at the session itself, the parties were able to narrow the two sides' views about the case sufficiently to provide the mediator with a basis for making a mediator's proposal to settle the

Action for $335 million.   The mediator's proposal was accepted by the two sides at the conclusion of that session.

Given the scope and complexity of the issues raised during the mediation process and the types of submissions, including visual and oral presentations that were made at the mediation sessions, many Barrack attorneys were involved in preparing the mediation statements and presentations because some firm attorneys had concentrated their efforts on obtaining discovery from Defendants, some had concentrated their efforts on legal research, and some were more involved with loss causation and damages issues.

Four Barrack partners attended the mediation sessions: Leonard Barrack, the senior partner and founder of the firm; and the three partners (Messrs. Rosen, Gittleman, and Jeffrey Barrack) who had the primary responsibility for the day-to-day case prosecution.   PSERS's Deputy General Counsel for Investments, Steven Skoff, also attended each of the sessions. Further, in between the sessions, Leonard Barrack engaged in direct conversations with the mediator and with the senior counsel for BoA in order to further the negotiations.

The Chart attached as Exhibit E identifies the firm attorneys who participated in preparing the various mediation statements, written responses to Defendants' statements, and the presentations made at the sessions, and the time they spent on the mediation efforts.   Notable contributors to this effort included Chad Carder, who was very active in pursuing discovery from Defendants and wrote significant portions of the mediation statements, and Messrs. Rosen, Gittleman, Jeffrey Barrack, and William Ban.   Barrack attorneys collectively spent 1,674.00 hours (2.1% of the total time expended in the case) in researching, writing, and preparing exhibits for the mediation statements and presentations, and attending the mediation sessions, for a total lodestar of $1,121,865.25 (3.2% of the total lodestar).

The parties ultimately reached an agreement in principle to settle this litigation on August 12, 2015.  But that was not the end of the case.  The parties negotiated for several months over various drafts of the stipulation and other settlement papers.  Those efforts were led by Mr. Rosen, with input from other firm personnel with relevant experience in drafting settlement agreements, working with claims administrators and custodian banks, and implementing notice and claim procedures.  We finalized the Stipulation of Settlement, including its accompanying exhibits, on March 11, 2016, after which we presented it to the Court for preliminary approval. Based on the Court's directives, and after having worked with Professor McGovern, the parties revised the Stipulation, Notice, Claim Form, and notice program, and re-submitted the settlement documents for preliminary approval.  The Court granted preliminary approval to the settlement and authorized dissemination of the Notice and Proof of Claim forms on June 15, 2016.

From August 13, 2015 through June 15, 2016, Barrack attorneys spent a total of 542 hours on the case.  This constitutes seven tenths of 1 percent of the total time spent in the prosecution of the Action.

### 3. Litigation Activities From the Agreement to Engage in Mediation to the Settlement of the Case

During the hearing on November 29, 2016, this Court also inquired about the litigation activities that Barrack conducted over the last two and one-half years of this case, starting with the parties' agreement in April 2014 to engage in a mediation of the case.  As the class had already been stipulated and ordered by this point, we divide this discussion into three categories: (1) our discovery efforts, which included the firm's continuing document discovery, the deposition program we put into place, and our work in connection with depositions of certain confidential witnesses and PSERS's investment advisors; (2) disputes that Barrack managed to

resolve with Defendants' counsel without Court intervention; and (3) disputes that Barrack was forced to bring to the attention of the Court.

### A. Pursuing Discovery from Defendants

Once the Court denied Defendants' motions to dismiss the Amended Complaint on April 17, 2013, and thereby lifted the PSLRA's mandatory stay of discovery, Barrack promptly prepared and served comprehensive document requests on Bank of America and the Executive Defendants, and communicated with the non-parties upon which document preservation subpoenas had earlier been served with the Court's approval,[2] that they would now be required to produce documents in response to the subpoenas.

Defendants broadly objected to PSERS's document requests and the firm, primarily through Mr. Gittleman, a Barrack partner with significant experience in overseeing and handling large-document case discovery efforts in securities and antitrust cases, led a protracted meet and confer process, which extended over 7 months, during which we negotiated every dimension of Defendants' document productions.[3]

In the summer of 2013, Bank of America commenced its document productions on a rolling basis. As of October 31, 2013, Defendants had produced 4.5 million pages of documents

---

[2] *See* Declaration of Mark R. Rosen in Support of Lead Plaintiff's Motion for Final Approval of Class Action Settlement, for Approval of Proposed Plan of Allocation, and in Support of Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses, filed August 30, 2016 (Docket No. 357) ("Rosen Declaration" or "Rosen Decl."), at ¶¶ 24-26.

[3] Mr. Gittleman, often assisted by Mr. Carder and Ms. Palley, negotiated with their counterparts at the defense firms concerning the selection of the custodians whose documents would be searched, the search terms that would be used, and pertinent time periods for their document productions. Ultimately, counsel on both sides agreed upon the search parameters, and Defendants' extensive productions of documents reflected those agreements. Similar efforts were made with counsel for the many non-parties upon whom we had served records subpoenas, which also resulted in agreed upon search terms, custodians, and categories of documents that would be produced by the non-parties.

and thousands of native files on the core issues in the litigation.[4]  By the time the parties agreed

in April 2014 to enter into mediation (without in any way slowing the prosecution of the Action),

Barrack attorneys had received and were in the process of reviewing the millions of pages of

documents produced by Bank of America, the Executive Defendants, and other non-parties.[5]  By

June 30, 2014, we had received and were reviewing 7.5 million pages of documents, and that

grew to over 8.2 million pages by December 31, 2014.[6]

Lead Counsel prepared for and conducted 23 fact witness depositions from June 2014

through June 2015.  *See* Rosen Decl., ¶ 45.  Mark Rosen, Jeffrey Gittleman and Jeffrey Barrack

had primary responsibility to prepare for and conduct the fact witness depositions.  These

depositions focused on BofA personnel who possessed probative information concerning the

core subjects of the case.  Witnesses included personnel with responsibility for loan repurchase

operations (Kathryn Martin, Scott Kurzban, Laurie Milleman), residential mortgage loan

operations (Elizabeth Chen, Mary Kanaga, Mark Ulmer, Lance Bell), risk processes related to

loan businesses (Paul Morrison, Craig Rosato, Frank McNichol), as well as the deposition of the

President of the Company's Home Loans division, Barbara Desoer.  The deposition program also

focused on personnel with responsibility for certain counterparties on rep and warranty claims

against BoA, including the monoline insurance companies (Susan Welsh), operational and

internal audit personnel (Cynthia Simantel, Andrew Solomon, Gordon Kent Sorey, Linda

DeMartini), and personnel with responsibility for the Company's internal controls (Jack

Schakett, Sharon Mason, Renee Hertzler).  Testimony was also elicited from the Controller of

---

[4] Joint Status Report Concerning Class Certification and Document Discovery, dated October 31, 2013, ¶4 (Docket No. 239).

