UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
PENNSYLVANIA PUBLIC SCHOOL            :
EMPLOYEES' RETIREMENT SYSTEM,
individually and on behalf of all others similarly   :
situated,
                                                   :       11cv733 (WHP)
                          Plaintiff,
                                                   :       OPINION & ORDER
    -against-
                                                   :
BANK OF AMERICA CORPORATION, et al.,
                                                   :
                         Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

WILLIAM H. PAULEY III, District Judge:

        Lead Plaintiff Pennsylvania Public School Employees' Retirement System ("PPSERS") seeks final approval of a $335 million settlement (the "Settlement") with Bank of America ("BofA"), the Executive Defendants, the Director Defendants, the Underwriter Defendants, and PricewaterhouseCoopers (collectively, "Defendants"). The Settlement resolves this class action involving misleading statements regarding BofA's reliance on the Mortgage Electronic Registration System ("MERS") and exposure to mortgage-backed security repurchase claims during the 2008 financial crisis. The law firm of Barrack, Rodos & Bacine ("Barrack"), Lead Counsel for PPSERS, also seeks this Court's approval of their request for attorneys' fees and expenses stemming from their representation of the class. For the following reasons, the motion for approval of the Settlement and Plan of Allocation is granted, and the motion for approval of attorneys' fees and expenses is granted in part and denied in part.

BACKGROUND

The factual background of this action is described in this Court's prior opinions and orders. See Pipefitters Local No. 636 Defined Ben. Plan v. Bank of America Corp., 275 F.R.D. 187 (S.D.N.Y. 2011); Penn. Public Sch. Employees' Retirement Sys. v. Bank of America Corp., 874 F. Supp. 2d 341 (S.D.N.Y. 2012); Penn. Public Sch. Employees' Retirement Sys. v. Bank of America Corp., 939 F. Supp. 2d 445 (S.D.N.Y. 2013).

A. **Procedural Background**

This Settlement is the product of nearly six years of litigation, which included several motions to dismiss and a protracted mediation. This Court appointed PPSERS as Lead Plaintiff and Barrack as Lead Counsel in June 2011 (ECF No. 56), and PPSERS filed the Consolidated Class Complaint several months later (ECF No. 59). Defendants moved to dismiss, with mixed results. This Court dismissed the Securities Act claims against all Defendants with prejudice and the Exchange Act claims against the Executive Defendants without prejudice, but denied the motion with respect to the Exchange Act claims against BofA. (ECF No. 148.) BofA moved for reconsideration, which this Court denied in August 2012. (ECF No. 167.)

Another round of procedural sparring broke out after PPSERS filed the Amended Class Complaint (ECF No. 158), which ended with the denial of Defendants' motion to dismiss and the Executive Defendants' motion for reconsideration in mid-2013 (see ECF Nos. 183, 222). The parties then shifted their focus to class certification. PPSERS moved to certify the class in November 2013 (ECF No. 243), and three months later Defendants stipulated to class certification without further motion practice (ECF No. 253).

The class certification stipulation largely marked the end of formal litigation, aside from several discovery disputes. Thereafter, the parties agreed to mediation. That mediation consisted of three sessions over the course of ten months, and involved ongoing discovery and "detailed written submissions," which Barrack claims were "akin to briefs and supporting exhibits that a party plaintiff would file in support of a summary judgment motion." (Lead Plaintiff's Post-Hearing Submission ("Post-Hearing Sub."), ECF No. 371 at 5.)  At the third mediation session in August 2015, the parties agreed to settle all claims for a $335 million cash payment by BofA.