[5] Joint Status Report Concerning Discovery, dated June 27, 2014, ¶2(a) (Docket No. 258).

[6] Joint Status Report Concerning Discovery, dated September 24, 2014, ¶A(1)(h) (Docket No. 268).

the Company (Bradley Weber), one of its investor relations executives (Edward McEntire), its chief financial reporting and accounting executive (Randy Shearer), and a key member of the BofA's board of directors (Charles Rossotti).

Each of these depositions required the preparation of detailed work-product to organize and analyze exhibits with which to examine these key witnesses. Many of the deposition exhibit books and lines of questioning were prepared with assistance from associate attorneys who had conducted focused reviews of documents that might be particularly relevant to the various witnesses. The last fact witness who was deposed before the settlement was reached on August 12, 2015, was Mr. Rossotti, who was deposed on June 17, 2015.

Barrack's discovery efforts also included our working with witnesses who Defendants' counsel might seek to depose. As this Court will recall, as part of Barrack's pre-complaint investigation, we had identified and interviewed confidential witnesses (CWs), several of whom provided information that was included in the Consolidated Complaint or the Amended Complaint. The CWs were primarily former employees of BofA or Countrywide. When it became clear that Defendants would be seeking depositions of at least some of the CWs, Barrack attorneys had discussions to advise the CWs of discovery that Defendants might pursue. Based on these discussions, certain of the CWs retained the firm to represent them in connection with the discovery that might be sought. Jeffrey Barrack and Julie Palley were the firm's primary contacts with the CWs.

Following a series of meet and confer conferences, Defendants noticed and conducted depositions of three CWs. These were: CW-5 on September 18, 2014, in Dallas; CW-6 on September 23, 2014, in Los Angeles; and CW-2 on December 19, 2014, in Los Angeles. Mr. Barrack prepared the witnesses for their depositions and defended each deposition, with

10

assistance from Ms. Palley.  After another series of meet and confers between the same Barrack attorneys and Defendants' counsel, Defendants served deposition subpoenas and conducted the depositions of CW-7 on April 20, 2015 in New York City, and CW-1 on May 28, 2015, in Houston.

Barrack attorneys also assisted in preparing for depositions representatives of four of PSERS's investment managers.  Given their work with PSERS in producing its documents, Mr. Barrack and Ms. Palley were the primary Barrack attorneys coordinating with the investment manager representatives for this task, and Mr. Rosen attended each of the depositions.  The depositions of the investment managers were taken on May 12, 2015, in San Diego (Denali Advisors); on May 14, 2015, in Albuquerque (Hanseatic Management); on May 20, 2015, in Boston (Hellman Jordan); and July 9, 2015, in New York City (John Hsu Capital).  No depositions were taken after the parties reached the agreement in principle to settle the litigation.

The 23 depositions taken by Barrack (all after the parties agreed to mediation) and the 11 depositions taken by Defendants' counsel (all but two of them after the parties agreed to mediation) are set forth in chart form in paragraph 45 of the Rosen Declaration.

### B.  Disputes that Barrack Resolved Without Court Intervention

The attorneys at Barrack entered into scores of meet and confer conferences and negotiations to resolve many issues that oftentimes are brought to a court's attention in federal securities law litigation.  Here, Barrack was able to resolve all disputes concerning the scope of the documents to be produced in response to Lead Plaintiff's document requests.  Barrack was also able to resolve all disputes regarding the manner in which Defendants would produce their documents, including the custodians whose records would be searched, using the search terms and the time periods negotiated by the parties.  Barrack was also able to convince Defendants to

agree to a stipulated class after undertaking discussions with Defendants' counsel about the efficiency of the market for BoA common stock and Common Equivalent Securities (CES), making extensive documents productions from PSERS and proffering two PSERS witnesses for deposition.[7]  These and similar efforts in other areas solved many such discovery and other disputes rather than burdening the Court with pre-motion submissions, requests for conferences, motion practice and arguments that would require adjudication.

---

[7] Barrack's work in obtaining Defendants' agreement to stipulate to the Class helped to set the stage for the parties' mediation efforts.  Briefly, after this Court's Order of July 30, 2013, which established a schedule for PSERS's anticipated class certification motion, PSERS's and BoA's counsel retained respective experts, each of whom independently studied the suitability of the action for class certification.  The expert Barrack retained was tasked with providing analysis and information concerning the efficiency of the market for BoA's common stock and CES, so that, consistent with *Basic Inc. v. Levinson,* 485 U.S. 224 (1988), PSERS could establish a presumption of reliance upon Defendants' statements or omissions based upon the efficient market hypothesis.  With this analysis in hand, Barrack conferred with BoA's counsel, and was able to convince Defendants not to contest market efficiency, while retaining their right to contest Lead Plaintiff's adequacy and the typicality of its claims.

On November 15, 2013, Lead Plaintiff moved for certification of the putative class.  Barrack prepared and filed an extensive opening memorandum of law in support of the class motion [Docket No. 244] as well as a detailed, 19-page declaration by Mr. Golan in support of the motion [Docket No. 245 (Ex. B)], which provided the Court with an analysis of each of the elements generally reviewed by courts in determining market efficiency issues.  On December 4, 2013, Defendants' counsel conducted the depositions of two PSERS designees, its Chief Investment Officer and its Deputy Chief Counsel for Investments.  Based on the credible and comprehensive testimony that PSERS's designees provided, and after further discussions between the parties, Defendants agreed not to contest either the typicality of PSERS's claims or its adequacy.  Subsequently, the parties filed a stipulation to the certification of the Class, and on February 14, 2014, the Court issued an Order approving the stipulation.