### B. **The Settlement Agreement and Plan of Allocation**

The Settlement covers a class consisting of purchasers of BofA common stock between February 27, 2009 and October 19, 2010 and creates a $335 million fund (the "Fund") to compensate class members for losses due to the alleged artificial inflation in the prices of BofA's common stock during the time that each member held shares.  On June 15, 2016 the Court granted preliminary approval of the Settlement and directed the parties to begin the notice process.  (ECF No. 338.)  To date, the Claims Administrator has received nearly 375,000 timely Proofs of Claim and only one timely objection,[1] which the individual subsequently withdrew. (See ECF No. 362.)  Fifty-one class members asked to be excluded from the Settlement, including a single institutional investor that had previously entered into a tolling agreement with BofA.  The Plan of Allocation directs Lead Counsel to reallocate any funds remaining six

---

[1] The Court received one other objection from an individual who may or may not have been a class member. (See ECF No. 370.) This objection was untimely by more than a month and did not conform to the requirements set out in the Notice Form for objecting to the Settlement.  Specifically, it does not contain any dates, prices, or numbers of shares/units of BofA stock to show that the individual is a class member.  This objection is deemed waived.

months after the initial distribution among those class members who have cashed initial checks. Any residual monies will then be donated to the New York Bar Foundation.

### C. **Attorneys' Fees and Expenses**

Barrack, which has litigated on behalf of the class on a contingency basis, seeks approval of fees and expenses in the following amounts, drawn from the Settlement Fund: (1) attorneys' fees of $51,675,000; (2) litigation expenses of $1,386,167.33; and (3) costs and expenses incurred by PPSERS as Lead Plaintiff in the amount of $130,323.70. Over the course of this action, Barrack devoted the time of forty-two attorneys and seven paralegals working at a blended rate of approximately $450 per hour. (See Declaration of Mark R. Rosen ("Rosen Decl."), ECF No. 357; Post-Hearing Sub., Exs. A–E.) In total, Barrack recorded 77,026.25 billable hours for a lodestar of $34,450,696.50. (See Rosen Decl., Ex. D.)

## DISCUSSION

### A. **Motion to Approve the Settlement and Plan of Allocation**

Under Federal Rule of Civil Procedure 23, the District Court must approve any class action settlement. See Fed. R. Civ. P. 23(e). The Court must "carefully scrutinize the settlement to ensure its fairness, adequacy and reasonableness, and that it was not the product of collusion." D'Amato v. Deutsche Bank, 236 F.3d 78, 85 (2d Cir. 2001) (internal citations omitted). This is a two-part inquiry wherein the Court "must determine whether both the negotiating process leading to a settlement and the settlement itself are fair, adequate, and reasonable." In re Currency Conversion Fee Antitrust Litig., 263 F.R.D. 110, 122 (S.D.N.Y. 2009).

i.) <u>Procedural Fairness</u>

The procedural fairness prong requires that the settlement "be the result of arm's-length negotiations and that plaintiffs' counsel have possessed the experience and ability, and have engaged in the discovery, necessary to [effective representation] of the class's interests." <u>Weinberger v. Kendrick</u>, 698 F.2d 61, 74 (2d Cir. 1982). Negotiation processes are presumed fair when these elements are present. <u>See</u> <u>Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.</u>, 396 F.3d 96, 116 (2d Cir. 2005). This Settlement is the product of nearly a full year of arm's-length mediation between able and experienced counsel, as well as a discovery process that involved more than eight million pages of documents and required Barrack to hire sixteen attorneys dedicated solely to this matter. (<u>See</u> Rosen Decl, ¶¶ 34–37, 68–74.) Although the parties ultimately stipulated to class certification, the mediation occurred after PPSERS had briefed the issue. <u>See</u> <u>D'Amato</u>, 236 F.3d at 85 ("When a settlement is negotiated prior to class certification . . . it is subject to a higher degree of scrutiny in assessing its fairness."). Accordingly, this Court finds that the negotiation process leading to this Settlement was fair, adequate and reasonable. <u>See</u> <u>Wal-Mart</u>, 396 F.3d at 116.

ii.) <u>Substantive Fairness</u>

At the substantive fairness stage of settlement approval, courts in the Second Circuit consider the nine factors set forth in <u>City of Detroit v. Grinnell Corp.</u>: (1) the complexity, expense, and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through trial; (7) the ability of the defendants to withstand greater judgment; (8) the range of

reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of the litigation. 495 F.2d 488, 463 (2d Cir. 1974). "[N]ot every factor must weigh in favor of settlement, rather the court should consider the totality of these factors in light of the particular circumstances." In re Global Crossing Sec. and ERISA Litig., 225 F.R.D. 436, 456 (S.D.N.Y. 2004) (citations omitted).