Barrack's ability to achieve a stipulated class – subject to Court approval – was a significant achievement.  It allowed Lead Plaintiff to clear what is, in other cases, a major hurdle to the prosecution of a securities case as a class action.  It obviated the need for competing expert declarations, expert depositions, and potentially an evidentiary hearing on the motion.  It also allowed the parties and this Court to concentrate on the merits of the case, and it thereafter allowed the parties to undertake mediation sessions without having the question of whether a class would be certified.

One such major discovery issue concerned whether Defendants would produce and/or write non-opposition letters allowing for the production of recorded testimony taken from various present or former BoA employees in a related administrative investigation conducted by the SEC.  Barrack partners Jeffrey Gittleman and Chad Carder had numerous meet-and-confer sessions with Defendants' counsel before securing their agreement to have the SEC depositions produced, thus keeping this from becoming an issue that would need to be brought to the Court for resolution.  The production of the testimony given in the related SEC proceeding became a valuable source of information and admissions for Barrack's on-going deposition program, especially as it related to the MERS-related claims in the case, and for our mediation efforts.

### C.  Disputes that Barrack Was Forced to Bring to the Court

As is now typical in discovery in cases involving the production of large quantities of electronic documents, the confidentiality agreement negotiated at the outset of discovery had a provision allowing a producing party to belatedly assert that a privileged document had been inadvertently produced and should be returned or "clawed back."  During the course of deposing various witnesses, a pattern began to emerge in which literally on the eve of, or even during the course of, a witness deposition, defense counsel would "claw back" documents that Barrack had anticipated using for questioning at a deposition (or had already attempted to introduce as a deposition exhibit).  This pattern of belated "claw backs" posed a significant hurdle to preparing for and conducting effective examinations.

When Defendants were unwilling to halt this last minute activity, Barrack brought this practice to the Court's attention and secured the Court's order amending the confidentiality agreement so that the producing party had to announce it was clawing back a document at least 10 days before a deposition.  If the producing party failed to provide such notice, the examining

party could use that document in its upcoming deposition.  After this change was put into place, last minute claw backs ceased to be a problem in conducting depositions.

Barrack also challenged BoA's withholding of tens of thousands of documents based upon the assertion of the bank examiners privilege.  After unsuccessfully engaging in the meet and confer process, and obtaining a pre-motion conference as a prerequisite to bringing a discovery motion, Barrack filed a motion to compel challenging these privilege claims, and was forced to respond to opposition submissions from BoA and a number of regulatory entities.  This motion was fully briefed and pending at the time the parties agreed to the proposed settlement.

### D.  The Time Spent in Litigation Activities from April 1, 2014 to August 12, 2015

The litigation activities that Barrack undertook from April 1, 2014 to August 12, 2015, are summarized above and more fully set forth in the Rosen Declaration, at ¶¶ 23-63.  Cumulatively, Barrack attorneys spent 46,189.5 hours on the prosecution of this Action from April 1, 2014 to August 12, 2015.  And, as previously stated, after reaching the agreement in principal to settle the litigation, Barrack attorneys spent 542 hours on settlement-related issues in this Action from August 13, 2015 to June 15, 2016.

### 4.  The Firm's Use and Billing of Associate Attorneys

As Barrack attorneys were working to secure Defendants' documents, we began the process of assembling a team of attorneys to review what would ultimately constitute over 8 million pages of materials.

It should be noted at the outset that it would have been impossible to simply staff this massive document review with existing Barrack attorneys.  Many had significant time commitments in existing cases they were prosecuting and it would have been inappropriate and

an inefficient use of resources to utilize more highly compensated senior attorneys (with higher billing rates) to conduct the initial document reviews that were required in this Action.

Barrack ultimately utilized a total of 26 associate attorneys in various aspects of the prosecution of the BoA litigation.[8] All associates, both those who had already been employed by the firm, and those who were hired specifically to work on this case, were paid a yearly salary and were treated as full-time employees. Unlike some other firms, on both the plaintiffs' and defendants' sides of class actions and other mass litigation, in addition to providing their salaries, Barrack offered every associate a wide range of benefits, including health care insurance, voluntary dental and life insurance, vacation and personal paid time off, payment of state bar attorney registration fees, reimbursement of fees for continuing legal education courses, and participation in Barrack's 401(k) plan after a certain period of time.[9] None of Barrack's associates were paid an hourly wage; none were part-time workers; none worked outside our offices; and none were hired to conduct rote assignments (as so-called "contract attorneys" are often hired to do). To the contrary, all of the associates assigned to the BoA case were salaried full-time attorneys who made use of their significant legal skills to greatly contribute to the prosecution and ultimate successful resolution of this case.

The document review work required a team of attorneys who worked exclusively on this case during various stretches of time from September 2013 until August 2015 – nearly two years – under the direction of Mr. Gittleman, Mr. Carder and other Barrack attorneys, to substantially

---

[8] *See* Rosen Decl., Ex. D (Chart of Barrack Attorney and Paralegal Time and Lodestar).

[9] Whether associates were working for the firm before the BoA case or were hired to work only on the case, they received the same benefits. They were treated identically with respect to the firm's 401(k) plan and worker's compensation insurance, and with respect to health insurance, they were provided the same health care plan options. Regardless of the plan an associate chooses, the firm pays the same amount toward the associate's premium.

complete their review of Defendants' document productions and the productions of various non-parties, and assist in the preparation for the 23 fact witness depositions ultimately taken by Barrack attorneys in this case.  During this time period, as Barrack attorneys recognized that other categories of documents, or documents of other BoA personnel or departments would likely also be relevant to the case, we continued to negotiate for – and review – additional documents.  In fact, even after Barrack reduced the number of associate attorneys working on the document reviews in April 2015, we continued to maintain a core group of associate attorneys who had been hired to assist in the prosecution of the case for the continuing review and deposition preparation that was on-going in the case right up to the time the parties agreed in principle to settle this action.

A number of the associates who worked on this case were long-time Barrack employees. Ten of the attorneys who provided legal services were either existing associates or over the years had worked on multiple cases at Barrack, including cases prosecuted by the firm before, during and/or after the BoA litigation.  These attorneys were Beth Seltzer, Julie Palley, Michael Toomey, Matthew Cyr, Terence Fernando, Thomas Engel, Michael Seeherman, Nakea Hurdle, Selen Okeuoglu (Pluck), and Mary Yurick.  These ten associate attorneys expended a total of 22,214 hours on this case, for a lodestar of $8,539,467.75.