In this case, the Grinnell factors weigh in favor of approving the Settlement. This case was a complex securities class action—a breed of litigation that courts have recognized as "notably difficult and notoriously uncertain," In re Flag Telecom Holdings, Ltd. Sec. Litig., No. 02-CV-3400, 2010 WL 4537550, at *15 (S.D.N.Y. Nov. 8, 2010)—that began in 2011 and reached a resolution through the exhaustive efforts of both parties. As discussed above, Defendants tested PPSERS's claims twice through motions to dismiss and the ensuing motions for reconsideration. The parties also took thirty-four depositions and briefed a discovery motion concerning Defendants' assertion of the bank examiner privilege. (See Rosen Decl. ¶¶ 43–44, 47–55.) Furthermore, the absence of objections to the Settlement and substantial number of timely Proofs of Claim is "extraordinarily positive." Dial Corp. v. News Corp., --- F.R.D. ----, 2016 WL 6426409, at *4; see also Maley v. Del. Global Tech. Corp., 186 F. Supp. 2d 358, 362 (S.D.N.Y. 2002) ("It is well-settled that the reaction of the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy.").

Although Defendants stipulated to class certification, they reserved their right to move to alter or amend the certification order if the parties failed to reach an agreement. (See Rosen Decl. ¶ 96.) This Settlement allows class members to recover part of their losses as soon

as possible and without the need for expert discovery, summary judgment motions, trial, and any appeal.  See Maley, 186 F. Supp. 2d at 366 ("Settling avoids delay as well as uncertain outcome at summary judgment, trial and on appeal.").  As with any complicated securities action, the class faced the very real risk "that a jury could be swayed by experts . . . who could minimize or eliminate the amount of Plaintiffs' losses."  In re Am. Bank Note Holographics, Inc., Sec. Litig., 127 F. Supp. 2d 418, 426–27 (S.D.N.Y. 2001).  Accordingly, the Court finds that the Settlement and Plan of Allocation is fair, reasonable, and adequate under the Grinnell standard.  The parties are directed to submit a revised judgment that designates the New York Bar Foundation as the recipient of any cy pres funds and provides that Plaintiff's attorneys' fees may be paid when 75% of the Settlement Fund has been distributed.

    B.  **Motion for Attorneys' Fees and Expenses**

        i.)    Attorneys' Fees

In a class action settlement, courts must carefully scrutinize lead counsel's application fee in order to "ensure that the interests of the class members are not subordinated to the interests of . . . class counsel."  Maywalt v. Parker & Parsley Petroleum Co., 67 F.3d 1072, 1078 (2d Cir. 1995).  A court's role in this context is "to act as a fiduciary who must serve as a guardian of the rights of absent class members."  McDaniel v. Cty. Of Schenectady, 595 F.3d 411, 419 (2d Cir. 2010).  The trend in the Second Circuit is to assess a fee application using the "percentage of the fund" approach, which "assigns a proportion of the common settlement fund toward payment of attorneys' fees."  Dial Corp., 2016 WL 6426409, at *6.  As a "cross-check on the reasonableness of the requested percentage," however, courts also look to the lodestar multiplier, which should be a reasonable multiple of the total number of hours billed at a

standard hourly rate.  <u>Goldberger v. Integrated Res., Inc.</u>, 209 F.3d 43, 53 (2d Cir. 2000).  In this case, Barrack has submitted billing records reflecting 77,026.25 hours for a lodestar of $34,450,696.50.  (<u>See</u> Rosen Decl., Ex. D.)  The requested fee of $51,675,000 thus represents approximately 15.4% of the Fund and a lodestar multiplier of 1.5.