However, as noted above, from time to time, Barrack also hires additional associates to specifically work on one case.  Barrack hired 16 associates who worked only on the BoA litigation.[10]  None of these attorneys was hired through, or worked for, an employment agency or

---

[10] These attorney are: Maria Cook-Lowman, Ernest Dubose, Warren Gaskill, Richard Golden, Michael Mirarchi, Nicholas Saidel, Eric Steckerl, Francine Wilensky, Taryn Deveau, Anthony Elias, Licardo Gwira, Radha Kachalia (Coller), Anthony Kanakis, D. Alex Latanision, Renee Nolan, and Jonathan O'Dwyer.  These 16 lawyers spent a total of 29,755.5 hours working on the BoA case, for a lodestar of $10,805,725.  The chart attached as Exhibit F to this submission

outside service, and all were interviewed by partners at the firm before being hired. Many of the 16 attorneys were not recent law school graduates. Rather, they were experienced attorneys with specific skill sets relevant to the litigation. By way of example, Maria Cook-Lowman is a 2002 law school graduate whose prior practice had included a focus on foreclosures; Eric Steckerl, a 1984 law school graduate, had a wide range of litigation and trial experience; Radha Kachalia (Coller), a 2010 law school graduate, had worked as an associate in a New York law firm's white-collar criminal defense and securities practice group; and Warren Gaskill, a 2004 law school graduate, had prior experience at another law firm in class action securities litigation. Another of the associates hired for the case, Licardo Gwira, had worked prior to law school as a mortgage processor-underwriter for a national mortgage services provider, which was particularly relevant to the issues involved in the BoA case.[11]

Given the millions of pages of documents produced by Defendants and non-parties, a large portion of the time many of the associates billed to this case was devoted to reviewing and analyzing documents. In this case, we reviewed over 8 million pages of documents,[12] analyzing them for use (a) establishing a detailed chronology of events, (b) during witness preparations, (c) in questioning and/or as exhibits at depositions, (d) as exhibits for potential discovery motions,

---

shows the dates when each of these attorneys worked on the BoA case, the length of their tenures, and their law school graduation dates. While 2 of the attorneys were let go within two months of their hiring based on performance issues, and a number left the firm either for personal reasons or to take positions elsewhere, most of the attorneys (12 of the 16) worked on the BoA case for periods from ten months to two years. The 16 attorneys were 1981 to 2013 law school graduates, the overwhelming majority of whom had positions elsewhere before joining Barrack to work on the BoA case.

[11] For more expanded descriptions of the associates' education and experiences prior to joining Barrack, *see* Rosen Decl., Ex. F (Barrack Firm Resume) at 12-19.

[12] This number actually understates the total number of pages that Barrack attorneys reviewed and analyzed because many native files such as spreadsheets were not individually paginated with Bates numbers.

and/or (e) as exhibits for our mediation statements and presentations. Significantly, in reviewing these documents, no attorney time was spent on typical tasks assigned by other firms to "contract" attorneys – first level "relevance reviews" or "privilege reviews" of the types normally conducted by a party producing discovery in order to identify documents potentially responsive to a document request. Compare *Henig v. Quinn Emanuel Urquhart & Sullivan LLP*, 151 F.Supp.3d 460, 461 (S.D.N.Y. 2015) (attorney suing former employer, which had been defense counsel in litigation, had been a "temporary contract attorney" who simply performed the "rote" job of tagging documents that were responsive to document requests or that were privileged). Rather, our associates engaged in a substantive review and analysis of documents, many of which involved complex repurchase agreements and accounting issues.

In order for all of the associates to effectively understand the significance of these documents, Barrack partners provided extensive training about the facts and theories of the case and closely interacted with and supervised them on a regular basis. At times, we had experts meet and work with the associates to help the attorneys understand complex accounting and other issues. We conducted several meetings a week at which lawyers reviewing documents presented summaries of hot documents. Moreover, in advance of meetings, summaries and analyses of important documents, along with copies of these documents, were circulated so that the entire team could be updated on case theories and facts. The associates reviewing documents were not performing "rote" jobs; rather, they were using their legal experience, judgment and training to fully understand the documents and their significance, how they impacted the legal theories being pursued in the case, and whether any of the evidence was appropriate for use at depositions or otherwise.

In addition to reviewing and analyzing documents, the associates also worked on other important aspects of the case. For example, Michael Toomey, a 2011 law school graduate, assisted with legal research and writing in connection with the motions to dismiss responses, performed legal research on a host of other issues as requested by Barrack partners, and worked on discovery requests to third parties. Julie Palley, a 2007 law school graduate who had previously worked for the Pennsylvania Securities Commission, performed research and writing on the bank examiners privilege briefs, participated in meet-and-confer discovery sessions with Defendants, worked with PSERS to assist in its production of its documents and interrogatory responses, worked on the confidentiality stipulation and with certain of the CWs, prepared witnesses, and attended depositions. Matt Cyr, a 2005 law school graduate, performed an extensive analysis of board and board committee minutes and assisted with deposition preparation. Nakea Hurdle, a 2003 law school graduate, assisted in the deposition preparation of multiple witnesses and performed research on stress testing issues. And Michael Mirarchi, a 2002 Harvard Law School graduate and law clerk for a judge on the United States Court of Appeals for the Third Circuit, conducted legal research on a number of issues related to the case. Moreover, most of the associates helped more senior Barrack attorneys in preparing for depositions.

In short, throughout this litigation, Barrack deployed the appropriate legal talent required to prosecute the case to a successful conclusion. All of Barrack's associates were integral members of the team that prosecuted this action and performed substantive work that benefitted the Class in numerous ways. In doing so, Barrack treated all personnel, including attorneys specifically hired to work on this Action, as legal professionals and utilized their skills in a manner best suited to produce a positive outcome for the Class.

**5.  The Basis for Different Billing Rates for the First Three Years of the Litigation and the Subsequent Three Years**

On June 20, 2011, this Court appointed PSERS to serve as Lead Plaintiff for this Action and approved PSERS's selection of Barrack as Lead Counsel.  PSERS, by its then Chief Counsel and Deputy Chief Counsel for Investments, negotiated the terms of the retention with Barrack. One of the key points of the negotiation was the fee that Barrack would be authorized to seek in the event PSERS and Barrack achieved a recovery for the class.  PSERS and Barrack discussed both percentage-based fees and the hourly rates of Barrack attorneys and paralegals that would be utilized in any lodestar-based calculation.  Barrack provided PSERS with a schedule of the firm's 2011 billing rates for all partners, associates and paralegals expected to work on the case. PSERS requested that the 2011 billing rates for attorneys and paralegals be frozen for the first three years of the litigation after PSERS's appointment as Lead Plaintiff, and that there should be limits on how those rates could be raised subsequently during the course of the litigation.