When assessing a fee application under the percentage of the fund method, courts consider the six <u>Goldberger</u> factors: (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations.  209 F.3d at 50.  In class actions involving "mega funds"—<u>i.e.</u> funds of more than $100 million—courts typically "account[] for these economies of scale by awarding fees in the lower ranges."  <u>Goldberger</u>, 209 F.3d at 52.  Here, the Court finds that the second, third, and fourth factors weigh in favor of the requested fee, while the remaining three factors support a reduction.

        a.)    **Factors Favoring Fee Application**

This case was lengthy, complex, and vigorously contested up to the point of class certification.  Plaintiffs brought two different types of complicated allegations: (1) the "rep and warranty claims," regarding BofA's alleged misleading statements to investors about its exposure to repurchase demands in connection with mortgage-backed securities; and (2) the "MERS claims," focusing on institutional risks from BofA and Countrywide's reliance upon a national mortgage database to track changes in the quality of loans secured by residential properties.  These claims survived two motions to dismiss, but even if Plaintiffs had prevailed on liability they faced considerable risk in establishing damages at trial.  With the assistance of able

and experienced counsel, the class obtained a favorable result that obviates the uncertainties associated with summary judgment, trial, and appeals.  Thus the second, third, and fourth Goldberger factors favor approval of Barrack's fee application.

        b.)    **Factors Favoring a Reduction**

Because plaintiffs' firms typically handle class actions on a contingency basis, public policy encourages the award of reasonable attorneys' fees to ensure that such cases find their way to court.  However, courts must also "guard against providing a monetary windfall to class counsel to the detriment of the plaintiff class." In re NTL Inc. Sec. Litig., No 02-CV-3013, 2007 WL 1294377, at *8 (S.D.N.Y. May 2, 2007).  For example, this Court has reduced fees "in view of the large percentage of hours attributable to attorneys with the highest billing rates, as well as the relatively early stage of the litigation in which the settlement was reached." In re Platinum and Palladium Commodities Litig., No 10-CV-3617, 2015 WL 4560206, at *4 (S.D.N.Y. July 7, 2015).  Ultimately, this Court's role is to ensure that "the lodestar [is not] enhanced without restraint above a fair and reasonable amount under all the facts and circumstances." In re Sumitomo Copper Litig., 74 F. Supp. 2d 393, 396 (S.D.N.Y. 1999).  There are two interconnected billing practices in this case that support a reduction in Barrack's fee application: the predominance of partner-level work on the substantive aspects of the litigation, and the use of temporary associates for the bulk of document discovery at standard associate hourly rates.

First, this Court notes that the overwhelming amount of billable legal work in this case was devoted to discovery. While there were two substantial motions to dismiss, the parties stipulated to class certification and never proceeded to summary judgment.  Instead, they

resolved the case at mediation. An examination of Barrack's post-hearing submission reveals that motion practice and mediation generated about 5% of the total billable hours and 6.7% of the lodestar. (See Post-Hearing Sub., Exs. A–E.) On closer scrutiny, however, it seems that most of the substantive work relating to motion practice and mediation was performed by Barrack partners: eleven different partners billed 88% of the hours devoted to the mediation and motions, creating 94% of the fees associated with those tasks. (See Post-Hearing Sub., Exs. A–E.) Indeed, no fewer than four Barrack partners—but no associates—attended the mediation sessions. (See Post-Hearing Sub. at 6.) This allocation of resources stands in stark contrast to the division of labor in the case as a whole. Twenty-six Barrack associates accounted for nearly 70% of the total hours and generated about 60% of the lodestar. (See Rosen Decl., Ex. D.) If partners handled the bulk of the motion practice and mediation responsibilities but generated comparatively few of the total hours, it stands to reason that the Barrack associates were primarily assigned to discovery work.