Barrack agreed to this request in both respects:  agreeing that the 2011 rates would be utilized for any litigation activities for three years from the signing of the retention agreement; and further agreeing that no attorney's or paralegal's rate could be increased by more than 20% for the duration of the case (notwithstanding how the firm might have otherwise increased its annual rates in the future).  Under the agreement, the original rates for Barrack professionals ranged from $500 to $740 for partners, $310 to $455 for the firm's existing associates, $350 to $375 for any additional associates hired specifically for this Action, and $270 to $295 for paralegals.  Consistent with the retention agreement, the hourly rates utilized in this case from the inception of the case through June 19, 2014, as shown in the time and expense chart attached as Exhibit D to the Rosen Declaration, were the firm's rates that had been set in 2011.

20

With the completion of three years from the date of the retention agreement, Barrack was allowed to raise its rates for this case by no more than 20%, no matter what rates might thereafter be put into effect by the firm.  As shown in the time and lodestar chart, this led to certain attorneys and the paralegals being billed at the firm's new rates while other attorneys' rates were capped by the 20% increase limitation.  The attorneys whose rates were capped were Leonard Barrack, Jeffrey Barrack, Jeffrey Gittleman, Chad Carder, Julie Palley, and Michael Toomey.  Accordingly, for the period from June 20, 2014 through July 31, 2016, the hourly rates utilized for this case ranged from $546 to $888 for partners, $372 to $415 for existing associates, $350 to $400 for the additional associates, and $290 to $325 for paralegals.  *See also* Rosen Decl. ¶ 124.

### 6.  The Firm's Use and Billing of Paralegals

Each year, Barrack undertakes a review of its hourly rates for all firm attorneys and paralegals.  As part of this review, we check to make sure our rates are within the range of rates that courts have approved for similar types of work; we look at rates used by other firms – plaintiffs' and defense firms – as identified in securities class action and bankruptcy court filings; and we assess our firm's cost structures on a year-to-year basis.

In the time and lodestar chart included as Exhibit D in the Rosen Declaration, we identified the time spent by, and the hourly rates of, the Barrack paralegals who assisted in this Action, first for the period from the inception of the case through June 19, 2014 (using our firm's 2011 rates), and then for the period from June 20, 2014 through July 31, 2016 (using our firm's 2016 rates).  These rates reflected the firm's regular, hourly rates for paralegals that we had set at the start of 2011, and that were re-set thereafter on an annual basis, culminating in the 2016 rates shown in the exhibit.  The 2011 rates were $270 per hour for most of our paralegals, with slightly more ($295 per hour) for Brett Wilmot, who has specialized securities market research and

21

analysis abilities and produces various types of reports regularly utilized in our securities litigation practice.  And the 2016 rates were $290 and $300 per hour for most of our paralegals, with slightly more ($325 per hour) for Mr. Wilmot.

In our fee submission in the *AIG 2008* securities class case, which encompassed the time spent by Barrack attorneys and paralegals on that matter from its inception in May 2008 through November 30, 2014, we included our 2014 rates for those paralegals who billed time into 2014. *See In re American International Group, Inc. 2008 Sec. Litig.*, No. 08-cv-4772-LTS-DCF (S.D.N.Y.) (Docket No. 470-3, filed Dec. 22, 2014), at page 7 of 42.  Our 2014 rates were $290 per hour for most of our paralegals (including Kristen Healy, Nina McGarvey, Joseph Morrison, Lisa Napolean and Gavin O'Hara – all of whom also worked on the BoA case), and slightly more ($310 per hour) for Mr. Wilmot.  Although not focusing directly on the rates identified for paralegals, Judge Swain found that the "legal work in this case was performed and billed in an appropriate manner." *Id.*, Transcript of Proceedings, March 20, 2015, at 38.  Indeed, at no time within the firm's long history of presenting its hourly rates to courts in securities and other types of class actions has any court determined that Barrack's paralegal rates were out-of-step or required a reduction.

### 7.  Authority for the Rule 11 Findings in the Proposed Final Judgment and Order

At the November 29, 2016 hearing, the Court requested that legal authority be provided for the parties' request that the Court make Rule 11 findings, as stated in the proposed final judgment and order.  The basis for this request is the provision in the Private Securities Litigation Reform Act, at 15 U.S.C. § 78u-4(c)(1), which reads as follows:

> In any private action arising under this chapter, upon final adjudication of the action, the court shall include in the record specific findings regarding compliance by each party and each attorney representing any party with each requirement of

Rule 11(b) of the Federal Rules of Civil Procedure as to any complaint, responsive pleading, or dispositive motion.

Here, no party has sought sanctions from another party based on any alleged non-compliance with Rule 11(b), and this Court has not independently raised any such non-compliance issues. Accordingly, the parties respectfully submit that the Rule 11 finding in the proposed judgment and order is appropriate.

### SECTION B:  DISCUSSION OF ISSUES FROM *DIAL CORP. V. NEWS CORP.*

At the hearing on November 29, 2016, the Court questioned how Lead Plaintiff would deal with certain issues identified in the Court's decision handed down a few weeks earlier in *Dial Corp. v. News Corp.*, No. 13cv6802, 2016 WL 6426409 (Oct. 31, 2016).  Specifically, in *Dial,* plaintiffs' counsel's did not "account for time billed by independent contract attorneys, which were earmarked as an expense," a practice that this Court "encourages the Plaintiffs' class action bar to consider adopting … in future actions."  2016 WL 6426409 at *3, 11.  The Court also noted that "some paralegals billed at a lofty $280 per hour."  *Id*. at *10.  We address both of the Court's observations below.