        Delegating the legwork of complex litigation (such as routine document review) to less-costly associates or temporary contract attorneys is common practice, and it is not this Court's place to dictate law firm structure or workflow. What is troublesome, however, is Barrack's practice of "gear[ing] up" for discovery by hiring a large group of temporary "associates" and billing them at the firm's standard rates for what this Court must assume was first-cut document review. (Rosen Decl. ¶ 34.) Barrack hired sixteen temporary attorneys in 2013 and 2014 to work exclusively on this matter at a blended rate of $362.50 per hour. (See Rosen Decl., Ex. D; Post-Hearing Sub., Ex. F.) Although these attorneys were "full-time [Barrack] associate attorneys" who were eligible to participate in the firm's health insurance and

401(k) plans, not one of the sixteen remains at the firm—the group as a whole stayed an average of twelve months, some as few as one month. (See Rosen Decl. ¶ 34, n.2; Post-Hearing Sub., Ex. F.) The new hires billed nearly 40% of the total hours in the case and generated $10,805,725 (or 31% of the lodestar) in legal fees for Barrack. (See Rosen Decl., Ex. D.) However, hiring a group of temporary associates and billing them out at more than $350 per hour for work that is typically the domain of contract attorneys or paralegals seems excessive.

On this point, Barrack's citation to In re Citigroup Inc. Bond Litig., 988 F. Supp. 2d 371 (S.D.N.Y. 2013) is instructive. In that case, Judge Stein drew a distinction between "contract" attorneys and "staff" attorneys—the latter being "full-time employees of the law firm" who are "provided benefits and ongoing legal education"—to determine the appropriate reduction in a fee application where plaintiffs' counsel had billed its staff attorneys at $385 per hour. In re Citigroup, 988 F. Supp. 2d at 377.

Barrack makes much of the Citigroup court's reference to a submission showing that defense counsel in that case—Paul, Weiss, Rifkind, Wharton & Garrison LLP—had submitted a fee application in an unrelated bankruptcy case with a blended rate of $333 per hour for staff attorneys, who performed "document review and similar routine tasks." 988 F. Supp. 2d at 377. But that ignores Judge Stein's finding that "$200 per hour [is] a fair approximation of the rate a reasonable paying client with bargaining power would pay" for the type of work performed by a contract attorney (e.g. first-cut document review), as well as the fact that Paul Weiss's clients—unlike the class members in this case—have the benefit of ex ante negotiations as to what they will pay for legal services. Citigroup, 988 F. Supp. 2d at 377. If it is true, as Barrack submits, that "[t]here were no so-called 'contract' lawyers hired either directly by

[Barrack] or through an external attorney provider," then this Court must conclude that the sixteen new hires performed work that might otherwise have been handled by contract attorneys. See Rosen Decl., ¶ 34, n.2; see also Dial, 2016 WL 6426409, at *11 ("To Counsel's credit, this [contract] attorney time was accounted as an expense rather than included in the lodestar."). The blended rate charged by Barrack for that work is unreasonable and warrants a reduction in the attorneys' fees.

It must be noted that this reduction is not a rebuke of Barrack's structure as a lean, partner-heavy firm that hires associates when necessary to prosecute large actions such as this one. Indeed, it is debatable which route more effectively advances a young lawyer's career: temporary placement through a staffing agency on a document-review project, or brief full-time employment with the understanding that the job ends with the discovery deadline. This Court does not presume to resolve that question here. Rather, this Court simply concludes that a reduction in the requested fees is warranted to avoid a windfall to Barrack for charging more than $350 per hour for associates who are contract attorneys in all but name, while simultaneously overstaffing the substantive legal work with high-priced partners.[2]