#### 1. Case Law Inside and Outside the Second Circuit Supports Plaintiff's Treatment of the Time of All Associates, Including Attorneys Specifically Hired for this Litigation, as Part of the Calculation for the Lodestar Cross-Check

Apart from this Court's comments in *Dial*, which were made after this case was nearly six years old and after all Barrack attorneys had completed all litigation-related tasks in the case, there was no precedent within this Circuit, or elsewhere, suggesting that the proper treatment of the time of any of the plaintiffs' attorneys should be as a reimbursable expense rather than as part of the counsel's lodestar.  Rather, during the time period of Barrack's employment of associate attorneys in this case, and to our knowledge continuing today, no court has ever ruled that the

time spent by attorneys hired by a firm to work in a case on behalf of a putative class must be compensated as an expense of the case, rather than as part of the firm's lodestar calculations. Indeed, even when putative class members have objected to including the time spent by true "contract attorneys" – *i.e.,* attorneys who are actually employees of temporary staffing agencies or attorneys who undertake far more menial work than the substantive document analysis and other work our associate attorneys undertook here – within the lodestar calculation, courts have uniformly ruled that such time is appropriately part of the prosecuting firm's lodestar, and not part of its expenses.

In the Section above, we endeavored to show that all of the associate attorneys, including those specifically hired to work on this case, were full-time professional employees of the firm, contributing to the overall successful prosecution of this Action, and were not so-called "contract" attorneys.  To recap: all of Barrack's 26 associate attorneys who worked on the BoA case, including the 10 who worked on many matters at the firm and the 16 who worked only on the BoA case, were W-2 employees of the firm who worked in our offices at 2001 Market Street, in Philadelphia, meaning that the firm paid FICA and Medicare taxes on their behalf, along with state and federal unemployment taxes, and their licensure fees; all had the opportunity to participate in the firm's 401(k) program, as well as our medical and dental insurance programs; all were able to participate in the firm's in-house CLE programs; and all were fully supervised by other on-site attorneys.  The associate attorneys were critical members of the litigation team and, as further shown above, many have significant credentials and experience.

However, even if this Court disagrees and wishes to classify the 16 associates who worked only on the BoA matter as "contract attorneys," precedent within this Circuit and elsewhere still supports the inclusion of their time as part of a firm's lodestar.

For example, in *Carlson v. Xerox Corp.*, 596 F.Supp.2d 400, 409 (D. Conn.), *aff'd*, 355 Fed. Appx. 523 (2d Cir. 2009), the District Court rejected objectors' argument that the lodestar was inflated because the contract attorneys should have been billed as an expense instead of at the hourly rate included within the plaintiff's firm's time and lodestar calculations. A similar attack on the treatment of the time of "contract attorneys" was rejected in *In re AOL Time Warner S'holder Deriv. Litig.*, No. 02 Civ. 6302(CM), 2010 WL 363113, *25 (S.D.N.Y. Feb. 1, 2010) (McMahon, *J.*). There, objectors challenged "the use of the multiplier to enhance the fees of so-called 'contract' or 'temporary' attorneys." These objections were rejected – in a description equally applicable to the present case – noting that "the contract attorneys here were not mere clerks, but exercised judgments typically reserved for lawyers, under the supervision of the firms' regular attorneys." *Id.; accord Takeda Chem. Indus. v. Mylan Labs., Inc.*, Nos. 03 Civ. 8253 (DLC), 04 Civ. 1996 (DLC), 2007 U.S. Dist. LEXIS 19614, *25 (S.D.N.Y. Mar. 21, 2007) (Cote, *J.*) (denying objection and noting that "[i]n complex litigation, contract attorneys are routinely used by well-established law firms who supervise their work").[13]

---

[13]    The question of the proper treatment of services rendered by contract attorneys was also considered in *In re Enron Corp. Sec., Deriv. & "ERISA" Litig.*, 586 F.Supp.2d 732 (S.D. Tex. 2008). In *Enron*, the Court noted "that the hiring of a contract or temporary attorney is a common practice in law firms today." *Id.* at 782. After analyzing "the question whether the charges of contract lawyers and paralegals may be billed separately as attorney's fees at a higher rate that the law firm pays them, the reasoning of the Supreme Court [in *Missouri v. Jenkins*, 491 U.S. 274 (1989)] appears to this Court to support an affirmative answer for any reasonable fee award in a common fund case if the particular facts regarding their services justified such billing." 586 F.Supp.2d at 783-84. The Court explained that in that Supreme Court case, no one "ever suggested that the hourly rate applied to the work of an associate attorney in a law firm creates a windfall for the firm's partners or is otherwise improper … merely because  it exceeds the cost of the attorney's services," and found that "the same reasoning applies to contract attorneys." *Id.* at 784-85. The Court concluded that "prevailing counsel can recover fees for [contract attorneys'] services at market rates rather that at their cost to the firm." *Id.* at 785.

*See also In re Apollo Group Inc. Sec. Litig.*, Nos. CV 04-2147-PHX-JAT, CV 04-2204-PHX-JAT, CV 04-2334-PHX-JAT,  2012 WL 1378677 (D. Az. Apr. 20, 2012) (refusing to reduce the

Judge Cote made this point explicitly in *In re WorldCom, Inc. Sec. Litig,* No. 02 Civ. 3288 (DLC), 2004 WL 2591402 (S.D.N.Y. Nov. 21, 2004).  In discussing an objection of a putative class member who asserted, among other things, that no multiplier was appropriate for document review work done by contract attorneys, Judge Cote wrote that the "extensive use of contract attorneys was justified by the need to review over ten million pages of documents and was a far more efficient way of proceeding than giving the task to more highly compensated counsel." *Id.* at *21 & n.48.

Finally, the American Bar Association has also reviewed, and specifically approved, the inclusion of the time of contract attorneys as part of a bill for legal services, and not as an expense to be reimbursed, explaining:

> In Formal Opinion No. 00-420, we concluded that a law firm that engaged a contract lawyer could add a surcharge to the cost paid by the billing lawyer provided the total charge represented a reasonable fee for the services provided to the client.  This is not substantively different from the manner in which a conventional law firm bills for the services of its lawyers.  The firm pays a lawyer a salary, provides him with employment benefits, incurs office space and other overhead costs to support him, and also earns a profit from his services; the client generally is not informed of the details of the financial relationship between the law firm and the lawyer.  Likewise, the lawyer is not obligated to inform the client how much the firm is paying a contract lawyer.

American Bar Ass'n, Standing Comm. on Ethics & Professional Responsibility, Formal Op. 08-451 (Aug. 5, 2008).