Considering all the circumstances, the simplest resolution is to reduce the lodestar multiplier from 1.5 to 1.2, resulting in attorneys' fees of $41,340,835.80, or 12% of the Fund. This percentage and multiplier is within the range of fees awarded in similar cases in this Circuit. See In re NASDAQ Market-Makers Antitrust Litig., 187 F.R.D. 465, 486 (S.D.N.Y. 1998) ("[W]here a class recovers more than $75–$200 million . . . fees in the range of 6–10 percent and

---

[2] Barrack also assigned seven paralegals to this matter, billing them at rates between $270 and $325 per hour—the same "lofty" range that weighed in favor of a fee reduction in a similar case before this Court. See Dial, 2016 WL 6426409, at *11; Rosen Decl., Ex. D.

even lower are common.); In re IndyMac Mortgage-Backed Sec. Litig., 385 F. Supp. 2d 363 (S.D.N.Y. 2015) (awarding 12% of a $75 million settlement fund); In re Bristol-Meyers Squibb Sec. Litig., 361 F. Supp. 2d 229 (S.D.N.Y. 2005) (awarding 3% of a $300 million fund); In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig., 991 F. Supp. 2d 437 (E.D.N.Y. 2014) (awarding 9.6% of a $5.7 billion settlement).

    ii.)    Litigation Expenses

Barrack also seeks reimbursement of $1,386,167.33 in litigation expenses. In class action settlements, "[a]ttorneys may be compensated for reasonable out-of-pocket expenses incurred and customarily charged to their clients." In re Currency Conversion, 263 F.R.D. at 131. When the "lion's share" of expenses reflects the typical costs of complex litigation such as "experts and consultants, trial consultants, litigation and trial support services, document imaging and copying, deposition costs, online legal research, and travel expenses," courts should not depart from "the common practice in this Circuit of granting expense requests." In re Visa/Mastermony Antitrust Litig., 94 F. Supp. 3d 517, 525 (S.D.N.Y. 2015). In this case, the Court finds that Barrack's itemized litigation expenses reflect these traditional costs of maintaining a complex securities action. (See Rosen Decl., Ex. E.) The motion for reimbursement of these expenses from the Fund is approved.

    iii.)    Lead Plaintiff's Expenses

PPSERS seeks approval of $130,323.70 in costs and expenses associated with its role as Lead Plaintiff. Under the PSLRA, the Court may award "reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of the class." 15 U.S.C. § 78u-4(a)(4). These awards compensate lead

plaintiffs for "the substantial time and effort the class representatives incurred, including written discovery, being deposed, reviewing and editing submissions, and attending hearings." In re Currency Conversion, 263 F.R.D. at 131.  Here, PPSERS actively participated in this litigation throughout the action and should be compensated for its time and effort in bringing about a favorable result.  (See Rosen Decl., Ex. A.)  The amount requested represents less than one hundredth of a percent of the Fund.  This award is comfortably below the rate awarded in similar cases, and is approved.  See In re Currency Conversion, 263 F.R.D. at 131 (award representing approximately 0.1% of the fund); Roberts v. Texaco, 979 F. Supp. 185 (S.D.N.Y. 1997) (0.18% of the total fund).

## CONCLUSION

The motion to approve the Settlement and Plan of Allocation is granted.  The motion to approve the application for attorneys' fees, litigation expenses, and Lead Plaintiff's expenses is granted in part and denied in part.  The litigation expenses and Lead Plaintiff's expenses are approved, and the fee request is approved in the amount of $41,340,835.80.  The litigation expenses and Lead Plaintiff's expenses may be reimbursed immediately.  Attorneys' fees may be paid once 75% of the Settlement Fund has been distributed.  Plaintiff is directed to submit a revised judgment in accord with this Opinion and Order forthwith.  The Clerk of Court is directed to close the motions pending at ECF Nos. 350 and 352.

Dated: December 27, 2016
     New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.