---

lodestar and award of attorneys' fees despite the fact that plaintiffs' counsel utilized contract attorneys); *In re The Mills Corp. Sec. Litig.*, 265 F.R.D. 246, 264-65 (E.D. Va. 2009) ("[T]he Court has absolutely no trouble finding that the contract attorneys should be billed at market versus cost.  They are part of the team brought in to benefit the class.  Their contributions are of a similar nature to the attorneys who are in the firms retained by plaintiffs, and they should be compensated in that manner."); *Morris v. Potter*, No. 06-cv-432-MSK, 2008 U.S. Dist. LEXIS 105409, *19-20 (D. Col. Dec. 22, 2008) (rejecting an objection to fees asserting that "the associates were, in fact, contract attorneys"); and *Andrews v. Lawrence Livermore Nat'l Sec., LLC*, No. C11-cv-3930-CW, 2012 U.S. Dist. LEXIS 5571, *8 (N.D. Cal. Jan. 18, 2012) (rejecting the contention that "an attorney's status as a contract attorney, as opposed to his or her employment as an associate" was relevant to the determination of reasonable hourly rates).

In *Dial,* this Court encouraged the plaintiffs' class action bar to consider the practice of expensing contract attorneys ***in future actions***, as the plaintiffs' counsel had voluntarily agreed to do in *Dial*.  However, the governing law and practice at the time Barrack hired attorneys to work on this case was unambiguously that the time of such attorneys is appropriately included within the firm's overall lodestar calculations.  Indeed, as shown above, the retention agreement between PSERS and Barrack, signed in June 2011, expressly anticipated that if the case survived Defendants' motions to dismiss, Barrack would be hiring additional associate attorneys to assist in the prosecution of this case, and even specified the hourly rates that Barrack could bill for such attorneys.  Given these facts and the state of the law at the time Barrack hired and had its associate attorneys working on this case, Lead Plaintiff and Barrack respectfully submit that to retroactively impose a contrary practice to a case that has already been litigated would be unwarranted.

Moreover, the facts in *Dial* – which most likely led the plaintiffs' counsel in that case to agree to expense their contract attorneys – are far different from the facts of this Action.  First, in *Dial*, the Court rejected counsel's proposal to have five firms each serve as co-lead counsel and instead appointed only two co-leads.  Plaintiffs engaged in an end run around the Court's Order, which was not discovered until the case was well under way.  From that point forward, the Court had repeatedly warned counsel, apparently to no avail, against unnecessary duplication of effort arising from this ersatz arrangement and warning that counsel would not be compensated for work found to be duplicative.  The Court also found that the legal teams prosecuting the case were top heavy, and that the time was "heavily weighted toward partners," which this Court found "atypical in practice" and reflected an over-allocation of work to more expensive partners.

Here, in sharp contrast, a single plaintiff and a single law firm prosecuted this case. No time whatsoever was spent at any time in the BoA litigation conferring or strategizing with other law firms, and no other law firms provided any work or billed any time to this case. While there were a large number of partners who participated in the prosecution of the case, work was pushed down to the lowest level of attorneys capable of handling each task, regardless of whether they were partners, existing associates, or associates specifically hired for this litigation. This is best demonstrated by the fact that over the nearly six year long history of this litigation, only 29% of the time devoted to the case was spent by firm partners and 71% of the time was spent by firm associates and paralegals. Indeed, the firm's founder and senior partner, Leonard Barrack, billed less than 50 hours to this case, almost all of it relating to the mediation and related discussions leading to the proposed settlement. Similarly, as explained at the hearing, the document production teams (obtaining documents from Defendants and producing documents from PSERS and its investment advisors) were supervised by three of the firm's less senior partners, Jeffrey Gittleman, Jeffrey Barrack and Chad Carder, with significant assistance from Julie Palley and other firm associates.

### 2. The Hourly Rates Utilized in the Time and Lodestar Calculations Were Reasonable and Have Been Approved by Judges in this Court and Throughout the Country

Barrack's inclusion of the time of the 16 associate attorneys hired to work only on this case, and the hourly rates indicated for their services, was also consistent with the practice in this District by Barrack and other plaintiffs' firms as well as large, primarily defense firms.

In the *AIG 2008* securities litigation, for example, Barrack provided the Court with its attorneys' hourly rates in a submission made December 22, 2014, for time expended from the inception of the case through November 14, 2014, in support of the fee application filed in that

case. The rates identified for the associate attorneys that the firm hired specifically to work on the AIG case ranged from $325 to $400 per hour, depending on the level of experience of the various attorneys. After considering an objection specifically focused on lead counsel's (one of which was Barrack) inclusion of the time and hourly rates of these so-called "contract attorneys" within counsel's overall lodestar, Judge Swain rejected the objection, as follows:

> The Court has thoroughly considered Mr. Brown's objection and finds it meritless. The legal work in this case was performed and billed in an appropriate manner. In particular, there is no impropriety in billing at appropriate lawyer rates the legal work of lawyers hired to work on a specific complex case.

*In re American International Group, Inc. 2008 Sec. Litig.,* No. 08cv4772 (S.D.N.Y., March 20, 2015), Transcript of Proceedings, at 38.

Numerous Judges within this District have similarly approved the billing and rates of another plaintiff's securities class action firm, Bernstein Litowitz Berger & Grossmann LLP (BLBG), which has consistently included significant "staff attorney" time within its case prosecutions, as reflected in its lodestar calculations in cases such as this. Indeed, BLBG's staff attorney rates have been accepted in cases throughout the country, including in numerous cases in the Southern District of New York.[14] Since 2011, those rates have been in the range of $340 to $395 per hour, depending on the seniority of the staff attorney.[15]

---

[14] *See, e.g., In re Bank of America Corp. Sec. Deriv. & ERISA Litig.*, Master File No. 1:09-MDL-2058 (PKC) (S.D.N.Y. 2013) (Castel, *J.*), ECF No. 829-11; *In re Lehman Bros. Sec. & ERISA Litig.*, No. 09-MD-2017 (LAK) (S.D.N.Y. 2012) (Kaplan, *J.*), ECF No. 807-12; *In re Wachovia Preferred Sec. & Bond/Notes Litig.*, Master File No. 09-cv-06351 (RJS) (S.D.N.Y. 2011) (Sullivan, *J.*), ECF No. 148-7; *Public Employees' Ret. Sys. of Miss. v. Merrill Lynch & Co.*, No. 08-cv-10841-JSR-JLC (S.D.N.Y. 2012) (Rakoff, *J.*), ECF No. 181-6.

[15] Two of the most senior BLBG staff attorneys were billed a $425 per hour based on their experience and the kinds of work they did. Barrack similarly billed a few of its most senior associates who undertook more advanced work at rates of $400 to $410 (within the first three year period) and $400 to $415 (within the second three year period).

There is similarly ample evidence demonstrating that the rates that Barrack submitted for the associate attorneys hired to assist in the prosecution of this case are in line with the market rates routinely charged by large New York City defense firms for staff attorneys performing the same or similar work.  For example, in sworn court filings, counsel for the defendants in the *Citigroup Bond Securities Litigation*, the law firm of Paul, Weiss, Rifkind, Wharton & Garrison LLP, charged its clients the same or very similar rates that Barrack billed for the associate attorneys who performed document review and other work in this case.  Specifically, Paul Weiss's staff attorneys conducted a non-substantive "first cut" review of many millions of pages of documents in order to make an initial determination as to whether those documents were responsive to the plaintiffs' document requests.  This review included, for example, checking the dates of the documents to see if they fell within a particular time frame, and scanning the documents to see if they contained certain words or phrases, or referenced certain individuals. This process was extremely rote; it did not involve any substantive analysis of the documents, did not require the staff attorneys to exercise any judgment, and in many instances did not even require the staff attorneys to read the entire document.

After this "first cut" review was completed by Paul Weiss's staff attorneys, Paul Weiss used its own in-house litigation staff attorneys to conduct a more substantive review of the documents.  This review included an examination of the documents to identify privilege or confidentiality issues, and then to make a substantive determination as to whether the documents were relevant and required to be produced.  Here, the work performed by Barrack's associate attorneys, which included a detailed review and analysis of more than 8 million pages of documents, was at least as substantive and important as that performed by Paul Weiss's staff attorneys in the *Citigroup Bond* case.

Finally, while PSERS and Barrack respectfully submit that the evidence provided herewith establishes that Barrack's associate attorney rates are reasonable, even if the Court were to impose a substantial reduction on these hourly rates, the requested fee would still result in a lodestar multiplier that is well below the average multiplier that other courts have awarded in cases of similar magnitude.

As identified above, 10 of the 26 associate attorneys worked over longer stretches of time at the firm, and were not hired to work only on the BoA case. The 16 associate attorneys who worked only on the BoA case spent a total of 29,755.5 hours, and incurred a total lodestar of $10,805,725 on the case. In the *Citigroup Bond* case, Judge Stein – while holding that staff attorneys were appropriately considered to be part of plaintiffs' counsel's lodestar calculation, rather than being viewed as an expense item – adjusted the plaintiffs' firm's staff attorneys billing rates to $300 per hour. *See In re Citigroup Inc. Bond Litig.*, 988 F.Supp.2d 371, 378 (S.D.N.Y. 2013). If the Court were to reduce the hourly rate here for the 16 associate attorneys who worked only on the BoA case to $300 per hour – notwithstanding that many of them were highly experienced attorneys who undertook different types of litigation activities in addition to their document review work – the resulting lodestar for the 16 attorneys would be $8,926,725. This is a $1,879,000 reduction in their lodestar total, and would result in an overall lodestar of $32,571,696 for the firm. Based on this, the requested fee would be a 1.5865 multiple of the adjusted lodestar, rather than the 1.5 multiple of the lodestar presented in the Rosen Declaration.

In the *Citigroup Bond* case, Judge Stein found that where the resulting multiple was 1.59, a 16% fee was reasonable. *Id.* Respectfully, such a lodestar multiple for the 15.5% fee sought here would still be very reasonable under the case law in this Circuit and in this District.

As for the firm's paralegal rates – $270 to $295 for the first part of the BoA case, and $290 to $325 for the second part of the case – those are also in line with the paralegal rates included in the firm's December 22, 2014 fee application in the *AIG 2008* securities class action, which ranged from $290 to $310 per hour for the paralegals who had worked on the case through its conclusion. While we understand the Court's comment in the *Dial* case that $280 appears to be excessive, the rates utilized in the fee application in this case were, in fact, the rates set by the firm in 2011 and later in 2016, and to our recollection, never before has the firm's paralegal rates been questioned.

However, should this Court believe that a lower rate is more appropriate for the services provided by the firm's paralegals, we respectfully submit that the hourly rate should not be set below $250 per hour. At that rate, the total lodestar for the 2,584 hours devoted to this case by the firm's paralegals would come to $646,000 – a reduction of $90,471.25 compared to the firm's overall lodestar of $34,450.696.50. As with the potential modification discussed above with respect to the lodestar figure for the 16 associate attorneys hired to work only on this case, such a lodestar reduction would have a very minor impact on the lodestar multiple inherent in the fee sought in Lead Plaintiffs' petition.

**CONCLUSION**

For the foregoing reasons, and those previously provided to the Court, Lead Plaintiff and Lead Counsel respectfully request that this Court grant final approval to the settlement, grant final approval to the plan of allocation, and award the fees and expenses (including

reimbursement for Lead Plaintiff's participation and supervision of this Action) as sought in the fee and expense application.

Dated:  December 8, 2016                          Respectfully submitted,

                                                  **BARRACK, RODOS & BACINE**
                                                  A. Arnold Gershon
                                                  William J. Ban
                                                  Michael A. Toomey
                                                  425 Park Avenue, 31st Floor
                                                  New York, NY 10022
                                                  Telephone: (212) 688-0782
                                                  Facsimile: (212) 688-0783

                                                             -and-

                                                  By:   /s/ Mark R. Rosen
                                                  Leonard Barrack
                                                  Mark R. Rosen
                                                  Jeffrey A. Barrack
                                                  Jeffrey B. Gittleman
                                                  Chad A. Carder
                                                  Julie B. Palley
                                                  3300 Two Commerce Square
                                                  2001 Market Street
                                                  Philadelphia, PA 19103
                                                  Telephone: (215) 963-0600
                                                  Fax: (215) 963-0838

                                                  *Attorneys for Lead Plaintiff*
                                                  *Commonwealth of Pennsylvania, Public*
                                                  *School Employees' Retirement System*
                                                  *and Lead Counsel for the Class*